THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN: 256535)
Jeffrey Mikel, Esq. (SBN: 350671)
5100 Campus Dr., Suite 200
Newport Beach, CA 92660
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
Cameron@sehatlaw.com
j.mikel@sehatlaw.com

Attorneys for Plaintiff, Linda Cooper, Individually
And On Behalf Of The Estate Of Elina Quinn Branco

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA COOPER, Individually, And On Behalf Of The Estate Of Decedent, ELINA QUINN BRANCO, <br><br> Plaintiff, <br><br> vs. <br><br> COUNTY OF SAN LUIS OBISPO, a governmental entity, form unknown; SIERRA MENTAL WELLNESS GROUP, a California Non-Profit Corporation, JASON HOOSON, individually, SAVANNAH WILLIAMS, individually; JOSH SIMPSON, individually; BONNIE SAYERS, individually; JULIA TIDIK, individually; BETHANY AURIOLES, individually, JANET BROWN, individually, SHELLE WATSON, individually; DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 2:24−cv−08187−CV−AJR <br><br> **[*PROPOSED*] FIRST AMENDED COMPLAINT/ INJUNCTIVE RELIEF/JURY TRIAL** <br><br> 1. **Deliberate Indifference to a Substantial Risk of Harm to Health -42 U.S.C. § 1983 and 14th Am. of U.S. Constitution 14th** <br> 2. **Failure to Provide Safe Conditions-** *14th Amendment* <br> 3. *State Created Danger-***14th Amendment-** <br> 4. **Supervisory Liability-42 U.S.C§1983** <br> 5. **Neglect of a Dependent Adult Per W&I Code 15610.57, 15657 (State)** <br> 6. **Negligent Training, Supervision, Retention (State)** <br> 7. **Monell- Failure to Train & Policy, Custom & Practice (42 U.S.C. §1983)** <br> 8. **14th Amendment Parental Interference Due Process Violation- (42 U.S.C. §1983)** <br> 9. **Wrongful Death (State)** |

## PRELIMINARY STATEMENT

1. Plaintiff, Linda Cooper, is the biological mother and successor-in-interest to Elina Quinn Branco, hereinafter referred to as "BRANCO" or "decedent". Linda Cooper is also acting in the capacity of a personal representative of the Estate of Elina Quinn Branco.

2. Plaintiff, on behalf of Elina Quinn, who was 19 years of age and a former mental health client of County of San Luis Obispo "hereinafter referred to as "SLO" or "COUNTY" and Sierra Mental Wellness Group "SIERRA" or "SIERRA" at the San Luis Obispo Crisis Stabilization Unit,  operated by SLO  by and through a privately contracted mental health provider, Sierra Mental Wellness Group, hereinafter after referred to as "SIERRA" or "SIERRA", brings this action against the COUNTY, SIERRA, and named defendants JASON HOOSON, BONNIE SAYERS, JULIA TIDIK, BETHANY AURIOLES, SHELLY WATSON, JANET BROWN, SAVANNAH WILLIAMS,  JOSH SIMPSON and DOES 1 through 10 for monetary damages to redress for the decedent's injuries and death resulting from Defendants' recklessness, neglect and deliberate indifference to her constitutional and state rights and liberties. Plaintiff brings this action under the state laws and the Fourteenth Amendment of the United States Constitution and the Civil Rights Act of 1871, as codified at 42 U.S.C. § 1983, as well California state law for injuries and death suffered as a result of the Defendants' substantial and deliberate indifference to Decedent's health and welfare while in their care and custody.  Plaintiff further bring her 14th Amendment Deliberate indifference claim under the recent 9th Circuit Court of Appeals decision in *Gordon v. County of Orange et* al. *888 F.3d 1118 (July 2018)*. Plaintiff states a claim against the Defendants for a failure to establish policies, procedures and training which resulted in the subject incident. This is a civil action seeking damages against the Defendants for committing acts under color of state law, and depriving Decedent of rights secured by the Constitution and laws

of the United States (42 U.S.C. § 1983). Defendants, County of San Luis Obispo, Sierra Wellness Mental Group, county officials, and the named individual Crisis Stabilization Unit personnel, staff, management and employees including, DOES "one" through "ten", were deliberately indifferent by, without limiting other acts and behaviors: failing to protect decedent from harm; failing to provide necessary and appropriate medical treatment,  failing to provide adequate training, supervision and management of staff, failing to provide necessary and appropriate observation and monitoring, falsifying records to deceptively indicate monitoring was performed, failing to have a registered nurse assess Decedent for any drug contraindications, failing to have a registered nurse assigned at the facility, failing to contact Decedent's mother to advise her of daughter's death,  failing to have a staff  supervisor during graveyard shifts, failing to have a policy manual at the facility and  failing to have life saving devices in proper working condition. Defendants deprived the Decedent's rights as guaranteed by the Fourteenth Amendment to the Constitution of the United States against cruel and unusual punishment.

3.   The Defendants, County of San Luis Obispo, Sierra Mental Wellness and the Crisis Stabilization Unit ("CSU") personnel and staff, management and employees violated the decedent's constitutional and state law rights and were deliberately indifferent by, without limiting other acts and behaviors: (1) deliberately ignoring and failing to heed to decedent's serious medical condition, to wit, decedent's known high risk of substance relapse and high risk of overdosing; (2) failing to monitor and observe Decedent in contravention to CSU mandatory welfare check policies (3) failing to maintain life-saving AED in proper working condition (4) failing to train CSU staff in monitoring and observation of high risk client (5) failing to implement policies and procedures on symptom assessment of opiate overdose (6) Failing to maintain a complete policy handbook manual at the CSU for staff to follow and abide by (7) Failing to assign

medically trained staff including nursing personnel the physical facility (8) Failing to train staff on the contraindication effect of certain medication in light of the client's underlying medical condition (9) Failing to abide by a 2021-2022 SLO Grand Jury finding indicating the CSU had poor management and failed to supervise staff to ensure clients were monitored and observed, increasing safety and health risk to clients (10) Allowing the CSU to be operated with poor management and non-existent staff supervision (11) Knowingly admitting clients with higher acuity levels than the CSU was capable of safely managing.   As a consequence of the defendants' actions, Decedent Elina Branco suffered debilitating physical and emotional injuries eventually succumbed to the aftereffects of subsequent substance toxicity and her ensuing death, all of which constituted a clear deprivation of her constitutional rights.

## JURISDICTION AND VENUE

4.   This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983 and under state statutes including the Neglect of a Dependent Adult Per W&I Code §§15610.57, 15657 to redress injuries and the death suffered by the plaintiff's decedent at the hands of Defendants.

5.   By a Government Tort Claim form dated July 5, 2024, pursuant to Government Code §911.2, the County of San Luis Obispo, through its Clerk of the Board of Supervisors, was sent a Notice of Claim regarding violations of Plaintiff's decedent's state and constitutional rights. The claim stated the time, place, cause, nature and extent of the plaintiff's decedent's injuries.

6.   On July 5th, 2024, Plaintiff through her counsel of record issued a *"Spoliation of Evidence and Request To Preserve And All Video Footage, Incident Reports And Any And All Notes And Documents Regarding Incident"* correspondence to County counsel, the Crisis Stabilization Unit and the San Luis Obispo Coroner's Officer.

7.   On August 28, 2024, the county rejected Plaintiff's Tort claim.

8.   This Court has jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

9.   At all relevant times, the Decedent was a mental health client at the San Luis Obispo Crisis Stabilization Unit, operated by the County of San Luis Obispo by and through Sierra Mental Wellness Group.

10.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

**PARTIES**

11.  At all times relevant to this complaint, Plaintiff, Linda Cooper, hereinafter referred to as "COOPER", is the biological mother and successor-in-interest to Elina Quinn Branco, and is an individual residing in the County of San Luis Obispo, California.

12.  Defendant County of San Luis Obispo, hereinafter known as "COUNTY" or "SLO", is a government entity that acts through individuals to establish its policies and that is capable of being sued under State and federal law.

13.  The San Luis Obispo Crisis Stabilization Unit (or "CSU"), located at 2180 B. Johnson Av., San Luis Obispo, CA 93401, is at all times relevant to this complaint a COUNTY operated facility by and through co-defendant Sierra Mental Wellness Group, under the jurisdiction of defendant COUNTY and was duly organized under the laws of the State of California.

