Douglas C. Smith, Esq. (SBN 160013)
David P. Hall, Esq. (SBN 196891)
SMITH LAW OFFICES, LLP
4001 Eleventh Street
Riverside, CA 92501
Telephone: (951) 509-1355
Facsimile: (951) 509-1356
dsmith@smitlaw.com
dhall@smitlaw.com

Attorneys for Defendants THE COUNTY OF SAN LUIS OBISPO and JASON HOOSON

[*ADDITIONAL COUNSEL LISTED BELOW*]

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA COOPER, Individually, And On Behalf Of The Estate Of Decedent, ELINA QUINN BRANCO,<br><br>        Plaintiff,<br><br>    vs.<br><br>COUNTY OF SAN LUIS OBISPO, a governmental entity, form unknown, SIERRA MENTAL WELLNESS GROUP, a California Non-Profit Corporation, JASON HOOSON, individually, SAVANNAH WILLIAMS, individually; JOSH SIMPSON, individually; BONNIE SAYERS, individually; JULIA TIDIK, individually; BETHANY AURIOLES, individually, JANET | Case No.: 2:24-cv-08187-SVW(AJRx)<br><br>**JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>*Complaint filed 9/23/24*<br>*First Amended Complaint filed 6/02/25* |

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

BROWN, individually, SHELLE                   )
WATSON, individually; DOES 1                  )
through 10, inclusive,                        )
                                              )
                  Defendants.                 )
                                              )

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Brian Hoffman, Esq. (SBN 150824)
Crystal Rorabaugh, Esq. (SBN313093)
WOOD SMITH HENNING & BERMAN, LLP
10960 Wilshire Blvd., 18th Floor
Los Angeles, CA 90024
Telephone: (310) 481-7600
Facsimile: (310) 481-7650
bhoffman@wshblaw.com
crorabaugh@wshblaw.com

Attorneys for Defendant JULIA TIDIK

Lawya Rangel, Esq. (SBN 242079)
Yolanda Lopez, Esq. (SBN 328922)
CLOUSESPANIAC ATTORNEYS
8038 Haven Avenue, Suite E
Rancho Cucamonga, 91730
Telephone: (909) 941-3388
Facsimile: (909) 941-3389
llrangel@csattys.com
yelopez@csattys.com
service@csattys.com

Attorneys for Defendant SAVANNAH WILLIAMS

Cameron Sehat, Esq. (SBN 256535)
Jeffrey Mickel, Esq. (SBN 350671)
SEHAT LAW FIRM, PLC
5100 Campus Drive, Suite 200
Newport Beach, CA 92660
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
cameron@sehatlaw.com
j.mickel@sehatlaw.com

Attorneys for Plaintiff LINDA COOPER, individually, and on behalf of the Estate of Decedent, ELINA QUINN BRANCO

3
**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................10

PLAINTIFF'S TABLE OF AUTHORITIES ........................................................14

MEMORANDUM OF POINTS AND AUTHORITIES...........................................16

DEFENDANTS' INTRODUCTION........................................................................16

PLAINTIFF'S INTRODUCTION...........................................................................18

DEFENDANTS' STATEMENT OF FACTS ..........................................................19

PLAINTIFF'S STATEMENT OF FACTS .............................................................28

THE LEGAL STANDARD FOR SUMMARY JUDGMENT. ................................30

JASON HOOSON .................................................................................................30

I.     HOOSON IS ENTITLED TO SUMMARY JUDGMENT UNDER
       QUALIFIED IMMUNITY. ......................................................................31
   A.   *Hooson's Position.* ...........................................................................*31*
     1.   Hooson Did Not Violate a Constitutional Right. ...........................31
     2.   There was No Clearly Established Right ......................................33
   B.   *Plaintiff's Position: Preliminary considerations: Hooson was a County
   employee acting under color of state law.* .................................................*34*
     1.   Hooson is not Entitled to Qualified Immunity because constitutional liability
     was well established by the under the "Youngberg professional judgment
     standard" and the objective deliberate indifference standard. ................35
     2.   Hooson's failed to exercise professional judgment when he referred Branco
     to the CSU, a non-LPS facility, on a "voluntary" basis after finding she was a
     danger to herself and gravely disabled by substance abuse disorder.....................36
     3.   Hooson's referral of Branco to the CSU, a non-LPS designated facility was
     also objective deliberate indifference under Gordon v Cty. Of Orange. ................39
II.    HOOSON IS ENTITLED TO SUMMARY JUDGMENT ON THE SECTION
       1983 CLAIMS DUE A LACK OF DELIBERATE INDIFFERENCE. ............41
   A.   *Hooson's Position.* ...........................................................................*41*
   B.   *Plaintiff's Position: Hooson failed both the professional judgment standard and
   deliberate indifference tests.* ..................................................................*44*
III.   HOOSON IS IMMUNE FROM ALL STATE LAW CLAIMS UNDER
       WELFARE AND INSTITUTIONS CODE SECTION 5278. ..........................44
   A.   *Hoosen Position.*...............................................................................*44*
   B.   *Plaintiff's Argument: Hooson's noncompliance with the basic requirements of
   5150 by failing to send Branco to a LPS designated facility as required by 5150 (a)
   means that Section Welf. & Inst. Code Section 5728 does not apply to immunize his
   misconduct* ......................................................................................*45*
THE COUNTY OF SAN LUIS OBISPO....................................................................46

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I.      THE *MONELL* CLAIM MUST BE DISMISSED. ..........................................46
   A.   *The County's Argument.* .........................................................................*46*
      1.   The County is Entitled to Summary Judgment for Its Policies. ....................47
      2.   There is No Evidence of a Violation for the Failure to Train. ......................50
   B.   *Plaintiff's Position.* ...............................................................................*51*
   1. The County by and through its contractor, Sierra, was deliberately indifferent to Brancos' safety because its practice of admitting detoxifying clients without proper training, policies and procedures was a moving force behind Plaintiff's Injury. .....................................................................................................................51
   2. The County Had A Policy Of Delegating Decision-Making Authority To Low-Level Psychiatric Technicians To Determine Whether A Client Meets Criteria for Admission. ...............................................................................................................54
   3. The County had a policy of inadequate documentation of client observations..54
   4. The County Was Deliberately Indifferent To Branco's Safety Because It Condoned CSU Staff Sleeping During the Nocturnal Shifts And Failed To Enforce A Claimed "No-Sleeping-On-The-Job" Policy in Nov. 2024 ..................................55
II.     PLAINTIFF DOES NOT QUALIFY AS A DEPENDENT ADULT. ..............56
   A.   *The County's Position.* ...........................................................................*56*
   B.   *Plaintiff's Position: Ms. Branco was a dependent adult because she was gravely disabled by substance abuse disorder from managing her need for personal safety on her own.* .......................................................................................*58*
JULIA TIDIK..............................................................................................................58
I.      TIDIK IS ENTITLED TO SUMMARY JUDGMENT AS TO THE FIRST, SECOND, THIRD, AND EIGHTH CAUSES OF ACTION BECAUSE SHE IS NOT A STATE ACTOR AND DID NOT ACT UNDER THE COLOR OF STATE LAW......................................................................................................58
   A. Tidik's Position...................................................................................*58*
      1.   The Public Function Test....................................................................61
      2.   The joint action test. .........................................................................62
      3.   The Governmental Nexus and State Compulsion Tests............................63
   B. *Plaintiff's Argument: Tidik satisfies the "close nexus / joint action test" due to her role in a complex and deeply intertwined County-initiated process of evaluating and detaining gravely disabled individuals at the County's Crisis Stabilization Unit.* .............................................................................................................*64*
II.     PLAINTIFF HAS FAILED TO ESTABLISH EVIDENCE THAT TIDIK'S CONDUCT VIOLATED PLAINTIFFS' FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS. ..............................................66
   A. Tidik's Position...................................................................................*66*

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*B. Plaintiff's Argument: Tidik, a nurse practitioner with a supervisory role over the CSU LVNs and LPTs, failed to take any steps to assess whether the CSU could safely monitor and care for Branco.* ............................................................................67

   1.    Tidik Did Not Act with Conscious Indifference or Gross Negligence and Therefore No Section 1983 Liability Can Attach ..................................................69

     A. Tidik's Position ...............................................................................................69

     B. Plaintiff's Position: Tidik's failures to properly assess Branco in connection with her arrival at the CSU fell so far below the standard of care that she cannot have exercised professional judgment and her actions constitute deliberate indifference............................................................................................................72

   2.    Plaintiffs Third Cause of Action for State Created Danger Under the 14th Amendment Fails as to Tidik.............................................................................73

     A. Tidik's Position ...............................................................................................73

     B. Plaintiff's Position: Tidik's failure to perform any assessment of whether Branco could be adequately treated at the CUS fell so far below the standard of care that her inaction in the face of known risks to Branco's health constituted deliberate inference. .................................................................................................75

   3.    Tidik Did Not Violate Plaintiff's Familial Association Rights, and Plaintiff's Eighth Cause of Action Fails .................................................................................75

     A. Tidik's Position ...............................................................................................76

     B. Plaintiff's Position: The deliberate indifference standard applies ot Plaintiff's 14th Amendment familial interference claims.........................................................76

III.     PLAINTIFFS' FIFTH CAUSE OF ACTION FOR ABUSE OF A DEPENDENT ADULT FAILS AS A MATTER OF LAW BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH THE REQUIRED ELEMENTS ................................................................................................................................76

*A. Tidik's Position*.....................................................................................................76

*B. Plaintif's Position: all of the elements of Plaintiff's abuse of a dependent adult claims  are satisfied.* .................................................................................................77

   1.    Plaintiff was Not a Dependent Adult as Defined by the EADACPA ............77

     A. Tidik's Position ...............................................................................................77

     B. Plaintiff's Position: Branco was a Dependent Adult as Defined by the EADACPA .............................................................................................................78

   2.    Tidik was not a "Care Custodian" as Defined by the Welfare and Institutions Code 15610.17 ........................................................................................78

     A. Tidik's Position ...............................................................................................78

     B. Plaintiff's Position: Welf. & Inst. Code, §15610.17(a) and (y) each make it clear that Tidik was a Care Custodian for the purposes of Welf. & Inst. Code, § 15610.57.................................................................................................................80

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

3.    No Triable Issue of Fact Exists to Support that Tidik was "Negligent" Within the Meaning of the EADACPA ...................................................................82

A. Tidik's Position ...............................................................................82

B. Plaintiff's Position: Tidik's failure to take any steps to determine whether Branco could be safely monitored at the CSU was a failure to provide medical care for Branco's Physical and mental health needs, as well as a failure to protect her from health and safety hazards constituting were neglect pursuant to Welf. and Inst. Code §15610.57(b). .............................................................84

B. Plaintiff's Position: Tidik's Neglect was reckless and egregious so that enhanced remedies are available. ...........................................................86

IV.    TIDIK IS ENTITLED TO SUMMARY JUDGMENT AS TO THE NINTH CAUSE OF ACTION FOR WRONGFUL DEATH BECAUSE THE UNDISPUTED EVIDENCE ESTABLISHES THAT SHE WAS NOT NEGLIGENT ......................................................................................87

A. Tidik's Position ...............................................................................87

B. Plaintiff's Position: Tidik breached her duty of care in multiple ways that directly and proximately caused Ms. Branco's death. ...............................................87

SAVANNAH WILLIAMS ...................................................................................88

I.    SAVANNAH WILLIAMS IS ENTITLED TO SUMMARY JUDGMENT AS PLAINTIFF's 1ST, 2ND, 3RD, 4TH, and 8TH CAUSES OF ACTION ..........88

1.    Plaintiff Cannot Establish State Action Under the Public Function Test ......89

2. Plaintiff Cannot Establish State Action Under the Joint State Action Test...........90

3. Plaintiff Cannot Establish State Action Under the Governmental Nexus Test. .91

4. Plaintiff Cannot Establish State Action Under the Compulsion Test.................92

B. PLAINTIFF's POSITION: Williams was a state actor under the joint action/ common nexus test articulated in Jensen v. Lane County. ......................................93

II. PLAINTIFF's §1983 CLAIMS FAIL SUBSTANTIVELY AGAINST WILLIAMS A THERE IS NO EVIDENCE THAT SHE ACTED WITH DELIBERATE INDIFFERANCE OR PERSONALLY PARTICIPATED IN THE ALLEGED DEPRIVATION OF RIGHTS...........................................................................95

A. WILLIAMS' POSITION...................................................................95

B. PLAINTIFF's POSITION: As the CSU manager with the authority on whether to reject patients form the facility, Williams personally participated in the Deprivation of Branco's rights by failing to take any steps to determine whether Branco could be safely monitored there and by ignoring the concerns of lower-level CSU staff who wanted to send her back to the hospital. Her inaction in light of the known consequences of Branco relapsing constitutes deliberate indifference. ........99

III.    PLAINTIFF's CAUSE OF ACTION NO. 5, NEGLECT OR ABUSE OF DEPENDENT ADULT FAILS AS DECEDENT WAS NOT A DEPENDENT

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

ADULT AND BECAUSE PLAINTIFF CANNOT ESTABLISH THE REQUISITE CONDUCT ...................................................................................101

A.   *WILLIAMS' POSITION*.....................................................................................*101*

B.   *PLAINTIFF's POSITION*....................................................................................*101*

1.   As a matter of law, DECEDENT was not a "Dependent Adult". ................102

A.   WILLIAMS' POSITION ........................................................................ 102

B.   PLAINTIFF's POSITION: Ms. Branco was a dependent adult because she was gravely disabled and unable to manage her need for personal safety on her own and thus she was a dependent adult. ........................................................ 102

2.   Plaintiff's Dependent Adult Abuse or Neglect Cause of Action Fails as Plaintiff cannot establish that Williams engaged in Physical Abuse or Neglect Nor that She Acted with Recklessness, Oppression, Fraud or Malice.........................103

A.   WILLIAMS' POSITION ........................................................................ 103

B.   PLAINTIFF's POSITION: Williams failure to take any steps to determine if Branco could be safely monitored in the CSU was Neglect. That neglect was reckless given the known consequences of inaction. ....................................... 105

IV.   PLAINTIFF's SIXTH CAUSE OF ACTION FOR NEGLIGENT TRAINING, SUPERVISION, OR RETENTION FAILS AS A MATTER OF LAW. .........107

A.   *WILLIAMS' POSITION*.....................................................................................*107*

➢   *B. PLAINTIFF'S POSITION: Sierra is liable for William's failure to trail CSU employees.* .....................................................................................................*107*

V.   PLAINTIFF'S 9TH CAUSE OF ACTION FOR WRONGFUL DEATH FAILS AS AGAINST WILLIAMS AS PLAINTIFF FAILS TO ESTABLISH THE BREACH OF A DUTY OWED TO DECEDENT WHICH CAUSED THE DAMAGES ALLEGED. ..................................................................................108

1.   Plaintiff Fails to Establish a Duty Owed by Williams ...............................108

A.   WILLIAM's POSITION ........................................................................ 108

B.   PLAINTIFF's POSITION: Williams and other CSU employees owed Branco a duty of care in that they were employed in a County created mental health facility that served clients including those gravely disabled from substance abuse. ........................................................................................ 110

2.   Plaintiff fails to establish Negligent Conduct against Williams which constituted a Breach of Duty..............................................................................111

A.   WILLIAM's POSITION ........................................................................ 111

B.   PLAINTIFF's POSITION: Williams's complete inaction in the face of known dangers that Branco would overdose if not carefully monitored was a breach of her duty of care. ........................................................................... 113

3.   Plaintiff's Claims Fail on the Element of Causation as Against Williams ..113

A. WILLIAMS' POSITION ........................................................................ 113

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

B.    PLAINTIFF's POSITION: There is a close causal connection between Williams conduct in failing to take measures to protect Branco's safety and her death. ...................................................................................................... 114

CONCLUSION ...................................................................................................114

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Nguyen,* 78 F.4th 1140 (9th Cir. 2023)........................................................69

*Am. Mfrs. Mut. Ins. Co. v. Sullivan* 526 U.S. 40 (1999)................................................90

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242(1986)....................................................29

*Artiglio v. Corning Inc.*, 18 Cal.4th 604 (1998) ..........................................................107

*Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991) .........................................................29

*Benavidez v. County of San Diego*, 993 F.3d 1134 (9th Cir. 2021) ..............................49

*Bias v. Moynihan*, 508 F.3d 1212 (9th Cir. 2007) .........................................................32

*Blum v. Yaretsky,* 457 U.S. 991 (1982)................................................... 59, 60, 62, 63

*Bolmer v. Oliveira*, 570 F.Supp. 2d 301 (CT Dist. Ct. 2008)........................................89

*Briley v. State of Cal.*, 564 F.2d 849 (9th Cir. 1977).....................................................59

*C.V. v. City of Anaheim,* 823 F.3d 1252 (9th Cir. 2016) ...............................................30

*Carter v. Prime Health Care et al.* 198 Cal.App.4th 396 (Cal. App. 2011) ........82, 103

*Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) .................................41

*Caviness v. Horizon Community Learning Center, Inc.* 590 F.3d 806 (9th Cir. 2010)59

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..............................................................29

*Christy v. Randlett* 932 F.2d 502, 504 (6th Cir. 1991) ..................................................87

*City of Canton v. Harris*, 489 U.S. 378 (1989) .............................................................46

*College Hospital, Inc. v. Superior Court*, 8 Cal.4th 704 (1994) .................................103

*Connick v. Thompson*, 563 U.S. 51 (2011)....................................................................49

*Corales v. Bennett* 567 F.3d 554 (9th Cir. 2009).........................................................112

*Covenant Care v. Superior Court* 32 Cal.4th 771 (Cal. 2004)..............................78, 103

*Delaney v. Baker* 20 Cal. 4th 23 (Cal. 1990)...........................................................82, 103

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ......................................................32

*Doe v. Capital Cities*, 50 Cal.App.4th 1038 (1996) ....................................................106

*Duarte v. Begrin*, 2007 U.S.Dist.LEXIS 14872 (N.D. Cal. Mar. 1, 2007) .................30

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*Estate of Conners by Meredith v. O'Connor*, 846 F.2d 1205 (9th Cir. 1988) ..............68

*Estate of Miller v. County of Sutter*, 2022 U.S. Dist. LEXIS 29273 (E.D. Cal. Feb. 16, 2022) ...............................................................................................................49

*Estate of Osuna v. County of Stanislaus*, 392 F.Supp.3d 1162 (E.D. Cal. 2019).......107

*Estate of Soakai v. Abdelaziz*, 137 F.4th 969 (9th Cir. 2025)........................................41

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002) ................................................. 60, 61, 90

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) .........62, 63

*Gonzalez v. Paradise Valley Hospital*, 111 Cal.App.4th 735 (2003)...........................44

*Huffman v. Interstate Brands Corp.*, 121 Cal.App.4th 679 (2004) ............................113

*Hyde v. City of Willcox*, 23 F.4th 863 (9th Cir. 2022)...................................................49

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) .......................................29

*J.L. v. Children's Institute, Inc.*, 177 Cal.App.4th 388 (2009).....................................107

*Jackson v. AEG Live, LLC*, 233 Cal.App.4th 1156 (2015)...........................................106

*Jackson v. East Bay Hosp.,* 980 F. Supp. 1341 (N.D. Cal. 1997) .................................58

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)............................ 58, 62, 91

*Jacobs v. Grossmont Hospital*, 108 Cal.App.4th 69 (2003)..........................................44

*Jensen v. Lane Cnty*, 222 F.3d 570 (9th Cir. 2000) ......................................................61

*Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2001)...................................................66

*Julian v. Mission Community Hospital*, 11 Cal.App.5th 360  (2017) ...........................89

*K.H. v. Morgan* 914 F.2d 846 (7th Cir. 1990)...............................................................90

*Kesner v. Superior Court*, 1 Cal.5th 1132 (2016)........................................................107

*Kidwell-Bertagnolli v. County of Sonoma,* 2024 U.S. Dist. LEXIS 65844 (N.D. Cal. Apr. 10, 2024) .......................................................................................................49

*Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003) ............................................. 61, 89, 91

*L.W. v. Grubbs,* 92 F.3d 894 (9th Cir. 1996)..................................................................73

*Lal v. California*, 746 F.3d 1112 (9th Cir. 2014) ..........................................................30

*Lee v. Katz,* 276 F.3d 550 (9th Cir. 2002) ...............................................................88, 91

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062 (9th Cir. 2013). ....................75

*Long v. Cty. of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006)..........................................58

*Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982) ......................................................58

*MacLellan v. County of Alameda*, 2014 U.S.Dist.LEXIS 29856 (N.D. Cal. Mar. 5, 2014); ..................................................................................................................................43

*Megargee v. Wittman*, 550 F.Supp.2d 1190 (E.D. Cal. 2008).......................................46

*Merrill v. Navegar, Inc.*, 26 Cal.4th 465 (2001) ..........................................................107

*Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978)..46

*Morrison v. Clinic*, 703 F. Supp. 3d 1245 (D. Mont. 2023)..........................................59

*Mullenix v. Luna*, 577 U.S. 7 (2015) ...........................................................................32

*Murgia v. Langdon* 61 F.4th 1096 (9th Cir. 2023). ................................................72, 73

*Musgrove v. Silver,* 82 Cal. App. 5th 694 (Cal.App. 2022) ..........................................86

*Nelson v. Pima Community College*, 83 F.3d 1075 (9th Cir. 1996)..............................47

*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 390 (Cal. App. 1999). ........................86

*Oroville Hospital v. Superior Court of Butte County*, 74 Cal.App.5th 382 (Cal. App. 2022) ............................................................................................................... 13, 78, 81

*Patel v. Kent Sch. Dist.,* 648 F.3d 965 (9th Cir. 2011)..................................................73

*Perez v. City of Fresno*, 98 F.4th 919 (9th Cir. 2024) ...................................................32

*Phillips v. TLC Plumbing, Inc.*, 172 Cal.App.4th 1133 (2009) ..................................106

*Porter v. Osborn*, 546 F.3d 1131(9th Cir. 2008).........................................................75

*Rayburn v. Hogue* 241 F.3d 1341 (11th Cir. 2001) ......................................................91

*Rodriguez v. County of Los Angeles*, 891 F.3d 776 (9th Cir. 2018).............................46

*Rowland v. Christian*, 69 Cal.2d 108 (1968)..............................................................108

*Sababin v. Superior Court,* 144 Cal.App.4th 81 (Cal. App. 2006) ..............................82

*Sakiyama v. AMF Bowling Centers, Inc.*, 110 Cal.App.4th 398 (2003).....................108

*Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).....................................................42

*Steward v. Superior Court* 16 Cal.App.5th 87 (Cal. App. 2017). ................................78

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*Sutton v. Providence St. Joseph Med. Ctr.* 192 F.3d 826 (9th Cir. 1999) ....................88

*Taylor v. Cnty. of Los Angeles*, No. 218CV09259ABSSX, 2020 WL 6136867, at *5 (C.D. Cal. Aug. 13, 2020),..............................................................................73

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989)................................................49

*Thompson v. City of Los Angeles*, 855 F.2d 1439 (9th Cir. 1989) ...............................48

*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996)........................................................46, 47

*Weissich v. Cnty of Marin*, 224 Cal.App.3d 1069 (1990) ...........................................112

*West v. Atkins*, 487 U.S. 42 (1988) .........................................................................58, 61

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010)........................................................41

*Winn v. Pioneer Medical Group, Inc.* 63 Cal.4th 148 (Cal. 2016).............................78

*Worthy v. City of Berkeley*, 573 F.Supp.3d 1398, (N.D. Cal. 2021). .........................32

*Youngberg v. Romeo*, 457 U.S. 307 (1982) .................................................. 68, 69, 73