14.  Defendant Sierra Mental Wellness Group, "SIERRA", doing business as "Sierra Mental Wellness Group" is a non-profit California corporation in the business of providing crisis mental health services and contracts its services to various counties such Placer, Colusa, Glenn, Nevada, Monterey and defendant SLO.

15.  Defendant Josh Simpson, hereinafter referred to as "SIMPSON", at all relevant times to the complaint is an employee of SIERRA and is employed in the

capacity of a Regional Manager of Program Operations in charge of supervising mental health crisis programs administered at the CSU. Defendant SIMPSON was also in charge of ensuring that the facility was in compliance with state laws and that the CSU was medically capable of addressing the medical needs the clients being admitted at the facility. SIMPSON was also responsible to ensure the CSU had working and operative policies and procedures for CSU staff to follow and abide by. Defendant SIMPSON is a duly authorized employee and agent of SIERRA, and was acting within the course and scope of his perspective official duties as a regional manager responsible for ensuring adequate training and adequate staff is provided at the CSU and acted with the complete authority and ratification of his principal, SIERRA. Defendant SIMPSON is being sued in his individual capacity.

16.    Defendant Savannah Williams, hereinafter referred to as "WILLIAMS", at all relevant times to the complaint is an employee of SIERRA, and at all times relevant to the complaint was employed in the San Luis Obispo Crisis Stabilization Supervisor in charge of the immediate supervision of the CSU staff including all individual named SIERRA defendants. Defendant WILLIAMS was in charge of ensuring that the facility was in compliance with state laws and that the CSU could handle the needs of the clients admitted at the CSU facility. WILLIAMS was responsible to ensure the CSU had an effective, operative policies and procedure manual for CSU staff to follow and abide by as of the time of the present incident. Defendant WILLIAMS is also a duly authorized employee and agent of SIERRA, and was acting within the course and scope of her perspective duties as a CSU Supervisor responsible for ensuring CSU staff were adequately trained and the facility was adequately staffed and acted with the complete authority and ratification of her principal, SIERRA. Defendant WILLIAMS is being sued in her individual capacity.

17.    Defendant Jason Hooson, hereinafter referred to as "HOOSON", at all

relevant times to the complaint is an employee of SIERRA and was employed in the capacity of a licensed psychiatric technician working for SIERRA as part of its mobile crisis unit team.  Defendant HOOSON is also part of the SLO Mental Health Evaluation Team, aka "MHET" and was a duly authorized agent for SLO. Defendant HOOSON is also a duly authorized employee and agent of SIERRA and was acting within the course and scope of his perspective official duties as a psychiatric technician with the mobile crisis unit, with the complete authority and ratification of his principal, SIERRA.  Defendant HOOSON is being sued in his individual capacity.

18.    Defendant Shelle Watson, hereinafter referred to as "WATSON", at all relevant times to the complaint is an employee of SIERRA and was employed in the capacity of a licensed psychiatric technician.  Defendant WATSON is also part of the SLO Mental Health Evaluation Team, aka "MHET", and hence was a duly authorized agent for SLO. Defendant WATSON is also a duly authorized employee and agent of SIERRA and was acting within the course and scope of her perspective official duties as a mental health staff at the CSU and in conjunction with the mobile crisis unit, with the complete authority and ratification of her principal, SIERRA.  Defendant WATSON is being sued in her individual capacity.

19.    Defendant Janet Brown, hereinafter referred to as "BROWN", at all relevant times to the complaint is an employee of SIERRA and was employed in the capacity of a licensed psychiatric technician.  Defendant BROWN is also part of the SLO Mental Health Evaluation Team, aka "MHET", and hence was a duly authorized agent for SLO. Defendant BROWN is a duly authorized employee and agent of SIERRA and was acting within the course and scope of her perspective official duties as a mental health staff at the CSU and in conjunction with the mobile crisis unit, with the complete authority and ratification of her principal, SIERRA.  Defendant BROWN is being sued in her individual capacity.

20.    Defendant Bonnie Sayers, hereinafter referred to as "SAYERS", at all relevant times to the complaint is an employee of SIERRA and was employed in the capacity of licensed psychiatric technician for SIERRA.  Defendant SAYERS is also part of the SLO Mental Health Evaluation Team, aka "MHET" and was a duly authorized agent for SLO. Defendant SAYERS is also a duly authorized employee and agent of SIERRA and was acting within the course and scope of her perspective official duties as a CSU mental health staff with the mobile crisis unit, with the complete authority and ratification of her principal, SIERRA.  Defendant SAYERS is being sued in her individual capacity.

21.    Defendant Julia Tidik, hereinafter referred to as "TIDIK", at all relevant times to the complaint is an employee of SIERRA and is employed in the capacity of an on-call nurse practitioner.  Defendant TIDIK is also part of the SLO Mental Health Evaluation Team, aka "MHET" and is a duly authorized agent for SLO. Defendant TIDIK is also a duly authorized employee and agent of SIERRA and was acting within the course and scope of her perspective official duties as a CSU on-call provider CSU with the complete authority and ratification of her principal, SIERRA.  Defendant TIDIK is being sued in her individual capacity.

22.    Defendant Bethany Aurioles, hereinafter referred to as "AURIOLES", at all relevant times to the complaint is an employee of SIERRA and was employed in the capacity of a psychiatric technician.  Defendant AURIOLES is also part of the SLO Mental Health Evaluation Team, aka "MHET" and was a duly authorized agent for SLO. Defendant AURIOLES is a duly authorized employee and agent of SIERRA and was acting within the course and scope of her perspective official duties as a psychiatric technician at the CSU with the complete authority and ratification of her principal, SIERRA.  Defendant AURIOLES is being sued in her individual capacity.

23.    Defendant Savannah Williams, hereinafter referred to as "WILLIAMS", at all relevant times to the complaint is an employee of SIERRA and was

employed in the capacity of a CSU supervisor and a licensed psychiatric technician. Defendant WILLIAMS is also part of the SLO Mental Health Evaluation Team, aka "MHET" and was a duly authorized agent for SLO. Defendant WILLIAMS is a duly authorized employee and agent of SIERRA and was acting within the course and scope of her perspective official duties as a CSU supervisor, with the complete authority and ratification of her principal, SIERRA. Defendant WILLIAMS is being sued in her individual capacity.

24. At all relevant times to this complaint, Defendants acted under color of state law, to wit, they acted in the performance of their official duties, with the purpose and effect of influencing the behaviors of clients including BRANCO and used their badge of authority to deprive BRANCO of her individual rights.

25. At all relevant times, BRANCO was in the custody of COUNTY, SIERRA and named individual defendants while she was being held against her will under a 5150 hold as being gravely disabled.

26. DOES 1 through 7 are employees of defendant SIERRA, and at all times relevant to the complaint were employed in the capacity of staff at the CSU. They are duly authorized employees and agents of the SIERRA and were acting within the course and scope of their perspective duties as staff at CSU with the complete authority and ratification of their principal, Defendant SIERRA. DOES 1 thru 7 are sued in their individual capacities.

27. DOES 8 through 10 are employees of defendant COUNTY, and at all times relevant to the complaint were employed in the capacity of COUNTY decision-maker, policymaker, ratification maker, supervisors and liaisons between SIERRA and COUNTY. They are duly authorized employees and agents of the COUNTY and were acting within the course and scope of their perspective duties at COUNTY with the complete authority and ratification of their principal, Defendant COUNTY. DOES 8 through 10 are sued in their individual capacities.

28. At all times mentioned herein, each and every defendant was the agent

of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every defendant herein.

**FACTUAL ALLEGATIONS**

29.    At all times relevant to this complaint, the decedent, Elina Branco, was a 19-year-old woman residing with her mother COOPER in the county of San Luis Obispo. Ms. Branco suffered from a substance use disorder with co-occurring mental illnesses of anxiety and borderline personality disorder.

30. On or about February 26th, 2024, Ms. Branco was admitted to the CSU on a 5150-hold due to being gravely disabled and a danger to herself. All Defendants had access to BRANCO's prior charting records indicating her high risk and underlying medical condition.

31.  On Monday May 13, 2024, COOPER discussed with her daughter that her daughter had been clean from substances for the last 12 days and desired to attend a drug rehabilitation facility.  COOPER's daughter filled out an admittance form for a rehabilitation treatment center. She then packed her bags for drug detoxification facility.

32.    On May 14, 2024, at approximately 5:00 p.m., upon arriving home COOPER discovered that her daughter had relapsed but was conscious and stayed with her until the next morning.