**Statutes**

22 C.C.R. § 80072.................................................................................................91

42 U.S. Code § 1983 ............................................................................. 30, 40, 87

Cal. Civ. Code, §3294.........................................................................................103

Cal. Welf. & Inst. Code § 15600 .........................................................................76, 100

Cal. Welf. & Inst. Code § 15610.17 ...............................................................76

*Cal. Welf. & Inst. Code* § 15610.23........................................................ 55, 76, 77, 101

*Cal. Welf. & Inst. Code* § 15610.57........................................................ 78, 79, 80, 82

Cal. Welf. & Inst. Code § 15657 ........................................................................81, 103

*Cal. Welf. & Inst. Code* § 5008........................................................................32, 42

*Cal. Welf. & Inst. Code* § 5150........................................................................ passim

*Cal. Welf. & Inst. Code* § 5278........................................................................44

Welfare and Institutions Code section 15610.23......................................................76

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................18

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Fed. R.Civ. P. 36(b) ....................................................................................................21

**Regulations**

22 CCR, § 51108............................................................................................................56

22 CCR, § 51109............................................................................................................56

22 CCR, § 51118............................................................................................................56

22 CCR, § 51121............................................................................................................56

22 CCR, § 51142............................................................................................................56

9 CCR, § 1840.348(b).....................................................................................................48

**Constitutional Provisions**

U.S. Const. Amendment XIV .........................................................................................65

## PLAINTIFF'S TABLE OF AUTHORITIES

**Cases:**

Ammons v Washington Dept. of Social and Health Services, 648 F.3d 1020, 1027 (9th Cir. 2010)…………………………………………………………………………….34,35

Covenant Care v. Superior Court, 32 Cal.4th 771 (Cal. 2004)…………..……78,80,82,102

Gordon v Cty. Of Orange, 888 F3d 1118, 1124 (9th Cir. 2018)…………………..38,68,72

Jackson v McIntosh, 90 F3d 330 at 332 (overruled on other grounds)………………….39

Jackson v Metropolitan Edison, 419 U.S. at 350……………………………………..58,62

Jacobs v Grossmont Hospital, 108 Cal.App.4th 69, 74 (2003)……………………43,44,45

Jensen v Lane, 222 F.3d 570 (9th Cir. 2021)…………………………………………60,91

Oregon Advocacy Center v Mink, 322 F.3d 1101, at 1121 (9th Cir. 2003)…………..…36

Oroville Hospital v. Superior Court of Butte County, 74 Cal.App.5th 382, (Cal. App. 2022)…………………………………………………………………………..……81

Rawson v Recovery Innovations, Inc., 975 Fed 742, 753 (9th Circuit 202)…….…….…33

Sakiyama v. AMF Bowling Centers, Inc., 110 Cal.App.4th 398 (2003)…………....108,109

Steward v Superior Court, 16 Cal.App 5th 87, 103 (2017)…………………………...80,81

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Townsend through Townsend v. County of Santa Cruz, 2021 WL 3913174 (N.D. Cal. 2023)…………………………………………………………………………………………………33,35,36

Winn v. Pioneer Medical Group, Inc., 63 Cal.4th 148, 155 (2016)………………………..80

Youngberg v Romeo, 102 S.Ct. 2452, 2457 (1982)………………………………………34,35

**Statutes:**

Welf & Inst. Code §5150 (a)……………………………………………………………………….28

Welf & Inst. Code § 5728…………………………………………………………………………44

Welf & Inst. Code, § 15610.23(a)…………………………………………………..56,57,76,77

Welf & Inst. Code, § 15610.23(b)……………………………………………………………76,77

Welf. & Inst. Code §15610.17 (a)………………………………………………………………70,71

Welf. & Inst. Code §15610.17 (y)………………………………………………………………76,79

Welf & Inst. Code §15610.17…………………………………………………………………..76,79

Welf & Inst. Code § 15610.57………………………………………………………………76,79,80

Health and Safety Code Section 1250.3 (a)(1)………………………………………………….79

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff LINDA COOPER, Individually, and on Behalf of the Estate of Decedent, ELINA QUINN BRANCO ("Plaintiff"), and Defendants COUNTY OF SAN LUIS OBISPO (the "County"), JASON HOOSON ("Hooson"), JULIA TIDIK ("Tidik"), and SAVANNAH WILLIAMS ("Williams") submit this memorandum in support of their Joint Motion for Summary Judgment.

### DEFENDANTS' INTRODUCTION

This lawsuit arises out of the death of a nineteen-year-old woman. Plaintiff filed her lawsuit alleging both federal and state causes of action. Plaintiff goes through great lengths to portrays her death as a tragedy that should have been avoided, but tragedy alone does not create liability.

The claims against Hooson are, at best, tenuous. Plaintiff placed the decedent on a 5150 hold as a matter of protection and referred her two one of the two facilities in the County of San Luis Obispo to help her. Despite conceding Hooson had probable cause to place the hold, Plaintiff claims he is liable merely because he selected one facility over another. Hooson is protected under both qualified immunity and state law immunity.

Plaintiff's *Monell* claim against the County is just as meritless. To maintain liability Plaintiff must present evidence of a policy or pattern of conduct. No such evidence exists. The County propounded a comprehensive interrogatory and asked to state the facts supporting liability against the defendant. Plaintiff's basis on liability against the County is founded on one incident. Plaintiff fails to identify any other situations where the County or Sierra engaged in tortious conduct. One incident is not sufficient to impose liability against the County. The motion for summary judgment should be granted.

With respect to Defendant Julia Tidik, PMHNP ("Tidik"), the uncontroverted evidence establishes that her care and treatment of Branco, including medication

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

management and continuation on home medications, was appropriate and proper. Tidik further contends that the evidence submitted in support of this motion fails to establish that she was a state actor in the treatment of Elina Branco ("Branco"), or showed deliberate or conscious indifference to Branco's medical condition, which is necessary to sustain a cause of action for a violation of the Plaintiff civil rights. The evidence further establishes that Tidik is not liable for the abuse of a dependent adult. She was not a care custodian as defined by California Welfare and Institutions Code section 15610.17, and is not guilty of recklessness, oppression, fraud, or malice as required by California Welfare and Institutions Code section 15657. Further, Tidik did not have the requisite state of mind to support a claim for punitive damages. The Motion for Summary Judgment should be granted.

With respect to Defendant Savannah Williams, ("Williams"), the undisputed evidence establishes that Plaintiff's civil rights claims fail. Williams as the conceded employee of a private non-profit employer, SIERRA MENTAL WELLNESS GROUP, was serving in a limited supervisory role for a Crisis Stabilization Unit and was not a state actor with respect to her involvement with Decedent. Furthermore, the evidence fails to establish that Williams personally participated in a deprivation of Decedent's rights or that she acted with deliberate indifference with respect to Decedent, and as such Plaintiff's claims under 42 U.S.C. §1983 fail substantively.

Williams also contends that Decedent's claim for abuse of a dependent adult fails as a matter of law as Decedent does not fall within the statutory definition of a "Dependent Adult" as defined by Welfare and Institutions Code §15610.23, and further because Williams did not engage in abuse or neglect with recklessness, oppression, fraud, or malice as required by Welfare and Institutions Code §15657. For these same reasons, Plaintiff's claims for punitive damages also fails.

Additionally, Williams contends that Plaintiff's claim for Negligent Training, Supervision, or Retention fails because Williams was not a covered employer. Finally,

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Williams contends that Plaintiff's claims for Wrongful Death fails as the evidence does not establish that Williams breached a duty owed to Decedent which caused the damages alleged. The Motion for Summary Judgment should be granted.

## PLAINTIFF'S INTRODUCTION

The CSU was a County created mental health facility intended to provide crisis services to individuals with various mental health needs. Through deliberate policy choices by the County and Sierra, the CSU's role expanded beyond its original role and began taking on alcohol and drug detoxifying clients. (JAF 267-298.) However, the CSU was never approved by the Department of Health Care Services to be a LPS facility. (JAF4 dispute and JAF 353.) Hooson did not exercise professional judgment and was deliberately indifferent to Branco's health and safety by sending her to the CSU when he was required to send her to and LPS designated facility, in this case the County operated PHF.

The CSU was a County mental health facility operated under contract by Sierra. As the defendants readily admit, the County "opened a crisis stabilization unit for public service." JAF 1. The County had a non-delegable duty to ensure that the Crisis Stabilization Unit (CSU) it contracted to operate met all applicable state licensure, LPS designation, and Medi-Cal certification requirements, including minimum staffing, safety, and clinical service standards. (Madaus Dec at paragraph 7 and JAF 357.)

As laid out in detail below the County had significant oversight over the operation of the CSU and had final approval of its policies. Though the audits of County employees, the County had knowledge of the changing polices and customs and practices of at the CSU. (JAF 265)

The County at even overrode some of Serra's policies and procedures aimed at client safety by pressuring Sierra to increase the census at the facility by taking on higher acuity clients, (i.e. clients detoxifying from drugs and alcohol) by informing Sierra management that failure to do so would result in their contract to operate the CSU would not be renewed. (JAF 268, 279, 283 and 268 to 298 generally.)

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Tidik, a nurse practitioner with employment duties at the CSU was placed on actual notice Branco's vulnerability of relapse by Hooson's 5150 determination. Tidik nevertheless failed to take any steps to determine what substance Branco overdosed even though Narcan would have indicated to any reasonable nurse in her position that Branco had suffered an opioid/opiate overdose. In failing to take any steps to determine what substance Branco had overdosed on Tidik failed to determine whether or not CSU could safely monitor Branco.

Williams was a CSU manager with the authority to review any safety concerns regarding client admissions to the CSU and deny certain client's admission to the facility if they could not be monitored there safely. JAF 400.  In addition to failing to deny Branco admission to the facility in virtue of Hooson's 5150 findings she failed to take any action to address the concerns of Bonnie Sayers who explicitly raised questions about whether Branco could be safely monitored given her grave disability by substance abuse and her testing positive for multiple drugs. JAF 365.

## DEFENDANTS' STATEMENT OF FACTS

The County opened a crisis stabilization unit ("CSU") for public service. Joint Appendix of Facts ("JAF") No. 1. The CSU was a facility to provide supportive services to individuals including crisis intervention. JAF No. 5. In 2019, the County and Sierra Mental Wellness Group ("Sierra") entered into a written contract for Sierra to operate the CSU. JAF No. 2. The County designated the CSU as a facility to provide evaluation and treatment in accordance with Welfare and Institutions Code section 5150. JAF No. 3. The State Department of Health Care Services approved the County designation of the CSU. JAF No. 4.

Hooson was working full time with the County as a youth triage crisis evaluator in May 2024. JAF No. 10. He has been a licensed psychiatric technician in the State of California since 1993. JAF No. 9. As part of his position, Hooson was designated

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

by the County to administer 5150 holds. JAF No. 11. He has substantial experience in the administration of 5150 holds. JAF No. 12.

On May 15, 2024, Plaintiff found Branco unconscious and called paramedics to her house. JAF Nos. 13 and 14. After arriving at Plaintiff's house, the paramedic gave Branco Narcan and a respirator. JAF No. 15. The paramedics placed Branco on a gurney and moved her into the ambulance. JAF No. 16. Branco then woke up. *Ibid*. Branco was taken to the hospital.

While at the Hospital, Plaintiff called the Tarzana Dual Diagnosis Treatment center in Tarzana, California to have Branco attend a detox program. JAF No. 17. The Tarzana facility informed Plaintiff that they would have a bed for Branco on the next day. JAF No. 18. Plaintiff then called the CSU while she was in the emergency room. JAF No. 19. Plaintiff was told the CSU would accelerate the paperwork to have her admitted to the CSU. JAF No. 20.

On May 15, 2024, Hooson learned about a case at the Twin City Community Hospital that needed his assistance. JAF No. 21. Hooson traveled to the hospital and met Plaintiff and Branco at 2:30 p.m. JAF No. 22. Plaintiff separately met with Hooson and explained the situation to him. *Ibid*. Plaintiff told Hooson about the condition that she found Branco that morning. JAF No. 23.

After assessing Branco at the hospital, Hooson believed she needed more monitoring than an out-patient facility could provide. JAF No. 26. At the same time, Hooson considered providing the least restrictive means to provide psychiatric care for Branco. JAF No. 27. After discussing the location of placement with Branco, Hooson believed the CSU would meet her needs. JAF No. 28. Plaintiff, however, claims Hooson understood that Branco was "an extremely high-risk client and could not be left unsupervised and unmonitored." JAF No. 25.

According to Plaintiff's discovery responses, Hooson agreed Branco needed to be admitted to the CSU to keep her safe overnight due to Plaintiff's conversation. JAF

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

No. 29. Plaintiff agreed based on Hooson's representation that Branco "would be in a safe and protective environment and monitored around the clock." JAF No. 30. Hooson also decided to place Branco on a 5150 hold. JAF No. 31. Hooson then transported Branco to the CSU in a vehicle. JAF No. 33.

Hooson and Plaintiff arrived at the CSU about 5:40 p.m. on May 15, 2024. JAF No. 34. Plaintiff claims Hooson handed Branco off to the CSU staff and told them that Branco had overdosed earlier in the morning and was at high risk of relapsing. JAF No. 35. Hooson also presented his crisis assessment report to the CSU staff. *Ibid.* Hooson left the CSU prior to 6:10 p.m. on May 15, 2024. JAF No. 36. After leaving the CSU, Hooson did not return to the CSU. JAF No. 37.

Once in the CSU, Branco went to bed at 9:35 p.m. on May 15, 2024. JAF No. 39. Branco stopped breathing at 10:45 p.m. on May 15, 2024. JAF No. 40. Branco died between 10:00 p.m. and 12:00 a.m. on May 15, 2024. JAF No. 41.

Defendant Julia Tidik ("Tidik") is a licensed psychiatric mental health nurse practitioner in the State of California. JAF No. 103. As of May 15, 2025, Tidik was an independent contractor for Defendant Sierra Mental Wellness Group, contracted to perform medication support and related services to Sierra's San Luis Obispo and Nevada County Crisis Stabilization Units. JAF Nos. 104-105. The applicable Contract Service Agreement expressly states that Tidik "is an independent CONTRACTOR, and not an employee, agent, joint venture, or partner of [SIERRA]." JAF No. 106. Tidik was not employed by the County of San Luis Obispo JAF No. 110, nor was she an Independent Contractor for the County of San Luis Obispo. JAF No. 111.

Tidik's contractual and actual duties at the SLO CSU consisted of providing medication management, prescribing, and monitoring psychiatric medications for clients who were admitted, with up to six direct in-person or telehealth psychiatric evaluations per month unless otherwise approved. JAF No. 107. During her scheduled on-call rotation weeks, Tidik was available to CSU staff 24/7 via telephone and electronic

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

means. JAF No. 108. Tidik relied on the licensed nursing staff at the CSU to provide her with relevant information pertaining to clients at the CSU. JAF No. 109. Tidik was not responsible for the supervision of Sierra's nursing staff on site at the CSU. JAF No. 120.

On May 15, 2024, Tidik was working remotely off-site as the on-call nurse practitioner for the CSU. JAF nos. 112-113. In that role, Tidik was available to assist with medication management, and assist the licensed staff with any clinical questions or concerns regarding Branco and other clients. JAF No. 126. Tidik was not involved with monitoring Branco while she was at the CSU. JAF No. 117. Branco had been treated at the Twin Cities emergency department earlier that day due to an unintentional drug overdose and was medically cleared as stable for discharge to the CSU. JAF Nos. 127-128.

On-site CSU nurse Bethany Aurioles, LPT conducted Branco's walk-in admissions evaluation at the CSU, JAF No. 134, and Branco's vital signs at the time of admission were within normal range. JAF No. 135. Branco reported that her overdose was unintentional, and she had only smoked marijuana that morning. JAF No. 137. She did not report or exhibit any signs or symptoms of withdrawal to Hooson or the CSU staff. JAF Nos. 136, 139.

The first communication Tidik received from CSU staff regarding Branco on May 15, 2024, occurred after Branco was admitted into the CSU when she was contacted by LPT Aurioles via the CSU's Microsoft Teams "NP Chat" thread. JAF Nos. 140-141. LPT Aurioles requested confirmation regarding whether Branco was cleared to take her home medications and receive any as-needed protocol medications while at the CSU. JAF No. 142.

LPT Aurioles provided Tidik with the following information in the CSU's Teams NP chat thread:

"New admit [redacted] # 642180
DOB [redacted]

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

> Hold 5150 GD
> Dx. BPD, MDD, PTSD, anxiety & insomnia per client.
> Medical dx. Denies.
> SUD: ETOH & THC.
> Presenting problem. Client brought in by MHET from
> Twin ED post mom finding her unconscious this am.
> Client endorses it was unintentionally, but had gotten THC
> from unknown source & only smoked that. Client and
> mother had been worki.g [sic] on rehab placement. Client
> needs a safe holding environment.
> Vs. 113/77, P. 86, R. 18, T. 95.9, Ox 98, pain 0.
> NKDA
> Meds. Zoloft 100 am,
> busbar 30 BID,
> Gabapentin 300 mg TID, lamictal 25 mg q HS (last night
> was first dose)
> trazadone 50 mg q hs
> Birth control Estarylla daily.
>
> And Bactrim 1 tab po x5 days, started on 5/13. Ok for
> CSU PRN protocol and home meds"

JAF No. 142.

After obtaining the relevant information pertaining to Branco's vital signs, current diagnosis, substance use disorders, presenting problems, and current home medications, Tidik conducted a clinical assessment and asked clarifying questions before confirming that Branco was cleared to take her home medications and any as-needed protocol medications while at the CSU. JAF Nos. 142-145. Tidik inquired if Branco had been tox screened at the emergency department, and if the tox screen included fentanyl, and staff confirmed that a tox screen was done at the ER, but they were unsure if fentanyl was included. JAF Nos. 143-144. The records provided to the CSU from Twin Cities did not list fentanyl on their toxicology screening or discharge diagnoses. JAF No. 129-130. Tidik confirmed that Branco did not have a history of seizures and was on antibiotics for a wound on her foot that was clean, dry, and

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

healing. JAF Nos. 146-149. Tidik also reviewed Branco's available records in the electronic health records system, and the records for Branco's most recent April 2024 psychiatric hospitalization. JAF Nos. 150-151.

Later that evening, LPT Savannah Williams contacted Tidik via the Teams Chat thread and informed her that Branco had been exchanging curse words with a male client at the CSU. JAF No. 152. LPT Williams reported that she spoke with Branco and told her that if she was unable to maintain and keep her composure, she would be stepped up to a higher level of care. *Id.* LPT Williams also reported that Branco had cried and apologized and was now sitting outside with the other female client and staff talking. *Id.*

Tidik responded and noted that during Branco's last hospitalization at Crestwood, on April 29, 2024, Branco has been started on naltrexone but did not appear to be on it still. JAF No. 153. She requested LPT Williams check with Branco to see if she was still taking it and encourage her to re-start if she didn't have any contraindications, because alcohol appeared to be a trigger to her mental health episodes. *Id.*

Approximately two hours later, Defendant Janet Brown, LPT sent a Teams Chat message to Tidik noting that Branco had calmed down and was now sleeping in the day room area. JAF No. 154. LPT Brown further reported that Branco was interacting with the other female client on the unit, which "seems to be beneficial to both of them." *Id.*

A minute later, Tidik responded, stating "Nice work everyone!" JAF No. 155. This was the last communication that Tidik had with the CSU staff on May 15, 2024 regarding Branco. JAF No. 157.

The Teams chat thread described above encompasses the entirety of Tidik's involvement with Branco at the CSU on May 15, 2024. JAF No. 156.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Tidik was not involved in Branco's evaluation for a 5150 hold, nor was she involved in the admissions process for Branco at the CSU. JAF Nos. 115-116, 131-132. Neither Jason Hooson nor any of the on-site staff members at the CSU ever reached out to Tidik with any concern regarding Branco's suitability for the CSU. JAF Nos. 158. Nobody contacted Tidik to report any concerns that Branco was suffering from withdrawal symptoms or experiencing drug cravings. JAF No. 159. Nor did any staff members contact Tidik with any questions or concerns regarding Branco's acuity level. JAF No. 160

The following morning, May 16, 2024, CSU staff members found Branco deceased. JAF 161.

During the autopsy, investigators discovered fentanyl powder and drug paraphernalia concealed in decedent's underwear. JAF 162. The coroner's report indicates that Branco's cause of death was determined to be a fentanyl overdose. JAF 163.

**Additional Facts Specific to Savannah Williams ("Williams"):** On May 15, 2024, after Decedent was medically cleared for discharge from Twin Cities Hospital, she was placed on a Welf. & Inst. Code §5150 hold by County employee, Hooson. JAF Nos. 10, 31, 107, 128, 180. Hooson transported Decedent to a Crisis Stabilization Unit operated by Sierra. JAF Nos. 2, 5, 33.

Williams is a Licensed Psychiatric Technician ("LPT") and was an employee of Sierra on the date of the incident. JAF Nos. 123, 181, 182. During the relevant period, Williams was the Medical Coordinator and lead Psychiatric Technician/Supervisor for the CSU. JAF No. 187. As a Medical Coordinator, Williams' duties included the day-to-day operations of the CSU, making sure that the CSU was flowing properly, showing staff by example with respect to conducting assessments, coping skills, and safety plans, and providing resources for staff to give to clients. JAF No. 188.

25

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

On May 15, 2024, Williams arrived at the CSU about 9:00 a.m. and her shift ended at 5:00 p.m. JAF No. 221. Williams left the CSU to attend a staff meeting which ran roughly from 5:00 p.m. to 7:00 p.m. JAF 222.

When Decedent arrived at the CSU at roughly 5:40 p.m. on May 15, 2024, the CSU workers on site were Defendants, LPT SHELLI WATSON, and LPT BETHANY AURIOLES, while the workers on site for the overnight shift were LPT, JANET BROWN and Licensed Vocational Nurse ("LVN"), BONNIE SAYERS. JAF Nos. 35, 121, 122, 123, 124, 230.

At the CSU, LVNs and LPTs had the same duties. Their duties included monitoring individuals, providing care, providing resources, and helping with coping skills. JAF No. 202. The CSU staff on duty when Decedent arrived did not consult with Williams about Decedent's admission. JAF Nos. 219, 221-225. The information that was provided to Williams about Decedent's admission was within the Microsoft Teams Nurse Practitioner "NP Chat" stream initiated at 6:48 p.m. and directed to the Nurse Practitioner Tidik, which reflected that Decedent's vital signs were stable and that she had been medically cleared for discharge from the hospital. JAF Nos. 135, 140, 142, 226-227.

 Accordingly, Williams learned about Decedent's admission, her 5150 information, and the fact that she had been medically cleared for discharge by the Emergency Room physician through the NP Chat stream. JAF Nos. 226-228. On the night of May 15, 2024, Williams returned briefly to the CSU to drop off food at about 7:00 p.m. JAF No. 229. While there, Williams was informed that Decedent and another client had been cussing at each other. Williams spoke with Decedent and the other client. Williams asked them both to comply with CSU rules and told them that if they could not maintain on the unit, they would be reevaluated and possibly stepped up to a higher level of care, a locked facility. JAF Nos. 152, 232.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

When Williams spoke with Decedent, she was able to assess her behavior. Decedent did not appear manic. Williams was close enough to ascertain whether her pupils were dilated and she did not notice them to be dilated. JAF Nos. 234-235. Williams did not observe any factors which lead her to believe that Decedent was under the influence of fentanyl. JAF Nos. 236-237. Nor, did Williams observe any factors which suggested to her that Decedent was going through withdrawal symptoms. JAF No. 238. After Williams' conversation with Decedent, it was her impression that Decedent had de-escalated. JAF No. 233.