33.    On May 15, 2024, at approximately 7:58 a.m., COOPER found her daughter unconscious and realized she had overdosed on Fentanyl. COOPER summoned paramedics and upon arrival, they immediately administered Narcan and provided respiratory support. BRANCO was stabilized and transported to the local hospital at Twin City Community Hospital; while in the emergency room, BRANCO was given additional doses of Narcan. BRANCO recovered and was monitored by ER staff.

34. While at the Hospital, COOPER contacted several more detox facilities and agreed with BRANCO to attend the Tarzana Dual Diagnosis Treatment center

in Tarzana, California.

35.    COOPER knew her daughter could not come home, that she was in a vulnerable state considering her recent overdose, and rather wanted her daughter to be kept under close observation and at the emergency room or some other facility until BRANCO could be safely transferred to a Rehab facility.

36.    At approximately 1:04 p.m., COOPER contacted the CSU in SLO and spoke with WATSON about her daughter's condition. COOPER advised WATSON that her daughter recently overdosed on fentanyl but was at the Twin City hospital. COOPER indicated that her daughter was probably going to be at the ER until the end of the day and that she needed a safe place where she could be admitted keeping her alive.  WATSON responded that she can refer a MHET member to get BRANCO a mental health evaluation at the emergency room and she could help facilitate the process.  The mental health evaluator can then place a hold on BRANCO and refer her to the CSU.  WATSON then indicates she can facilitate the transfer application from the CSU to the detox facility and will be at the CSU at 7:30 AM on 05/16/24 so she can fax the paperwork over to Tarzana Treatment Center.

37.    At approximately 2:30 p.m., COOPER met with HOOSON, a mental health evaluator from SIERRA.

38.     COOPER told him of the entire situation upon which time HOOSON agreed that Ellie needed to be admitted to the CSU so to keep her safe overnight until all the forms could be faxed over to Tarzana Treatment Center.

39.    COOPER was also apprehensive about leaving her daughter alone and unmonitored, especially after her recent overdose. In fact, COOPER expressed to HOOSON that her daughter **must** be monitored overnight until the next morning when she can be admitted to a rehab center in Tarzana.

40.    In response, HOOSON evaluates BRANCO and deems her suitable for the CSU.   HOOSON reassures COOPER by advising her the CSU is a more

appropriate facility to transfer her to as opposed to a psychiatric hospital. Of importance, HOOSON decides to place BRANCO on a 5150 Hold as an additional layer of reassurance and indicated that BRANCO couldn't leave the facility until the following morning when she would be off to her to the treatment center the next morning.  COOPER agreed based on HOOSON's representation that her daughter would be in a safe and protective environment and monitored around the clock.

41.    HOOSON Crisis Assessment Form indicates the following pertinent findings: "*Chronic, daily substance use with blatant disregard for her well-being and presents a grave risk to her personal safety*". He further notes *"a history of suicidal ideation resulting in prior inpatient psychiatric admissions indicate that there is a co-occurring disorder that meets the criteria for grave disability at this time*".  HOOSON assessed BRANCO as an elevated risk of immediate self-harm in light of her current behavioral and substance use disorder. He specifically notes "*Client requires close monitoring, support and supervision to prevent recurrence of what likely would have been her death without her mother finding her and the subsequent administration of Narcan*".  Additionally relevant, HOOSON notes: "*Parent indicates that she believes client would use again if she were not directly transferred/admitted and fears client will overdose.* Over the past several weeks, client has demonstrated significant lapses in judgment, impulse control and an inability to refrain from using illicit substances that present a grave risk to her personal safety.*"

42.    As such, HOOSON understood BRANCO to be an extremely high-risk client and could not be left unsupervised and unmonitored. A discussion was even held amongst the three whereby HOOSON relayed to COOPER and BRANCO that a 5150 Hold would be in her best interest and that she would be safe and monitored at the CSU.

43.    COOPER and BRANCO relied on HOOSON's evaluation, reassurance

and recommendation to transfer BRANCO to the CSU.  Unbeknownst to COOPER, the CSU also happened to be run and operated by HOOSON's employer, SIERRA.

44.  In light of HOOSON's reassurances, COOPER repeatedly expressed her concerns for her daughter's safety and whether she wouldn't be better off in a psychiatric facility or even remain at the hospital. However, HOOSON reassured and advised her that her daughter would be monitored around the clock until the next morning.

45.  At approximately 5:10 p.m., BRANCO was deemed medically stabled for discharge from the Twin City Hospital.  BRANCO's vital signs were stable enough to be released and transferred under the 5150 Hold to the CSU. BRANCO hugs her mother who tells her she'll be at the facility first thing in the morning to pick her up and take her to the rehab. Center. HOOSON then escorts BRANCO in his personal vehicle and transports her to the CSU.

46.  Once she arrived at the CSU, COOPER contacts WATSON who advises her that her daughter is safe and is taking a shower. COOPER asked WATSON to have her daughter call her back once done showering.  However, COOPER never heard from her daughter.

47.  At approximately 6:08 p.m., AURIOLES conducts an assessment upon BRANCO and notes "*Client brought by MHET from Twin ED post mom finding her unconscious this am... client and mother had been working on rehab placement, client needs as a safe holding environment. Among her assessment* findings, she notes the client is "*admitted to the CSU as a 5150 Hold*", notes her mental illness as BPD.

48.  HOOSON who hands off BRANCO to the CSU staff, presents this crisis assessment report and advises the CSU staff including WATSON, AURIOLES, BROWN, SAYERS and others in charge of assessing and monitoring BRANCO that she has overdosed the morning of and was at high risk of relapsing and by

implication was a danger-to-herself if not closely supervised and monitored while at the CSU. The SIERRA staff were also aware that the client was to be transition forthwith to a rehab center first thing in the morning.

49.   HOOSON also prepared a form titled "CSU Acceptance Screening Tool" which is a screening tool for the Mobile Crisis to evaluate the appropriateness of referring a person to the CSU. This diagnostic tool was handed to WATSON and AURIOLES. Of pertinence, he notes under Presenting Problems: "*Drug OD this Am-5150 for GD D/T Substance Use-wants residential rehab (Tarzana)* ..also noting the time of the hold as "1630". Under "*possible Treatment Needs and Goals" he notes "linkage services, Supporting Monitoring and MH Support*"

50.   According to all reports and information at Defendants' disposal, BRANCO was not left unmonitored and was to be supervised. Importantly, upon admission to the facility, BRANCO was not given new clothing nor requested to turn over her personal items including any contraband she would have had as customarily required per CSU policy.

51.   At 7:30 p.m., a night shift change took place upon which time defendant BROWN, SAYERS and DOES 1-2 took over the facility. However, there was no supervisor on duty during the evening/morning shift.

52.   Of relevance, BRANCO's charts noted 2-hour monitoring checks starting at 7:30 p.m. noting her vitals being taken and indicated the following: BRANCO was apparently noted to have an altercation with a male peer talking with staff. Her charting note indicate" She was offered and taught coping skills to help de-escalate herself. The client will continue to be monitored"

53.   Of further pertinence, BRANCO was noted to go to bed at 2135.

54.   According to her charting notes, the night staff at the CSU charted identical monitoring notes: "***engaged in therapeutic rest without incident. Breathing is even and unlabored. Will continue to monitor for any changes***." ***At 23:30, 1:30 am, 3:30 am, 5:30 am. At 7:30 am*** the check claims to indicate **"*the***

*client is lying in bed with eyes closed, breathing evenly and without labored*
*breathing. Relevant information be passed on the day shift for continuity of*
*care."*

55.    However, sometime between 8:00 a.m. and 8:30 a.m., Defendants
BROWN, AURIOLES, SAYERS and DOES 1-3, called 911 to report that
BRANCO was in an "unresponsive" state.

56.    A mobile crisis response team from the SLO Fire department responded
to the CSU to attend to BRANCO. However, no amount of advanced life care
support nor cardiopulmonary resuscitation would have made a difference in
reviving BRANCO.

57.    Scott Kim, a mobile crisis response team member assessed BRANCO and
determined she *had expired for well <u>over 8-10 hours</u> as her body had begun to*
*show signs of Livor Mortis[1].*

58.    Additionally, based on a subsequent coroner investigation, BRANCO's
time of death was not recent but rather took place sometime between **10:00 p.m.**
**and 12:00 a.m.** on May 15th.