During her stay at the CSU, Decedent did not report, exhibit or convey signs or symptoms of withdrawal or signs of being under the influence to CSU staff, including Williams. JAF Nos. 136-139, 152, 231-241. At 8:14 p.m., Williams documented in the NP Chat that Decedent and another client had been exchanging curse words, that she had spoken with Decedent and told her that if she was unable to maintain and keep her composure, she would be stepped up to a higher level of care, that Decedent had cried and apologized, and was currently sitting outside with the other female client and staff talking. JAF Nos. 152, 239.

After de-escalating the situation between Decedent and the other client, Williams left the CSU but remained available on-call. JAF Nos. 35, 34-35, 72, 192-194, 220, 241. At 9:58 pm, BROWN sent a message in the NP Chat noting that Decedent had calmed down and was now sleeping in the day room area. that she was interacting with the other female client on the unit, which "seems to be beneficial to both of them." JAF No. 154. At 9:59 p.m. NP Tidik commented in the NP Chat, "Nice work everyone!!" JAF No. 155. Tidik was also available on-call 24-7 to the staff attending to Decedent. JAF Nos. 108, 112, 126.

Williams was not contacted by CSU staff after being informed that everything had calmed down and the Decedent was sleeping. JAF Nos. 241-243. When Williams arrived at the CSU around 8:30 a.m. on the morning of May 16, 2024, the Decedent

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

was the first client she checked on. Williams immediately undertook first aid attempts upon finding Decedent. JAF Nos. 244-249. Unfortunately, such efforts were futile, as Decedent had passed at some point between 10:00 p.m. and 12:00 a.m. JAF No. 41. The first responders who arrived did not even attempt CPR. JAF No. 249. During the Decedent's autopsy, investigators discovered fentanyl powder and drug paraphernalia had been concealed in Decedent's underwear. She was determined to have died of a fentanyl overdose. JAF Nos. 162-163.

### PLAINTIFF'S STATEMENT OF FACTS

Contrary to Defendants' assertion, the CSU was never approved by the Department of Health Care Services to be a LPS facility. JAF 4 dispute and JAF 353.

On the morning of May 15, 2024, Linda Cooper found her daughter unconscious as a result of a fentanyl overdose. Cooper summoned paramedics. They administered Narcan, provided respiratory support, and transported her to Twin City Community Hospital.

While at the Hospital, Cooper contacted several detox facilities. She and Branco agreed that Branco would seek further treatment at the Tarzana Dual Diagnosis Treatment center. Also, at the hospital Branco was given several more doses of Narcan, at approx. 9:08 a.m., and again at 11:40 a.m. by the emergency room staff to reverse any lingering effects of the fentanyl that was still in her system.

Cooper knew her daughter could not come home because she was vulnerable to suffering another overdose. She wanted her daughter to be kept under close observation and at the emergency room or some other facility until BRANCO could be safely transferred to a Rehab facility.

Cooper contacted the CSU and spoke with Shelle Watson. She advised Watson that her daughter recently overdosed on fentanyl, was at the Twin City hospital, and needed a safe place where she could be admitted and safely monitored to keep her alive. Watson responded that she would refer a Mental Health Evaluation Team

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

(MHET) member to evaluate Branco at the emergency room. The mental health evaluator can then place a hold on BRANCO and refer her to the CSU.

The mental health evaluator Defendant Jason Hooson was sent to the hospital to evaluate Branco. After speaking to Cooper and Branco he determined that Branco was "gravely disabled" by substance abuse pursuant to Welfare and Institutions code § 5150. Despite the fact that §5150 (a) requires placement of a gravely disabled person "in a facility designated by the county and approved by the State Department of Health Care Services" for up to 72 hours, Hooson referred Branco to the CSU which was not approved for the purposes of 5150. Hooson purportedly choose the CSU because Branco did not want to be placed in a more restrictive facility, and because the CSU was appropriate for "voluntary" 5150 holds. (JAF 11.) In any case, Hooson's placed Branco on a 5150 hold so that she could be safely monitored to prevent her from relapsing.

Hooson transported Branco from Twin Cities Hospital to the CSU in his vehicle. He allowed her to change into her own clothes before leaving the hospital and he did not search her belongings. He was apparently unaware that Sierra's policies and procedures required that clients be transported from the hospital to the CSU in their hospital gown. (JAF 378-379.) This policy was intended to prevent clients from smuggling drugs and/or any other contraband into the facility. After her death investigators, discovered that Branco had managed to concealed drugs in her underpants.

No one searched Branco or her belongings upon her entry into the CSU. While at the CSU and in the plain view of licensed psych technicians Janet Brown and Bonnie Sayers, Branco went to the bathroom and is believed to have ingested drugs. At approximately 10:49 pm while lying in her bed in front of the "nursing station" Branco began to writhe under her blanket, an obvious sign she was suffering some kind of medical distress. Then she suddenly stopped moving. Her death went undiscovered until the next morning.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## THE LEGAL STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Under this standard, the moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record it believes demonstrates the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Id.* at 325. Instead, the moving party need only prove there is an absence of evidence to support the non-moving party's case. *Id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Celotex*, at 324.

### JASON HOOSON

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# I.    HOOSON IS ENTITLED TO SUMMARY JUDGMENT UNDER QUALIFIED IMMUNITY.

### A.    *Hooson's Position.*

The claims against Hooson are based on a four-hour interaction between himself, Plaintiff and Branco. On May 15, 2024, Hooson met with Plaintiff and Branco at a hospital. After assessing Branco, he determined that she should be placed on a 5150 hold. He also determined that she should be placed in the CSU, provided the CSU accepted her. Plaintiff claims that Hooson violated Section 1983. Hoosen is entitled to qualified immunity. *Duarte v. Begrin*, 2007 U.S.Dist.LEXIS 14872, at *21-22 (N.D. Cal. Mar. 1, 2007) ["Qualified immunity is available for state hospital officials involved in psychiatric confinement."].

"'In determining whether an officer is entitled to qualified immunity, [courts] consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.'" *C.V. v. City of Anaheim,* 823 F.3d 1252, 1255 (9th Cir. 2016), citing *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). Hooson will address both prongs.

**1.    Hooson Did Not Violate a Constitutional Right.**

Plaintiff's interrogatory responses identify the following facts against Hooson:

- Plaintiff met with Hooson at 2:30 p.m. on May 15, 2024 and told him about the entire situation with Branco. JAF No. 22.

- Based on Plaintiff's conversation, Hooson agreed Branco needed to be admitted to the CSU to keep her safe overnight. JAF No. 29.

- Hooson told Plaintiff that the CSU is a more appropriate facility to transfer Branco to as opposed to a psychiatric hospital. JAF No. 46.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

- As an additional layer of reassurance, Hooson placed Branco on a 5150 hold. JAF No. 31.

- Plaintiff agreed based on Hooson's representation that Branco "would be in a safe and protective environment and monitored around the clock." JAF No. 30.

- Hooson understood that Branco was "an extremely high-risk client and could not be left unsupervised and unmonitored." JAF No. 25.

- Hooson told Plaintiff and Branco "that a 5150 Hold would be in her best interest and that she would be safe and monitored at the CSU." JAF No. 47.

- Plaintiff and Branco relied on Hooson's recommendation to transfer Branco to the CSU. JAF No. 48.

- Despite her concerns, Hooson reassured and advised Plaintiff that Branco would be monitored around the clock until the next morning. JAF No. 30.

- Hooson transported Branco to the CSU in his personal vehicle. JAF No. 33.

- When Hooson delivered Branco to the CSU, he advised the CSU staff that Branco "had overdosed the morning of and was at high risk of relapsing and by implication was a danger-to-herself if not closely supervised and monitored while at the CSU." JAF No. 35.

None of these facts show how Hooson violated Plaintiff's or Branco's Constitutional rights. On May 15, 2024, Hooson met with Plaintiff and Branco and performed an assessment of Branco. Plaintiff does not argue Hooson's assessment was wrong, improper or negligent.

Hooson then placed Branco on a 5150 hold. This hold did not violate the Constitution because Plaintiff admitted Hooson had probable cause to place Branco

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

under a 5150 hold. JAF No. 32. It is a conclusively established fact. Fed. R.Civ. P. 36(b).

Hooson made the decision to place Branco in the CSU. Since the CSU is a county designated facility, it was statutorily authorized to receive individuals on a 5150 hold. Welf. & Inst. Code, §§ 5008(n) and 5150(a). At 5:40 p.m. on May 15, 2024, Hooson and Branco arrived at the CSU, and Hooson informed the staff about Branco's overdose and was at a high rise of relapsing. Plaintiff left the CSU before 6:10 p.m. on May 15, 2024. Plaintiff also admitted Hooson did not perform any medical treatment on Plaintiff on May 15, 2024. JAF No. 38. In short, Plaintiff's facts show Hooson did not violate the Constitution.

.............................................................................................................................................2. ............................................................................................................There was No Clearly Established Right

Assuming there was a Constitutional violation, Hooson did not violate a clearly established right. "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Perez v. City of Fresno*, 98 F.4th 919, 924-25 (9th Cir. 2024), citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "Although there need not be a case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Ibid* citing *Mullenix*, at 12. "'The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Ibid.*, citing *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

When examining qualified immunity in the context of a 5150 hold, courts are faced with the question of whether there was probable cause for the hold. See *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007); *Worthy v. City of Berkeley*, 573 F.Supp.3d 1398, 1406 (N.D. Cal. 2021). Plaintiff's concession that Hooson had

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

probable cause to place Branco under a 5150 hold means the Court need not address this issue. JAF No. 32.

As far as the remaining claims, Hooson has been unable to locate any case where a decision to place an individual under a 5150 hold in one approved facility as opposed to another facility constitutes a violation of the Constitution. Unless Plaintiff can direct the Court to some legal authority to establish a violation, Hooson is immune from liability.

Lastly, there is also the issue of SB 43 which was enacted on January 1, 2024. JAF Nos. 44 and 45. "This bill expands the definition of 'gravely disabled' to also include a condition in which a person, as a result of a severe substance use disorder, or a co-occurring mental health disorder and a severe substance use disorder, is, in addition to the basic personal needs described above, unable to provide for their personal safety or necessary medical care, as defined." 2023 Cal. SB 43, ¶ 2. Since SB 43 was enacted only five months prior to May 15, 2024, there was no published case law interpreting it or outlining the responsibilities when it comes to acting utilizing a 5150 hold on an individual suffering from severe substance use disorder. The lack of clarity further supports the lack of a clearly established right. Summary judgment should be granted.

**B.      Plaintiff's Position: Preliminary considerations: Hooson was a County employee acting under color of state law.**

A claim under 42 U.S.C. § 1983 requires a plaintiff prove (1) that a right secured under the constitution or the laws of the United States was violated and (2) that the alleged violation was committed by a person acting under color of state law.

The state has a 14th Amendment obligation to provide adequate medical and/or mental health treatment to those it has ordered involuntarily committed similar to its obligation to provide the same to pretrial detainees. See Townsend v County of Santa

---

34

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Cruz, 2021 WL 3913174, 4 (ND Cal. 2021) citing Rawson v Recovery Innovations, Inc., 975 Fed 742, 753 (9th Circuit 202). Furthermore, "[i]nvoluntarily Committed patients in state mental health hospitals have a Fourteenth Amendment due process right to be provided safe conditions by the hospital administrators." Ammons v Washington Dept. of Social and Health Services, 648 F3d 1020 (2011). Citing Youngberg v. Romeo, 457 US 310 (1982).

Here, Hooson violated Elina Branco's 14th Amendment rights by failing to provide adequate mental health care and failing to provide safe conditions while she was in state custody and involuntarily committed pursuant to Welfare and Institutions Code Section 5150.

With respect to the under color of law requirement, there is no dispute that Hooson was acting under color of state law when he placed Branco on a 5150 hold and sent her to the CSU. (SUF 10 and SUF 370.) Hooson testified that at the time of the incident he was employed both by Sierra and the County. (SUF. 9, 11, 370 and Hooson Deposition 23:5) More specifically, he was the county's youth triage crisis evaluator and a member of the mental health evaluation team providing crisis evaluation and assessment for individuals under the age of 21 to determine if they met 5150 or 5585 and/or formulate a safety plan if an individual did not meet those criteria. (Hooson Deposition 23:12-21.)

1. **Hooson is not Entitled to Qualified Immunity because constitutional liability was well established by the under the "Youngberg professional judgment standard" and the objective deliberate indifference standard.**

Hooson is not entitled to qualified immunity because he violated Branco's fourteenth amendment rights, and her rights were clearly established at the time of his misconduct.

Hooson's decision to send Branco to the CSU, a non-LPS designated facility, after finding that there was probable cause to place her on a 5150 hold on the grounds

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

that she was a danger to herself and was gravely disabled violated her 14th Amendment due process rights to both 1) adequate mental healthcare while involuntarily committed under the "Youngberg professional judgment standard" test and 2) to safe conditions of confinement under the "deliberate indifference" test. Under either test, Hooson's decision was a clearly established constitutional violation and he is not entitled to qualified immunity.

**2. Hooson's failed to exercise professional judgment when he referred Branco to the CSU, a non-LPS facility, on a "voluntary" basis after finding she was a danger to herself and gravely disabled by substance abuse disorder.**

Defendants argue that the only grounds to hold Hooson liable would be if he placed Branco on an involuntary hold without probable cause.  However, In Youngberg v Romeo, 102 S.Ct. 2452, 2457 (1982) the Supreme court held that the mere fact that [the involuntarily committed individual] has been committed under proper procedures does not deprive him of all liberty interests under the 14th Amendment.

In Ammons v Washington Dept. of Social and Health Services, 648 F.3d 1020, 1027 (2010), the Ninth circuit ruled that in the context of involuntary commitment "liability may be imposed for failure to provide safe conditions 'when the decision made by the professional is such a substantial departure from accepted professional judgment, practice, or standard as to demonstrate the person did not base the decision on such judgment.' " The court referred to this standard as the "Youngberg professional judgment standard" Ammons, 648 F3.d at 1027.

Similarly, in Townsend through Townsend v. County of Santa Cruz, 2021 WL 3913174 (N.D. Cal. 2023) the court denied the defendants' motion for summary judgment where they released Townsend from a 5150 hold without performing the psychiatric hold required by 5150 prior to release. Townsend, 2021 WL 3913174 at 10. The court explained that "an individual who is placed on a 5150 hold has a

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

constitutional right under the 14th amendment to adequate mental health care," Townsend, at 8 and that "the Constitution requires that hospital officials, in order to protect a patient's right to safe conditions, exercise professional judgment." Townsend, at 9. The court further elaborated, "Many of the cases applying *Youngberg* address the right of involuntarily committed individuals to "safe conditions," which is slightly different than the right to adequate mental health care asserted here. However, in *Mink*, the Ninth Circuit expressly recognized the Fourteenth Amendment right of mentally incapacitated criminal defendants to "mental health treatment that gives them a realistic opportunity to be cured or improve the mental condition for which they were confined." Townsend, at 9, citing Oregon Advocacy Center v Mink, 322 F.3d 1101, at 1121 (9th Cir. 2003).

As set forth in the Declaration of expert clinical social worker Madaus, as a County employed mental health evaluator, Hooson had "a responsibility to comply with the Lanterman-Petris-Short (LPS) Act (WIC §§5000 et seq.), which limits involuntary psychiatric detention (i.e. 5150 holds) to facilities that are LPS-designated by the county and approved by the State Department of Health Care Services (WIC §§5008(n), 5150(a), and 5404)." As a mental health evaluator for the County, Hooson should have been well aware of this requirement. In fact, Hooson hand wrote the words "licensed LPS facility" in the "To:" section of his Application for up to 72 Hour Assessment.

However, Hooson brought Branco to the CSU which was not an LPS designated facility. As Madaus explains in his declaration, the CSU "was not listed by the California Department of Health Care Services (DHCS) as an approved LPS-designated facility," and DHCS the only LPS-designated facility in the county is the Luis Obispo County Psychiatric Health Facility (PHF).

The difference in designation is not a mere formality. The PHF was a locked inpatient facility staffed by mental health professionals as well as medically trained

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

nurses. The CSU was originally intended to be an outpatient facility. Without adequately adapting its monitoring procedures, the County began treating the CSU as an inpatient facility by allowing clients placed on 5150 holds to be treated there for up to 72 hours. Pursuant to the County's own policies, and in contravention of 5150 (a), the even the clients of the CSU placed on a 5150 hold, could leave the facility. At the time of the incident, the CSU was had only licensed psych technicians and licensed vocational nurses nominally supervised by nurse practitioners who were often off-site.

The County and Hooson attempt to obscure the critical distinction between an LPS-designated facility and an outpatient facility by characterizing Hooson's 5150 hold on Branco as a "voluntary hold." However, as Madaus explains in his declaration, there is no such concept in the Lanterman-Petris-Short (LPS) Act (WIC §§5000 et seq.) If any hold is placed on an individual pursuant to 5150 it is by definition involuntary and pursuant to 5150 (a) any "assessment, evaluation, and crisis intervention, or placement for evaluation and treatment" must be in "a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

Having recognized that Branco was a danger to herself and gravely disabled due to severe substance use, Hooson's decision to send her to a non-LPS designated facility in violation of the requirements of 5150 (a) was such a substantial departure from accepted professional judgment, practice, or standard as to demonstrate he did not base the decision on any professional judgment.

In addition to knowing that the CSU was not an LPS facility, Hooson also knew or should have known that the CSU was not an appropriate facility to send Branco under the circumstances. Among other things,

Hooson knew that the CSU was not a detox facility.

Hooson knew that the CSU was intended to provide crisis services for clients with lower acuity

38

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Hooson knew that the CSU did not do 15-minute checks even though they housed clients overnight.

Linda Cooper told Hooson that she was afraid that her daughter would relapse and suffer a potentially fatal overdose if she was not carefully monitored.

Hooson's stated reason for choosing the CSU over the PHF further demonstrates that his decision was not based on professional judgment. Hooson claimed that Branco expressed a preference for being treated at the CSU instead of the more restrictive PHF. However, Hooson's decision to allow Branco to effectively choose the facility and place Branco on a "voluntary" 5150 hold was incoherent. When placing Branco on a 5150 hold, he explicitly concluded that she was so impaired by substance abuse disorder that that she was unable to provide for her own personal safety, including refraining from using substances that could kill her, and thus was "gravely disabled." He nevertheless claims she was an appropriate referral to the CSU under the so-called "voluntary" exception which by its own terms would only apply if Branco would not pose a significant risk to herself.

**3. Hooson's referral of Branco to the CSU, a non-LPS designated facility was also objective deliberate indifference under <u>Gordon v Cty. Of Orange</u>.**

In addition to failing exercise professional judgment, Hooson's decision was deliberately indifferent to Branco's right to safe conditions of confinement. In the in the pretrial detainee/ jail context, "the Supreme Court has treated medical care claims substantially the same as other conditions of confinement violations including failure to protect claims." <u>Gordon v Cty. Of Orange</u>, 888 F3d 1118, 1124 (9th Cir. 2018).

Thus, for pretrial detainees, a Fourteenth amendment violation can be based on deliberate indifference where a plaintiff demonstrates:

(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm

(3) The defendant did not take reasonable measures to abate the risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures caused the plaintiff's injuries

With respect to the third element, the defendant's conduct must be objectively unreasonable. (9th Circuit Pattern Jury instructions 9.30 Particular Rights—Fourteenth Amendment—Pretrial Detainee's Claim Re Conditions of Confinement/Medical Care)

Additionally, in the context of jail medical care or lack thereof, to show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and the defendants chose this course in conscious disregard of an excessive risk to plaintiff's health. Jackson v McIntosh, 90 F3d 330 at 332 (overruled on other grounds)

Here, Hooson's decision to refer Branco to the CSU was unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to her health. Thus, Hooson's actions constituted deliberate inference. Hooson was a member of the MHET and should have been trained to understand and implement the requirements of the Lanterman-Petris-Short Act in order to place potential clients under 5150 holds. Indeed, in their motion papers defendants concede, "Hooson recognized that Branco needed more monitoring than an out-patient facility could provide." JAF26.  Moreover, Hooson was also aware of Branco's recent fentanyl overdoses and her need for careful monitoring. Hooson's own 5150 documentation demonstrates he was actually aware that Branco was at serious risk of relapsing, was

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

gravely disabled, and a danger to herself, but he nevertheless failed to send her to the PHF, an LPS designated facility, as required by 5150 (a).

Additionally, by ignoring the requirements of 5150 (a) and sending Branco to the CSU instead of the PHF, Hooson made an intentional decision with respect to the conditions under which she was confined. The CSU was a non-LPS designated facility intended for outpatient care for low acuity clients. Hooson was aware that the staff at the CSU did not perform 15-minute safety checks. By choosing to send Branco to the non-LPS designated facility with less intensive monitoring, Hooson put Branco at substantial risk of suffering serious harm, namely a relapse with potentially fatal consequences. Hooson did not place Branco in a proper facility to abate the risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved. A reasonable mental health evaluator would have appreciated the high degree of risk from improperly placing Branco because the statute required that she be placed in a facility designated by the county for evaluation and treatment ***and approved by the State Department of Health Care Services.*** Moreover, Hooson's own 5150 application demonstrates that he did in fact appreciate the high risk that Branco would relapse. Thus, the consequences of the defendant's conduct were obvious; and by not placing Branco in the PHF Hooson caused Branco's death. For all these reasons he violated her 14th Amendment due process rights through deliberate indifference.

## II.    HOOSON IS ENTITLED TO SUMMARY JUDGMENT ON THE SECTION 1983 CLAIMS DUE A LACK OF DELIBERATE INDIFFERENCE.

### A.    *Hooson's Position.*

Plaintiff's complaint makes various claims for violations of Section 1983 against Hooson. Deliberate indifference is a required element in the 1983 claims asserted against Hooson. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1069 (9th

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Cir. 2016) [Objective deliberate indifference is the standard for section 1983 claims involving pretrial detainees]; *Estate of Soakai v. Abdelaziz*, 137 F.4th 969 (9th Cir. 2025) [State-created danger requires the plaintiff to show the defendant acted with "deliberate indifference to known or obvious danger."]; *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) [In interference with parental relationship cases, an employee's deliberate indifference may suffice to shock the conscience when actual deliberation is practical.].

On May 15, 2024, Hooson placed Branco under a 5150 hold. JAF No. 31. It is undisputed Hooson had probable cause to place Branco on a 5150 hold. JAF No. 32. Hooson made this placement as a County employee and determined it was appropriate to the place Branco in the CSU. JAF Nos. 28 and 43. Hooson did not provide any medical treatment to Branco at the CSU on May 15, 2024. JAF No. 42. Hooson was not present at the CSU after 6:10 p.m. on May 15, 2024. JAF Nos. 37.

In fact, Plaintiff relies on Hooson's assessment of Branco. Plaintiff noted Hooson's Crisis Assessment Form provided notice to the CSU staff about Branco's substance abuse and being a grave risk. JAF No. 50. Plaintiff states that Hooson assessed Branco at "an elevated risk of immediate self-harm in light of her current behavioral and substance use disorder." JAF No. 50. Plaintiff does not claim Hooson's assessment was erroneous. JAF No. 51.