59.    At approximately 8:06 a.m., COOPER contacts the CSU and asks to
speak with WATSON. SAYERS answers the call and tells COOPER that
WATSON was not in until later on. COOPER thought it was odd since WATSON
had informed COOPER the day prior, she would coordinate her daughter's
transfer to the rehab by faxing over the necessary documents and transfer form,
first thing in the morning. COOPER then asked to speak with her daughter to
which SAYERS responds: "everyone is still sleeping", which again seems odd to
COOPER since her daughter was supposed to be ready to leave the facility.

60.    At 8:43 a.m., COOPER calls again and asks to speak with her daughter.
SAYERS again tells her that she is still sleeping and asked for COOPER's phone
number which she thought was odd.

61.    At 9:01 a.m., COOPER receives a call from a first responder breaking the

---

[1] Livor mortis, also known as postmortem lividity, is a passive process of blood accumulating within the
blood vessels in the dependent parts of the body due to gravity and takes several hours to take effect.

devastating news that her daughter was dead. Then, everything went dark.

62.    Defendants BROWN, AURIOLES, SAYERS and DOES 1-3 falsified BRANCO's medical records because had the 2-hour checks been conducted, BRANCO's medical distress would have been noticed hours much earlier than at 9:30 am, *10-12 hours earlier* than when she was found dead the next morning.

63.   Defendants failed to monitor and observe BRANCO despite being on notice that she was a vulnerable client with a high risk of relapse and high risk for medical distress. In fact, defendants' failure was a serious dereliction of their duties and the one responsibility they had toward their client: to monitor for signs of distress.

64.  Both COUNTY and SIERRA were aware CSU staff regularly failed to monitor clients. A prior Grand Jury finding specifically noted the staff playing video games, covering their computer screens, and tampering with the video surveillance system.

65.   Not only did Defendants BROWN, AURIOLES, SAYERS and DOES 1-3 fail to monitor and check on clients for signs of medical distress, they lied about their welfare checks and falsified BRANCO's medical record, a violation of a criminal California Penal Code §471.5.

66.   Additionally, both SAYERS and BROWN had slept on the job during the time they were responsible for monitoring BRANCO and were both terminated from employment. Curiously, despite having reviewed video surveillance footage depicting both psychiatric techs sleeping behind the nurse's station, SIERRA management placed them on paid administrative leave and did not terminate their employment for several months after BRANCO's death.

67.  Both SIERRA and COUNTY management were aware of SIERRA employees sleeping on the job, especially during the nocturnal shift when presumably clients' welfare depended on the staff staying awake and alert.

68. This was well known as early as a November 2023 meeting between

SIERRA management and CSU Staff when both BROWN and SAYERS admitted to sleeping during the night shifts and were scolded by management. As a result, SIERRA implemented a "no-sleeping" policy to state the obvious but apparently, sleeping during the evening nocturnal shifts went unchecked until BRANCO's death when a video review by SIERRA management revealed that both SAYERS and BROWN had slept during their shifts. Despite notice of the negligent conduct, both SIERRA and COUNTY failed to take any remedial action. COUNTY was or should have been on notice of SIERRA's nocturnal staff misconduct upon reviewing SIERRA's newly implemented "no sleeping" policy and through regular performance and compliance reviews as mandated contractually.

69.   It is unimaginable how Defendants who supposedly were stationed within the CSU staffing monitoring area, in the same open living area as clients such as BRANCO, with only four beds to monitor and unobstructed visual sight, would fail to notice that BRANCO was not in fact engaged in a therapeutic rest, that she stopped breathing, that her chest was not rising up and down and that should would been initially cyanotic, or exhibit bluish color as the early stage just after cardiac arrest.

70.   Upon information and belief, Defendants may have in fact been alerted of BRANCO's distress much earlier in time than the next morning yet failed to take any action and left her dead, for several hours until the next morning, perhaps hoping to claim her death took place coincidently right before the morning check or to buy time to find another scapegoat

71.   Most egregiously, Defendants BROWN, AURIOLES, SAYERS, WATSON and DOES 1-3 cowardly pushed off the devasting news to first responder Scott Kim instead of calling COOPER themselves to notify her of her daughter's death. Aside from the fact that SAYERS lied to COOPER when she called earlier to check on her daughter, defendants utterly failed to take any responsibility for their action. To make things worse, they disgracefully requested

a first responder to notify COOPER so they can avoid explaining to the mother of a client how in the world they failed to monitor and watch someone who was supposed to be discharged the next morning.

72.    COOPER who had just spoken earlier that morning with SAYERS who with a straight face told COOPER that WATSON was unavailable and said absolutely nothing about her daughter's death. Rather, she lied to COOPER and told her that "everyone was sleeping", implying her daughter was breathing, sound and alive.

73.  Of additional importance to BRANCO's welfare, an independent source revealed that the CSU facility's AED (automated external defibrillator), a life-saving device designed to treat a person in cardiac arrest, was not working at the time of BRANCO's demise. This too was well known by all defendants including SIERRA management and supervisors since an AED device would need to be checked daily for proper functioning.

### BRANCO's *5150-Hold* And CSU's History Of Neglect

74.    At all relevant times, the CSU is staffed and operated by SIERRA under contract with SLO county.  The facility consists of a large open room that doubles as a lobby and a sleeping area with oversized chairs that fold out into beds that can accommodate four patients. The CSU is also equipped with live closed-circuit surveillance video system recording activity that takes place in the lobby/sleeping area where BRANCO would have been housed.

75.  Under the contract with SIERRA, SLO would pay SIERRA for each client SIERRA would provide mental health services either at the CSU or through the mobile crisis unit.

76.    Under the auspice of Welfare and Institute Code 5150, if a qualified individual evaluates a person and determines them to fit the criteria under the hold, the person can lawfully be detained under the provision of Section 5150. If a hold is initiated, the person is deemed to be under the care and custody of the

holding authority. At all times relevant to this complaint, HOOSON, while acting within the scope and duty of his position, as a SIERRA's mobile crisis unit psychiatric technician, was qualified under the definition of this section to administer and institute a 5150 hold against BRANCO. Once the 5150 hold was initiated, BRANCO was under the care and custody of COUNTY acting by and through SIERRA, as the holding authority.

77.    In conjunction with SIERRA, SLO Behavioral Health Services has primary responsibility for providing services to persons experiencing mental health issues, including all persons on a 5150 Hold.

78.    According to a 2021-2022 SLO Grand Jury finding, the CSU was not medically staffed and unequipped to provide medical care to clients with underlying medical conditions including those conditions requiring a higher level of care. As of the date of the present incident, the CSU still lacked adequate medical staffing in the form of nurses or physicians to treat clients with urgent medical conditions and all defendants were aware of this fact by virtue of the Grand Jury finding warning both SLO and SIERRA of the facility's lack of medical staff.

79.    According to the same 2021-22 Grand jury finding, surveillance video footage depicted SIERRA staff stationed at the CSU seen relaxing and playing on their phones despite contrary assertions that they were busy attending to other clients and had specifically refused admission of new clients to the County's psychiatric health facility (PHF) when requested if they can place an incoming client. Findings further revealed that in response to being confronted with their neglect of duties, SIERRA staff covered the cameras with pieces of tape and paper rendering them useless. The video camera incident represents a reckless disregard to the safety of both clients and the public that the SIERRA staff is employed to serve.

80.  Under the original contract with COUNTY, SIERRA agreed and

stipulated that a registered nurse, a psychiatric technician or other psych. staff
must be at the facility full-time. Upon another San Luis Obispo grand Jury
finding, SIERRA admitted that there was no nurse was ever physically stationed
at the CSU facility.

81.  Separately, as an outpatient facility, the CSU was designed as a
therapeutic milieu where clients' crisis could be safely managed and de-escalated
until they could be discharged. The CSU was never intended to perform as a detox
or residential treatment center nor capable medically to safely manage clients who
either had recently overdosed or were in active drug or alcohol withdrawals.

82.  At all times relevant, SIERRA has further implemented a written policy
barring the admission of clients who were either under the influence of substances
or were at risk of suffering from substance withdrawals. The reason for the policy
is because clients who need active detoxification protocols need to be medically
monitored for changes of condition and managed with specific drug withdrawal
medication neither of which is available at the CSU. Further, some substance
withdrawal can lead to complications and/or death if not properly managed and
monitored. Other substances like fentanyl are so addictive that unless a client is
properly detoxified, they are at great risk for re-using to self-medicate and to
address painful withdrawal symptoms.