A review of Plaintiff's interrogatory responses shows the limit of her claim. Plaintiff asserts Hooson understood that Branco was "an extremely high-risk client and could not be left unsupervised and unmonitored." JAF No. 25. Plaintiff claims Hooson reassured her that "the CSU is a more appropriate facility to transfer [Branco] to as opposed to a psychiatric hospital." JAF No. 46. "A discussion was even held amongst the three whereby HOOSON relayed to COOPER and BRANCO that a 5150 Hold would be in her best interest and that she would be safe and monitored at the CSU." JAF No. 47. In other words, Hooson acted with deliberate indifference when

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

he placed Branco in the CSU as opposed to the PHF. This claim fails as a matter of law.

Hooson was authorized to place Branco "in a facility designated by the county for evaluation and treatment." Welf. & Inst. Code § 5150(a). The statute defines a "facility designated by the county for evaluation and treatment" as "a facility that meets designation requirements duly established by the State Department of Health Care Services in accordance with [Welfare and Institutions Code section] 5404 …" Welf. & Inst. Code, § 5008(n)(1). The CSU was designated by the County to provide evaluation and treatment for clients placed on a 5150 hold. JAF No. 3. Plaintiff does not claim otherwise. JAF No. 60.

Given the CSU was an appropriate facility to receive Branco as part of a 5150 hold, Plaintiff cannot establish Hooson's decision to place Branco as opposed to the PHF subjects him to liability. "A difference of opinion does not amount to a deliberate indifference to [Branco's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Even so, Hooson has nearly twenty years of experience in his field and has placed about one hundred individuals with the CSU. JAF No. 9. Plaintiff failed to provide any facts showing Hooson was aware of prior issues at the CSU. JAF No. 53. Plaintiff admitted she did not know Hooson prior to meeting him on May 15, 2024. JAF No. 54. Plaintiff also testified she was not present when Hooson spoke with Branco on May 15, 2024. JAF No. 55. After Hooson met with Branco, she was agreeable to go to the CSU. JAF No. 56.

In making the decision to take Branco to the CSU, Hooson felt it was his obligation to provide Branco with the safest environment and the least restrictive means possible. JAF No. 27. He assessed Branco before any decision was made about the type of placement she needed. JAF No. 57. Hooson felt Branco could be

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

adequately treated with the level of care that was available at the CSU on a hold. JAF Nos. 58 and 59. There is no deliberate indifference.

### B. Plaintiff's Position: Hooson failed both the professional judgment standard and deliberate indifference tests.

As argued above, Hooson's actions failed both the professional judgment standard and deliberate indifference tests. Hooson's "feelings" about the least restrictive means and about where Branco could be adequately treated are not relevant since 5150 (a) required that she be placed in a facility designated by the county for evaluation and treatment *and approved by the State Department of Health Care Services,* e.g. an LPS-designated facility.

### III. HOOSON IS IMMUNE FROM ALL STATE LAW CLAIMS UNDER WELFARE AND INSTITUTIONS CODE SECTION 5278.

### A. Hoosen Position.

There is no question Hooson was authorized to issue a 5150 hold on Branco and did, in fact, place Branco on a 5150 hold. JAF Nos. 11 and 31. Hooson had probable cause to place Branco under a 5150 hold. JAF No. 32. Hooson transported Branco from the hospital to the CSU on May 15, 2024. JAF No. 33. As noted above, Plaintiff's state law claims arise out of Hooson's decision to place Branco on a hold under Welfare and Institutions Code section 5150. JAF Nos. 22, 25, 29, 30, 31, 33, 35, 46, 47, and 48.

Under the Lanterman-Petris-Short Act, "an individual may be brought to an appropriate facility for an evaluation if there is 'probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled.'" *MacLellan v. County of Alameda*, 2014 U.S.Dist.LEXIS 29856, at *17 (N.D. Cal. Mar. 5, 2014); Welf. & Inst. Code § 5150. "Individuals authorized under this part to detain a person for 72-hour treatment and evaluation pursuant to Article 1 (commencing with Section 5150) . . . shall not be held either criminally or

civilly liable for exercising this authority in accordance with the law." Welf. & Inst. Code § 5278. "[T]he immunity of section 5278 necessarily applies to individuals or entities who make the decision to detain, when that decision is supported by probable cause." *Jacobs v. Grossmont Hospital*, 108 Cal.App.4th 69, 76 (2003).

Since Plaintiff admitted Hooson had probable cause to place Branco on a 5150 hold, the only remaining issue is whether Hooson's decision to place Plaintiff in the CSU as opposed to the PHF is inherent in Branco's 5150 hold. *Id*., at 78. ["[T]he scope of section 5278 immunity extends to claims based on facts that are inherent in an involuntary detention pursuant to section 5150."]. There is no dispute it is.

"The protected conduct is confined to the *exercise* of statutory authority to detain, evaluate and treat against the patient's wishes, and does not extend to the *manner* in which evaluation and treatment are carried out." *Gonzalez v. Paradise Valley Hospital*, 111 Cal.App.4th 735, 741 (2003) [Italics in original]. The statute allowed a person to be placed "in a facility designated by the county for evaluation and treatment." Welf. & Inst. Code § 5150(a).

The County designated the CSU as a facility for the evaluation and treatment of clients, including 5150 holds. JAF No. 3. Hooson opted to place Branco in the CSU. JAF No. 28 and 29. Welfare and Institution Code 5150 expressly authorizes a person to be placed in a designated facility. Hooson's decision is within the exercise of the statute.

Plaintiff does not claim Hooson's assessment of Plaintiff was negligent. JAF No. 61. Plaintiff further admitted Hooson did not provide any medical treatment to Branco on May 15 and 16, 2024. JAF Nos. 38 and 42. He is, therefore, entitled to statutory immunity for all state court claims. *Jacobs*, at 76.

**B.   Plaintiff's Argument: Hooson's noncompliance with the basic requirements of 5150 by failing to send Branco to a LPS designated facility as required by 5150**

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

***(a) means that Section Welf. & Inst. Code Section 5728 does not apply to immunize his misconduct***

Hooson's noncompliance with the basic requirements of 5150 by failing to send Branco to a LPS designated facility as required by 5150 (a) means that Section 5728 does not apply to immunize his misconduct.

Courts have rejected the idea that § 5278 "applies to anything that may occur in the course of evaluation and treatment provided during the 72-hour period." Jacobs v Grossmont Hospital, 108 Cal.App.4th 69, 74 (2003). Instead, the immunity is limited "to the decision to detain as well as for the detention and its inherent attributes, including that the patient must necessarily be evaluated and treated without consent." Jacobs, at 78.

Here, there is simply no conceivable way that failing to comply with the explicit placement requirements of 5150 (a) could be considered "an inherent attribute" of Hooson's decision to place Branco on an involuntary hold.

Furthermore, even assuming *arguendo* that 5278 applies, Jacobs v Grossmont Hospital also made it clear that "the immunity does not extend to other negligent acts, intentional torts, or criminal wrongs committed during the course of the detention, evaluation, or treatment," Jacobs, 108 Cal.App.4th 69 at 79. As such, Hooson would not be immunized from all state claims. He can be held liable for negligent acts committed during the detention including when he ignored Sierra's policies and procedures requiring clients be transported from the hospital to the CSU in their hospital gown and negligently failed to take any steps to ensure she was not taking drugs into the facility.

**THE COUNTY OF SAN LUIS OBISPO**

**I.      THE *MONELL* CLAIM MUST BE DISMISSED.**

**A.   *The County's Argument.***

The County is being sued under *Monell* for a failure to train and for its policies. "[A] local government may be liable if 'execution of a government's policy or

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury.'" *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018), citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). Alternatively, "a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Rodriguez*, at 802, citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). The County is entitled to summary judgment on Plaintiff's *Monell* claim.

**1........................ The County is Entitled to Summary Judgment for Its Policies.**

The first issue is the existence of policies. "A plaintiff can establish a 'policy or custom' by showing: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Megargee v. Wittman*, 550 F.Supp.2d 1190, 1205 (E.D. Cal. 2008).

A review of Plaintiff's response to contention interrogatories reveals a legal theory largely based on the events that occurred to Branco on May 15, 2024. JAF Nos. 62. Plaintiff does not reference similar conduct that occurred to any other client at another time. JAF Nos. 63. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff first identifies Sierra's no sleeping policy in her interrogatory response. JAF No. 64. In November 2023, Sierra management held a meeting to discuss the staff sleeping on the job. JAF No. 65. Sierra then implemented a "no sleeping" policy that prohibited staff from sleeping on the shifts. JAF No. 66.

Plaintiff contends Sayers and Brown were sleeping on the night of Branco's death. JAF No. 70. Plaintiff, however, does not identify any other date or instance where other Sierra employees were sleeping on their shift after November 2023. JAF No. 73. Plaintiff cannot rely on a single event to show a policy existed. *Trevino*, at 918.

Without any details of other instances, Plaintiff require the Court to speculate other employees were sleeping on their shifts. This is insufficient because "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-1082 (9th Cir. 1996).

Plaintiff also refers to the 2021-2022 Grand Jury finding against the County. JAF No. 75. Plaintiff claims the Grand Jury report said, "the CSU was not medically staffed and unequipped to provide medical care to clients with underlying medical conditions including those conditions requiring a higher level of care." JAF No. 75. This is simply not true.

The Grand Jury was aware of two instances of CSU staff covering the cameras with paper. JAF No. 83. The report further noted "SMWG staff can be seen appearing to relax, on their phones or talking with each other." JAF No. 82. The Grand Jury was "in possession of photographs depicting a SMWG staff member making an obscene hand gesture in the direction of a County employee with whom they had just interacted." JAF No. 84. Plaintiff does not claim the video cameras were blocked on May 15, 2024 nor reference any hand gestures. There is no claim that either Plaintiff's or Branco's injuries were caused by a blocked camera or hand gestures. *Thompson v.*

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*City of Los Angeles*, 855 F.2d 1439, 1444 (9th Cir. 1989) ["Only if a plaintiff shows that his injury resulted from a permanent and well-settled practice may liability attach for injury resulting from a local government custom."].

Further undermining Plaintiff's claim, the Grand Jury report makes no mention of CSU's inability to meet the medical care of clients. The Grand Jury observed that Sierra could not meet the contract requirement about a registered nurse being at the facility because the current nurse was in San Luis Obispo County fourteen days per month. JAF Nos. 77 and 78. The Grand Jury noted the Sierra contract called for access to a psychiatrist, and "a contract psychiatrist is available via telemedicine." JAF No. 80. There is no comment about inadequate staffing.

Plaintiff avers, "both SLO and SIERRA failed to ensure that medically trained staff like nurses would be physically present at the CSU when clients were treated." JAF No. 89. The Grand Jury report states, "[i]n late 2021 an amendment to the contract was adopted stipulating that either a registered nurse, a psychiatric technician, or other psychiatric service provider be at the facility when clients are present." JAF No. 79. This is consistent with California law. A crisis stabilization unit is required to have "a minimum of one Registered Nurse, Psychiatric Technician, or Licensed Vocational Nurse on site at all times beneficiaries are present." 9 CCR, § 1840.348(b). Plaintiff has not cited any instance where the CSU did not have at least one Registered Nurse, Psychiatric Technician, or Licensed Vocational Nurse present. JAF No. 90.

Finally, Plaintiff claims "[b]oth COUNTY and SIERRA were aware CSU staff regularly failed to monitor clients" JAF No. 91. Other than these conclusory statements, Plaintiff failed to provide further details. Plaintiff does not identify any other dates, names of clients, or instances where CSU failed to monitor clients. JAF No. 92. "A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040,

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1045 (9th Cir. 1989). Plaintiff's failure to identify a specific policy or pattern means the Monell claim fails as a matter of law.

**2............................There is No Evidence of a Violation for the Failure to Train.**

Plaintiff's claim against the County for failure to train does not fare any better. "To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153-1154 (9th Cir. 2021). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). With respect to the second element, "[t]he need for training must be 'so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately in indifferent to the need.'" *Estate of Miller v. County of Sutter*, 2022 U.S. Dist. LEXIS 29273, at *15-16 (E.D. Cal. Feb. 16, 2022), citing *Canton*, 489 U.S. at 390. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, at 62.

A review of Plaintiff's discovery responses shows her claim largely rests on the circumstances surrounding Branco's death. Plaintiff focuses on the events surrounding her admission and stay at the CSU. JAF No. 62. This is insufficient because "an inadequate training policy itself cannot be inferred from a single incident." *Hyde v. City of Willcox*, 23 F.4th 863, 875 (9th Cir. 2022). Therefore, Branco's death alone is not sufficient to prove a failure to train amounting to deliberate indifference. *Kidwell-Bertagnolli v. County of Sonoma,* 2024 U.S. Dist. LEXIS 65844, at *43 (N.D. Cal. Apr. 10, 2024).

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff's claim about Sierra's employees sleeping on the shift is unsupported by the evidence. There was a policy in place that prohibited staff from sleeping on the job. Plaintiff has not come forward with any other instances of sleeping on the shifts. JAF No. 73. Without a pattern, Plaintiff has no *Monell* claim against the County.

The 2021-2022 Grand Jury report only mentions issues about Sierra's ability to perform under its contract with the County, the lack of responsiveness to inquiries and the covering of cameras. JAF Nos. 77 – 84. It does not mention Sierra employees sleeping on the job or any concerns about high acuity patients who are going through withdrawal. *Ibid*. Plaintiff has no claim for a lack of training, and summary judgment should be granted on the seventh cause of action.

## B. *Plaintiff's Position.*

**1. The County by and through its contractor, Sierra, was deliberately indifferent to Brancos' safety because its practice of admitting detoxifying clients without proper training, policies and procedures was a moving force behind Plaintiff's Injury.**

The CSU was a County mental health facility operated under contract by Sierra. As the defendants readily admit, the County "opened a crisis stabilization unit for public service." JAF 1. The County had a non-delegable duty to ensure that the Crisis Stabilization Unit (CSU) it contracted to operate met all applicable state licensure, LPS designation, and Medi-Cal certification requirements, including minimum staffing, safety, and clinical service standards. (Madaus Declaration at paragraph 7 and JAF 354.)

According to Sierra's contract to operate the CSU, Sierra agreed to numerous County oversights including operations, management, policy making and reviewing, final policy and procedure approval, to maintain logs of all grievances, to allow access to the electronic medical charts, to report all incidents, to maintain County approved quality management plan requiring thorough utilization reviews, monitoring process and quality assurance/ improvement activities, and required to submit to quarterly and

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

monthly audits by the County's Department of Behavior Health's Quality Control Department. (JAF 265.)

The County through its audits and oversight had a significant role in advising and shaping how Sierra operated the CSU. In fact, the County retained the authority of final approval of Sierra's policies and procedures. (JAF 265-266.) The Couty employees Jeffrey Elliot and Nurse Angela Atwell also audited of charts of CSU clients. (See 326 to 331.) On November 18, 2023, Sierra held a CSU staff and management meeting during which management shared a "theme" to increase the CSU census among other management and staff topics.  JAF173 Sierra's upper management expressed a need to increase the census at the CSU out of fear of losing the company's contract with the county to operate the CSU and consequently of Sierra's employees losing their jobs. JAF274. Sierra executive Ryan Walsh also expressed a desire to find creative ways to increase the census, JAF269, including taking on higher acuity clients JAF273-274, such as alcohol detoxifying clients. Although Sierra ultimately rejected the idea of treating alcohol detoxifying clients at the CSU, Walsh began to look for ways to circumvent the contractual and licensing prohibiting from admitting drug and alcohol detoxifying clients. (JAF 276)

From October of 2023 until May of 2024, the CSU consistently increased the census by an average of 10-25% month-over year. JAF 277

Simultaneously, the county assigned registered nurse Angela Atwell to conduct regular audits of the CSU's policies and operations, including of its nocturnal welfare and monitoring policies. JAF 292 These audits put the county on notice that the increase of the CSU's census was at least partially due to admitting higher acuity clients including drug and alcohol clients. JAF 293

Defendant Janet Brown also voiced her concern via the CSU teams messaging thread that despite the decision to admit alcohol withdrawing clients, there were no protocols for employees to follow and no guidance from supervising staff. JAF296 and 297.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

During the same period from November 2023 to May 2024, Sierra management removed the individual CSU policies, including the important Admission Criteria, W&I 5150 holds and Pre-Admission policies from the CSU policy binder, ostensibly because Sierra and County were revising them.

Thus, the County also exerted a significant degree of influence on Sierra's business and operational decisions regarding the CSU. Several witnesses testified that Sierra decided to increase the census at the facility by admitting clients detoxifying from alcohol and opioids/opiates use because Sierra perceived that continued funding from the county was dependent on increasing the census at the CSU. (JAF 267-285.) Steven Lampe, the CSU's assigned psychiatrist/prescriber from 2019 until November 2023, testified that Ryan Walsh (a Sierra employee) told him that the County was unhappy with the low CSU census. (JAF 279.) Lampe further testified that these concerns motivated Sierra to terminate the employment of Sandy Farley to alleviate County's concerns of the low CSU census since her efforts to reject high acuity clients on safety grounds was seen as unnecessary "gatekeeping." (JAF 270-275 and 279-282.)

In effect, pressure from the County resulted in the termination of Steven Lampe and former CSU manager Nurse Sandy Farley and transformed CSU policy from a custom where clients needed to be deemed safe and fit for treatment at the CSU to a policy where any denial needed to be specifically justified by a CSU manager and/or an off-site nurse PR actioner.

Thus, the County's concerns about the CSU census apparently overrode the safety concerns of Sierra's own employees and its existing policies and procedures which made it clear the CSU was not a detoxification center and that clients who were under the influence of drugs, withdrawing, or posed a risk of withdrawing should not be admitted to the facility. (JAF 287-289.) The County was aware of efforts to increase the census at the CSU and signaled their approval of these efforts. (JAF 295.) At the same time CSU staff including Janet Brown, Bonnie Sayers, and Savannah

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Sinclair voiced concerns to CSU management that the CSU was taking on high acuity drug and alcohol detoxing clients with no training or medical capacity to safely manage them. (JAF 296.)

**2. The County Had A Policy Of Delegating Decision-Making Authority To Low-Level Psychiatric Technicians To Determine Whether A Client Meets Criteria for Admission.**

A psychiatric technician can perform behavioral assessments but not medical diagnosis. JAF299. Bethany Aurioles testified that as a LPT she could not interpret CSU clients' lab results nor convey them to a clinician. JAF 300 and 301.

Prior to the incident, CSU management directed low level staff that they were "no longer required to review ER client's incoming hospital lab work" despite contrary written policies requiring the same. JAF 303.

Beginning in November 2023, the CSU no longer had an onsite Nurse manager and both CSU nurse practitioners were working remotely off site. Additionally, psych tech Savannah Williams was promoted to CSU manager. JAF 304.

Since at least November 2023, a CSU manager or nurse practitioner would only be consulted to potentially override a CSU staff admission decision if staff denied admission. JAF 305.

This policy of deferring to the admissions decisions of low-level staff without medical training increased the risk that that clinically inappropriate clients, would be placed in the CSU which was unable to meet their needs.

**3. The County had a policy of inadequate documentation of client observations.**

The County allowed the contractor to document client observations every 2 hours, rather than the prevailing practice of documenting every 15 minutes. This practice commonly leads to staff believing that they do not need to provide continuous and intensive supervision and intervention. The contractor changed this policy almost immediately after Ms. Branco's death, likely in recognition of the lack of supervision Failure to enforce industry-standard supervision made it foreseeable

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

that a client in distress could go undetected until it was too late for life-saving measures. See declaration of Madaus at paragraph 15.

### 4. The County Was Deliberately Indifferent To Branco's Safety Because It Condoned CSU Staff Sleeping During the Nocturnal Shifts And Failed To Enforce A Claimed "No-Sleeping-On-The-Job" Policy in Nov. 2024

The county also had a longstanding custom and practice of condoning CSU staff sleeping during nocturnal shifts, and when Sierra finally was forced to change its policy, the county failed to take any steps to enforce the new policy. See JAF 340-345. On the night Branco died in plain view of the "nursing station," CSU surveillance video shows Janet Brown set up a makeshift bed in her reclining chair and then did not look up from her monitor or walk up to Branco's cot. JAF 348-352

**The County Was Deliberately Indifferent To Branco's Welfare and Safety By Condoning A Policy Of Referring Persons On W&I 5150 *Involuntarily* Holds To A *Non-LPS* Designated CSU Facility by creating an exception for voluntary 5150 holds.**

As Madaus explains in his declaration:

Sierra Mental Wellness Group explicitly stated in their policies that, "*The CSU is not a designated LPS facility, therefore all services are provided on a voluntary basis.*" However, they maintained a workaround policy that explicitly allowed individuals on a "voluntary" 5150 hold to be admitted if the CSU staff determined they did not "*pose a significant risk to self, other clients, or staff,*" This policy is inconsistent with WIC § 5150(a), which provides that an individual taken into custody under a 5150 hold must be placed for evaluation and treatment in a facility "*designated by the county and approved by the State Department of Health Care Services.*" There is no provision under California law for a "voluntary" 5150 hold, and such a policy undermines the statutory protections for individuals subject to involuntary detention. California law recognizes only two categories of psychiatric admission: voluntary treatment under WIC § 6000 et seq., or

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

involuntary detention under the LPS Act. A "voluntary" 5150 admission is incompatible with § 5150(a)'s requirement that custody be in a facility designated by the county and approved by the State Department of Health Care Services.

This policy was also moving force in in Branco's death because the statute required that she be placed in the PHF but instead she was placed in the CSU which was not able to meet her needs.

As such, there is ample evidence, without resorting to speculation, that the County maintained official policies and unofficial customs and practices that were deliberately indifferent to substantial risks of serious harm and these policies were a moving force in bringing about Branco's death.

## II.    PLAINTIFF DOES NOT QUALIFY AS A DEPENDENT ADULT.

### A.    *The County's Position.*

"Dependent adult" means a person, regardless of whether the person lives independently, between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." Welf & Inst. Code, § 15610.23(a). "'Dependent adult' includes any person between the ages of 18 and 64 years who is admitted as an inpatient to a 24-hour health facility, as defined in Sections 1250, 1250.2 and 1250.3 of the Health and Safety Code." Welf & Inst. Code, § 15610.23(b).

Plaintiff has not alleged or identified any facts suggesting that Branco had any physical or mental limitation that restricted her ability to carry out normal activities or to protect her rights. JAF Nos. 93 – 95. She is apparently contending that her admission to the CSU made her an inpatient at a 24-hour health facility. The definition of "inpatient" precludes her from making that claim.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

"'Inpatient' is "a person who has been admitted to a hospital, skilled nursing facility, or intermediate care facility for bed occupancy for purposes of receiving inpatient services." 22 CCR, § 51108. "'Inpatient services' means preventive diagnostic, or treatment services provided in a hospital, skilled nursing facility, or intermediate care facility to a patient who is a registered inpatient in that facility." 22 CCR, § 51142.

"'Hospital' means any institution, place, building, or agency … which maintains and operates organized facilities for one or more persons for the diagnosis, care and treatment of human illness, which may include convalescence and care during and after pregnancy, or which maintains and operates organized facilities for any such purpose, and to which persons may be admitted for overnight stay or longer." 22 CCR, § 51109. "Skilled nursing facility means any institution, place, building, or agency which is licensed as a skilled nursing facility by the Department or is a distinct part or unit of a hospital, meets the standard specified in section 51215 of these regulations … and has been certified by the Department for participation as a skilled nursing facility in the Medi-Cal program." 22 CCR, § 51121(a). "'Intermediate care facility' means a facility which is licensed as such by the Department or is a hospital or skilled nursing facility which meets the standards specified in Section 51212 and has been certified by the Department for participation in the Medi-Cal program." 22 CCR, § 51118.