83.  Based on several witnesses including defendants BROWN, SAYERS, and
non-party witnesses Dr. Stephan Lampe, former SIERRA employee Savannah
Sinclair, Erika Kuiken, former SLO mobile crisis first responder Scott Giem, and
Ryan Walsh, and SIERRA upper management staff and others, SIERRA
management from as early as October of 2023 until the date of the present
incident, began incentivizing the CSU and COUNTY personnel to increase client
census in order to justify keeping the contract between SIERRA and COUNTY
and to keep the CSU open.  Along those lines, both current and former employees
were instructed to increase numbers out of fear of losing their jobs and having the

CSU shut down.

84. A common theme of increasing the CSU census was continuously impressed by SIERRA management including WILLIAMS, Bethany Shakespear, Ben Donaldson, and other SIERRA supervisors on all SIERRA personnel out of fear of losing the SIERRA-COUNTY contract and hence, losing their jobs at the CSU. This theme was aggressively pursued and instilled on all defendants and other employees from at least the November 2023 meeting until the date of the present incident.

85. Considering the incentive to increase the CSU census, several defendants including BROWN, SAYERS and other SIERRA employees voiced their concerns about higher acuity level clients being accepted as early as the November 2023 SIERRA personnel meeting. This meeting was also attended by WILLIAMS, Nicole Vanneman, TIDIK, Terra Clayton and AURIOLES.

86. To effectively increase numbers, SIERRA made several key decisions endangering the safety of CSU clients. Namely, SIERRA failed to renew Dr. Stephan Lampe's contract and removed Nurse Sandy Farley' from her position as a full-time registered nurse and manager of the CSU. SIERRA also began accepting higher level acuity clients better suited for an acute or inpatients facility.

87. Nurse Farley, as a CSU manager had decision-making authority to admit or refuse clients until about October of 2023 when she replaced with non-medically trained WILLIAMS However, because Dr. Lampe, as a supervising doctor to nurse practitioners and to Nurse Farley denied more clients than was needed to keep the census and hence, their contract, both in essence were "let go" or relocated and substituted with two on-call nurse practitioners, who never saw patients and no longer had authority to deny admission. These on-call nurse practitioners were TIDIK and Terra Clayton. Nurse Farley's admission authority did not pass on the nurse practitioners, but rather to Defendant WILLIAMS, a non-medically trained psychiatric technician who after Nurse Farley was no

longer a CSU manager, would take over and make admission decisions.

88.  In fact, WILLIAMS and all named CSU defendants were strongly incentivized during three SIERRA staff meetings in November 2023, February 2024 and earlier the same day as BRANCO's death on may 15, 2024, to increase the census numbers and in fact commanded the CSU staff for their stellar job in helping the community by admitting more clients, ultimately achieving the goal to keep the CSU contract active, to keep the facility open and to keep their jobs, even if that meant knowingly taking on higher acuity level clients such as detoxifying clients, in active withdrawal or at risk for the same and placing them at harm's way.

89.  Despite having a specific policy denying detoxifying clients to the CSU, WILLIAMS, SIMPSON, and other SIERRA management removed the entire policy manual from the CSU and left an empty binder starting from November of 2023 until *several months* after BRANCO's death.

90. Starting from October/November of 2023 until at least the date of BRANCO's admission, WILLIAMS, SIMPSON, and TIDIK in conjunction with WILLIAMS and in line with SIERRA's theme of increasing the census began to accept clients with acuity levels higher than the facility was capable of safely managing and should have instead been referred to higher level of care like the SLO Psychiatric Health Facility or other inpatient acute facilities. Starting on or about October of 2023 until the death of the present incident.

91. This increased CSU census push was known to all SIERRA personnel, defendant WILLIAMS, TIDIK and to COUNTY defendants who collaborated with SIERRA management to ensure the numbers were kept high to justify continuing the contract with SIERRA.

92.  When properly administered and managed, a crisis stabilization unit can provide tremendous relief to hospital emergency rooms and to persons in mental crisis by diverting such individual to a safe place where individuals can be

de-escalated within a 24-hour period. However, when a CSU accepts higher level of acuity than it can safely manage, it quickly becomes a dangerous milieu where clients can be harmed due to the lack of adequate medical resources.

93.    Considering the 2021-2022 Grand Jury finding, and upon information and belief, COUNTY amended the CSU contract with SIERRA to add an expressed stipulation that a registered nurse, a psychiatric technician, or psychiatric services would always be physically present when clients are seen at the CSU.  However, as of all times relevant to this complaint, both SLO and SIERRA failed to ensure that medically trained staff like nurses would be physically present at the CSU when clients were treated. The sole presence of psychiatric technicians at the CSU was grossly insufficient to reasonably handle clients who either had co-morbid medical conditions or those suffering from acute medical distress.

94.    A psychiatric technician is not trained nor allowed to assess for medical conditions nor to provide vital medical care to patients suffering from an acute medical condition.  Neither can psychiatric technicians perform comprehensive medical assessments to uncover an underlying medical condition that may prove fatal if not immediately addressed.

95.    A psychiatric technician's scope of responsibility for client care is limited to monitoring a patient's behavior or mental health but restricted from performing any comprehensive medical assessment nor assess a client's vital signs to assess for medical distress.

96.    At all relevant times to the complaint, Defendants were all bound by California Penal Code Section 471.5 stating that "*Any person who alters or modifies the medical record of any person, with fraudulent intent, or who, with fraudulent intent, creates any false medical record, is guilty of a misdemeanor*".

97.    Elina Branco was 19 years of age when she passed away.

## **FIRST CLAIM FOR RELIEF**

### **DELIBERATE INDIFFERENCE TO A SUBSTANTIAL RISK OF HARM TO BRANCO'S SAFETY AND HEALTH -14th AMENDMENT**

### **On behalf of the Estate of ELINA BRANCO and Against HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON and DOES 1-10**

### **(42 U.S.C. § 1983, 14th Amendment of the U.S. Constitution)**

98.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-97 of this Complaint with the same force and effect as if fully set forth herein.

99.     Defendants made intentional decisions with respect to the conditions under which BRANCO was confined. Specifically, Defendant HOOSON referred BRANCO to an ill-equipped facility, with knowledge that it and its staff was not medically capable to provide medical care to clients, like BRANCO with underlying co-morbid medical conditions, a fact well known to all named defendants including COUNTY and SIERRA. HOOSON further acting as an agent of SIERRA was also incentivized to aggressively push clients from hospitals to the CSU at the risk and danger to client's health and safety, knowing the facility was incapable to handle clients such as BRANCO who suffered from underlying medical conditions. Defendants WATSON and AURIOLES made intentional decisions to medically accept BRANCO into the CSU knowing of her underlying medical condition and the high risk that she posed. Defendant TIDIK made the intentional decision to authorize medication that was contra-indicated to BRANCO's medical condition and post-overdose state, without clinically evaluating and assessing BRANCO, rather relying on assessments from non-medically trained AURIOLES, WATSON and other CSU DOES 1-3 staff.  Defendants BROWN, SAYERS, AURIOLES and DOES 1-3 made the intentional decisions not to monitor BRANCO for signs of medical distress including signs of breathing during a span of 10 to 12 hours prior to

notifying the authorities that she had expired. Defendant BROWN, SAYERS, AURIOLES and DOES 1-3 further made intentional decisions to falsify BRANCO's monitoring logs to cover up their failure to monitor the client on a 2-hour basis.  Defendants WILLIAMS, as a supervisor and psychiatric technician made the intentional decision to operate the CSU without an on-site supervisor during the evening-to-morning shifts and failed to have a proper policy and procedure manuals available to CSU staff. Defendant SIMPSON, as regional manager, made the intentional decision, by omission, failing to ensure the CSU was always adequately staffed with registered nurses and supervisor so that clients were being cared for and monitored. Defendant SIMPSON failed to ensure the proper level of training was provided to the CSU staff to handle clients with underlying conditions.

100. Those intentional decisions regarding conditions of confinement placed BRANCO at a substantial risk of suffering serious harm to her health and ensuing death.

101.  Defendants failed to take all the aforesaid reasonable available measures to abate such risk of fatality.

102.  The defendants' failure to take those measures caused BRANCO's death.

103. The Defendants, by ignoring BRANCO in this situation and by failing to provide proper medical attention, acted with deliberate indifference to a serious health condition and the medical needs of BRANCO.