On May 15, 2024, Plaintiff was placed in the CSU. JAF No. 34. As of that date, the CSU was not licensed as a hospital, licensed skilled nursing facility or an intermediate care facility. JAF Nos.96 – 98. Branco does not meet the definition of an "inpatient to a 24-hour health facility" is not a disabled adult under the statute. Summary judgment should be granted.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

***B.  Plaintiff's Position: Ms. Branco was a dependent adult because she was gravely disabled by substance abuse disorder from managing her need for personal safety on her own.***

Pursuant to Welf & Inst. Code, § 15610.23(a) a dependent adult is "a person, regardless of whether the person lives independently, who has physical *or mental limitations* that restrict his or her ability to carry out normal activities or to protect his or her rights. (emphasis added.)

Here, as Hooson concluded in his 5150 application, Branco's substance abuse disorder in combination with her other mental health conditions, were so severe that he concluded she was a gravely disabled adult with a blatant disregard for her own wellbeing and presented a grave risk to her personal safety. (Hooson transcript 210:23-25 and 211:1-3) It is unclear how defendants could contend that Branco could carry out normal activities and/or protect her rights when she could not adequately look after her own safety. As such her grave disability satisfied the "restrict his or her ability to carry out normal activities and/or protect her rights" requirement.

Additionally, Branco satisfies Welf & Inst. Code, § 15610.23(b) because she was admitted to the CSU on an involuntary hold for up to 72 hours. While the CSU was not officially an inpatient facility, Defendants effectively treated it like an inpatient facility by regularly placing individuals on 5150 holds there for up to 72 hours. Defendants should not be permitted to improperly place individuals in the CSU overnight then deny that it is an inpatient facility when it suits their purposes.

## JULIA TIDIK

I.  **TIDIK IS ENTITLED TO SUMMARY JUDGMENT AS TO THE FIRST, SECOND, THIRD, AND EIGHTH CAUSES OF ACTION BECAUSE SHE IS NOT A STATE ACTOR AND DID NOT ACT UNDER THE COLOR OF STATE LAW**

*A. Tidik's Position*

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

"To state a claim under § 1983, a plaintiff must plead two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006), citing *West v. Atkins*, 487 U.S. 42, 48 (1988). The "under color of State law" requirement is a part of the prima facie case for a *section* 1983 claim, and therefore, the plaintiff bears the burden of proof on the issue. *West*, 487 U.S. at p. 48.

Here, Plaintiff's First, Second, Third, and Eighth causes of action applicable to Tidik involve alleged constitutional violations under section 1983, and therefore, to maintain her action, Plaintiff is required to plead and prove sufficient facts to establish that Tidik was engaged in state action under the color of law. No such facts have been established.

In order to act under color of State law, the defendant must "have exercised power 'possessed by virtue of State law and made possible only because the wrongdoer is clothed with the authority of State law.'" *West v. Atkins*, 487 U.S. at p. 49 (1988). "The complained of action must be 'fairly attributable to the state,' and not to a private actor." *Jackson v. East Bay Hosp.,* 980 F. Supp. 1341, 1356 (N.D. Cal. 1997), citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982). Thus, a tenuous connection to the State will not convert a private action into one under color of State law. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351-2 (1974).

Despite the First Amended Complaint's allegation that Tidik was "a duly authorized employee and agent of Sierra," (Ex. 23, FAC para. 21), it is undisputed that Tidik was not an employee or agent of Sierra. Instead, Tidik is a licensed psychiatric mental health nurse practitioner, (PMHNP), JAF 103, working as an *independent contractor* pursuant to a Contract Service Agreement with Sierra to perform medication support and related services to Sierra's San Luis Obispo and Nevada County Crisis Stabilization Units. JAF Nos. 104-105 and 107. The applicable Contract

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Service Agreement expressly states that Tidik "is an independent CONTRACTOR, and not an employee, agent, joint venture, or partner of [SIERRA]." JAF No. 106. Tidik was *not* employed by the County of San Luis Obispo, nor was she an Independent Contractor for the County of San Luis Obispo. JAF Nos. 110-111. She was instead a private individual.

The evaluation of whether state action occurred with respect to a private individual "'begins by identifying the specific conduct of which the plaintiff complains.' *Sullivan,* 526 U.S. at 51 (internal quotation marks omitted); *see also Blum,* 457 U.S. at 1003 ('Faithful adherence to the "state action" requirement ... requires careful attention to the gravamen of the plaintiff's complaint.'). 'It is important to identify the function at issue because an entity may be a State actor for some purposes but not for others.' *Lee,* 276 F.3d at 555 n. 5." *Caviness v. Horizon Community Learning Center, Inc.* 590 F.3d 806, 812–813 (9th Cir. 2010).

"Generally, private doctors and hospitals are not considered to be state actors." *Morrison v. Clinic*, 703 F.Supp. 3d 1245, 1251 (D. Mont. 2023), citing *Briley v. State of Cal.*, 564 F.2d 849, 855-56 (9th Cir. 1977) [noting that "private hospitals and physicians have consistently been dismissed from § 1983 actions for failing to come within the color of state law requirement of this section"]. Although in appropriate cases a private individual or business may be held to have acted under color of state law, "'[the] mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.' [Citation.]" *Blum*, at p. 1004.

Here, the gravamen of the complained of action by Tidik involves her professional medical decisions regarding Branco's medication management after her admission to the CSU, as Plaintiff alleges she "made the intentional decision to authorize medication that was contra-indicated to BRANCO's medical condition and post-overdose state." Ex. 23 FAC p. 24:20-21. The undisputed evidence establishes

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

that on the night of the incident, Tidik was on-duty off-site as the on-call nurse practitioner for the CSU. JAF Nos. 112-113. Tidik's only involvement in the care and treatment of Branco on May 15, 2024 was as the remote on-call nurse practitioner. When acting as the on-call practitioner, Tidik was available 24/7 to CSU staff by telephone and electronic means, JAF No. 108, and relied on licensed nursing staff at the CSU to provide her with relevant information pertaining to clients at the CSU. JAF 109. She was not involved in the process of evaluating Branco for the 5150 hold placed by Hooson, JAF Nos. 31 and 114, the decision to admit Branco's into the CSU, or monitoring Branco while she was at the CSU. JAF Nos. 115, 117.

Four tests are used to determine whether a private entity or individual is acting under the color of state law: 1) a sufficiently close nexus between the State and the challenged action so that the action of the latter may be fairly considered as an act of the State itself; 2) a State has exercised coercive power or significant encouragement that the complained of action must be deemed to be an action of the State; 3) the private entity has exercised powers that are typically exclusive to State action; and 4) if the private individual conspired with the State in performing the complained of action. See e.g. *Blum*, at pp. 1004-05; see also *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002).

Since Tidik is a private medical provider, and the conduct at issue involves her medical decision-making, unless Plaintiff can establish that one of the four tests apply, Plaintiff's constitutional claims fail. As explained below, since Tidik's actions in connection with her treatment to Branco did not constitute state action under any of these tests articulated by the Supreme Court, summary judgment should be granted as to the First, Second, Third, and Eighth Causes of Action.

**1.**................................................................................**The Public Function Test**

"'Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

agencies or instrumentalities of the State and subject to its constitutional limitations.' *Lee*, 276 F.3d at 554-55 (internal quotation marks omitted). The public function test is satisfied only on a showing that the function at issue is 'both traditionally and exclusively governmental.' *Id*. at 555." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003). The Ninth Circuit has noted that most other courts "have held that mental health commitments do not constitute a function exclusively reserved to the state." *Jensen v. Lane Cnty*, 222 F.3d 570, 574-75 (9th Cir. 2000). Furthermore, "the provision of medical services is a function traditionally performed by private individuals." *West*, at p. 57 n. 15 (1988).

Here, the allegations specific to Tidik, a private individual, involve her decisions regarding the provision of medical care to Branco. Since this is not a function that is traditionally or exclusively a government function, under the public functions test, Tidik was not acting under the color of law.

**2. ...................................................................................... The joint action test.**

"Under the joint action test, 'courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.' *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995), citing *Collins*, 878 F.2d at 1154." *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002), overruled on other grounds in *Pearson v. Callahan* 555 U.S. 223 (2009).

"To be liable as a co-conspirator, a private defendant must share with the public entity the goal of violating a plaintiff's constitutional rights. [*Phelps Dodge Corp.* 865 F.2d at 1540-1541]; *see also Gallagher*, 49 F.3d at 1453-54 (holding that public university's acquiescence in private security team's pat-down searches of concert-goers did not establish state action under joint action test, despite shared goal of producing a profitable event)." *Franklin v. Fox, supra,* 312 F.3d at p. 445.

Here, there are no facts that establish that Tidik was acting in concert with any county or government officials when she was making her determinations regarding

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

the provisioning of medical care to Branco. Therefore, under the joint action test, she was not a state actor.

**3.....................................The Governmental Nexus and State Compulsion Tests.**

The governmental nexus test requires a plaintiff to "demonstrate that 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.' Under this approach, a state normally can be held responsible for a private decision 'only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1448 (10th Cir. 1995), quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974) and *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).Under the nexus test, "mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum v. Yaretsky, supra,* 457 U.S. at 1004-05.

As explained and applied in *Blum* and *Gallagher*, the existence of a regulatory system outlining the propriety of temporary holds for mental evaluation and treatment does not provide the necessary nexus between government action and private individuals acting under such system. Nor does a contract between San Luis Obispo County and Sierra Mental Wellness Group, transform the actions of Tidik, an independent contractor for Sierra Mental Wellness Group, into state action.

Likewise, the County's regulation of the Crisis Stabilization Unit does not transform Tidik's medical and professional assessment of Branco and related orders into state action for purposes of civil rights liability. As discussed elsewhere in this motion, the evaluation and treatment of persons by medical practitioners such as Tidik has been held to be private action, involving professional judgment, and not any exclusive or traditional act of the state. There is no interwoven set of facts or

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

circumstances alleged which could lead a reasonable jurist to conclude that any symbiotic relationship existed between Tidik and the County. There is no demonstration of state approval of any treatment rendered to Branco, and as in *Blum* and *Gallagher*, and even if it did exist such would not be sufficient to find state action in these circumstances.

Accordingly, the undisputed evidence establishes that Tidik was not acting under the color of law when she provided medication management services to Branco pursuant to her contract with Sierra, and summary judgment should be granted as to the First, Second, Third, and Eighth causes of action.

**B. Plaintiff's Argument: Tidik satisfies the "close nexus / joint action test" due to her role in a complex and deeply intertwined County-initiated process of evaluating and detaining gravely disabled individuals at the County's Crisis Stabilization Unit.**

Tidik satisfies the "close nexus / joint action test" articulated by the Ninth Circuit in Jensen v Lane, 222 F.3d 570 (2021) and is a state actor subject to 1983 liability. In Jensen, 222 F.3d 570, 574, Plaintiff sued a private physician and other defendants in connection with his involuntary civil commitment. The Court reversed the lower court's granting of summary judgment to the doctor stating, "On the facts of this case we hold that Dr. Robbins was a 'state actor' for the purposes of being a defendant in a § 1983 action." The court elaborated, "The record is clear that Dr. Robbins and the County through its employees have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others. County employees initiate the evaluation process, there is significant consultation with and among the various mental health professionals (including both PA [Psychiatric Associates] psychiatrists and county crisis workers), and PA helps to develop and maintain the mental health policies of LCPH. We are convinced that the state has so deeply insinuated itself into

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

this process that there is "a sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself." Id. at 575 citing *Jackson,* 419 U.S. at 350.

Here, as in Jensen, Branco's involuntary commitment occurred through an intertwined process involving county employees as well as Sierra and its employees. The CSU was a County mental health facility operated under contract by Sierra. As the defendants readily admit, the County "opened a crisis stabilization unit for public service." JAF 1. Significantly, Hooson was undisputedly a county-employed youth triage crisis evaluator (JAF 10), and he was acting in that capacity at all times relevant to this action. He decided there was probable cause that Branco was gravely disabled and made the decision to send her to the CSU. He also transported her from the hospital to the facility. Additionally, Hooson testified at the time of the events in question he was **actually employed both by County and by Sierra**. (JAF 370).

Moreover, the County through its audits and oversight had a significant role in advising and shaping how Sierra operated the CSU. In fact, the County retained the authority of final approval of Sierra's policies and procedures. (JAF 265-266.) The Couty employees Jeffrey Elliot and Nurse Angela Atwell also audited of charts of CSU clients.

Moreover, the County exerted a significant degree of influence on Sierra's business and operational decisions regarding the CSU. Several witnesses testified that Sierra decided to increase the census at the facility by admitting clients detoxifying from alcohol and opioids/opiates use because Sierra perceived that continued funding from the county was dependent on increasing the census at the CSU. (JAF 267-285.) Steven Lampe, the CSU's assigned psychiatrist/prescriber from 2019 until November 2023, testified that Ryan Walsh (a Sierra employee) told him that the County was unhappy with the low CSU census. (JAF 279.) Lampe further testified that these concerns motivated Sierra to terminate the employment of Sandy Farley to alleviate County's concerns of the low CSU census since her efforts to reject high acuity

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

clients on safety grounds was seen as unnecessary "gatekeeping." (JAF 270-275 and 279-282.) Thus, the County's concerns about the CSU census apparently overrode the safety concerns of Sierra's own employees and its existing policies and procedures which made it clear the CSU was not a detoxification center and that clients who were under the influence of drugs, withdrawing, or posed a risk of withdrawing should not be admitted to the facility. (JAF 287-289.) The County was aware of efforts to increase the census at the CSU and signaled their approval of these efforts. (JAF 295.) At the same time CSU staff including Janet Brown, Bonnie Sayers, and Savannah Sinclair voiced concerns to CSU management that the CSU was taking on high acuity drug and alcohol detoxing clients with no training or medical capacity to safely manage them. (JAF 296.) In fact, Defendant Bonnie Sayers testified that she directly raised concerns to CSU manager Williams about whether Branco could be safely treated at the facility and wanted to send her back to the hospital JAF 365.

## II.     PLAINTIFF HAS FAILED TO ESTABLISH EVIDENCE THAT TIDIK'S CONDUCT VIOLATED PLAINTIFFS' FOURTEENTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS.

### A. Tidik's Position

Assuming *arguendo,* that Tidik was acting under the color of law during the times applicable to this case, Plaintiff has failed to establish that Tidik's alleged conduct violated Plaintiff or Branco's substantive Due Process rights, as required to establish Section 1983 liability as plead. The pertinent provision of the Fourteenth Amendment declares that no State shall "deprive any person of life, liberty or property without due process of law ...". U.S. Const. Amendment XIV. "In order for a person acting under color of state law to be liable under section 1983 there must be a showing of **personal participation** in the alleged rights deprivation: there is no

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

respondeat superior liability under section 1983." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2001).

As explained below, Tidik is entitled to Summary Judgment as to all section 1983 claims because the undisputed evidence establishes that Tidik did not violate Plaintiff or Branco's constitutional rights, and instead acted reasonably, and within the standard of care of an on-call nurse practitioner during Branco's CSU admission.

*B. Plaintiff's Argument: Tidik, a nurse practitioner with a supervisory role over the CSU LVNs and LPTs, failed to take any steps to assess whether the CSU could safely monitor and care for Branco.*

As set forth in detail in the declaration of nurse practitioner expert Price, Tidik personally participated in the deprivation of plaintiff's rights because Tidik failed to properly assess Branco when she arrived at the facility, relied on obviously inadequate drug screening information regarding Branco's fentanyl use given, and improperly allowed Branco's admission to the CSU knowing that her level of care needs exceeded the facility's resources and capabilities.

As a nurse practitioner, Tidik was the highest-ranking clinical decision maker at the time of the incident and one of the few professionals involved in operating the CSU with medical training. JAF 367 and Exhibit 34. Per her employment contract, her duties included providing "support, guidance and assistance to all CSU leadership staff for any client related issues, questions, admittance, denials, and other operational decisions." JAF 361 and Exhibit 17.  As such, even where a county-employed mental health evaluation team member, such as Jason Hooson, referred a client to the CSU, Tidik had the authority to at least advise CSU managers regarding admittance and denial to the facility based on her medical training and professional judgment. Moreover, given the limited scope of practice under the licensing of LVN and LPTs JAF 362 and 368, Tidik was in a supervisory role over the LVNs and LPTs at the CSU especially in regards to questions of admissions to the facility.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Tidik was also aware that CSU staff were concerned about lacking training and policies in regards to clients withdrawing or at risk of withdrawing from drugs and alcohol. Tidik testified that Brown had expressed such concerns directly to her. Moreover Sierra's policies and procedures in effect at the time of the incident made it clear that the CSU was not a detox center and that clients withdrawing from drugs and alcohol or at risk of withdrawing from drugs and alcohol were not appropriate for admission. JAF 287-289.

In the case of Ms. Branco, Tidik did not assess Branco in person or via telehealth. She her involvement in Branco's care was limited to text message communication with CSU staff. Most critically, Tidik did not exercise even the most basic judgment to meet the standard of care for a nurse because she failed to investigate what substance Branco had overdosed on, failed to rule out that Branco still had fentanyl in her system, and consequently failed to make any judgment about whether or not Branco could be safely monitored at the CSU. The records available to Tidik at the time Branco arrived at the CSU strongly indicated Branco had recently overdosed on Fentanyl since there were numerous references to her receiving and responding well to Narcan. She did not however receive a full toxicology report, made no efforts to obtain one, did not take a full history of Branco's substance abuse, did not request a urine tox screen to rule out whether Branco still had fentanyl in her system. Had Tidik performed her duties diligently and determined that Branco had recently overdosed on Fentanyl she would have rejected her admission to the CSU due to the likelihood she would relapse and/or suffer from withdrawals. Even assuming that a reasonable nurse practitioner could have admitted Branco to a limited facility like the CSU, she should have been placed on a Q15 overnight watch. Tidik did make such an order and thus was monitored every 2 hours.

Tidik had an important role in exercising her professional medical judgment to determine whether Branco could be safely treated at the CSU and instead she did nothing and simply deferred to Hooson's determination. Tidik's inaction, in light of

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

her duties at the CSU is sufficient to find that she personally participated in the deprivation of Ms. Branco's rights resulting in her death and the loss of Plaintiff's daughter.

**1........Tidik Did Not Act with Conscious Indifference or Gross Negligence and Therefore No Section 1983 Liability Can Attach**

*A. Tidik's Position*

Plaintiff's First and Second causes of Action are based upon Branco's Fourteenth Amendment substantive due process rights to adequate medical care and safe conditions while she was admitted to the CSU under a section 5150 hold for grave disability. Plaintiff has alleged constitutional violations based on both the *Youngberg v. Romeo*, 457 U.S. 307 (1982) and the *Gordon v. County of Orange,* 888 F.3d 1118 (9th Cir. 2018) standards, for inadequate medical care and failure to provide safe conditions. Ex. 23, FAC p. 2:22-25, 25:22-25, 26:22-25.

Under the *Youngberg* standard, to determine whether a plaintiff's substantive due process right has been violated by a medical professional such as Tidik the court utilizes the professional judgment test. The professional judgment test requires a "finding of conscious indifference amounting to gross negligence" by the professional in order to impose liability. *Estate of Conners by Meredith v. O'Connor*, 846 F.2d 1205, 1208 (9th Cir. 1988).

Under the *Gordon* standard, the court Plaintiff must establish the following:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

plaintiff's injuries. … **The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."**(citation omitted). Thus, **the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard**." (citation omitted)

*Gordon v. County of Orange* 888 F.3d 1118, 1125 (9th Cir. 2018), emphasis added.

The *Youngberg* and *Gordon* "tests differ only slightly. Both ask whether [Defendant's] conduct was reasonable, and both require [Plaintiff] to show that [Defendant's] conduct was worse than negligent." *Alexander v. Nguyen,* 78 F.4th 1140, 1444 (9th Cir. 2023). Accordingly, unless the Plaintiff can establish that the complained of conduct of the Tidik was more than negligent, liability cannot be found.

Here, there is no triable issue of fact on whether Tidik was "deliberately indifferent," "consciously indifferent," or "grossly negligent" with respect to Branco's situation. The undisputed evidence establishes that Tidik's involvement with Branco on the date of the incident was limited to her role as an off-site, on-call nurse practitioner, who authorized Branco to continue her home medications and take any as-needed protocol medications during her overnight stay at the CSU. JAF Nos. 114, 140-157. Tidik was not physically present at the CSU during Branco's admission to the CSU. JAF No. 133. She was not involved in the decision to place Branco on a 5150 hold, JAF Nos. 31, 115, 131, nor was she consulted or involved in the decision to admit Branco to the CSU. JAF No. 116, 132.

Tidik responded thoughtfully when presented with Branco's case, and asked reasoned, pertinent questions to obtain additional relevant information needed to make a clinical decision regarding Branco's medication management, and treatment while at the CSU. JAF No. 170-171. Tidik reviewed the available electronic records for Branco's CSU admission. JAF No. 150. She also reviewed the available records from

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

a previous 5150 psychiatric hospitalization in April, including a review of her medications from that stay. JAF No. 151, 153. Tidik then requested staff members at the CSU speak with Branco regarding why she discontinued a medication used for alcohol use disorder, as her review of the records showed that alcohol had been a trigger for Branco in the past. JAF No. 153. Tidik was not provided with any information from on-site staff that would indicate that Branco was in active withdrawal, or suffering from drug cravings. JAF No. 159. Nor did any staff at the CSU contact Tidik with any concerns regarding Branco's physical condition, acuity level, or suitability for the CSU. JAF No. 158-160. All the information available to Tidik indicated that Branco had suffered an unintentional drug overdose, likely from laced marijuana, and was at the CSU pending transfer to a private recovery program. JAF No. 137, 142.

There is ample evidence that Tidik met the applicable professional standard of an on-call nurse practitioner regarding her care and treatment of Branco. Emma Magana, a qualified, experienced, and well-trained psychiatric mental health nurse practitioner, has opined that the professional standard of care for an on-call nurse practitioner in an environment such as the CSU, required being available to on-site staff to handle any requests or inquiries, and respond to them in a timely manner. JAF No. 166. The standard required Tidik to obtain the relevant clinical information from licensed on-site nursing staff and ask any relevant clarifying questions to obtain any missing information necessary to respond to the specific request of the on-site staff. JAF No. 167. The standard of care did not require Tidik to make an in-person assessment of Branco prior to confirming she could be continued on her home medications. JAF No. 168.

Here, Tidik exercised appropriate professional judgment and clinical decision making with respect to her assessment of Branco, and her decision to continue her on her home medications. JAF Nos. 169-171. There was no information communicated

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

to Tidik by licensed staff at the CSU that would have indicated that any additional interventions or orders were needed for Branco. JAF Nos. 121-124, 164. Branco received appropriate medical care from Tidik, including continuing her on her home medications to ensure continuity of care. JAF No. 165. Tidik responded timely to the on-site staff's initial request for authorization to continue Branco on her home medications, and asked appropriate follow up questions to obtain additional information before confirming Branco was authorized to take these home medications while at the CSU overnight. JAF No. 171. There were no contraindications for the continued medications contained in the records reviewed by, or available to, Tidik. JAF No. 172.

No reasonable jury could conclude, from these uncontroverted facts, that Tidik was consciously indifferent or grossly negligent with respect to Branco's situation. The uncontroverted facts lead inescapably to the conclusion that Tidik was diligent, compassionate, and professional when assessing Branco's medications, and acting as the on-call nurse practitioner for the CSU on the night of the incident. The fact that without Tidik's knowledge, Branco snuck fentanyl into the CSU concealed in her underwear, and overdosed on it while at the CSU, JAF Nos. 162-163, is not sufficient to support an inference of conscious indifference or gross negligence. And certainly not sufficient to support an award of punitive damages.