104. Such acts and omissions of the Defendants violated BRANCO constitutional rights guaranteed under 42 U.S.C. § 1983, and the Fourteenth

105. Amendments to the United States Constitution and under *Gordon v. County of Orange*

106. As a direct and legal result of Defendants' acts, Decedent's estate has suffered damages, including, without limitation *Pre-Death* pain and suffering, loss of life, and loss of opportunity for life.  Such damages also including attorneys'

fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Decedent's Estate for punitive damages under 42 U.S.C. § 1983 and under C.C. §3294 because the aforesaid conduct rises to clear and convincing evidence of malice, fraud and oppressive conduct justifying the award of punitive and exemplary damages.

## SECOND CLAIM FOR RELIEF

**FAILURE TO PROVIDE SAFE CONDITIONS (On behalf of the Estate of ELINA BRANCO and Asserted Against all Defendants COUNTY, SIERRA, HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON and DOES 1-10)**

107.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-106 of this Complaint with the same force and effect as if fully set forth herein.

108.    Under *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S. Ct. 2452, 73 L.E.d.2d 28 (1082), an individual placed on a 5150 *Hold* is provided a constitutional right to safe conditions. The action of state actor's vis-a-vis an involuntarily held person falls under a professional judgment standard and such actors will be held liable if their conduct was a substantial departure of professional standards, practice or judgments. Of importance, the combination of a patient's involuntary commitment and her total dependence on her custodian obliges the government to take thought and make reasonable provision for the patient' welfare. Under *Youngberg*, the 14th amendment interest to due process is trigged when either special relationship exits (*eg*: under a W&I 5150 hold) or under the state-created-danger exception, both of which are applicable here to Ms. BRANCO's relationship to Defendants.

109.    At all relevant times to this complaint, every single defendant's acts and omission was a substantial departure of professional standards, practice or judgment.

110.    Defendants HOOSON's conduct and action was a substantial departure from standards when he placed BRANCO under a 5150 Hold and convinced COOPER that her daughter would be in a safe facility at the CSU, as opposed to remaining at the hospital, transferred to the psychiatric facility, or even remaining with COOPER overnight until she could be admitted to a rehab facility. HOOSON understood SIERRA was financially incentivized to refer and admit clients to the CSU, which was operated and managed by SIERRA under a financial contract with COUNTY. HOOSON was also aware that that patients with underlying co-morbid medical conditions like BRANCO, would face an impending risk of self harm and danger to their health if allowed to be left unmonitored and unsupervised by non-medically trained staff which comprised of psychiatric technicians, without the presence of registered nurses nor supervising staff to supervise technicians during over-night shift.

111.  Defendants AURIOLES, WATSON, BROWN, SAYERS and DOES 1-3 actions and omissions were a substantial departure from professional standards when they deemed BRANCO acceptable to the CSU knowing that the CSU was not equipped to care and provide treatment to clients with underlying medical conditions nor to address emergent medical situations. Defendants' actions substantially departed from accepted standards when they subsequently failed to observe and monitor BRANCO over a period of 10-12 hours and falsified medical records indicating that 2-hour welfare checks had been performed. Defendants AURIOLES, WATSON, BROWN, SAYERS and DOES 1-3 also knew BRANCO suffered from a serious underlying co-morbid medical condition, had overdosed earlier that day, presented a high risk of self-harm and danger to her health if allowed to be left unmonitored and unsupervised by non-medically trained staff which comprised of psychiatric technicians.

112. As a direct and legal result of Defendants' acts, Decedent's estate has suffered damages, including, without limitation *Pre-Death* pain and suffering, loss

of life, and loss of opportunity for life.  Such damages also including attorneys'
fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally,
Defendants are liable to Decedent's Estate for punitive damages under 42 U.S.C.
§ 1983 and under C.C. §3294 because the aforesaid conduct rises to clear and
convincing evidence of malice, fraud and/or oppressive conduct justifying the
award of punitive and exemplary damages.

### THIRD CLAIM FOR RELIEF

### *STATE-CREATED DANGER*-14th AMENDMENT

### (On behalf of the Estate of ELINA BRANCO and Asserted Against Defendants HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON and DOES 1-10)

113.     Plaintiff repeats and re-alleges each and every allegation in
paragraphs 1-97 of this Complaint with the same force and effect as if fully set
forth herein.

114.     At all times relevant to this Complaint, defendants HOOSON,
SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON
were acting under color of state law as COUNTY and SIERRA mental health
crisis staff and supervisors.

115.     Under the Fourteenth Amendment, BRANCO had a constitutional
right to be free from Defendants' affirmative action of placing her in a position of
actual, particularized danger.   Specifically, while under the Defendants' care and
authority, Defendants had an affirmative duty not to expose BRANCO to more
danger than she would have been prior to their encounter.

116.     On May 15th, 2024, Defendants HOOSON, SAYERS, TIDIK,
AURIOLES, WATSON, BROWN, WILLIAMS and SIMPSON were all aware of
BRANCO's previous hospitalization for an earlier drug overdose, and that she had
been released as medically stabled but required close medical supervision and
continuous monitoring for any signs of deterioration. Defendants were aware of

BRANCO's underlying co-morbid medical condition and her high risk of self harm in light of her post overdose condition. Defendants were aware that the CSU facility was not staffed with personnel qualified with medical background and training to attend and care for BRANCO's comorbid medical condition. Defendants were further aware of the CSU's prior history of personnel neglect, including staff routinely failing to monitor clients placing them at a grave risk of danger to their health and safety.

117.    Once defendant HOOSON assessed and deemed BRANCO eligible for a 5150 hold, he placed her on a hold and subsequently referred her to CSU with numerous reassurances to COOPER that her daughter would be in safe hands and closely monitored. These reassurances were made despite COOPER's inquiries as to whether her daughter would be better suited and monitored at the psychiatric hospital or even stay with her overnight until the next morning when she would transfer to the rehab facility. By pushing and recommending a SIERRA facility as BRANCO's place of detention and monitoring, knowing of the facility's serious and numerous shortcomings including history of client neglect, HOOSON made an affirmative decision which placed BRANCO in a position far worse than she was before being placed into the authority and care of the defendants. HOOSON's affirmative act created a foreseeable risk that BRANCO would be in grave danger and/or suffer serious medical distress without the proper medical treatment, close monitoring or higher level of care than provided at the CSU.

118.    Despite WATSON and AURIOLES assessing BRANCO and being advised of her underlying comorbid medical conditions including her earlier overdose, Defendants made an intentional decision to accept BRANCO into the facility. Defendant made the decision knowing full well that neither they nor the CSU was qualified to care for and address BRANCO's medical condition. Defendants made an affirmative decision which placed BRANCO in a position far

worse than she was before being placed into the authority and care of the
defendants. Defendant WATSON and AURIOLES's affirmative act created a
foreseeable risk that BRANCO would be in grave danger and/or suffer a serious
medical distress without the proper medical treatment, close monitoring or higher
level of care than provided at the CSU.

119.    Defendant BROWN, SAYERS, AURIOLES and DOES 1-3 made
the intentional decision not to monitor BRANCO for signs of medical distress
including signs of breathing during a span of 10 to 12 hours prior to notifying the
authorities that she had expired. Defendant BROWN, SAYERS, AURIOLES and
DOES 1-3 further made intentional decision to falsify BRANCO's monitoring
logs to cover up their failure to monitor the client on a 2-hour basis.  Defendants
made an affirmative decision which placed BRANCO in a position far worse than
she was before being placed into the authority and care of the defendants.
Defendants' affirmative act created a foreseeable risk that BRANCO would be in
grave danger and/or suffer serious medical distress without the proper medical
treatment, close monitoring or higher level of care than provided at the CSU.

120.    Defendants WILLIAMS, as a supervisor and trainer made the
intentional decision to allow the CSU to be operated without an on-site supervisor
during the evening-to-morning shifts and failed to have a proper CSU operating
manual available to CSU staff. Defendant SIMPSON, as a regional manager made
the intentional decision, by omission, failed to ensure the CSU was staffed
adequately with registered nurses and supervisors, and failed to ensure clients
were being cared for and monitored at the facility. Defendant SIMPSON failed to
 ensure the proper level of training was provided to the CSU staff to handle clients
with underlying conditions.  WILLIAMS and SIMPSON made affirmative
decisions which placed BRANCO in a position far worse than she was before
being placed into the authority and care of the defendants. Defendants' affirmative
act created a foreseeable risk that BRANCO would be in grave danger and/or

suffer serious medical distress without the proper medical treatment, close monitoring or higher level of care than provided at the CSU.