Accordingly, this Court should conclude that Plaintiff has failed to establish that Tidik violated Branco's Due Process rights to either adequate medical care or safe conditions, and Summary Judgment should be granted as to the First and Second Causes of Action on this alternate ground.

*B. Plaintiff's Position: Tidik's failures to properly assess Branco in connection with her arrival at the CSU fell so far below the standard of care that she cannot have exercised professional judgment and her actions constitute deliberate indifference.*

72

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Tidik's failures to properly assess Branco in connection with her arrival at the CSU fell so far below the standard of care that she cannot have exercised professional judgment and her actions constitute deliberate indifference. As set forth in detail above, Tidik failed to identify the specific substance Brano ingested when she recently overdosed and failed to order any urine tox screen to determine whether she still had fentanyl in her system. This information was critical to assessing the direct cause of Branco's current issues and to determining whether or not Branco could be safely monitored and treated at the CSU. Branco's hospital record indicated that she had received three doses of Narcan in the ER indicating potential fentanyl/ opioid involvement. Tidik was the most highly trained medical professional employed by the CSU at the time of the incident, but she allowed Branco to be admitted without taking any steps to determine whether her needs could be met there. Tidik had an important oversight role but seems to have conceptualized her job as simply overseeing the continuation of client's medication.

Given limited scope of the care the onsite LVNs and LPTs could provide, the known limitations CSU as reflected in Sierra's policies and procedures, it was deliberate indifference to fail take any steps to determine whether the CSU could safely monitor Branco.

**2..... Plaintiffs Third Cause of Action for State Created Danger Under the 14th Amendment Fails as to Tidik**

*A. Tidik's Position*

To establish a claim under the state-created danger doctrine, a plaintiff must establish all of the following elements: (1) affirmative conduct by the state actor that created or exposed the plaintiff to a particularized danger they would not otherwise have faced; (2) that the harm suffered was foreseeable; and (3) that the state actor acted with deliberate indifference to the known or obvious danger. *see Murgia v. Langdon* 61 F.4th 1096, 1111 (9th Cir. 2023).  "As to the second requirement,

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

'Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'' This standard is higher than gross negligence and requires a culpable mental state." *Murguia v. Langdon*, *Supra*, at p. 1111, quoting *Patel v. Kent Sch. Dist.,* 648 F.3d 965, 974 (9th Cir. 2011).

Even if the Court found that Tidik's actions reached the *Youngberg* or *Gordon* standard of conscious indifference, it would not be sufficient to meet the more stringent standard of deliberate indifference required for liability under the state created danger doctrine. "To meet this standard, a plaintiff must show that the state actor 'recognized an unreasonable risk and *actually intended to expose* the plaintiff to such risk without regard to the consequences to the plaintiff.'" *Taylor v. Cnty. of Los Angeles*, No. 218CV09259ABSSX, 2020 WL 6136867, at *5 (C.D. Cal. Aug. 13, 2020), *aff'd sub nom. Taylor by & through Davies v. Cnty. of Los Angeles,* No. 20-56021, 2021 WL 4596583 (9th Cir. Oct. 6, 2021), quoting *L.W. v. Grubbs,* 92 F.3d 894, 900 (9th Cir. 1996), emphasis added.

As thoroughly analyzed in section 1 above, and incorporated by reference herein, the undisputed evidence establishes that Tidik's actions were within the standard of care for a nurse practitioner, JAF Nos. 165, 168-173, and they did not rise to the level of gross negligence or conscious indifference, which is a lower standard than deliberate indifference. Based on the information relayed to Tidik by the CSU Staff, she believed that Branco was a suitable candidate for the CSU. JAF No. 175. Branco had been medically cleared from the hospital in stable condition, JAF 128, and her vital signs were within normal limits at the time of her admission to the CSU. JAF 135. Further, Branco claimed her overdose was accidental and did not report or exhibit any signs or symptoms of withdrawal to Hooson or CSU staff. JAF 136-138. Tidik simply did not receive or ignore any information from CSU staff that would

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

establish that she recognized or intended to expose Branco to an unreasonable risk of harm. JAF Nos. 158-160, 164.

Furthermore, given that Branco had suffered an overdose the morning of May 15, 2024, JAF No. 127, and her autopsy revealed she concealed fentanyl and drug paraphernalia on her person, JAF No. 162, Plaintiffs cannot establish that Branco would not have overdosed had she not been admitted to the CSU. In fact, this was the precise risk that had led to Hooson placing Branco on a 5150 hold in the first place. JAF No. 35.

Accordingly, since Plaintiff has failed to establish that Tidik either created or exposed Branco to a particularized danger she would not otherwise have faced or acted with a deliberate indifference to a known risk to Branco's health or safety, Plaintiff's Third Cause of Action fails, and Summary Judgment should be entered.

***B. Plaintiff's Position: Tidik's failure to perform any assessment of whether Branco could be adequately treated at the CUS fell so far below the standard of care that her inaction in the face of known risks to Branco's health constituted deliberate inference.***

As argued above, Tidik's failure to perform any assessment of whether Branco could be adequately treated at the CUS fell so far below the standard of care that her inaction in the face of known risks to Branco's health constituted deliberate inference. The risk substantial risk that Branco could relapse and/or suffer withdrawal and potentially die as a result was established by Decedent's medical records and by Hooson's 5150 documentation. Nevertheless, Tidik consciously disregarded this risk by failing to make her own assessment of whether Branco should have been admitted to the facility.

**3. Tidik Did Not Violate Plaintiff's Familial Association Rights, and Plaintiff's Eighth Cause of Action Fails**

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*A. Tidik's Position*

In order to prove a claim for a violation of the Right of Familial Association under the Fourteenth Amendment, Plaintiff is required to prove that the alleged official conduct "shocks the conscience." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1062 (9th Cir. 2013). To satisfy this standard, a plaintiff must show that the state official either (1) acted with deliberate indifference, or (2) acted with a purpose to harm. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

Accordingly, since, as discussed above, the undisputed evidence establishes that Tidik did not act with deliberate indifference to Branco, and there no evidence that she acted with a purpose to harm Branco, this claim, like the State Created Danger claim, must fail, and Summary Judgment should be granted as to the Eighth Cause of Action.

*B. Plaintiff's Position: The deliberate indifference standard applies ot Plaintiff's 14th Amendment familial interference claims.*

As defendants correctly admit, the shocks the conscience standard for a violation of the Right of Familial Association claim can be satisfied where the official in question acted with deliberate indifference. As argued above, Tidik's inaction in the face of a known substantial risk of serious harm constitutes to Branco deliberate indifference.

**III.    PLAINTIFFS' FIFTH CAUSE OF ACTION FOR ABUSE OF A DEPENDENT ADULT FAILS AS A MATTER OF LAW BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH THE REQUIRED ELEMENTS**

*A. Tidik's Position*

The Fifth Cause of Action purports to state a state law claim for "Neglect of a Dependent Adult." This cause of action is based upon the Elder Abuse and Dependent

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Adult Civil Protection Act ("EADACPA"). (*Cal. Welf. & Inst. Code* §§ 15600, *et seq.*) In order to properly plead and prove a cause of action for EADACPA, the Plaintiff must establish that (1) Branco was a "dependent adult" as defined by *Cal. Welf. Inst. Code* § 15610.23; (2) that Tidik was a "care custodian" as defined by Section 15610.17; and (3) that Tidik's alleged negligent acts were reckless" or that the acts were "done with oppression, fraud or malice" by Section Plaintiff has failed to establish any of these three points

### B. Plaintif's Position: all of the elements of Plaintiff's abuse of a dependent adult claims are satisfied.

For the reasons argued above and restated below, Decedent was a dependent adult pursuant to both 15610.23 (a) and (b).

Tidik was a care custodian as defined by Section 15610.17 because Branco was a gravely disabled dependent adult relying on the CSU staff, including Tidik, to manage her need for personal safety because she was incapable of doing so herself. Also, Tidik seems to overlook Welf. & Inst. Code 15610.17 (y) which includes "any […] person providing health services or social services to elders or **dependant adults**" (emphasis added) as part of the definition of care custodian.

Tidik's inaction was neglect within the meaning of Welf and Inst Code Section 15610.57 and was more than professional negligence because it involved the custodial aspect of Tidik's care (i.e. the need that Branco was unable to manage herself). Given that the risks to Branco's personal safety were well documented in Hooson's 5150 determination, Tidik's inaction in light of the known risk was also reckless within the meaning of Welf and Inst Code Section 15657.

### 1................Plaintiff was Not a Dependent Adult as Defined by the EADACPA

### A. Tidik's Position

Tidik hereby incorporates and joins the County's argument above that Branco did not fit the definition of a "Dependent Adult" as it is defined by *Welfare and*

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*Institutions Code* section 15610.23. Since Branco was not a "dependent adult" for purposes of the EADACPA, Tidik is entitled to Summary Judgment as to the Fifth Cause of Action.

### B. Plaintiff's Position: Branco was a Dependent Adult as Defined by the EADACPA

Stated briefly, Pursuant to Welf & Inst. Code, § 15610.23(a) a dependent adult is "a person, regardless of whether the person lives independently, who has physical *or* mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights."

Branco's substance abuse disorder in combination with her other mental health conditions, were so severe that Hooson correctly determined her to be a gravely disabled pursuant to Welf & Inst. Code, § 5150. Among other things, He reached this conclusion because Branco had a "disregard for her own wellbeing and presented a grave risk to her personal safety."

Branco satisfied the definition of a "dependent adult" in Welf & Inst. Code, § 15610.23(a) because she "could not carry out normal activities and/or protect her rights" since she could not adequately look after her own safety.

Additionally, Branco satisfies Welf & Inst. Code, § 15610.23(b) because she was admitted to the CSU on an involuntary hold for up to 72 hours. While the CSU was not officially an inpatient facility, Defendants effectively treated it like an inpatient facility by regularly placing individuals on 5150 holds there for up to 72 hours. Defendants long standing practice of improperly placing individuals in the CSU overnight effectively made the CSU an inpatient facility.

### 2. Tidik was not a "Care Custodian" as Defined by the Welfare and Institutions Code 15610.17

### A. Tidik's Position

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff's Adult Dependent Abuse Claim is based on allegations of neglect as defined by California *Welf. & Inst. Code*, § 15610.57. That statute defines neglect as the "[t]he negligent failure of any **person having the care or custody of an elder** or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." *Welf. & Inst. Code*, § 15610.57(a)(1) (emphasis added). The necessary custodial relationship exists when "certain party has assumed a **significant measure of responsibility for attending to one or more of an elder's basic needs** that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." *Winn v. Pioneer Medical Group, Inc*. 63 Cal.4th 148, 158 (Cal. 2016) (emphasis added).

Importantly, **custodial care and professional medical care are not the same**, and claims under the Act are not brought against health care providers in their capacity as providers but, rather, against custodians and caregivers. *Covenant Care v. Superior Court* 32 Cal.4th 771, 786 (Cal. 2004). The *Covenant Care* Court emphasized that the function of a health care provider is distinct from that of a custodian. *Id.*

The assessment of care and custody status is not based on a "task-by-task basis" but requires the "focus on the extent of dependence by a patient on a health care provider rather than on the nature of the particular activities that comprised the patient-provider relationship." *Steward v. Superior Court* 16 Cal.App.5th 87, 103-104 (Cal. App. 2017). The court explained that the court's "focus must be on the specific relationship developed between the defendants and decedent." *Id.*

The case of *Oroville Hospital v. Superior Court of Butte County*, 74 Cal.App.5th 382, 405-406 (Cal. App. 2022), is instructive on the care custodian issue. There, the defendants "agreed to provide decedent in-home nursing services for wound care for a pressure injury to her left ischium or buttock." *Id.* at 388. The *Oroville* court held that defendants were not "care custodians" because the defendant's in-home wound care of

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

plaintiff was not a "'basic need' of the type an able-bodied and fully competent adult would ordinarily be capable of managing on his or her own." *Id*. At 405-406.

In the present case, the evidence is clear that Tidik was not Branco's care custodian. Rather, as laid out in section II above, Tidik was an off-site on-call nurse practitioner while Branco was admitted to the CSU, JAF Nos. 113-114, who provided CSU staff with clearance to allow Branco to continue taking her home medications while at the CSU. JAF Nos. 140-156. Tidik was not physically present at the CSU during Branco's admission, JAF No. 133, and was not responsible for monitoring Branco while she was at the CSU. JAF No. 117. Accordingly, since Tidik was not involved in any "custodial care," or responsible for any of Branco's "basic needs" while Branco was admitted to the CSU, Plaintiff's Fifth Cause of action fails as to Tidik.

### B. Plaintiff's Position: Welf. & Inst. Code, §15610.17(a) and (y) each make it clear that Tidik was a Care Custodian for the purposes of Welf. & Inst. Code, § 15610.57.

Tidik was a care custodian as defined by Section *Welf. & Inst. Code*, §15610.17 because Branco was a gravely disabled dependent adult relying on the CSU staff, including Tidik, to manage her need for personal safety because she was incapable of doing so herself.

*Welf. & Inst. Code*, § 15610.17 states, "Care custodian" means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: […]  (y) Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or **person providing health services or social services to** elders or **dependent adults**." (emphasis added.)

80

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Additionally, § 15610.17 (a) includes in the definition employees of "Twenty-four-hour health facilities, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code."

In turn, Health and Safety Code Section 1250.3 (a)(1) states, "Chemical dependency recovery hospital" means a health facility that provides 24-hour inpatient chemical dependency recovery services for persons who have a dependency on alcohol or other drugs, or both alcohol and other drugs."

As such the CSU was a 24-hour facility within the meaning of § 15610.17 (a) and additionally Tidik was a care custodian as defined by § 15610.17 (y).

Similarly, *Welf. & Inst. Code*, § 15610.57 defines neglect as the "[t]he negligent failure of any person having the care or custody of an elder **or a dependent adult** to exercise that degree of care that a reasonable person in a like position would exercise." *Welf. & Inst. Code*, § 15610.57(a)(1) (emphasis added).

The cases Tidik cites do not change the plain meaning of Welfare and Institutions Code *Welf. & Inst. Code*, § 15610.57 and 15610.17 (a) and (y) and actually support Plaintiff's claims. In Covenant Care v. Superior Court, 32 Cal.4th 771 (Cal. 2004), the court held the procedural requisites to seeking punitive damages for professional negligence do not apply to punitive damages claims under the EADACPA. The court's additional guidance that for example nursing homes perform "both custodial functions and provide professional medical care" actually demonstrates that Tidik was a "care custodian". The nature of plaintiff's claim is that Tidik's failures go directly to the custodial aspect of her function at the CSU in addition to simply failing to provide professional medical care. Branco was determined to be gravely disabled, unable to look after her own personal safety, and thus, a dependent adult. Specifically, she was dependent on CSU staff to look after her personal safety by preventing her from relapsing on drugs because she was incapable of doing so herself. Far from only being responsible for supervising the distribution of

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

medications, Tidik had a role performing nursing assessment and in advising on admissions and denials to the facility. Tidik did nothing to assess whether or not Branco could be safely monitored at the facility, the same basic need that Branco could not meet herself. See also Winn v. Pioneer Medical Group, Inc., 63 Cal.4th 148, 155 (2016) defining a custodial relationship as "where a person has assumed significant responsibility for attending to one or more of those basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance."

Similarly, Steward v Superior Court, 16 Cal.App 5th 87, 103 (2017) the court found the defendants were acting as care custodians in they "accepted Carter as a patient, with knowledge of his confused state" and that he was a poor historian and required assistance with feeding, lacked the ability to consent. The court reasoned these were all acts for which "[o]ne would not normally expect an able-bodied and fully competent adult to depend on another." Steward, 16 Cal.App 5th 87, 103.

Finally, Oroville Hospital v. Superior Court of Butte County, 74 Cal.App.5th 382, (Cal. App. 2022) is factually distinguishable in that the defendants provided only in-home wound care, as opposed to general nursing for her other health issues, and were not responsible for bathing, feeding, changing or transporting decedent. Notably, wound care for a pressure injury is normally managed by medical professionals and not something able-bodied and fully competent adult would ordinarily be capable of managing without assistance.

As such, Tidik was a care custodian of Ms. Branco prior to her death.

**3.......... No Triable Issue of Fact Exists to Support that Tidik was "Negligent" Within the Meaning of the EADACPA**

*A. Tidik's Position*

Section 15657 of the California *Welfare and Institutions Code* ("W&I Code") provides heightened remedies to a plaintiff who can prove "by clear and convincing

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57," and who can demonstrate that the defendant acted with "recklessness, oppression, fraud, or malice in the commission of [this] abuse." *Carter v. Prime Health Care et al.* 198 Cal.App.4th 396 (Cal. App. 2011). Neglect includes, among other things, **a failure to**: (1) assist in personal hygiene, or in the provision of food, clothing, or shelter; (2) provide medical care for physical and mental health needs; (3) protect from health and safety hazards; and (4) prevent malnutrition or dehydration. *W&I Code* § 15610.57(b).

To recover the enhanced remedies available under the Elder Abuse Act from a health care provider, **a plaintiff must prove more than simple or even gross negligence in the provider's care or custody of the elder.** See *Delaney v. Baker* 20 Cal.4th 23, 32 (Cal. 1990). See also e.g. *Sababin v. Superior Court,* 144 Cal.App.4th 81, 88 (Cal. App. 2006). **Elder Abuse is distinct from the professional negligence of a health care provider and includes "egregious withholding of medical care."** See e.g. *Delaney,* supra at 35. (Emphasis added).

In *Covenant Care v. Superior Court, supra,* 32 Cal.4th 771, the California Supreme Court laid out rules distinguishing a theory of medical malpractice from a theory of abuse (i.e. elder abuse) under Welfare & Institutions Code. The Court distinguished elder abuse from medical malpractice as follows:

> As used in the Act, neglect refers **not to the substandard performance of medical services** but, rather, to the "failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their **custodial** obligations." [Citation]

*Id.* at 783 [emphasis added].); *See also, Delaney v. Baker supra,* at p. 34 .

The California Supreme Court made it clear that allegations indicating only medical malpractice **will not** be permitted to support claims of Elder Abuse. To

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

support a claim of abuse, a plaintiff must affirmatively allege oppression, fraud, or malice, as *Covenant Care* states:

> [I]f the neglect (or other abuse) is reckless or done with oppression, fraud, or malice, "then the action falls within the scope of [Welfare and Institutions Code] Section 15657 and as such cannot be considered simply 'based on ... professional negligence' ... That only these egregious acts were intended to be sanctioned under section 15657 is further underscored by the fact that the statute requires liability to be proved by a heightened 'clear and convincing evidence' standard."

*Id.* at 784.

Quite simply, Plaintiff has failed to establish neglect as defined by the EADACPA. As explained more fully in section II above, and incorporated herein, the undisputed evidence is clear that Tidik acted within the standard of care for a psychiatric mental health nurse practitioner and did not engage in any actions which could be considered "malice," "fraud," or "oppression" when providing on-call medication management services to Branco. Accordingly, there is no dependent adult abuse by Tidik, and she is entitled to summary judgment on this claim, and Plaintiff is not entitled to enhanced remedies under the act, including punitive damages.

*B. Plaintiff's Position: Tidik's failure to take any steps to determine whether Branco could be safely monitored at the CSU was a failure to provide medical care for Branco's Physical and mental health needs, as well as a failure to protect her from health and safety hazards constituting were neglect pursuant to Welf. and Inst. Code §15610.57(b).*

Pursuant to Welf. and Inst. Code §15610.57(b) neglect includes, among other things, a failure to: (2) provide medical care for physical and mental health needs; and (3) protect from health and safety hazards.

Here, plaintiff brings a claim for neglect under the EADACPA against Tidik based on her failure to provide care for Branco's health needs (i.e. her need to be

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

monitored and prevented from relapsing) and failure to protect her from a health and safety hazard (i.e. drug relapse and a potentially fatal overdose).

Branco's physical and mental health need to be prevented from relapsing and the health and safety hazard of a potential relapse were both known to Tidik and the staff at the CSU and were the basis of her being referred to the facility in the first place. Additionally, as argued above, her need to be prevented from the hazard of relapse was directly related to her being gravely disabled by substance abuse and consequently her status as a dependent adult in a custodial relationship with Tidik and the staff at the CSU. In other words, she was a dependent adult under the custodial care of Tidik and the CSU because she lacked the capacity to look after her own personal safety.

Beyond definitions and statutory construction, here, Tidik was the highest ranking clinical decisionmaker at the time of the incident. She did not assess Branco in person or via telehealth. Her involvement in Branco's care was limited to text message communication with CSU staff. Most critically, Tidik did not exercise even the most basic judgment to meet the standard of care for a nurse because she failed to investigate what substance Branco had overdosed on, failed to rule out that Branco still had fentanyl in her system, and consequently failed to make any judgment about whether or not Branco could be safely monitored at the CSU. The records available to Tidik at the time Branco arrived at the CSU strongly indicated Branco had recently overdosed on Fentanyl since there were numerous references to her receiving and responding well to Narcan. She did not however receive a full toxicology report, made no efforts to obtain one, did not take a full history of Branco's substance abuse, did not request a urine tox screen to rule out whether Branco still had fentanyl in her system. Had Tidik performed her duties diligently and determined that Branco had recently overdosed on Fentanyl she would have rejected her admission to the CSU due to the likelihood she would relapse and/or suffer from withdrawals. Even

85

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

assuming that a reasonable nurse practitioner could have admitted Branco to a limited facility like the CSU, she should have been placed on a Q15 overnight watch. Tidik did make such an order and thus was monitored every 2 hours.

Regardless of whether or not she could unilaterally deny a potential client admission to the CSU, Tidik had an important role in considering the safety of potential client admissions. (Notably, Defendant Williams, a CSU manager at the time of the incident, testified that Tidik could unilaterally determine a client was not appropriate for admission to the CSU.) Williams also testified that assessing the withdrawal risk a potential client presents "depend on what the drug is" (Williams 161:10-15 and 170:8) and "how under the influence they are." (172:11-12.) Williams further that it was possible to get a tox screen done in the unit if one was not done by the time the client arrived. (205:10-11.)  Tidik had more than enough information to alert her that Branco should not be admitted to the facility or at least that her fitness for the facility should have been investigated further.  At an absolute minimum, the facts available to Tidik were sufficient to order 15-minute safety checks instead of the default 2 hour checks. Under these circumstance, Tidik's failure to do any of these things was neglect within the meaning of Section 15610.57.

**B. Plaintiff's Position: Tidik's Neglect was reckless and egregious so that enhanced remedies are available.**

Enhanced remedies pursuant to Welf. and Inst. Code Section 15657 are also applicable here because Tidik's inaction and failure to assess whether Branco could be safely treated at the CSU given her grave disability and recent fentanyl overdose was more than malpractice, it was tantamount to an egregious withholding of care. As argued above since Branco was gravely disabled from managing her need for personal safety by herself. Thus, Tidik's failure to goes to the custodial aspects of her duties as well as representing a failure to provide medical care. Moreover, Tidik's neglect of Branco was reckless because the risk that she could relapse and suffer a fatal overdose

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

were documented in Hooson's 5150 determination and communicated directly from her mother, Linda Cooper to CSU staff.

## IV.    TIDIK IS ENTITLED TO SUMMARY JUDGMENT AS TO THE NINTH CAUSE OF ACTION FOR WRONGFUL DEATH BECAUSE THE UNDISPUTED EVIDENCE ESTABLISHES THAT SHE WAS NOT NEGLIGENT

### A. Tidik's Position

Under California law, a Plaintiff cannot establish a cause of action for wrongful death unless they can establish "'(1) a "wrongful act or neglect" on the part of one or more persons [(that is, negligence)] that (2) "cause[s]" (3) the "death of [another] person."'" *Musgrove v. Silver,* 82 Cal.App. 5th 694, 705 (Cal. App. 2022), quoting *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 390 (Cal. App. 1999). Thus, unless Plaintiff can establish the predicate that Tidik acted negligently in her care and treatment of decedent, the claim for wrongful death fails.