121.    As a direct and legal result of Defendants' acts, Decedent's estate has suffered damages, including, without limitation *Pre-Death* pain and suffering, loss of life, and loss of opportunity for life.  Such damages also including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Decedent's Estate for punitive damages under 42 U.S.C. § 1983 and under C.C. §3294 because the aforesaid conduct rises to clear and convincing evidence of malice, fraud and/or oppressive conduct justifying the award of punitive and exemplary damages.

## FOURTH CLAIM FOR RELIEF
### SUPERVISORY LIABILITY
### Under 42 U.S.C. 1983
### (Against Defendants SIMPSON, WILLIAMS
### and WATSON and DOES 1-10)

122.    Plaintiff repeats, re-states, and incorporates each and every allegation in paragraphs 1 through 121 of this Complaint with the same force and effect as if fully set forth herein.

123.    At all times relevant to this Complaint, SIMPSON, WILLIAMS and WATSON were acting under color of law as SIERRA staff supervisors and upper management to lower-level staff including Defendants HOOSON, SAYERS, TIDIK, AURIOLES, WATSON and BROWN.

124.    Defendant WILLIAMS, as an off-site supervisor approved and

125.     condoned the acceptance of BRANCO into the CSU facility leading subordinate staff to believe they were capable of medically treating and caring for her. On-site day supervisor, WATSON's separate assessment and ensuing admission of BRANCO into the CSU was also relied upon other subordinate defendants into thinking the facility was capable to handling BRANCO's needs.

126.    It was foreseeable that a failure to take charge and instruct CSU staff to refuse admission of BRANCO would place her at an unreasonable risk of harm to health and medical conditions. Despite the fact that BRANCO suffered from multiple co-morbid medical conditions, supervisor WATSON and WILLIAMS instructed subordinate staff and co-defendants to accept her into the facility, therefore placing her at unreasonable risk to her safety and health.

127.    Defendants WILLIAMS and WATSON disregarded a known or obvious consequence that a failure to take charge and deem BRANCO a refusal directly endangered BRANCO's health and thus violates Decedents' constitutional rights to safe conditions.

128.    Defendant WILLIAMS and WATSON's conduct was so closely related to the deprivation of BRANCO's right to be the moving force that caused the constitutional violation, injuries and death.

129.    As a direct and legal result of supervising defendants' acts, Plaintiff and Decedent have suffered damages, including, without limitation, past and future pain and suffering, and compensatory damages.  Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983.

## FIFTH CLAIM FOR RELIEF

### NEGLECT OF A DEPENDENT ADULT IN VIOLATION OF THE ELDER AND DEPENDENT ADULT ABUSE CIVIL PROTECTION ACT W&I §§ 15610.57 & 15657 (Against Defendants COUNTY, SIERRA, HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON and DOES 1-10)

130.    Plaintiff re-alleges each and every allegation as contained in

paragraphs 1 through 129, inclusive, of this complaint, and incorporate the same herein by reference as though set forth at length.

131.    At all relevant times to the complaint, BRANCO was deemed a Dependent Adult within the meaning of the Elder and Dependent Abuse statute and considering her then-existing unique physical, mental and legal status when she was placed on a 5150 hold based on "gravely disabled", as unable to care for her basic life necessities.

132.    At all times relevant to this complaint, defendants COUNTY, SIERRA, HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON assumed substantial caretaking and custodial relationship with BRANCO with ongoing responsibilities to ensure not to endanger her health and safety.

133.    At all times relevant to this complaint, defendants COUNTY, SIERRA, HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON had custody and care of BRANCO.

134.    Defendants COUNTY, SIERRA, HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON failed to use the degree of care that a reasonable person in the same situation would have used in providing for BRANCO's basic needs, by 1. Failing to protect her from health and medical hazard 2. Failing to closely observe and monitor her 3. Falsifying monitoring logs to state that monitoring was conducted 4. Failing to provide BRANCO with life-saving measures 5. Failing to notify local authorities in a timely manner upon being first notified of BRANCO's medical distress 6. Failing to supervise night shift staff to ensure proper client monitoring compliance 7. Failing to maintain life-saving AED devices in working conditions 8. Failing to maintain a complete CSU policy & procedure handbook on site.

135.    As a result of Defendants' conduct, BRANCO and Plaintiff on behalf of BRANCO's estate were harmed. Defendants' COUNTY, SIERRA, HOOSON,

SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON's
conduct was a substantial factor in causing BRANCO's harm and ultimate death.

136.    Because defendants COUNTY, SIERRA, HOOSON, SAYERS,
TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON acted with
recklessness, oppression and fraud in neglecting BRANCO, in addition to
compensatory damages including wrongful death damages, Plaintiff will be
seeking enhanced remedies under W&I Code §15657 seeking to recover
attorney's fees and costs as well for damages for Decedent's pre-death pain and
suffering.

## SIXTH CAUSE OF ACTION
## NEGLIGENT TRAINING, SUPERVISION, AND RETENTION
## (Against Defendants SIERRA, COUNTY, SIMPSON, WATSON, WILLIAMS and DOES 8-10)

137.    Plaintiff re-alleges each and every allegation as contained in
paragraphs 1 through 136, inclusive, of this complaint, and incorporate the same
herein by reference as though set forth at length.

138.    At all times relevant to this complaint, Defendants SIERRA,
COUNTY, SIMPSON, WATSON, WILLIAMS, and each of them, by and
through their agents, subcontractors, and employees, knew or reasonably should
have known of the propensities of Defendants AURIOLES, HOOSON, BROWN,
SAYERS, WATSON and DOES 1-3 for wrongful, dangerous, reckless and

deliberately indifferent conduct, and that said Defendants had been poorly and
improperly trained in their duties, lacked sufficient experience to be entrusted with
the duties of performing the same, and knew or in the exercise of due care
reasonably should have known that entrusting said Defendants to perform such
duties were substantially certain to result in serious and substantial injury and/or

damage to members of the public including Plaintiff and Decedent.

139.    At all times herein mentioned, the Defendants AURIOLES, HOOSON, BROWN, SAYERS, WATSON DOES 1-3 and other employees, agents, and other representatives, given their wrongful, dangerous, and exploitive propensities, lack of skill, training, and experience, and to provide reasonable supervision of said employees and/or agents.

140.    Specifically with regards to defendant COUNTY, defendant provided inadequate management, supervision, and oversight of its mental health contract with SIERRA at the CSU facility and failed to ensure that the facility was properly managed, and clients were adequately cared for.   Because the provision of crisis mental health is a non-delegable duty, Defendant COUNTY failed to ensure SIERRA properly staffed the CSU with qualified medical personnel and that such personnel was properly trained to handle client with underlying co-morbid medical conditions.

141.    COUNTY further failed to ensure that payments to SIERRA were appropriately spent toward properly and adequately managing and operating the facility.

142.    With regards to SIERRA Defendant, it failed to ensure, adequate supervision and retention of staff responsible for medically accepting or refusing incoming clients including regional manager and supervisors SIMPSON and WILLIAMS.

143.    The Defendants COUNTY, SIERRA, WILLIAMS and SIMPSON and DOES 8-10 and each of them, negligently retained and/or failed to supervise Defendants HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, DOES 1-3 and other employees, agents, and other representatives, in their position of trust and authority and were able to commit the wrongful acts complained of herein against Plaintiff.  Defendants COUNTY, SIERRA, WILLIAMS and SIMPSON and DOES 8-10, and each of them negligently failed to provide

reasonable supervision of their employees and agents.

144.   As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered, and continues to suffer, injuries including severe anxiety, humiliation, embarrassment, great pain of mind and body, shock, loss of self-esteem, disgrace, loss of enjoyment of life, and other severe mental and emotional distress, loss of earnings and earning capacity, and damage to her reputation. Plaintiff is therefore entitled to general and compensatory damages in a sum in excess of the minimum jurisdiction of the court and according to proof at trial.

145.   Defendants COUNTY, SIERRA, WILLIAMS and SIMPSON and DOES 8-10 engaged in the acts alleged herein and/or condoned, permitted, authorized, directed, approved, and/or ratified the conduct of their employees, subcontractors, and agents, and are therefore vicariously liable for the wrongful conduct of their employees, subcontractors, and agents for this cause of action. Plaintiff is further entitled to incidental and consequential damages, plus pre- judgment interest at the prevailing legal rate pursuant to California <u>Civil Code</u> §3287 or any other provision of law providing for prejudgment interest, all in a sum according to proof at time of trial.