In the present case, Plaintiff's wrongful death claim against Tidik fails because the undisputed evidence establishes that she did not breach the standard of care with respect to her care and treatment of Branco. Tidik hereby incorporates the standard of care analysis of retained expert Emma Magana set forth in section II above. Since Tidik has established through competent expert testimony that she did not violate the standard of care with respect to her treatment of Branco, Plaintiff cannot establish a breach of duty on the part of Tidik, which is required to prove wrongful death. Accordingly, Tidik is entitled to summary judgment as to Plaintiff's Ninth Cause of Action.

### B. Plaintiff's Position: Tidik breached her duty of care in multiple ways that directly and proximately caused Ms. Branco's death.

Tidik was the highest ranking clinical decisionmaker at the time of the incident. Regardless of whether or not she could unilaterally deny clients admission to the CSU, Tidik had an important role in determining whether or not potential clients could be safely treated there and if not in referring such clients to a higher level or care. She received 5150 documentation from Hooson that established that Branco was gravely disabled, unable to manage her own need for personal safety, and needed to be carefully monitored to prevent her from relapsing and from suffering a potentially fatal overdose. She also received hospital record from Twin Cities Hospital which did not include a test for fentanyl and did not follow up in any way, she did order a urine tox screen, did not evaluate Branco in person or via remote medicine, and did not order 15 minute safety checks. Under these circumstances there were multiple breaches of care, set forth in detail in the Declaration of nursing expert Price that were a direct and proximate cause of Branco's death.

## SAVANNAH WILLIAMS

## I.  SAVANNAH WILLIAMS IS ENTITLED TO SUMMARY JUDGMENT AS PLAINTIFF's 1ST, 2ND, 3RD, 4TH, and 8TH CAUSES OF ACTION

### A.  WILLIAMS' POSITION

Plaintiff alleges causes of action under 42 U.S.C. § 1983 for (1) Deliberate Indifference to a Substantial Risk of Harm to Health; (2) Failure to Provide Safe Conditions; (3) State Created Danger-14th Am.; (4) Supervisory Liability-42 U.S.C. §1983; and (8) Parental Interference Due Process Violation, in relation to the May 2024 death of her daughter, ELINA BRANCO. (Doc. no. 103, First Amended Complaint "FAC"). In order to pursue these §1983 causes of action, Plaintiff must show that Williams acted under color of law as a state actor. Absent this crucial element, a section 1983 claim will not lie. *Christy v. Randlett* 932 F.2d 502, 504 (6th Cir. 1991). The color of law requirement excludes from the reach of Section 1983 all

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

"merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 43 (1999). Plaintiff bears the burden of proving that the private party's acts constitute state action, and the Court must start with the presumption that private conduct does not constitute state action. *Sutton v. Providence St. Joseph Med. Ctr.* 192 F.3d 826, 835 (9th Cir. 1999). Only in rare circumstances can a private party be viewed as a 'state actor' for Section 1983 purposes. *Id.*

The Ninth Circuit employs four different tests to identify state action: (1) Public function; (2) Joint action; (3) Governmental compulsion or coercion; and (4) Governmental nexus. *Sutton*, supra, 192 F.3d at 835-836, Plaintiff cannot establish State Action under any of the recognized tests.

**1. Plaintiff Cannot Establish State Action Under the Public Function Test**

"Under the public function test, when private individuals or groups are endowed by the state with powers or functions governmental in nature, they become agencies or instrumentalities of the state and subject to its constitutional limitations*" Lee v. Katz,* 276 F.3d 550, 555 (9th Cir. 2002). The public function test is satisfied only upon a showing that the function at issue is "both traditionally and exclusively governmental." *Id.* at 555. In this case, after being medically cleared for discharge from Twin Cities Hospital, Decedent was receiving crisis stabilization services from Defendant SIERRA after she was placed on a §5150 hold by Defendant County employee, Defendant Hooson. JAF Nos. 10, 11, 31, 128, 180. Decedent was receiving services at a CSU which was a private non-profit entity providing contracted services to County. JAF Nos. 2, 5, 182.

Williams is an LPT and was working as an employee of SIERRA at the time of the incident. JAF Nos. 123, 181-183. The undisputed evidence is that Williams was not the person who placed the Decedent on a 5150 hold, was not consulted with respect to admitting Decedent, and was not on site when Decedent was admitted to the CSU. JAF Nos. 31, 34-35, 134, 189, 190, 219, 225. Rather, Williams held the position

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

of Medical Coordinator and lead Psychiatric Technician/Supervisor for the CSU. JAF No. 187.

Williams was available on-call but was not on-site working the night shift when Decedent passed. JAF Nos. 35, 72, 134, 192-194. There is no issue of fact with respect to Williams as a private actor who was not even on location at the time of Decedent's passing.

Even if Plaintiff claimed that the existence of the 5150 hold itself somehow altered private activity into State Action, applicable precedent is clear that mental health commitments do not constitute a function exclusively reserved to the state. See *Bolmer v. Oliveira*, 570 F.Supp. 2d 301, 321 (CT Dist. Ct. 2008) - mere private use of a state involuntary commitment statute does not vest the private actor with the power of the state. *Id.* Furthermore, the provision of Crisis Stabilization services in the form of assessment, medication monitoring and the provision of resources, even if they were categorized as medical services are not exclusively or traditionally government function. "The detention, assessment, and treatment of mentally disordered persons is not within the exclusive province or prerogative of the state." *Julian v. Mission Community Hospital*, 11 Cal.App.5th 360, 397 (2017). Accordingly, it cannot be said that Williams was acting under color of law under the Public Function test.

**2. Plaintiff Cannot Establish State Action Under the Joint State Action Test**

The joint action standard holds that a private party may be sued as a state actor under §1983 only if the state, "so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity" and "knowingly accepted benefits derived from unconstitutional behavior." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003). This occurs when the state knowingly accepts the benefits derived from

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

unconstitutional behavior." *Id*. at 1092. In assessing the joint action test, "Courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Franklin v. Fox,* 312 F.3d 423, 445 (9th Cir. 2002). "A Plaintiff may demonstrate joint action by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the state or its agents." *Id.* It should be noted that Ninth Circuit cases have "been careful to require a substantial degree of cooperation before imposing civil liability for actions by private individuals that impinge on civil rights" *Id*. Such facts have not been alleged here, as they do not exist.

Plaintiff appears to contend that Williams as an employee of SIERRA can be held to be a state actor by virtue of the fact her employer contracts with the County to provide crisis stabilization services. Any such contention has been repeatedly rejected by applicable precedent. See *K.H. v. Morgan* 914 F.2d 846, 852 (7th Cir. 1990), recognizing that private parties "even if paid by the state, are not state agents for constitutional purposes." *Id*. The law is clear that "[A]ction taken by private entities with the mere approval or acquiescence of the state is not state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan* 526 U.S. 40, 52 (1999). Here, Williams as an employee of a private entity is not a joint actor with the County under the very stringent definitions set forth by the appliable case law. There is absolutely no evidence that Williams was acting in concert with any government actors with the purpose of effecting a deprivation of Decedent's constitutional rights.

**3. Plaintiff Cannot Establish State Action Under the Governmental Nexus Test.**

Courts have identified the nexus test as the vaguest of the four approaches and have stated that: "state action may be found if, though only if, there is such a 'close nexus between the state and the challenged action' that seemingly private behavior 'may be fairly treated as that of the state itself.'" *Lee v. Katz 276* F.3d 550, 554, (9th

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Cir. 2002). Here, Plaintiff fails to provide any factor which could come close to establishing the requisite nexus for state action to be found. As stated above, neither a contract for services with a government entity nor licensure by a government entity equates to state action. The U.S. Supreme Court has observed that the "mere fact that a business is subject to state regulation does not by itself convert its action into that of the state." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974), See also *Rayburn v. Hogue* 241 F.3d 1341, 1348 (11ᵗʰ Cir. 2001) noting the requirement of a symbiotic relationship involving the "'specific conduct of which the plaintiff complains." *Id.* There is absolutely no evidence to support the existence of such a symbiotic relationship as between Williams as a CSU employee and any government actor with respect to the conduct of which Plaintiff complains. Williams' role as a lead LPT/Supervisor for a private CSU does not create the necessary nexus to impose state actor status.

### 4. Plaintiff Cannot Establish State Action Under the Compulsion Test

The compulsion test considers whether the "coercive influence" or "significant encouragement" of the state effectively converts a private action into government action. *Kirtley v. Rainey* 326 F.3d 1088, 1094 (9ᵗʰ Cir. 2003). The inquiry focuses on whether the entity or its employees are under such government compulsion that they act on behalf of the state. The case before this Court does not deal with state compulsion or coercive influence; in fact, just the opposite exists here. As established by testimony and evidence, the CSU is not a locked facility, and the Decedent had the right to refuse services and to leave if she wanted to. JAF Nos. 6, 186 ; 22 C.C.R. §80072.

Plaintiff has no evidence speaking to any sort of compulsion or coercive influence with respect to the provision of Crisis Stabilization services generally, and more specifically with respect to Williams. Williams is entitled to judgment as a matter of law.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**B. PLAINTIFF's POSITION: Williams was a state actor under the joint action/ common nexus test articulated in Jensen v. Lane County.**

William's conduct in this case satisfies the "close nexus / joint action test" articulated by the Ninth Circuit in <u>Jensen v Lane</u>, 222 F.3d 570 (2021). For the reasons set forth in detail above, here, as in <u>Jensen</u>, Branco's involuntary commitment occurred through an intertwined process involving county employees as well as Sierra and its employees.

The CSU was a County mental health facility operated under contract by Sierra. As the defendants readily admit, the County "opened a crisis stabilization unit for public service." JAF 1. Significantly, Hooson was undisputedly a county-employed youth triage crisis evaluator (JAF 10), and he was acting in that capacity at all times relevant to this action. He decided there was probable cause that Branco was gravely disabled and made the decision to send her to the CSU. He also transported her from the hospital to the facility. Additionally, Hooson testified at the time of the events in question he was **actually employed both by County and by Sierra**. (JAF 343).

Moreover, the County through its audits and oversight had a significant role in advising and shaping how Sierra operated the CSU. In fact, the County retained the authority of final approval of Sierra's policies and procedures. (JAF 265-266.) The Couty employees Jeffrey Elliot and Nurse Angela Atwell also audited of charts of CSU clients. (See JAF 326 to 331) Several witnesses testified that Sierra decided to increase the census at the facility by admitting clients detoxifying from alcohol and opioids/opiates use because Sierra perceived that continued funding from the county was dependent on increasing the census at the CSU. (JAF 267-285.) Steven Lampe, the CSU's assigned psychiatrist/prescriber from 2019 until November 2023, testified that Ryan Walsh (a Sierra employee) told him that the County was unhappy with the low CSU census. (JAF 279.) Lampe further testified that these concerns motivated Sierra to terminate the employment of Sandy Farley to alleviate County's concerns of

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

the low CSU census since her efforts to reject high acuity clients on safety grounds was seen as unnecessary "gatekeeping." (JAF 270-275 and 279-282.)

Thus, the County's concerns about the CSU census apparently overrode the safety concerns of Sierra's own employees and its existing policies and procedures which made it clear the CSU was not a detoxification center and that clients who were under the influence of drugs, withdrawing, or posed a risk of withdrawing should not be admitted to the facility. (JAF 287-289.) The County was aware of efforts to increase the census at the CSU and signaled their approval of these efforts. (JAF 295.) At the same time CSU staff including Janet Brown, Bonnie Sayers, and Savannah Sinclair voiced concerns to CSU management that the CSU was taking on high acuity drug and alcohol detoxing clients with no training or medical capacity to safely manage them. (JAF 296.)

Williams was a CSU manager employed directly by Sierra with the ultimate authority to reject patients form the facility. She claims she shared this authority with the nurse off-site Nurse practitioners. Lower-level CSU staff could only admit clients to the facility and if they had questions regarding admission criteria they could ask Williams. Williams also testified that assessing the withdrawal risk a potential client presents "depend on what the drug is" and "how under the influence they are." (JAF 402) Williams further that it was possible to get a tox screen done in the unit if one was not done by the time the client arrived. (JAF 403)   Williams took no steps to determine what drug Branco had overdosed on earlier and did not order any follow-up testing nor suggest any such measures to nurse practitioner Tidik.

Most critically, Williams testified that she agreed with the decision to admit Branco to the CSU (JAF 406) and that she did not reject Branco's admission to the facility. Given the County's direct involvement in this case through Hooson's referral of Branco to the CSU, the degree of influence and control the County exerted over Sierra regarding the operation of the facility, the deeply intertwined process of evaluating and detaining gravely disabled adults involving county employees as well

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

as Sierra and its employees, and Williams's direct role in admitting Branco to the facility, her actions satisfy the joint action/ common nexus test articulated in Jensen v. Lane County.

## II. PLAINTIFF's §1983 CLAIMS FAIL SUBSTANTIVELY AGAINST WILLIAMS A THERE IS NO EVIDENCE THAT SHE ACTED WITH DELIBERATE INDIFFERANCE OR PERSONALLY PARTICIPATED IN THE ALLEGED DEPRIVATION OF RIGHTS

### A.    WILLIAMS' POSITION

Even assuming arguendo that Williams could be deemed to be a state actor, which is expressly disputed, Plaintiff's claims would fail substantively as the undisputed facts do not support a claim of deliberate indifference with respect to Williams. Deliberate indifference is a required element in the 1983 claims. See *Castro v. County of Los Angeles* 833 F.3d 1060 (9th Cir. 2016) recognizing that a mere lack of due care is insufficient to support such a claim. *Id.* at 1069-1071. It has been recognized that this standard is "higher than gross negligence and requires a culpable mental state." *Murguia v. Langdon* 61 F.4th 1096, 1111 (9th Cir. 2023). Additionally, a person cannot be deemed to be acting under color of state law under §1983 without a showing of personal participation in the alleged rights deprivation. *Jones v. Williams* 297 F.3d 930, 934 (9th Cir. 2002).

There is no evidence that Williams either acted with deliberate indifference to known consequences with respect to her involvement with Decedent or that she personally participated in a violation of Decedent's constitutional rights. Plaintiff alleges that Williams, as a supervisor and LPT made the intentional decision to operate the CSU without an on-site supervisor during the evening-to-morning shifts and failed to have a proper policy and procedures manuals available to CSU staff.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

(Doc. no. 103, FAC 84). There is absolutely no evidence that Williams was responsible for any operational decisions.

The undisputed evidence is that Williams was an experienced LPT working as an LPT with some lead responsibilities. JAF Nos. 187, 196-202, 205. Williams was a CSU employee who worked the day shift and was available on- call to staff during the night shift which ran from May 15, 2024, into May 16, 2024. JAF Nos. 72, 193, 218-220, 241-243. The CSU's Nurse Practitioner, Tidik was also available on-call 24-7 to the staff attending to Decedent. JAF Nos. 108, 112, 126. When Decedent arrived at the CSU at roughly 5:40 p.m. on May 15, 2024, the CSU workers on site were LPT SHELLI WATSON, and LPT BETHANY AURIOLES, while the CSU workers on site for the overnight shift were LPT JANET BROWN and LVN BONNIE SAYERS. JAF Nos. 35, 121, 122, 123, 124, 230.

At the CSU, LVNs and LPTs have the same duties. Their duties included monitoring individuals, providing care, providing resources, and helping with coping skills. JAF No. 202. The CSU staff on duty did not consult with Williams about Decedent's admission. JAF Nos. 219, 222-223, 225. Williams learned about Decedent's admission, her 5150 information, and the fact that she had been medically cleared for discharge by the Emergency Room physician through the Microsoft Teams, NP Chat stream. JAF Nos. 225-228.

On the night of May 15, 2024, Williams returned briefly to the CSU after a staff meeting in order to drop off food at about 7:00 p.m. JAF No. 229. While at the CSU, Williams was informed that Decedent and another client had been cussing at each other. Williams spoke with Decedent and the other client. Williams asked them both to comply with CSU rules and told them that if they could not maintain on the unit, they would be reevaluated and possibly stepped up to a higher level of care, a locked facility. JAF Nos. 152, 232. When Williams spoke with Decedent, she was able to assess her behavior. Decedent did not appear manic. Williams sat across from her

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

close enough to ascertain whether her pupils were dilated and she did not notice them to be dilated. JAF Nos. 234-235. During the 10-20 minutes that Williams spoke with Decedent, Williams did not observe any factors which lead her to believe that Decedent was under the influence of fentanyl. JAF Nos. 236-237. Nor, did Williams observe any factors which suggested to her that Decedent was going through withdrawal symptoms. JAF Nos. 237-238. After Williams' conversation with Decedent, it was her impression that Decedent had de-escalated. JAF No. 233.

At 8:14 p.m., Williams documented in the NP Chat that Decedent and another client had been exchanging curse words, that she had spoken with Decedent and told her that if she was unable to maintain and keep her composure, she would be stepped up to a higher level of care, that Decedent had cried and apologized, and was currently sitting outside with the other female client and staff talking. JAF Nos. 152, 239. After de-escalating the situation, Williams left the CSU, but remained available on-call should any issues arise. JAF Nos. 72, 193, 218-220, 241-243.

At 9:58 pm, BROWN sent a message in the NP Chat noting that Decedent had calmed down and was now sleeping in the day room area. that she was interacting with the other female client on the unit, which "seems to be beneficial to both of them." JAF No. 154. At 9:59 p.m. NP Tidik commented in the NP Chat, "Nice work everyone!!" JAF No. 155.

The undisputed evidence is that Williams was not working on site during the overnight shift on May 15, 2024. JAF Nos. 72, 134, 192-194. 208-243. Williams was not contacted by CSU staff after being told through the NP Chat that everything had calmed down and the Decedent was sleeping. JAF Nos. 240-243.

Plaintiff alleges that the night staff on duty (BROWN and SAYERS) failed to properly monitor Decedent, and were asleep during the shift (Doc. 103, FAC ¶66;

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

JAF No. 73).[1]  However, the evidence reflects that both BROWN and SAYERS were trained on CSU's monitoring and two-hour client documentation policies, and that all staff, including BROWN and SAYERS signed an acknowledgement of CSU's "No-sleep" policy in connection with a November 2023 meeting in which all staff were informed that sleep during the night shift was not allowed. JAF Nos. 69-71, 74-76, 206. Further, there is no evidence that staff including BROWN and SAYERS were asleep during the night in question. *Id*. It is undisputed that no staff person ever told Williams that any worker continued to sleep at work after signing the no-sleep policy. JAF Nos. 206-209.

Ultimately, on the night of the incident, Williams was available on-call but did not receive any communications with concerns about Decedent after being informed that everything had settled down. When Williams arrived at the CSU around 8:30 a.m. on the morning of May 16, 2024, the Decedent was the first client she checked on. Williams immediately undertook first aid attempts. JAF Nos. 241-248. Unfortunately, such efforts were futile as Decedent had passed at some point between May 15, 2024, at 10:00 p.m. and May 16, 2024, at 12:00 a.m. JAF No. 41. The first responders who arrived did not even attempt CPR. JAF No. 249.

Additionally, while Plaintiff makes allegations relating to potentially missing or incomplete written policies and procedures manual on the date of the incident there is no evidence that the policies were in fact missing on the date of the incident. More importantly, there is absolutely no evidence that the staff on duty were looking for or unable to find written policies on the date. Williams believes the policies were physically available during the time period between May 1, 2024, to May 15, 2024. JAF No. 212. Nonetheless, the undisputed evidence is that, while policies existed,

---

[1] Williams does not concede Plaintiff's allegations with respect to Defendants BROWN or SAYERS or any Defendants.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Williams did not work on them, and they were being updated by Williams' superiors. JAF No. 212.

There is absolutely no evidence of personal participation in an alleged violation of constitutional rights by Williams, nor is there any evidence of deliberate indifference. All of Plaintiff's §1983 claims fail substantively against Williams and she is entitled to judgment as a matter of law.

**B.     PLAINTIFF's POSITION: As the CSU manager with the authority on whether to reject patients form the facility, Williams personally participated in the Deprivation of Branco's rights by failing to take any steps to determine whether Branco could be safely monitored there and by ignoring the concerns of lower-level CSU staff who wanted to send her back to the hospital. Her inaction in light of the known consequences of Branco relapsing constitutes deliberate indifference.**

By her own admission Williams had a supervisory role at the CSU and her duties included reviewing the safety concerns of lower-level CSU staff's about admitting clients to the unit. (i.e. their concerns about whether a client should be denied admission to the facility because their particular needs exceeded the type of care the CSU could safely provide). JAF 400.

Hooson's 5150 application put Williams on notice that Branco was gravely disabled by substance abuse disorder and could not manage her own personal safety. Williams was also aware of Branco's mother's concern that her daughter was at risk of relapsing unless she was monitored closely.

Although Williams was careful to point out that was Branco admitted without her direct input, Williams testified that she agreed with Branco's admission to the facility. JAF 406.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Williams was nevertheless aware that lower-level CSU staff had long raised concerns about admitting drug and alcohol withdrawing clients into the facility.

Most critically, Bethany Sayers testified that she and other night shift staff directly raised concerns about whether or not Branco could be safely monitored at the CSU while Williams was physically present at the CSU. (Williams transcript 21:23-25 to 22:1-3) Sayer's testimony is worth quoting at length. She testified:

We were questioning -- well, first of all, **it was the first time that anybody had ever been on the unit for grave disability for substance abuse. It was a new designation.** So that was shocking and kind of just – you know, it was just -- we didn't know what to do. We were kind of confused about it. So -- **and then when we were told what happened to her through the day, and then when we saw her medical chart and she had on her toxicology multiple substances, which we in the past hadn't taken people with that.** So the whole thing was concerning from the beginning. And so we were starting to question it, which we often did, because it was a struggle for a while.

So -- but that day, we questioned it in shift change. And then Ellie kind of got into some altercations with another client on the floor. So then it went into that. And then we questioned it when we came out to the point of saying that we wanted her to go back to the hospital. And -- yes. So yes, we questioned it. (emphasis added ) Williams transcript 21:3-21 (JAF 365)

We said we didn't feel comfortable -- we didn't feel comfortable from the beginning. But then when she started, you know, bickering and -- you know, verbally fighting with the other client, then we -- we just were, like, she needs to go to a higher level of care. **You know, we kind of jumped on that at that point to try to get her back to the hospital.** (emphasis added) Williams transcript 22:4-10

Thus, Williams apparently ignored Sayers's concerns about the lack of training and procedures regarding clients with "grave disability for substance abuse" and the

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

fact that her toxicology report indicated the use of multiple substances. Instead, Williams chose to only addressed the altercation between Branco and another resident. Williams threatening Branco with referral to higher level of care (i.e. monitoring at the locked PHF facility) in order to get Branco's assurances that she would be less disruptive. Williams did not so much as consult with Tidik about the safety concerns the CSU staff members raised. She did not take any steps to implement 15 minute safety checks for Branco.