## <u>SEVENTH CLAIM FOR RELIEF</u>
### FAILURE TO TRAIN & CUSTOM/PRACTICE/POLICY-
### *MONELL* (42 U.S.C. §1983)
### (Against Defendants COUNTY and SIERRA)

146.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 145 of this Complaint with the same force and effect as if fully set forth herein.

147.   At all times relevant to the Complaint, Defendants COUNTY and SIERRA representatives had knowledge of BRANCO's underlying co-morbid medical conditions and that she had suffered from an emergency medical condition. Further, defendant entities were aware that the CSU unit was not

equipped to care for clients with co-morbid medical conditions requiring close monitoring and medical care if need be. Given the known limitations of CSU it

was obvious that CSU staff would need special training to care adequately for medically unstable clients and to assess whether such patients should even be accepted into the facility.

148.    Defendant COUNTY and SIERRA knew that the CSU routinely lacked registered nurses at the facility to clinically evaluate clients with underlying medical conditions. COUNTY and SIERRA were further aware that the facility was minimally supervised and managed, and that night shift staff routinely fails to comply with required monitoring and welfare checks at the risk to client safety. COUNTY and SIERRA knew that the named individual Defendants had not been trained adequately in monitoring, documenting and assessing medically unstable patients within the confines of a short-term crisis facility such as the CSU, and that this failure to train led to a reckless treatment and care to BRANCO, ultimately resulting in her death. COUNTY and SIERRA were further aware of the lack of any meaningful policies and procedures available to on-site staff and that the staff was routinely left to their own device as to how to properly address clients with co-morbid medical conditions.

149.    Separately, Defendant COUNTY and SIERRA had a custom, practice and policy of relying on non-medically trained staff to routinely medically assess clients with co-morbid medical conditions which was a violation of California nursing and medical standards, medical state laws, and the illegal practice of nursing without the proper credentials, training and experience, all at the expense to clients' health and safety.

150.    Despite a prior SLO 2021-22 Grand Jury finding that the CSU had poor management, the facility suffered instances where unsupervised staff failed to monitor and observe patient, and thereby increase safety and health risk to clients COUNTY and SIERRA allowed the CSU to be operated with poor management

and non-existent staff supervision, yet failed to take any meaningful remedial action, in essence condoning the noted deficiencies by the grand jury.

151.    As a result of SIERRA and COUNTY's failure to adequately train and implement policies, or even have policies prohibiting the numerous violations and knowns deficiencies under which the CSU had regularly operated with, BRANCO was caused undeserved pain and agony all culminating to her death on May 15th, 2024.

## EIGTH CLAIM FOR RELIEF

### INTERFERENCE WITH PARENTAL RIGHTS-SUBSTANTIVE DUE PROCESS VIOLATION- (14th Am. -42 U.S.C. §1983)

### (Against Defendants HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON and DOES 1-3)

152.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 151 of this Complaint with the same force and effect as if fully set forth herein.

153.   Plaintiff had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with her daughter, BRANCO.

154.   BRANCO also had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in BRANCO's familial relationship with her mother, COOPER.

155.   The aforementioned actions of Defendants along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of BRANCO and Plaintiff, with purpose to harm

unrelated to any legitimate medical authority under the W&I 5150 statute.

156.  As a direct and proximate result of these actions, BRANCO experienced pain and suffering and eventually died. Defendants thus violated the substantive due process rights of Plaintiff to be free from unwarranted interference with their familial relationships with BRANCO.

157.  As a direct and proximate cause of the acts of Defendants, Plaintiff suffered emotional distress, mental anguish, and pain. Plaintiff has also been deprived of the life-long love, companionship, comfort, society, care and sustenance of BRANCO, and will continue to be so deprived for the remainder of her natural life.

158.  The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights of and safety of BRANCO and Plaintiff therefore warrants the imposition of exemplary and punitive damages as to Defendants.

159.  Plaintiff brings this claim individually and as successor-in-interest to BRANCO and seeks both survival damages and wrongful death damages. Plaintiffs also seek attorneys' fees.

## NINTH CLAIM FOR RELIEF
### WRONGFUL DEATH
### (Against Defendants COUNTY, SIERRE, HOOSON, SAYERS, TIDIK, AURIOLES, WATSON, BROWN, WILLIAMS, SIMPSON, and DOES 1-10)

160.   Plaintiff re-alleges each and every allegation as contained in paragraphs 1 through 159, inclusive, of this complaint, and incorporate the same herein by reference as though set forth at length.

161.   Plaintiff is entitled to bring an action for the wrongful death of BRANCO on or about May 15, 2024, pursuant to C.C.P. Section 377.60 based on his relationship to the decedent.

162.     On or about May 15, 2024, Defendants caused undue hardship and neglected their duties to BRANCO.

163.  As a result of the same, BRANCO suffered and died due to complications from her underlying medical condition.

164.  As a proximate result of the negligence, and neglect under the Elder Abuse and Dependent Adult Statute, Defendants, and each of them, decedent was found expired on May 16, 2024.

165.  As a proximate result of the negligence of defendants as herein alleged, and the death of Decedent, BRANCO, Plaintiff has been deprived of the Decedent's loss companionship, comfort, affection, society, and solace, and will continue to be deprived of the relationship of her daughter, and her comfort to the same extent as prior to her injuries and death, all to their general and special damages according to proof.

166.  As a further proximate result of the negligence and neglect of Defendants, and each of them, as alleged herein, and the death of Decedent, Plaintiff has additional incurred funeral and burial expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in her favor and against all Defendants, and DOES 1 through 10 inclusive, as follows:

1.  For general and compensatory damages according to proof;

2.  For wrongful death damages suffered by Plaintiff personally including but not limited to loss companionship, comfort, affection, society, and solace, deprived of the relationship of her daughter, burial and funeral expenses.

3.  For *pre-death* pain and suffering, loss of life and loss of opportunity of life under 42 USC sect. 1983 federal damages recoverable to the Estate of Elina Branco.

4.  For wrongful death damages and pre-death pain and suffering damages under the Neglect of a Dependent Adult Per W&I statute, and enhanced remedies including attorney's fees under the same statute.

5.  For punitive damages against SIERRA and the named individual defendants

in an amount to be proven at trial under both federal and state laws.

6.   For pre-judgment interest;

7.   For reasonable costs of this suit and attorneys' fees per 42 U.S.C. §1988;

8.   For such further other relief as the Court may deem just, proper, and appropriate and

9.   For injunctive relief as indicated below.

## REQUEST FOR INJUNCTIVE RELIEF

Plaintiff further prays and requests a court order requiring the Defendants COUNTY and SIERRA to comply with the following injunctive reliefs aimed to ensure future client safety, regulatory adherence, and to prevent avoidable deaths due to staff deliberate indifference, neglect of care, lack of training, poor management, and lack of supervision:

1.   Cease Operation: a court order mandating the immediate suspension of the San Luis Obispo Crisis Stabilization until it complies with all applicable state regulations

2.   Corrective Action: an order requiring the CSU facility to implement specific corrective actions including hiring a night supervisor during evening and early morning times when clients are monitored; Requiring a registered nurse to be physically assigned to the facility, not just on an on-call/remote basis; hiring additional qualified staff, requiring medical clearance and assessment by a registered nurse or nurse practitioner, not just psychiatric technicians; updating the CSU policy manual with a complete set of documents available to facility staff; implementing more frequent welfare checks than two-hours checks and actually ensure that the monitoring staff comply with the mandated welfare checks; ensure that closed-circuit video surveillance system operates from a centralized location and prohibit any staff attempts at tampering or obstructing camera views.

3.   Independent Monitor: Appointment of an independent monitor to oversee

the facilities' operations and ensure compliance with state and health and safety
regulations.

4.   <u>Prohibiting New Admissions</u>: preventing COUNTY and SIERRA from
admitting new clients until they demonstrate compliance with regulatory
standards.

5.   <u>Mandatory Training</u>: requiring COUNTY and SIERRA to provide
mandatory training for staff on specific issues such as patient safety, monitoring,
change in condition, and regulatory compliance

6.   <u>Facility Closure</u>: a temporary or permanent closure of the CSU until
regulatory compliance is verified.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Date: April 8, 2025          THE SEHAT LAW FIRM, PLC

By: *<u>/s/ Cameron Sehat</u>*
      Jeffrey Mikel, Esq.
      Attorneys for Linda Cooper on behalf of
      Elina Branco