Given the known risks to Branco's safety as established by Hooson's 5150 determination and Williams's awareness that Branco's mother was concerned that "her daughter was at risk of relapsing unless she was monitored closely," Williams's inaction personally involves her in the deprivation of Branco's rights and constituted deliberate indifference

## III. PLAINTIFF's CAUSE OF ACTION NO. 5, NEGLECT OR ABUSE OF DEPENDENT ADULT FAILS AS DECEDENT WAS NOT A DEPENDENT ADULT AND BECAUSE PLAINTIFF CANNOT ESTABLISH THE REQUISITE CONDUCT

### A. WILLIAMS' POSITION

In order to establish a claim under the Elder Abuse and Dependent Adult Civil Protection Act (Cal. Welf. & Inst. Code §§ 15600, et seq.), the Plaintiff must establish that the Decedent was an Elder or a "Dependent Adult". There is no question that Decedent was 19 when she died, (Doc. no. 103, FAC, ¶2), accordingly Plaintiff must establish both that she was "Dependent Adult" and that Williams engaged in physical abuse or neglect with recklessness or with oppression, fraud or malice. Plaintiff cannot establish any of these elements.

### B. PLAINTIFF's POSITION

As argued above, Decedent was gravely disabled and unable to manage her need for personal safety, and thus, she was a dependent adult. William's conduct in

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

failing to take any steps to determine whether Branco could be safely monitored in the facility was neglect and was reckless in that the risks of inaction were known to Williams through Hooson's 51050 determination and through Branco's mother's warnings.

### 1.    As a matter of law, DECEDENT was not a "Dependent Adult".

### A.    WILLIAMS' POSITION

Decedent's failure to fall into the statutory definition of a "Dependent Adult" is thoroughly addressed above within the arguments raised by County at argument II (A) and is hereby incorporated by reference as if set forth herein. Williams joins in County's position that Decedent does not fall within the statutory definition of a "Dependent Adult" as defined by Welfare and Institutions Code section 15610.23. JAF Nos. 96-101.

### B.    PLAINTIFF's POSITION: Ms. Branco was a dependent adult because she was gravely disabled and unable to manage her need for personal safety on her own and thus she was a dependent adult.

Pursuant to Welf & Inst. Code, § 15610.23(a) a dependent adult is "a person, regardless of whether the person lives independently, who has physical *or* mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights."

Branco's substance abuse disorder in combination with her other mental health conditions, were so severe that Hooson correctly determined her to be a gravely disabled pursuant to Welf & Inst. Code, § 5150. Among other things, He reached this conclusion because Branco had a "disregard for her own wellbeing and presented a grave risk to her personal safety."

102

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Branco satisfied the definition of a "dependent adult" in Welf & Inst. Code, § 15610.23(a) because she "could not carry out normal activities and/or protect her rights" since she could not adequately look after her own safety.

Additionally, Branco satisfies Welf & Inst. Code, § 15610.23(b) because she was admitted to the CSU on an involuntary hold for up to 72 hours. While the CSU was not officially an inpatient facility, Defendants effectively treated it like an inpatient facility by regularly placing individuals on 5150 holds there for up to 72 hours. Defendants long standing practice of improperly placing individuals in the CSU overnight effectively made the CSU an inpatient facility.

**2. Plaintiff's Dependent Adult Abuse or Neglect Cause of Action Fails as Plaintiff cannot establish that Williams engaged in Physical Abuse or Neglect Nor that She Acted with Recklessness, Oppression, Fraud or Malice.**

**A. WILLIAMS' POSITION**

Under California law claims of Dependent Adult Abuse are governed by the Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA") set forth in Cal. Welf. & Inst. Code §15600, et seq. The EADACPA protects dependent adults and the elderly from abuse, neglect, or abandonment. The EADACPA defines the term "Abuse of an elder or a dependent adult" to include "(1) Physical abuse, neglect, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering. (2) The deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering…" *Id.*

The EADACPA provides for certain enhanced remedies available to a plaintiff who proves abuse of a dependent adult, by clear and convincing evidence that a defendant is liable for physical abuse, or neglect as these terms are defined in the EADACPA. See *Carter v. Prime Healthcare Paradise Valley LLC*, 198 Cal.App.4th

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

396, 404 (2011). To recover these enhanced remedies a plaintiff is required to prove more than "simple, or even gross negligence, in the provider's care or custody of the elder." *Id.* at 405. A plaintiff must prove "by clear and convincing evidence" that "the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of" the neglect. *Id.*, citing Welf. & Inst. Code, §15657. In order to obtain the EADACPA's heightened remedies, a plaintiff must establish conduct essentially equivalent to conduct that would support recovery of punitive damages." *Id.*, citing *Covenant Care, Inc. v. Superior Court*, 32 Cal.4th 771, 789 (2004). Absent the existence of acts which constitute egregious abuse against dependent adults, these enhanced remedies will not apply. *Id.* at 405.

Accordingly, the type of oppression, fraud, or malice which a plaintiff must prove must be of an intentional, willful, or conscious wrongdoing of a despicable or injurious nature. See Cal. Civ. Code, §3294, subd. (c); see also *College Hospital, Inc. v. Superior Court*, 8 Cal.4th 704, 721 (1994). Similarly, the degree of recklessness contemplated by the EADACPA refers to a subjective state of culpability greater than simple negligence. As defined within applicable caselaw "Recklessness", unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action ... with knowledge of the serious danger to others involved in it.' " *Delaney v. Baker*, 20 Cal.4th 23, 31-32 (1999).

There is no clear and convincing evidence of conduct by Williams which can be classified as neglect or abuse sufficient to support this claim. Nor is there any evidence that Williams acted with recklessness, oppression, fraud, or malice in the commission of said abuse or neglect. As thoroughly detailed above, Williams did not work the night shift on May 15, 2024, was never provided with information which caused her to have concerns about Decedent's safety, interacted with Decedent and was not presented with any signs or symptoms that caused her to be concerned that

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Decedent was either under the influence of a substance or withdrawing from a substance. JAF Nos. 220-243.

Further, Williams was available to the night shift on-call but did not receive any communications after being informed that everything had settled down after the incident involving the Decedent and another client. Williams did not chart for the Decedent. Williams immediately had paramedics called upon finding the Decedent. Williams immediately provided CPR upon finding the Decedent. The policies and procedures manuals, to the extent they are relevant, were being revamped by Williams' superiors. JAF Nos. 152-155, 212, 240-253. This claim fails as a matter of law, as against Williams.

For the same reasons stated above, Plaintiff cannot establish a right to punitive damages against Williams.

**B.      PLAINTIFF's POSITION: Williams failure to take any steps to determine if Branco could be safely monitored in the CSU was Neglect. That neglect was reckless given the known consequences of inaction.**

Pursuant to Welf. and Inst. Code §15610.57(b) neglect includes, among other things, a failure to: (2) provide medical care for physical and mental health needs; and (3) protect from health and safety hazards.

Here, plaintiff brings a claim for neglect under the EADACPA against Williams based on her failure to provide care for Branco's health needs (i.e. her need to be monitored and prevented from relapsing) and failure to protect her from a health and safety hazard (i.e. drug relapse and a potentially fatal overdose).

Branco's physical and mental health need to be prevented from relapsing and the health and safety hazard of a potential relapse were both known to Williams and were the basis of her being referred to the facility in the first place.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Williams had a supervisory role at the CSU and her duties included reviewing the safety concerns of lower-level CSU staff's about admitting clients to the unit. (i.e. their concerns about whether a client should be denied admission to the facility because their particular needs exceeded the type of care the CSU could safely provide).

Hooson's 5150 application put Williams on notice that Branco was gravely disabled by substance abuse disorder and could not manage her own personal safety. Williams was also aware of Branco's mother's concern that her daughter was at risk of relapsing unless she was monitored closely.

Williams was also aware that lower level staff were generally concerned about the safety of admitting drug and alcohol detoxifying clients to the CSU.

Most critically however, Williams ignored staff's safety concerns regarding Branco specifically. Bethany Sayers testified that she and other night shift staff directly raised concerns about whether or not Branco could be safely monitored at the CSU while Williams was physically present.

Williams apparently ignored Sayers's concerns about the lack of training and procedures regarding clients with "grave disability for substance abuse" and the fact that her toxicology report indicated the use of multiple substances. Instead, Williams chose to only addressed the altercation between Branco and another resident.

Williams did not so much as consult with Tidik about the safety concerns the CSU staff members raised. She did not take any steps to implement 15-minute safety checks for Branco.

Given the known risks to Branco's safety Williams's inaction was "neglect" in the form of "withholding care" and reached the level of recklessness in light of the known risks established by Hooson's 5150 determination and Branco's mother's warnings.

106
**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## IV.    PLAINTIFF's SIXTH CAUSE OF ACTION FOR NEGLIGENT TRAINING, SUPERVISION, OR RETENTION FAILS AS A MATTER OF LAW.

### A.    WILLIAMS' POSITION

In order to establish Negligent Training, Supervision/Retention, Plaintiff is required to establish that Williams was an employer, and as a matter of law, she was not. California law recognizes the theory that an employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee. *Doe v. Capital Cities*, 50 Cal.App.4th 1038, 1054 (1996). "Negligence liability will be imposed on an employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.'" *Phillips v. TLC Plumbing, Inc.*, 172 Cal.App.4th 1133, 1139 (2009). Plaintiff concedes that Williams is an employee of SIERRA. JAF No. 182.

It is undisputed that Williams was an employee of Defendant SIERRA and not the employer of any individual involved in the case, and thus she cannot be charged with Negligent Training, Supervision and Retention. See Judicial Council of California Civil Jury Instructions (2025) CACI 426 Instructions for Use- "Give this instruction if the plaintiff alleges that the employer of an employee who caused harm was negligent in the hiring, supervision, or retention of the employee after actual or constructive notice that the employee created a particular risk or hazard to others." See *Jackson v. AEG Live, LLC*, 233 Cal.App.4th 1156, 1187-88, fn. 10 (2015). This claim fails as against Williams as a matter of law.

### ➢ B.    PLAINTIFF'S POSITION: Sierra is liable for William's failure to trail CSU employees.

Absent additional as yet undiscovered facts, Plaintiff concedes that the lack of training and policies demonstrated by the facts of this case go to Sierra's liability for

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

negligent training, supervision, and/or retention rather than William's personal liability.

## V.   PLAINTIFF'S 9TH CAUSE OF ACTION FOR WRONGFUL DEATH FAILS AS AGAINST WILLIAMS AS PLAINTIFF FAILS TO ESTABLISH THE BREACH OF A DUTY OWED TO DECEDENT WHICH CAUSED THE DAMAGES ALLEGED.

The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Estate of Osuna v. County of Stanislaus*, 392 F.Supp.3d 1162, 1184 (E.D. Cal. 2019) (quotes and cites omitted).) Since wrongful death must be predicated on a tort claim, Wrongful Death claims fail as a matter of law if the Court finds that Plaintiff cannot establish a cause of action for Negligence.

In order to establish Negligence, Plaintiff must prove (1) a duty on the part of defendant toward plaintiff; (2) defendant's breach of that duty; and (3) harm to plaintiff caused by the breach. *Kesner v. Superior Court*, 1 Cal.5th 1132, 1142 (2016).

### 1.   *Plaintiff Fails to Establish a Duty Owed by Williams*

### A.   WILLIAM's POSITION

Absent the existence of a legally recognized duty, there is no liability for negligence, no matter how easily an injury might have been prevented. *J.L. v. Children's Institute, Inc.*, 177 Cal.App.4th 388, 396 (2009). The existence and scope of duty are questions of law for the Court. *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 477 (2001); *Artiglio v. Corning Inc.*, 18 Cal.4th 604, 614 (1998). In this case, Williams as a CSU supervisor, who was on-call and off site when the incident occurred did not have a duty to prevent the adult Decedent from voluntarily using illicit drugs which Decedent brought into the CSU in her underwear. There is no question that the drugs upon which Decedent overdosed were brought into the CSU by the Decedent herself

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

and were later found concealed in her underwear. JAF Nos. 162-163. There is no question that Decedent consumed the drugs of her own volition and choice and without Williams' knowledge.

There does not appear to be any precedent under which a defendant can be held liable merely for failing to prevent an adult from obtaining and using illicit drugs. Rather, and to the contrary, the court in *Sakiyama v. AMF Bowling Centers, Inc.*, 110 Cal.App.4th 398 (2003), rejected the position that a general failure to prevent drug use could be a basis for liability. In that case, four teenage girls attended a rave and used drugs. While driving home, they crashed into a tree, killing the driver and one of the passengers and injuring the other two girls. The court applied the factors enunciated by the Supreme Court in *Rowland v. Christian*, 69 Cal.2d 108, 113 (1968), to ascertain that no duty to prevent illicit drug use existed ([1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved.). *Sakiyama*, 110 Cal.App.4th at p. 407. In declining to find such a duty, the court stated, "To impose ordinary negligence liability on a business owner that has done nothing more than allow its facility to be used for an all-night party, even if we assume that AMF knew that drugs would be used at the party, would expand the concept of duty far beyond any current models." *Sakiyama*, 110 Cal.App.4th 398, 406. The undisputed evidence here is that the CSU is not a locked facility, that individuals cannot be restrained from leaving, and that the Decedent brought the illicit drugs into the facility herself. JAF Nos. 6, 162-163, 186.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Williams cannot be charged with the duty of preventing the adult Decedent from consuming drugs which Decedent brought into the CSU without anyone's knowledge.

**B. PLAINTIFF's POSITION: Williams and other CSU employees owed Branco a duty of care in that they were employed in a County created mental health facility that served clients including those gravely disabled from substance abuse.**

Williams cites to *Sakiyama v. AMF Bowling Centers, Inc.*, 110 Cal.App.4th 398 (2003) to argue that Williams acting as a CSU manager did not owe Branco a Duty of care. Sakiyama is obviously factually distinguishable. In the instant case, the CSU was a County created facility that provided mental health services to various individuals including those that were gravely disabled by substance abuse. The County contracted with Sierra to provide such services and Williams was undisputedly an employee of Sierra. In Sakiyama, the primary defendant was the owner of a bowling alley sued for allowing an all-night rave to take place on the premises where some attendees consumed drugs and were involved in a fatal car accident. The Court found the Sakiyama defendants did not owe plaintiffs any duty of care. The Court noted, "…the all-night party at issue resembles may commonplace commercial activities. Countless bars and restaurants for example are open late and provide patrons the opportunity to drink alcohol, become intoxicated and drive." Here, by contrast the CSU existed to prevent the type of harm Branco suffered and its employees were trained to recognize among other things sings of drug use and symptoms of drug withdrawal. Thus, here, a finding of a duty of care to prevent drug use / overdoses at a facility like the CSU applicable to its employees creates virtually no risk of expanding the scope of liability to any other type of business or premises.

110
**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Moreover, the foreseeability of harm to Branco in the instant case was much greater than the foreseeability of the harm in *Sakiyama* and the closeness of the connection between the defendant's conduct is much closer in the instant case than it was in *Sakiyama.* The bowling alley in Sakiyama was created for the purpose of entertaining people on the premises and not for providing care to individuals gravely disabled by substance abuse. Williams and the other CSU defendants were trained professionals and on notice of the risk to Ms. Branco in virtue of Hooson's 5150 determination, his referral of Branco to the facility, and her mother's warnings that Branco would relapse and potentially overdose unless she was carefully monitored.

The moral blame is greater too in that Williams and the CSU staff had actual notice of the harmful consequences of failing to do the jobs they were hired to do. Moreover, the Defendants in *Sakiyama* searched individuals upon entry into the premises and in the instant case defendants did not.

### 2. Plaintiff fails to establish Negligent Conduct against Williams which constituted a Breach of Duty

#### A.    WILLIAM's POSITION

Plaintiff  makes grouped allegations of allegedly negligent conduct against Williams and other Defendants asserting that Defendants endangered Decedent's health and safety by failing to protect her from a health and medical hazard, failing to monitor her, falsifying Decedent's monitoring logs, failing to provide lifesaving measures, failing to notify authorities of medical distress, failing to supervise the night shift, and failing to maintain the CSU policies and procedures manual. Doc. no. 103, FAC¶¶ 117-119. The undisputed evidence is that Williams was not on-site when Decedent was admitted nor was she consulted with respect to the admission. JAF Nos. 221-225. The information that was provided to Williams about Decedent's admission was within the NP Chat stream and directed to the Nurse Practitioner which reflected

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

that Decedent's vital signs were stable and she had been medically cleared for discharge from the hospital. JAF Nos. 134-142. 227-228.

Williams did not believe that Decedent was at risk of harm because she had been medically cleared by the Emergency Room doctors. JAF No. 228. During her stay at the CSU, Decedent did not report, exhibit or convey signs or symptoms of withdrawal or signs of being under the influence to CSU staff, including Williams. JAF Nos. 136-139, 152, 231-241. Williams did not work the night shift on May 15, 2024. Both BROWN and SAYERS were trained on CSU's monitoring and two-hour client check documentation policies. Williams was available on call overnight from May 15-16, 2024, but did not receive any communications after being informed that everything had settled down after the incident involving the Decedent and another client. Williams did not chart for the Decedent. JAF Nos. 70-72, 152, 154-155, 203, 220-253.

When Williams arrived at the CSU on May 16, 2024, she immediately sought paramedics upon finding Decedent, and promptly provided CPR. JAF Nos. 244-248. Additionally, the evidence reflects that CSU policies and procedures manuals, to the extent they are relevant, existed and were in the process of being revamped by Williams' superiors. JAF Nos. 88-91, 212.

Plaintiff also alleges that BROWN and SAYERS slept during the night shift, however, there is absolutely no evidence that establishes this. JAF Nos. 69-71, 74-76, 206-209. Further, there is no evidence that staff including BROWN and SAYERS were asleep during the night in question. *Id.* It is undisputed that no staff person ever told Williams that any worker continued to sleep at work after signing the no-sleep policy. JAF Nos. 69-71, 74-76, 206-209.

There is no evidence that Williams engaged in negligent conduct, and she is entitled to judgment as a matter of law.

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**B.     PLAINTIFF's POSITION: Williams's complete inaction in the face of known dangers that Branco would overdose if not carefully monitored was a breach of her duty of care.**

Williams's complete inaction in the face of known dangers that Branco would overdose if not carefully monitored was a breach of her duty of care.  It is simply absurd to say that Williams did not believe that Decedent was at risk of harm because she had been medically cleared by the Emergency Room doctors. In fact, William's own testimony established otherwise. For example, she testified that assessing the withdrawal risk a potential client presents "depend on what the drug is" and "how under the influence they are." (JAF 402) As argued above Hooson's 5150 determination, Linda Cooper's warnings about her daughter's condition, and Sayers's explicit raising of concerns about whether Branco could be safely monitored at the facility unequivocally put Williams on actual notice that Branco was at risk of suffering severe harm. Moreover, Branco was not searched upon entry into the facility and it would be a equally egregious breach of Williams's duties to fail to ensure that she was searched and/or to simply assume she was searched.

**3.     Plaintiff's Claims Fail on the Element of Causation as Against Williams**

**A. WILLIAMS' POSITION**

Plaintiff's claims against Williams further fail on the element of causation. Plaintiff may recover damages if Decedent's death was "caused by the wrongful act or neglect of another." See C.C.P. §377.60. Causation has been defined as a "reasonably close connection between the Defendant's conduct and the resulting injury". *Corales v. Bennett* 567 F.3d 554, 572 (9th Cir. 2009). Where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact. *Weissich v. Cnty of Marin*, 224 Cal.App.3d 1069,1084 (1990). Causation must be

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

proven within a reasonable degree of probability. To regard an action as a cause of damages claimed, it must be more than a slight, theoretical, trivial, or negligible factor in causing harm. *Huffman v. Interstate Brands Corp.*, 121 Cal.App.4th 679, 696 (2004). There is absolutely no evidence which supports a claim of causation with respect to Williams. The undisputed evidence here is that there is not a single alleged action or omission attributable to Williams which was a substantial factor in causing the Decedent's tragic death. It is undisputed that Williams was not on-site on the night of the incident, did not observe and was not apprised of any sign or symptoms of potential drug use or withdrawal, was never contacted with any information about Decedent which warranted intervention, and immediately undertook first aid attempts upon finding Decedent. JAF Nos. 70-72, 152, 154-155, 203, 220-253.

Unfortunately, no amount of intervention by Williams would have made a difference as she arrived on May 16, 2024, at about 8:30 a.m. and Decedent passed away sometime between 10:00 p.m. on May 15, 2024, and 12:00 a.m. on May 16th. JAF Nos. 41, 244.

**B.     PLAINTIFF's POSITION: There is a close causal connection between Williams conduct in failing to take measures to protect Branco's safety and her death.**

The reasonably close connection between Williams conduct and the resulting injury is established by the same facts that demonstrate the foreseeability of the harm. Branco deemed to be gravely disabled by substance abuse, she was unable to look after her personal safety, her mother warned the CSU staff that she would relapse and potentially overdose if she was not carefully monitored and Bethany Sayers explicitly raised concerns about whether Branco could be safely monitored at the facility.

## CONCLUSION

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Hooson requests the Court grant his motion on the first, second, third, fifth, eighth and ninth causes of action in Plaintiff's first amended complaint.

The County requests the Court to grant its motion on the seventh and eighth causes of action.

Tidik requests the Court grant her motion on the first, second, third, fifth, eighth, and ninth causes of action in Plaintiff's First Amended Complaint.

Williams requests the Court grant her motion on the first, second, third, fourth, fifth, sixth, eighth, and ninth causes of action in Plaintiff's First Amended Complaint.

Plaintiff respectfully requests defendants motion be denied on all grounds.


DATED:  October 23, 2025          SMITH LAW OFFICES, LLP

                                  *David Hall*
                                  By:_____
                                      Douglas C. Smith
                                      David P. Hall
                                      Attorneys for Defendants
                                      COUNTY OF SAN LUIS OBISPO and
                                      JASON HOOSON

DATED:  October 23, 2025          WOOD SMITH HENNING & BERMAN LLP

                                  *Crystal Rorabaugh*
                                  By:_____
                                      Brian Hoffman
                                      Crystal Rorabaugh
                                      Attorneys for Defendant
                                      JULIA TIDIK

DATED:  October 23, 2025          CLOUSESPANIAC ATTORNEYS

                                  *Lawya Rangel*
                                  By:_____
                                      Lawya Rangel
                                      Yolanda Lopez
                                      Attorneys for Defendant
                                      SAVANNAH WILLIAMS

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

DATED: October 23, 2025          SEHAT LAW FIRM, PLC

                                 *Cameron Sehat*
                          By: _____
                                 Cameron Sehat
                                 Jeffrey Mikel
                                 Attorneys for Plaintiff
                                 LINDA COOPER, individually, and on
                                 behalf of the Estate of Decedent, ELINA
                                 QUINN BRANCO
                                 Attorneys for Defendant
                                 SAVANNAH WILLIAMS

<u>CERTIFICATIONS</u>

The undersigned, counsel of record for COUNTY OF SAN LUIS OBISPO and JASON HOOSON, certifies that their portion of this joint brief contains 5,660 words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 23, 2025          *David Hall*
                                 _____
                                 David Hall

The undersigned, counsel of record for JULIA TIDIK, certifies that her portion of this joint brief contains 6,996 words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 23, 2025          *Crystal Rorabaugh*
                                 _____
                                 Crystal Rorabaugh

The undersigned, counsel of record for SAVANNAH WILLIAMS, certifies that her portion of this joint brief contains 6,529 words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 23, 2025          *Lawya Rangel*
                                 _____
                                 Lawya Rangel

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The undersigned, counsel of record for LINDA COOPER, individually, and on behalf of the Estate of Decedent, ELINA QUINN BRANCO, certifies that her portion of this joint brief contains _____words, which complies with the word limit of L.R. 11-6.1.

DATED:  October 23, 2025                    *Cameron Sehat*

                                           Cameron Sehat

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**