Douglas C. Smith, Esq. (SBN 160013)
David P. Hall, Esq. (SBN 196891)
SMITH LAW OFFICES, LLP
4001 Eleventh Street
Riverside, CA 92501
Telephone: (951) 509-1355
Facsimile: (951) 509-1356
dsmith@smitlaw.com
dhall@smitlaw.com

Attorneys for Defendants COUNTY OF SAN LUIS OBISPO and
JASON HOOSON

*ADDITIONAL COUNSEL LISTED BELOW*]

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA COOPER, Individually, And On Behalf Of The Estate Of Decedent, ELINA QUINN BRANCO, <br><br> Plaintiff, <br> vs. <br><br> COUNTY OF SAN LUIS OBISPO, a governmental entity, form unknown, SIERRA MENTAL WELLNESS GROUP, a California Non-Profit Corporation, JASON HOOSON, individually, SAVANNAH WILLIAMS, individually; JOSH SIMPSON, individually; BONNIE SAYERS, individually; JULIA TIDIK, individually; BETHANY AURIOLES, individually, JANET | Case No.: 2:24-cv-08187-CV(AJRx) <br><br> **JOINT APPENDIX OF FACTS IN SUPPORT OF AND *IN OPPOSITION* TO MOTION FOR SUMMARY JUDGMENT** <br><br><br> *Complaint filed 9/23/24* <br> *First Amended Complaint filed 6/02/25* |

1
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

BROWN, individually, SHELLE          )
WATSON, individually; DOES 1          )
through 10, inclusive,                )
                    Defendants.       )

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Brian Hoffman, Esq. (SBN 150824)
Crystal Rorabaugh, Esq. (SBN313093)
WOOD SMITH HENNING & BERMAN, LLP
10960 Wilshire Blvd., 18th Floor
Los Angeles, CA 90024
Telephone: (310) 481-7600
Facsimile: (310) 481-7650
bhoffman@wshblaw.com
crorabaugh@wshblaw.com

Attorneys for Defendant JULIA TIDIK


Lawya Rangel, Esq. (SBN 242079)
Yolanda Lopez, Esq. (SBN 328922)
CLOUSESPANIAC, APLC
8038 Haven Avenue, Suite E
Rancho Cucamonga, 91730
Telephone: (909) 941-3388
Facsimile: (909) 941-3389
llrangel@csattys.com
yelopez@csattys.com
service@csattys.com

Attorneys for Defendant SAVANNAH WILLIAMS


Cameron Sehat, Esq. (SBN 256535)
Jeffrey Mickel, Esq. (SBN 350671)
SEHAT LAW FIRM, PLC
5100 Campus Drive, Suite 200
Newport Beach, CA 92660
Telephone: (949) 825-5200
Facsimile: (949) 313-5001
cameron@sehatlaw.com
j.mickel@sehatlaw.com

Attorneys for Plaintiff LINDA COOPER, individually, and on behalf of the Estate of Decedent, ELINA QUINN BRANCO

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff LINDA COOPER, Individually, and on Behalf of the Estate of Decedent, ELINA QUINN BRANCO ("Plaintiff"), and Defendants COUNTY OF SAN LUIS OBISPO (the "County"), JASON HOOSON ("Hooson"), JULIA TIDIK ("Tidik"), and SAVANNAH WILLIAMS submit this Joint Appendix of Facts in support of their Joint Motion for Summary Judgment.

| SUF No. | Defendants County of San Luis Obispo and Jason Hooson's Facts | Supporting Evidence | Opposing Party's Response |
|---|---|---|---|
| **Issue No. 1: Jason Hooson is Entitled to Qualified Immunity for Plaintiff's Claims.** **Disputed. See issue no. 17** | | | |
| 1. | The County of San Luis Obispo (the "County") opened a crisis stabilization unit ("CSU") for public service. | Warren Decl. ¶ 2. | Undisputed. |
| 2. | In 2019, the County and Sierra Mental Wellness Group ("Sierra") entered into a written contract for Sierra to operate the CSU. | Warren Decl. ¶ 2. | Undisputed. |
| 3. | The County designated the CSU as a facility to provide evaluation and treatment in accordance with Welfare and Institutions Code section 5150. | Warren Decl. ¶ 3; Hooson Decl. ¶ 6. | **Disputed** in *part*. The CSU was not an Lanterman Petris Short designated facility which under WIC 5150 is the only class of facility allowed to hold and treat 5150 clients. (See Ex. 27 Decl. Of Maddaus ₱ 10, & |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | Ex. 28 W&I Code Section 5150 & See Ex. 29 DCHC list of approved 24 hour and outpatient/CSU; See Ex. 8 Farley depo. 75:2-19 |
| 4. | The State Department of Health Care Services approved the County designation of the CSU. | Warren Decl. ¶ 3. | **Objection**: Ambiguous as to what exactly the DHCS approved the CSU to operate as. It never approved it as an LPS facility so it begs the question what exactly did the County approve the CSU to operate as?<br><br>**Disputed**. The CSU was never a LPS nor ever approved by the State Department of Health Care Services to be an LPS designated facility. (See Ex. 8 Farley Depo 75:2-19; Ex. 10 Aurioles Depo. 124: 19-25; See Ex. 31 DHCS List of approved CSU) |
| 5. | The CSU was a facility to provide supportive services to individuals including crisis intervention. | Warren Decl. ¶ 2. | **Objection**: Ambiguous as to the meaning of "crisis intervention". |

5

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | **Disputed** if crisis intervention includes detoxifying clients, the CSU was not designated as a "detox" or intended to be operated as one, or even capable of safely managing clients under the influence, detoxifying or in active withdrawal from substances (See Ex. 36 Sierra-County contract; See also Ex. 33 Sierra Mental Wellness Group—Policies and Procedures) |
| 6. | Individuals who were in the CSU were held on a voluntary basis which meant they could leave the facility. | Warren Decl. ¶ 2; Hooson Decl. ¶ 6. | **Disputed in part**. By law, 5150 hold could not leave voluntarily because they were held against their will, *involuntarily* which is the subject of a controversial policy by County in the way it operated its CSU.<br><br>See Ex. 29 Plaintiff Expert Mat Madaus Decl. para. 1-10 |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 7. | The County also operated a Psychiatric Health Facility ("PHF") in the city of San Luis Obispo. | Warren Decl. ¶ 4; Hooson Decl. ¶ 6. | Undisputed. |
|---|---|---|---|
| 8. | The PHF was a lockdown facility for the more complicated cases. | Warren Decl. ¶ 4; Hooson Decl. ¶ 6. | **Objection**: vague and ambiguous as to "more complicated cases". The PHF was a facility to hold 5150 Holds due, had Q15 (every 15-minute welfare checks), full medical staff including registered nurse an psychiatrist in the building, and lock down<br><br>Undisputed, broadly speaking. |
| 9. | Hooson has been a licensed psychiatric technician in the State of California since 1993. | Hooson Decl. ¶ 2. | Undisputed. |
| 10. | In May 2024, Hooson was working full time with the County as a youth triage crisis evaluator. | Hooson Decl. ¶ 3. | **Disputed** in *part*. He was also working as MHET evaluator as part of a joint venture between County and Sierra.<br><br>See SUF 370 |
| 11. | Hooson was designated by the County to administer involuntary | Hooson Decl. ¶ 3. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | holds under Welfare and Institutions Code 5150. | | |
| 12. | Hooson estimated he placed about 100 individuals under a 5150 hold as "gravely disabled." | Hooson Decl. ¶ 5. | Undisputed. |
| 13. | On May 15, 2024, Linda Cooper ("Plaintiff") found her daughter, Elina Branco ("Branco") unconscious. | Ex. 4, No. 4 (pgs 4:25-27.)[1] | Undisputed. |
| 14. | Plaintiff called the paramedics to her house. | Ex. 4, No. 4 (pgs 4:25-27). | Undisputed. |
| 15. | Once at Plaintiff's house, the paramedic gave Branco Narcan and a respirator. | Ex. 7, pg. 233:12-20 | Undisputed. |
| 16. | Branco woke up after she was placed in the ambulance on a gurney. | Ex. 7, pgs. 233:22-234:6. | **Objection**: vague and ambiguous as to the term "woke up" suggesting that she may take a nap. The correct medical term is "regained consciousness". <br><br> **Undisputed** that she regained consciousness, erroneously |

---

[1]     Plaintiff's response to the interrogatory is lengthy. The page and line numbers of the referenced statements are provided to assist the Court.

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | described as "wake up" |
| 17. | While at the Hospital, Plaintiff contacted the Tarzana Dual Diagnosis Treatment center in Tarzana, California to have Branco attend a detox program. | Ex. 4, pg. 5:5-7. | Undisputed. |
| 18. | The Tarzana facility informed Plaintiff that they would have a bed for Branco on the next day. | Ex. 7, pgs. 279:22-280:6. | Undisputed. |
| 19. | While Branco was in the emergency room, Plaintiff called CSU. | Ex. 7, pg. 278:10-13. | Undisputed. |
| 20. | Shelli Watson of the CSU told Plaintiff that they would accelerate the paperwork to have her admitted to the CSU. | Ex. 7, pg. 281:12-21. | **Disputed** in *part as* it omits the entirety of her conversation with Cooper because she also reassured Plaintiff that her daughter would be safe, monitored every 15 minutes and was going to survive.<br><br>Ex. 7 Cooper Depo. 286:19-25 |
| 21. | On May 15, 2024, Hooson learned about a possible case that needed his assistance at the Twin | Hooson Decl. ¶ 7. | Undisputed. |

9

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | City Community Hospital in Templeton, California. | | |
| 22. | At 2:30 p.m. on May 15, 2024, Plaintiff spoke with Hooson separately to tell him about the entire situation with Branco. | Ex. 4, No. 4 (pgs 34:1-5.); Ex. 7, pg. 251:6-14; Hooson Decl. ¶ 8. | **Objection**: vague as to "tell him about the entire situation with Branco". She specifically informed him that Branco had overdosed the morning of, was found blue in the face.<br><br>Undisputed. |
| 23. | Plaintiff told Hooson about the condition that she found Branco that morning. | Hooson Decl. ¶ 8. | Undisputed |
| 24. | Plaintiff claims she felt Branco could not come back home as it would be unsafe. | Ex. 4, No. 4 (pgs 33:12-15.) | Undisputed |
| 25. | According to Plaintiff's discovery responses, Hooson understood that Branco was "an extremely high-risk client and could not be left unsupervised and unmonitored." | Ex. 4, No. 4 (pgs 35:6-7.) | Undisputed |
| 26. | After assessing Branco at the hospital, Hooson believed she needed more monitoring than an out- | Hooson Decl. ¶ 11. | Undisputed |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | patient facility could provide. | | |
| 27. | Hooson also considered providing the least restrictive means to provide psychiatric care for Branco. | Hooson Decl. ¶ 11. | Undisputed |
| 28. | After discussing the location of placement with Branco, Hooson believed the CSU would meet her needs. | Hooson Decl. ¶ 12. | Undisputed |
| 29. | According to Plaintiff's discovery responses, Hooson agreed Branco needed to be admitted to the CSU to keep her safe overnight due to Plaintiff's conversation. | Ex. 4, No. 4 (pgs. 34:3-5.) | Undisputed |
| 30. | Plaintiff agreed based on Hooson's representation that Branco "would be in a safe and protective environment and monitored around the clock." | Ex. 4, No. 4 (pgs. 34:15-17.) | Undisputed |
| 31. | Hooson placed Branco on a 5150 hold. | Hooson Decl. ¶ 12; Ex. 4, No. 4 (pgs. 34:11-15.) | Undisputed |
| 32. | Plaintiff admitted that Jason Hooson had probable cause to place Elina Quinn Branco | Ex. 5, No. 10. | **Objection**: Immaterial fact as Hooson's decision to place a WIC5150 |

11

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | under a hold pursuant to Welfare and Institutions Code section 5150. | | hold is not at issue. Rather, his decision to refer Branco to a non LPS designation lower level of care CSU vs. an LPS designated facility and higher level of care and monitoring is the material fact, here.<br><br>Undisputed. |
| 33. | Hooson transported Branco to the CSU in a vehicle. | Ex. 4, No. 4 (pgs. 35:22-23.) | Undisputed. |
| 34. | Hooson and Plaintiff arrived at the CSU for admission at about 5:40 p.m. on May 15, 2024. | Hooson Decl. ¶ 13. | Undisputed. |
| 35. | Plaintiff claims Hooson handed Branco off "to the CSU staff, presents this crisis assessment report and advises the CSU staff including WATSON, AURIOLES, BROWN, SAYERS and others in charge of assessing and monitoring BRANCO that she has overdosed the morning of and was at high risk of relapsing and by implication was a danger-to-herself if not closely supervised and | Ex. 4, No. 4 (pg. 36:6-11.) | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | monitored while at the CSU." | | |
| 36. | Hooson left the CSU prior to 6:10 p.m. on May 15, 2024. | Hooson Decl. ¶ 13. | Undisputed. |
| 37. | Hooson did not return to the CSU on May 15, 2024 after he left around 6:10 p.m. | Hooson Decl. ¶ 13. | Undisputed. |
| 38. | Plaintiff admitted that Jason Hooson did not provide any medical treatment to Elina Quinn Branco on May 15, 2024. | Ex. 5, No. 15. | Undisputed. |
| 39. | While in the CSU, Branco went to bed at 9:35 p.m. on May 15, 2024. | Ex. 4, No. 4 (pg. 37:5-6.) | Undisputed. |
| 40. | Branco stopped breathing at 10:45 p.m. on May 15, 2024. | Ex. 5, No. 21. | Undisputed. |
| 41. | Branco died between 10:00 p.m. and 12:00 a.m. on May 15, 2024. | Ex. 4, No. 4 (pg. 37:22-24.) | **Disputed**. Branco likely died shortly after she stopped breathing which based on the video likely occurred just after she stopped convulsing and moving.<br><br>Ex. 35 Video HA CSU Main Room North |

13

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 42. | Plaintiff admitted that Jason Hooson did not provide any medical treatment to Elina Quinn Branco on May 16, 2024. | Ex. 5, No. 16. | Undisputed. |
|---|---|---|---|
| 43. | Hooson was working as an employee of the County during his contact with Branco. | Hooson Decl. ¶ 14. | Disputed **in part**. He worked in a dual Sierra-County capacity acting as both Sierra and County's W&I 5150 MHET evaluator<br><br>See Fact 307 |
| 44. | Prior to January 1, 2024, Hooson would not have been able to place Branco on a 5150 hold because substance abuse could not have been considered as a basis for the hold. | Hooson Decl. ¶ 15. | Undisputed |
| 45. | After January 1, 2024, a new law allowed Hooson to consider Branco's substance abuse as a ground for a 5150 hold. | Hooson Decl. ¶ 15. | Undisputed |
| 46. | Hooson told Plaintiff that the CSU is a more appropriate facility to transfer Branco to as opposed to a psychiatric hospital. | Ex. 4, No. 4 (pg. 34:10-11.) | Undisputed |
| 47. | Hooson told Plaintiff and Branco "that a 5150 Hold would be in her best | Ex. 4, No. 4 (pg. 35:7-10.) | Undisputed |

14

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | interest and that she would be safe and monitored at the CSU." | | |
|---|---|---|---|
| 48. | Plaintiff and Branco relied on Hooson's recommendation to transfer Branco to the CSU. | Ex. 4, No. 4 (pg. 35:11-12.) | Undisputed |

| SUF No. | Fact | Supporting Evidence | Opposing Party's Response |
|---|---|---|---|
| **Issue No. 2**: There is No Evidence Jason Hooson Acted with Deliberate Indifference. <br><br> **Disputed. See issue no. 17** | | | |
| 49. | See. JAF Nos. 3, 4, 9, 11, 25, 27, 28, 31, 32, 34, 35, 36, 37, 38, 42, 43, 45, 46, and 47. | | See corresponding Opposing Party responses |
| 50. | Plaintiff's interrogatory responses cited the contents of Hooson's Crisis Assessment Form as evidence providing notice to the CSU staff about Branco's substance abuse and being a grave risk. | Ex 4, No. 4 (pg. 34:18-35:5). | **Objection**. Violation of Court's MSJ order re requiring a single statement of undisputed and disputed facts, not compound, separately in its row, not legal argument, no legal conclusions. Best evidence rule. <br><br> Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 51. | Hooson's Crisis Assessment Form assessed Branco at "an elevated risk of immediate self-harm in light of her current behavioral and substance use disorder." | Ex 4, No. 4 (pg. 34:23-24). | **Objection**. Violation of Court's MSJ order re requiring a single statement of undisputed and disputed facts, not compound, separately in its row, not legal argument, no legal conclusions. Best evidence rule.<br><br>Undisputed. |
| --- | --- | --- | --- |
| 52. | Plaintiff does not claim the information contained in Hooson's Crisis Assessment Form was negligent or false. | Ex. 4, No. 4 (pgs. 35:6-36:12.) | **Objection**. Violation of Court's MSJ order re requiring a single statement of undisputed and disputed facts, not compound, separately in its row, not legal argument, no legal conclusions. The purported fact also seeks opposing party to refute a negation which is not a proper alleged fact per the court's order.<br><br>**Disputed**. Hooson's assessment was a breach of the standard of care requiring a 5150-hold due to grave disability on the basis of substance |

16

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | use disorder, and to be monitored in a higher level of care such as the PHF<br><br>Ex. 29 Plaintiff Expert Matt Mads Decl. Paras. 4,17,21 |
| 53. | Plaintiff's interrogatory responses cited the contents of Hooson's "CSU Acceptance Screening Tool" as the "screen tool for the Mobile Crisis to evaluate the appropriateness of referring a person to the CSU. | Ex. 4, No. 4 (pg. 36:13-36:19.) | Undisputed. |
| 54. | Plaintiff does not claim the information contained in Hooson's Crisis Assessment Form was negligent or false. | Ex. 4, No. 4 (pg. 36:20-36:26.) | **Objection**. Violation of Court's MSJ order re requiring a single statement of undisputed and disputed facts, not compound, separately in its row, not legal argument, no legal conclusions. The purported fact also seeks opposing party to refute a negation which is not a proper alleged fact per the court's order.<br><br>**Disputed**. Hooson's assessment was a |

17

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | breach of the standard of care requiring a 5150-hold due to grave disability on the basis of substance use disorder, and to be monitored in a higher level of care such as the PHF<br><br>Ex. 29 Plaintiff Expert Matt Mads Decl. Paras. 4,17,21 |
|---|---|---|---|
| 55. | Plaintiff's interrogatory responses failed to provide any facts showing Hooson was aware of prior issues at the CSU. | Ex. 4, No. 4 (pg. 32:15-46:11.) | **Objection**. Violation of Court's MSJ order re requiring a single statement of undisputed and disputed facts, not compound, separately in its row, not legal argument, no legal conclusions. The purported fact also seeks opposing party to refute a negation which is not a proper alleged fact per the court's order.<br><br>**Disputed**. Hooson's assessment was a breach of the standard of care requiring a 5150-hold due to grave disability on the |

18

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | basis of substance use disorder, and to be monitored in a higher level of care such as the PHF<br><br>Ex. 29 Plaintiff Expert Matt Mads Decl. Paras. 4,17,21 |
|---|---|---|---|
| 56. | Plaintiff did not know Hooson prior to meeting him on May 15, 2024. | Ex. 7, pg. 240:1-5. | Undisputed. |
| 57. | Plaintiff also testified she was not present when Hooson spoke with Branco on May 15, 2024. | Ex. 7, pg. 254:9-16. | Undisputed. |
| 58. | After Hooson met with Branco, she was agreeable to go to the CSU. | Hooson Decl. ¶ 12. | Undisputed. |
| 59. | Hooson assessed Branco before any decision was made about the type of placement she needed. | Hooson Decl. ¶¶ 10 and 11. | Undisputed. |
| 60. | Hooson believed the placement at the CSU was in Branco's best interest. | Hooson Decl. ¶ 12. | **Objection**. Calls for a legal conclusion and expert witness opinions.<br><br>**Disputed**. His own declaration undermines any belief he thought the CSU was in her best interest as he admittedly declares |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | in paragraph 11 "*I felt Branco needed more monitoring than an out-patient facility could provide.*" Hooson Decl. Para 11 |
|---|---|---|---|
| 61. | Hooson was not trying to mislead Plaintiff or Branco. | Hooson Decl. ¶ 12. | **Objection**. Calls for a legal conclusion. Also, immaterial whether he tried to mislead her or not, his professional duties required him to make a competent assessment and comply with policies impacting his MHET position. Ex. 33 P&P Preadmission 4-6 Undisputed to the extent he wrote a self-serving declaration. |
| 62. | Plaintiff does not claim that the County failed to designate the CSU to provide evaluation and treatment for clients placed on a 5150 hold. | Ex. 4, No. 4 (pgs. 7:8-12, 10:14-20, 12:22-13:7.); First Amended Complaint ¶¶ 13, 74-96. | **Objection**. Violation of Court's MSJ order re requiring a single statement of undisputed and disputed facts, not a legal argument, no legal conclusions. Best evidence rule. |

20

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | **Disputed**. County operating the CSU to detain and evaluate involuntarily held clients under the auspice of WIC5150 yet requesting their consent was a controversial policy. Ex. 29 Madaus Declaration. 1-10 |
|---|---|---|---|

| SUF No. | Fact | Supporting Evidence | Opposing Party's Response |
|---|---|---|---|
| **Issue No. 3**: Jason Hooson is Entitled to Immunity Under Welfare and Institutions Code Section 5278 for All State Law Claims<br><br>**Disputed.** | | | |
| 63. | See. JAF Nos. 11, 22, 25, 28, 29, 30, 31, 32, 33, 38, 42, 46, 47, 48, and 61. | | See Prior Opposing Party Responses. |
| 64. | Plaintiff does not claim Hooson's assessment of Plaintiff was negligent. | Ex. 4, No. 4 (pgs. 35:6-36:26.) | **Disputed**. See fact 370-393 |

| SUF No. | Fact | Supporting Evidence | Opposing Party's Response |
|---|---|---|---|
| **Issue No. 4**: Plaintiff Cannot Establish a *Monell* Claim Against the County.<br><br>**Disputed**. See Issues 11-15 | | | |
| 65. | A review of Plaintiff's response to contention interrogatories reveals a legal theory largely based | Ex. 4, No. 4 (pgs. 5:11-10:5.) | **Disputed**. See Issues no. 12 -15, and Facts 167-241 |

21

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | on the events that occurred to Ms. Branco on May 15, 2024. | | |
| 66. | Plaintiff does not reference similar conduct that occurred to any other client at another time. | Ex. 4, No. 4 (pg. 10:6-18:8.) | **Disputed**. See Issues no. 12 -15, and Facts 167-241 |
| 67. | Plaintiff's discovery responses state, "[b]oth SIERRA and COUNTY management were aware of SIERRA employees sleeping on the job, especially during the nocturnal shift when presumably staying awake during the shift would be of most importance when clients were engaged in therapeutic rest." | Ex. 4, No. 4 (pg. 11:1-4.) | Undisputed. |
| 68. | In November 2023, Sierra had a meeting with staff at the CSU. | Ex. 9, pgs. 75:22-77:7, 78:24-79:3; Ex. 10, pgs. 66:8-11, 68:7-14; and Ex. 11, pg. 129:20-25. | Undisputed. |
| 69. | At the November 2023 meeting, Sierra issued a new policy that prohibited sleeping on all shifts. | Ex. 9, pgs. 75:22-77:7, 78:24-79:3; Ex. 10, pgs. 66:8-11, 68:7-14; and Ex. 11, pg. 129:20-25. | Undisputed. |
| 70. | The CSU staff had a monitoring policy that required staff to do a documented two-hour check. | Ex. 8, pgs. 76:22-77:5. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 71. | The CSU staff, including Bonnie Sayers and Janet Brown, were training on the two-hour monitoring policy. | Ex. 8, pgs.77:14-78:7. | Undisputed. |
|---|---|---|---|
| 72. | Bonnie Sayers, a licensed psychiatric technician, worked from 7:30 p.m. on May 15, 2024 to 8:00 a.m. on May 15, 2024. | Ex. 9, pgs. 36:20-23, 75:14-15. BS | Undisputed. |
| 73. | Plaintiff contends Sayers and Brown were sleeping on the night of Branco's death. | Ex. 4, No. 4 (pg. 10:21-23.) | Undisputed. |
| 74. | No one from Sierra human resources told Bonnie Sayers that she had been sleeping on the night of May 15, 2024. | Ex. 9, pg. 80:20-25. | Undisputed. |
| 75. | No one from Sierra human resources told Bonnie Sayers that Janet Brown had been sleeping on the night of May 15, 2024. | Ex. 9, 81:2-5. | **Disputed**. Brown was terminated from her employment at SIERRA for sleeping on the job <u>and</u> falsifying her observation logs.<br><br>The Main Room South Video captures at 22:48:32 Branco sit up and covers her upper torso with her bed sheet to apparently conceal from view |

23

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | likely her ingesting the Fentanyl. Concurrently, the video also shows Brown retrieve from her car bedding, pillows and comforter to start making herself more comfortable and go to sleep at 22:53:39 Just <u>two minutes</u> after Branco's medical distress where she is in a prone position but apparently kicking her legs upward at 22:51:40 and stops moving at dies at around 22:54:52.<br><br>Ex. 57 Text message from Janet Brown to Savannah Sinclair re termination dated Aug 27, 2024.<br><br>Ex. 35 Video Main Room North at 22:53:39<br>Ex. 34 Main Room South at 22:51:40 |
| 76. | Other than May 15, 2024, Plaintiff's responses to discovery do not identify any other information about other Sierra employees who were | Ex. 4, No. 4 (pg. 11:1-12:2.) | **Objection** to defense counsel selectively focusing on written discovery at the exclusion of all oral depositions |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | sleeping on their shift after November 2023. | | of the many witnesses taken who have attested to Brown and Sayers having slept during their shift and the video evidence demonstrating the same.<br><br>**Disputed**. See OPR 75 |
| 77. | Plaintiff's discovery responses repeatedly reference findings in the 2021/2022 Grand Jury Report. | Ex. 4, No. 4 (pgs. 10:14-20, 13:16-14:15, 17:13-21, 24:16-19, and 27:18-25.) | Undisputed. |
| 78. | Plaintiff claims the Grand Jury Report said, "the CSU was not medically staffed and unequipped to provide medical care to clients with underlying medical conditions including those conditions requiring a higher level of care." | Ex. 4, No. 4 | Undisputed. |
| 79. | On July 26, 2022, the 2021/2022 San Luis Obispo Grand Jury issued a report entitled, "*San Luis Obispo County Mental Health Services: a Safe Harbor or a Perilous Journey for Those in Need?*" (the "Grand Jury Report") | Ex. 1; Warren Decl. ¶ 6. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 80. | The Grand Jury Report stated Sierra could not meet the contract requirement about a registered nurse being at the facility because the current nurse was in San Luis Obispo County fourteen days per month. | Ex. 1, pg. 13. | Undisputed. |
| 81. | The Grand Jury Report stated, "[t]he original County contract for the CSU stipulated that a registered nurse be at the facility full-time." | Ex. 1, pg. 13. | Undisputed. |
| 82. | The Grand Jury Report stated, "[i]n late 2021 an amendment to the contract was adopted stipulating that either a registered nurse, a psychiatric technician, or other psychiatric service provider be at the facility when clients are present." | Ex. 1, pg. 13. | Undisputed. |
| 83. | The Grand Jury report states, "[t]he County contract with SMWG for operation of the CSU calls for access to a psychiatrist. There is no psychiatrist on duty at the CSU. A contract psychiatrist is available via telemedicine." | Ex. 1, pg. 13. | Undisputed. |

26

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 84. | The Grand Jury Report identifies an issue in August 2021 where the CSU staff claimed they were too busy to accept a placement from a hospital. | Ex. 1, pg. 14. | Undisputed. |
|---|---|---|---|
| 85. | The Grand Jury Report then noted the CSU cameras showed the CSU was empty where "SMWG staff can be seen appearing to relax, on their phones or talking with each other." | Ex. 1, pg. 14. | Undisputed. |
| 86. | The Grand Jury Report stated the CSU staff taped paper over the cameras on two occasions. | Ex. 1, pg. 14. | Undisputed. |
| 87. | The Grand Jury Report stated, it is "in possession of photographs depicting a SMWG staff member making an obscene hand gesture in the direction of a County employee with whom they had just interacted." | Ex. 1, pg. 14. | Undisputed. |
| 88. | The CSU had a written policy and procedure (P&P 101-CSU) governing "Admission, AWOL and discharge of clients." | Ex. 2; Ex. 8, pgs. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 89. | The CSU policy P&P 101-CSU contains a policy for clients placed on a 5150 hold. | Ex. 2, pgs. 1-5. | Undisputed. |
|---|---|---|---|
| 90. | The CSU had a written policy and procedure (P&P 006) governing "CSU preadmission procedure." | Ex. 2. | Undisputed. |
| 91. | The CSU policy P&P 101-CSU contains a list of "Barriers to Treatment." | Ex. 2, pg. 2. | Undisputed. |
| 92. | Plaintiff claims, "both SLO and SIERRA failed to ensure that medically trained staff like nurses would be physically present at the CSU when clients were treated." | Ex. 4, No. 4 (pg. 17:16-19.) | Undisputed. |
| 93. | Plaintiff has not cited any instance where the CSU did not have at least one Registered Nurse, Psychiatric Technician, or Licensed Vocational Nurse present. | Ex. 4, No. 4 (pg. 13:16-14:6, 17:13-18:8.) | Undisputed. |
| 94. | Plaintiff's discovery responses state, "[b]oth COUNTY and SIERRA were aware CSU staff regularly failed to monitor clients" | Ex. 4, No. 4 (pg. 24:16-17.) | Undisputed. |

28

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 95. | Other than these conclusory statements, Plaintiff does not identify any other dates, names of clients, or instances where CSU failed to monitor clients. | Ex. 4, No. 4 (pg. 24:16-22.) | **Objection**. Mistakes the standard of proof to establish *Monell* Liability against County for failure to train and unconstitutional practice/custom because proof of prior injury is *not required* to establish that County had actual or constructive knowledge that its practices were substantially certain to cause a constitutional violation *(Sandoval v. County of Sandiego 985 F3d at 682) (Townsend v. County of Santa Cruz, 2021 WL 393174)* <br><br> **Disputed** that were no other instances when the CSU staff failed to monitor NOC clients by implication during the period when former CSU RN manager Sandy Farley was employed, she attested to the custom and practice |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | of night staff taking extended "2-4 hour" sleeping breaks during times they were supposed to monitor night clients, said pattern continued. Upper Sierra management, and by implication County through its auditors were aware that the NOC shift sleeping was condoned when clients were present. Even after Sierra' November 2023 meeting during which a new "no sleeping policy was mandated" several staff including defendants Janet Bonnie Sayers, Janet Brown verbally voiced their opposition to the new policy.<br><br>Ex. 8 Farley Depo. 88:14-90:15<br>Ex. 9 Sayers Depo 77:9-21 |

///

///

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| SUF No. | Fact | Supporting Evidence | Opposing Party's Response |
|---|---|---|---|
| **Issue No. 5: Elina Branco Does Not Qualify as a "Dependent Adult" Under California's Elder Abuse Statutes, Welfare and Institutions Code section 15600, *et seq.*** **Disputed: Aside from Hooson's determination that she qualified as gravely disabled due to substance use disorder to be placed on an involuntary hold, the CSU was regularly treated as a 24 hour+ facility frequently detaining clients for 48 hours, 72 hours and even longer periods.** | | | |
| 96. | Plaintiff has not identified any facts suggesting that Branco had any physical limitation that restricted her ability to carry out normal activities or to protect her rights | Ex. 4, No. 4 (pgs. 4:11-14, 7:13-18, | **Objection**: not a carefully crafted fact subject to a dispute but really amounts to a legal contention asked in the negative. **Disputed**: a dependent adult can meet the criteria not just by physical but also psychological and cognitively incapacity including grave disability due to Substance Use Disorder. See Ex. 30 WIC 5150 code Section and Ex. 40 Hooson 5150 Declaration of Branco. Ex. 29 Madaus Decl. para. 19 |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 97. | Plaintiff alleges "Branco suffered from a substance use disorder with co-occurring mental illnesses of anxiety and borderline personality disorder." | First Amended Complaint ¶ 29. | Undisputed |
|---|---|---|---|
| 98. | Plaintiff has not identified any facts suggesting that Branco's anxiety and borderline personal disorder restricted her ability to carry out normal activities or to protect her rights. | Ex. 4, No. 4 (pgs. 4:11-14, 7:13-18, | **Objection**: not a carefully crafted fact subject to a dispute but really amounts to a legal contention asked in the negative.<br><br>**Disputed**: a dependent adult can meet the criteria not just by physical but also psychological including grave disability.<br>See Ex. 30 WIC 5150 code and Ex. 40 Hooson 5150 Declaration of Branco. Ex. 29 Madaus Decl. para. 19 |
| 99. | In May 2024, the CSU was not licensed as a hospital. | Warren Decl. ¶ 5. | Undisputed. |
| 100. | In May 2024, the CSU was not licensed skilled nursing facility. | Warren Decl. ¶ 5. | Undisputed. |
| 101. | In May 2024, the CSU was not licensed as an intermediate care facility. | Warren Decl. ¶ 5. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| SUF No. | Fact | Supporting Evidence | Opposing Party's Response |
|---|---|---|---|
| **Issue No. 6: Julia Tidik is Not a State Actor** | | | |
| **Disputed. Private providers providing a public service qualify as government actors for purposes of 42 U.S.C. 1983** | | | |
| 102. | Fact 31, is hereby incorporated by reference. | | |
| 103. | Julia Tidik is a licensed psychiatric mental health nurse practitioner. | Ex. 15 Tidik Tr. p. 26:20-21; Ex. 22 Declaration of Julia Tidik ("Tidik Decl." para. 1). | Undisputed. |
| 104. | Tidik was an independent contractor for Defendant Sierra Mental Wellness Group. | Tidik Tr p. 23:23-24, 33:12-34:1; Exhibit 17 Tidik Contract Service Agreement; Exhibit "18" standardized procedures. | Undisputed. |
| 105. | Nurse Tidik was contracted to perform medication support and related services on an on-call basis to Sierra's San Luis Obispo and Nevada County Crisis Stabilization Units. | Tidik Tr 38:16-18; Exhibit 17 Tidik Contract Service Agreement. | **Disputed** in *part*. Nurse Tidik's responsibility, as the *only* Nurse supervisor, had an implicit supervisory role Of the CSU multidisciplinary treatment team. Per the Sierra/County contract, each CSU client had been |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | given an assessment of physical and behavioral health **under the direction of the nursing supervisors**<br><br>Ex. 36 Sierra-County Amendment Contract po. 18 of 50, Para. 19 |
| 106. | The applicable Contract Service Agreement expressly states that Nurse Tidik "is an independent CONTRACTOR, and not an employee, agent, joint venture, or partner of [SIERRA]." | Exhibit 17 Tidik Contract Service Agreement | **Objection**: Immaterial as to her responsivities and obligations toward clients of the CSU and of the County, having provided services to the public, she is deemed a state actor for 42 USC 1983 purposes.<br><br>Undisputed. |
| 107. | Tidik's contract and actual duties at the SLO CSU consisted of providing medication management, prescribing, and monitoring psychiatric medications for clients who were admitted, with up to six direct in-person or telehealth psychiatric evaluations per month unless otherwise approved. | Tidik Tr p 23:23-25:25; Exhibit 17 Tidik Contract Service Agreement | Undisputed. |
| 108. | During her scheduled on-call rotation weeks, Tidik was available to CSU staff 24/7 by | Ex. 15 Tidik Tr. p. 39:2-4 | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | telephone and electronic means. | | |
| 109. | Tidik relied on the licensed nursing staff at the CSU to provide her with relevant information pertaining to clients at the CSU. | Ex. 15 Tidik Tr. p. 66 12-17, 66:25-67:4; 92:5-17; 98:4-9. | **Disputed** in part if the fact implies that she acted within the standard of care when she relied on low level staff to provide her with relevant clinical information concerning CSU clients as RN and NP's have to conduct their own subjective, objective and plan of care which includes their own diagnosis and if need be, differential diagnosis. Disputed to imply there were other registered nurses on duty that day. Aside from Bonnie Sayers, a licensed vocational nurse, all other Defendants on duty that day including Williams, Brown, Aurioles and Watson were psych. Technician. Tidik had no contact with Sayers, much less relied on any so called "nurses" or psych tech. to relay information pertaining to CSU clients.<br><br>See Ex. 18 NP Standardized Protocols<br><br>Ex. 37 See Plaintiff NP expert, |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | Rebekah Price Decl. Opinions 1,2 |
|---|---|---|---|
| 110. | Nurse Tidik was not employed by the County of San Luis Obispo on May 15, 2024. | Ex. 22 Tidik Decl. para. 6. | **Disputed** inasmuch to insinuate that County had no responsibility toward clients at the CSU because she was providing non-delegable mental health services to the public.<br><br>See Facts no.169-170 |
| 111. | Nurse Tidik was not an independent contractor for the County of San Luis Obispo on May 15, 2024. | Ex. 22 Tidik Decl. para. 6. | **Disputed** inasmuch to insinuate that County had no responsibility toward clients at the CSU because she was providing non-delegable mental health services to the public.<br><br>See Facts no.167-170 |
| 112. | On May 15, 2024, Nurse Tidik was on call at the CSU. | Ex. 22 Tidik Decl. para. 7. | Undisputed. |
| 113. | On May 15, 2024, Nurse Tidik was working remotely off-site. | Ex. 22 Tidik Decl. para. 7. | Undisputed. |
| 114. | Tidik's only involvement in the care and treatment of Branco on May 15, 2024, was as the remote, on-call nurse practitioner. | Ex. 22 Tidik Decl. para. 7-10. | **Disputed** because as the highest ranking CSU medical staff, having lent her license to operate the CSU,  she was as much involved in client |

36

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | admission as the lower level staff, and which per her contractual terms with Sierra required her to make competent clinical evaluations to ensure client fitness and raise concerns to lower staff by implication; and as the highest medical ranking staff, she was at least responsible to ensure lower non medically trained staff were not making admission decisions without conferring with her. |
| | | | Per P&P 4 "CSU 23 Hour Admission Criteria" required "*all clients that are presented will be evaluated by CSU* "**nurse***" and mental health and a decision given to the presenting hospital/location/person within 30 minutes*" Admittedly, Tidik failed to follow this policy. |
| | | | EX 18 See Standardized Procedures for Nurse Practitioners at SMWG Ex 37 Nurse Price Decl. Opi. 4 |

37

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 115. | Tidik was not involved in the evaluation of Branco for a 5150 hold. | Ex. 22 Tidik Decl. para. 9. | Undisputed. |
|---|---|---|---|
| 116. | Tidik was not involved in the acceptance of Branco into the CSU. | Ex. 15 Tidik Tr.p. 47:20-22; 108:7-19; Ex. 22 Tidik Decl. para. 10. | **Disputed** in part because as the highest ranking CSU medical staff, having lent her license to operate the CSU,  she was as much involved in client admission as the lower level staff, and which per her contractual terms with Sierra required her to make competent clinical evaluations to ensure client fitness and raise concerns to lower staff by implication; and as the highest medical ranking staff, she was at least responsible to ensure lower non medically trained staff were not making admission decisions without conferring with her.<br><br>Per P&P 4 "CSU 23 Hour Admission Criteria" required "*all clients that are presented will be evaluated by CSU* "**nurse**" *and mental health and a decision given to the presenting hospital/location/person within 30 minutes*" |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  |  | Admittedly, Tidik failed to follow this policy.<br><br>EX 118 See Standardized Procedures for Nurse Practitioners at SMWG Ex 37 Nurse Price Decl. Opi. 4 |
|---|---|---|---|
| 117. | Tidik was not involved in monitoring of Branco during her admission at the CSU. | Ex. 22 Tidik Decl. para. 14. | **Disputed**.  See OPR no. 116 Ex 37 Price Decl. Opi. 1m 3, 4 |

| SUF No. | Fact | Supporting Evidence | Opposing Party's Response |
|---|---|---|---|
| **Issue No. 7**: **Tidik Did Not Act with Conscious Indifference or Gross Negligence and Therefore No Section 1983 Liability Can Attach** | | | |
| **Objection. Misstates the standard of proof for deliberate indifference to a *pre-trial detainee* & to a WIC 5150 involuntary holds and misstates elements of 14th Amendment deliberate indifference to Branco's serious medical condition. (*See Gordon v. County of Orange; persons detained per W&I5150 are entitled to due process under the 14th Amendment as much as a pretrial detainee*)** | | | |
| **Disputed. Tidik's medical training placed her in a unique position to ensure Branco's acuity met the criteria for CSU fitness but failed to take reasonable alternative measures to ensure the same (*See Gordon v. County of Orange*)** | | | |
| 118. | Facts 31, 107-109, and 112-117 are hereby incorporated by reference. | | |

39

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 119. | [intentionally omitted] | [intentionally omitted] | |
|---|---|---|---|
| 120. | Tidik was not responsible for the supervision of Sierra's nursing staff on site at the CSU. | Ex. 22 Tidik Decl. p. 2, para. 8. | **Disputed**. As the highest-ranking medical staff. See OPR no. 114 |
| 121. | CSU Staff member Bethany Aurioles is a Licensed Psychiatric Technician. | Ex. 10, Aurioles Tr. p. 26:19-22, 27:22-25; FAC p. | Undisputed. |
| 122. | CSU Staff member Shelli Watson is a Licensed Psychiatric Technician. | Ex. 16 Watson Tr. p. 16:19-21; FAC p. 7:2. | Undisputed. |
| 123. | CSU Supervisor Savannah Williams is a Licensed Psychiatric Technician. | Ex. 23 FAC p. 9:1-2. | Undisputed. |
| 124. | CSU Staff member Bonnie Sayers is a Licensed Vocational Nurse. | Ex. 9 Sayers Tr. p. 179:7. | Undisputed. |
| 125. | CSU Staff member Janet Brown is a Licensed Psychiatric Technician. | Ex. 23 FAC p. 7:22. | Undisputed. |
| 126. | As the on-call nurse practitioner, Tidik was available to assist with medication management for Branco, and assist the licensed staff with any clinical questions or concerns regarding Branco. | Ex. 22 Tidik Decl. para. 11. | **Disputed** inasmuch as this fact trivializes other important clinical obligations required of an on-call nurse practitioner.  For example, a full clinical picture |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | required her to inquire whether Branco had titrated the Fentanyl or posed a risk of being under the influence.  A simple urine panel requested onsite would have ruled out any drugs in her system. That was not done. Neither were any follow up request to the ER nurses to rule out any prior Fentanyl tox screening. That was not done. Branco's ER toxicology results tested positive and easily obtainable had there been a follow up or a "nurse to nurse" as required of CSU preadmission policy. That was not done.<br><br>Ex. 32 CSU Preadmission policy 101<br>Ex. 39 Cooper-ER Tox result positive for Fentanyl, P. 52 of 54 |

41

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | Ex. 24 Williams depo. 205:12-206:2; 219:20-25 <br><br>Ex. 37 Plaintiff Nurse Practitioner Expert, Rebekah Price Decl. Opin. 1-3 |
|---|---|---|---|
| 127. | On May 15, 2024, Branco was treated at the Twin Cities emergency department due to an unintentional drug overdose. | Exhibit 20 CSU medical records at bate SIERRA 000050. | Undisputed. |
| 128. | Prior to being admitted to the CSU, Branco was medically cleared from Twin Cities Hospital in stable condition. | Exhibit 23 First Amended Complaint para. 45. | Undisputed. |
| 129. | Branco was discharged from Twin Cities Hospital with diagnosis of altered mental status, methamphetamine use, cocaine use, and borderline personality disorder in adolescent. | Exhibit 20 CSU medical records at bate SIERRA 000054. | Undisputed. |
| 130. | The discharge paperwork provided by Twin Cities to Hooson and the CSU did not list fentanyl in their drug screen urine results. | Ex. 26 Hooson Tr. p. 123:20-124:17; Exhibit 20 CSU medical records at bate SIERRA 000052-53. | **Disputed** as the ER records show a positive Fentanyl toxicology results. Also disputed to insinuate that Hooson had no knowledge nor |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | suspected she had overdosed on Fentanyl, as the EMT record indicate "history of Fentanyl", required Narcan which is strictly used to reverse an opiate overdose.<br><br>Exhibit 20-CSU medical records.<br><br>Ex. 39 Cooper ER positive Tox Results p. 52 to 54 |
| 131. | Hooson did not consult with Tidik when conducting his evaluation of Branco's suitability for a 5150 hold. | Ex. 26 Hooson Tr. 258:5-19; Ex. 22 Tidik Decl. para. 9. | Undisputed. |
| 132. | Neither Hooson nor CSU staff consulted with Tidik when determining whether Branco was a suitable client for the CSU. | Ex. 26 Hooson Tr. 258:5-19; Ex. 22 Tidik Decl. Para. 9 | Undisputed that Hooson had no communications with Tidik. **Disputed** to suggest that Tidik was not required to inquire with him to assess Branco's acuity as required of her pursuant to her contract. See OPR no. 126<br>Disputed that CSU staff did not consult with her. There was lengthy Teams Chat |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | communication between Aurioles, Tidik and Williams. It was evident that no drug test was requested nor follow up before approving Brancon for admission.<br>See  EX 19 NP Chat |
| 133. | Tidik was not physically present at the CSU during Branco's May 15, 2024 admission. | Ex. 22 Tidik Decl. para. 7 | **Objection**:<br>Immaterial fact as to whether she was physically present at the building.  She owed a duty to perform a competent acuity assessment, including verifying any toxicology results, requesting tox screening and determining whether the facility's resources and monitoring capabilities met the level of care required by Branco when directing her admission into CSU for treatment.<br><br>Undisputed. |
| 134. | CSU staff member Bethany Aurioles, conducted Branco's CSU | Exhibit 20 at Bate SIERRA 000036 | **Disputed**. Branco was not a "walk in" but a referral on a |

44

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | walk-in evaluation at approximately 5:42 PM. | | 5150 hold from Hooson.<br><br>See Ex. 40 Hooson Application for 72-hour hold. |
| 135. | At the time of Branco's Admission to the CSU, her blood pressure was 113/77, pulse 86, respiratory rate of 18, with a temperature of 95.9. All within normal limits. | Ex. 15 Tidik Tr.155:8-9; Exhibit 20 CSU Records at bate SIERRA 000040. | Undisputed. |
| 136. | Branco did not report symptoms of withdrawal to Hooson or CSU staff. | Exhibit 20 CSU Records at bate SIERRA 000040-44; Ex. 10, Aurioles Tr. p. 129:23-130:8; Hooson Tr. p. 170:8-20. | Undisputed. |
| 137. | Branco reported to CSU staff that her overdose was unintentional, and she had only smoked marijuana that morning. | Exhibit 20 CSU Records at bate SIERRA 000036, 38; | **Objection:** Calls for an expert opinion if this fact is offered to imply the absence of other reasonable source of information to explain the overdose. For example, an expert would attest that aside from a client's subjective explanation, a provider it would not be reasonable |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | for a medical provider to solely rely on a client's purported self-diagnosis as to the reason for her overdose but rather to also look for other sources of information such as the EMT report and hospital reports of Narcan administration, and hospital toxicology report to ascertain if opiates and Fentanyl was the reason for the overdose.<br><br>Undisputed that Branco self-diagnosed her condition. |
| --- | --- | --- | --- |
| 138. | Branco did not exhibit any signs or symptoms of withdrawal to Hooson or CSU staff. | Exhibit 20 CSU Records at bate 000040-44; Ex. 10, Aurioles Tr. p. 129:23-130:8; Watson Tr. p. 103:25-104:5; Sayers TR. p. 41:24-25:4; Williams Tr. p. 268:22-269:6. | **Disputed** in part if this fact presumes that Branco was administered a COWS or Clinical Opiate Withdrawal Scale to assess and measure the level of her assessment. Neither a COWS nor a fentanyl urine tox was ordered by Tidik. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | EX 19-NP Teams Chat between Tidik and Aurioles |
|---|---|---|---|
| 139. | Neither Hooson nor CSU staff observed any signs that Branco was under the influence. | Hooson Tr. p. 187:15-17; Williams Tr p. 268:3-21. | **Disputed** in **part** that Branco wasn't showing signs of being under the influence in light of her positive fentanyl tox results and requiring three doses of Narcan during the day. Hospital Discharge ER Records p. 23-46** shows her tested positive for Fentanyl at approximately 3:00 p.m. in the afternoon and had been given Narcan three separate times during a window of time of approximately 8:30 to 1130 am.<br><br>Ex. 39 Hospital Discharge ER Records p. 23-46** |
| 140. | At approximately 6:48 p.m., LPT Aurioles sent a Teams Chat message to Tidik, regarding Ms. Branco. | Ex. 10, Aurioles Tr p. 114:17-23; Ex. 19 NP Chat Thread | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 141. | This 6:48 pm Teams Chat message was the first communication Tidik received on May 15, 2024, regarding Branco. | Ex. 22 Tidik Decl. para. 11 | Undisputed. |
|---|---|---|---|
| 142. | LPT Aurioles provided Nurse Tidik with the following information in the CSU's Teams NP chat thread:<br><br>"New admit [redacted] # 642180 DOB [redacted] Hold 5150 GD Dx. BPD, MDD, PTSD, anxiety & insomnia per client. Medical dx. Denies. SUD: ETOH & THC. Presenting problem. Client brought in by MHET from Twin ED post mom finding her unconscious this am. Client endorses it was unintentionally, but had gotten THC from unknown source & only smoked that. Client and mother had been worki.g [sic] on rehab placement. Client needs a safe holding environment. Vs. 113/77, P. 86, R. 18, T. 95.9, Ox 98, pain 0. NKDA Meds. Zoloft 100 am, busbar 30 BID, | Ex. 19 NP  Chat Thread | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | Gabapentin 300 mg TID, lamictal 25 mg q HS (last night was first dose) trazadone 50 mg q hs Birth control Estarylla daily. And Bactrim 1 tab po x5 days, started on 5/13. Ok for CSU PRN protocol and home meds?" | | |
| 143. | At 6:51 pm, Nurse Tidik replied on the Teams Chat with three follow up questions: 1. "Did they test for fentanyl or other substances?" 2. "BPD borderline or bipolar?" and 3. "What's the bactrim for?" | Ex. 19 NP  Chat Thread | Undisputed. |
| 144. | At 6:53 pm, LPT Aurioles responded to Nurse Tidik's inquiries, stating "borderline, unsure about the fentnyl [sic], they tox screened. will look when have time. unsure of why bactrim, just found while she was in shower. | Ex. 19 NP  Chat Thread | Undisputed. |
| 145. | At 6:54, Nurse Tidik confirmed that Ms. Branco was cleared for as-needed protocol and home medications. | Ex. 19 NP  Chat Thread | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 146. | At 6:55, LPT Aurioles stated she would get more information ASAP, and that the client was recently out of jail, and the Lamictal was a new prescription. LPT Aurioles asked if the prescription could have been due to a seizure. | Ex. 19 NP Chat Thread | Undisputed. |
|---|---|---|---|
| 147. | At 6:56, Nurse Tidik asked if Ms. Branco had a history of seizures. | Ex. 19 NP Chat Thread | Undisputed. |
| 148. | At 6:58, LPT Aurioles confirmed that the Bactrim was "for healing wound on top of right foot. it looks clean and dry currently. Nurse Tidik "liked" this response. | Ex. 19 NP Chat Thread | Undisputed. |
| 149. | At 6:59 pm, LPT Aurioles confirmed that LPT. Branco did not have a history of seizures, and that "mom endorsed that she had been on it before with no adverse reactions." | Ex. 19 NP Chat Thread | Undisputed. |
| 150. | At approximately 8:00 pm, Tidik reviewed the available records in the CSU's electronic records system, which included the staff admission note. | Ex. 15 Tidik Tr. p. 142:18 18-143:5; Ex. 19 NP Chat Thread | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 151. | Tidik also reviewed the records from Branco's most recent April, 2024 psychiatric hospitalization around that same time. | Ex. 15 Tidik Tr. p. 142:25 18-143:5; Ex. 19 NP  Chat Thread | Undisputed. |
| --- | --- | --- | --- |
| 152. | At 8:14 p.m., Defendant Savannah Williams, LPT, sent a Teams Chat message to Nurse Tidik to inform her that Ms. Branco had been exchanging curse words with a male client at the CSU. LPT Williams reported that she spoke with Ms. Branco, and told her that if she was unable to maintain and keep her composure, she would be stepped up to a higher level of care. She reported that Ms. Branco had cried and apologized, and was currently sitting outside with the other female client and staff talking. | Ex. 19 NP  Chat Thread | Undisputed. |
| 153. | At 8:18, Nurse Tidik responded, and noted that during Ms. Branco's last hospitalization at Crestwood, on April 29, 2024, Ms. Branco had been started on naltrexone, but didn't appear to be on it still. She requested LPT | Ex. 19 NP  Chat Thread | Undisputed. |

51

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  | Williams check with Ms. Branco to see if she was still taking it, and encourage her to re-start if she didn't have any contraindications, because alcohol appeared to be a trigger to her mental health episodes. |  |  |
| --- | --- | --- | --- | --- |
| 154. | At 9:58 pm, LPT Brown sent a Teams chat message to Nurse Tidik noting that Branco had calmed down, and was now sleeping in the day room area. LPT Brown further reported that Ms. Branco was interacting with the other female client on the unit, which "seems to be beneficial to both of them." | Ex. 19 NP  Chat Thread | Undisputed. |
| 155. | At 9:59 pm Nurse Tidik responded "Nice work everyone!!". | Ex. 19 NP  Chat Thread | Undisputed. |
| 156. | Tidik did not have any communication with the CSU staff regarding Branco outside of the NP Teams chat. | Ex. 22 Tidik Decl. para. 12; Ex. 10, Aurioles Tr. p. 52:12-25; | Undisputed. |
| 157. | LPT Brown's 9:58 PM message was the final communication Tidik had with CSU staff regarding Branco on May 15, 2024. | Ex. 22 Tidik decl. para 12. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 158. | Neither Jason Hooson, nor any of the on-site staff members at the CSU ever reached out to Tidik with any concerns regarding Branco's suitability for the CSU. | Ex. 22 Tidik Decl. para. 15 | Undisputed. |
|---|---|---|---|
| 159. | Nobody contacted Tidik to report any concerns that Branco was suffering from withdrawal symptoms, or experiencing drug cravings. | Ex. 22 Tidik Decl. para. 15 | Undisputed. |
| 160. | No staff members contacted Tidik with any questions or concerns regarding Branco's acuity level. | Ex. 22 Tidik Decl. paras. 9, 15 | **Disputed**. The hospital discharge report, as reflected in Aurioles' Teams Chat communication with Tidik, reported an opiate overdose, multiple administration of Narcan staggered over several hours, and a request from Tidik herself to see if Branco had been drug tested prior to the CSU admission. All this information would have reasonably raised acuity concerns and red flags as to a newly admitted patient to the CSU. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | EX 19 Teams Chat and EX 37 Expert Price Decl. Opinions 1-4 |
|---|---|---|---|
| 161. | The following morning, May 16, 2024, CSU staff members found Ms. Branco deceased. | Ex. 10 Aurioles Tr. p. 150:11-13. | Undisputed. |
| 162. | During the autopsy, investigators discovered fentanyl powder and drug paraphernalia concealed in decedent's underwear. | Ex. 25. Officer Geremia Tr p. 58:17-25; 59:6-60:1. | Undisputed. |
| 163. | Ms. Branco's cause of death was determined to be a fentanyl overdose. | Ex. 25. Officer Geremia Tr. p. 63:14-24. | **Objection**. Calls for a legal conclusion, expert opinion and is ambiguous use of a term of art "cause of death". A medical cause of death is different than a legal cause of death.<br><br>**Disputed** to suggest that the legal cause of death was due to fentanyl overdose. See SUFs 261-408 |
| 164. | There was no information communicated to Tidik by staff at the CSU that would have indicated that any additional | Ex. 21, Declaration of Emma Magana, PMHNP ("Magana decl.") at p. 14:13-14. | **Disputed**. The hospital discharge report, as reflected in Aurioles' Teams Chat communication with |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | | |
|---|---|---|---|---|
| | interventions or orders were needed for Ms. Branco. | | | Tidik, reported a morning opiate overdose, multiple administration of Narcan staggered over several hours, and a request from Tidik herself to see if Branco had been drug tested prior to the CSU admission. All this information would have reasonably raised acuity concerns and red flags as to a newly admitted patient to the CSU was at imminent risk for relapse.<br><br>EX 19 Teams Chat and EX 37 Expert Price Decl. Opinions 1-4 |
| 165. | Ms. Branco received appropriate medical care from Tidik, including continuing her on her home medications to ensure continuity of care. | Ex. 21, Magana Decl. at p. 13:27-14:1, 15:8-9. | | **Objection**. Call for a legal and medical expert conclusion.<br><br>Disputed Branco received appropriate care.<br><br>EX 37 Expert Price Decl. Opinions 1-4 |
| 166. | The standard of care for an on-call nurse practitioner in an | Ex. 21 Magana Decl. at p. 14:16-19. | | **Objection**. Call for a legal and medical expert conclusion. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | environment such as the CSU, required being available to on-site staff to handle any requests or inquiries, and respond to them in a timely manner. | | Disputed as to the purported limited scope of Tidik's standard of care. Per her own contract with Sierra, she was required to conduct a competent medical assessment of CSU clients and was allotted "face-to-face" assessments at the facility. Her contract specifically stated "contractors agree to provide any or all the following services.. including evaluation of need for medication, of clinical effectiveness and side effects"<br><br>EX 37 Expert Price Decl. Opinions 1-4 |
|---|---|---|---|
| 167. | The applicable standard of care required Tidik to obtain the relevant clinical information from licensed on-site nursing staff, and ask any relevant clarifying questions to obtain any missing information necessary to respond to the specific request of the on-site staff. | Ex. 21 Magana Decl. at p. 14:19-22. | Undisputed that these were some of her requirements and standard of care as the highest CSU ranking medical staff.<br><br>**Disputed** that this fact depicts the entire standard of |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | care required of Tidik.<br><br>See OPR 116 |
|---|---|---|---|
| 168. | The applicable standard of care did not require Tidik to make an in-person assessment of Ms. Branco prior to confirming she could be continued on her home medications. | Ex. 21 Magana Decl. at p. 14:23-25. | **Disputed** to infer that by not being required to conduct an in-person assessment before confirming her home medication, Tidik was relieved of her responsibility in conducting a competent medical and acuity assessment. Tidik failed to properly assess, including failing to identify the specific substance ingested which she had recently overdosed, failed to evaluate the level of any other substance in the system, overlooking this aspect of her clinical assessment.<br><br>Ex. 37 Price Decl. Opi 1-4 |
| 169. | It was within the standard of care for Tidik to rely on the information and assessments | Ex. 21 Magana Decl. at p. 14:25 – 15:2. | Undisputed it was partially within the standard of care to |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | |
|---|---|---|
| conveyed to her by licensed nursing staff at the CSU when determining whether it was appropriate for Branco to be continued on her home medications and take as-needed medications as necessary. | | rely on information conveyed to her from lower-level staff.

**Disputed** to infer that the standard of care did not require any additional medical inquiry and assessment as the only medically trained provider in acuity  and drug toxicity assessment.

Of importance, neither LVN nor LP can practice nursing nor conduct nursing assessments, much less perform any kind of acuity assessment of clients known to have recently overdosed and under the influence of opiates.

It is not the standard of care for nurse practitioners like Tidik to rely upon nursing assessments conducted by PTs and LVNs in assessing their own client acuity. In fact, these out-of-license |

58

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | assessments were warned of by County Auditor Angela Atwell.<br><br>See Ex 54, Nov. 22, 2023 Email From Angela Atwell to Julianne Schmidt 9 Cosb 63994-63995)<br><br>It is <u>not</u> the standard of care for NP's to dispense with their acuity assessment of clients at the CSU.<br><br>Ex 37 Price. Decl. Opinion no. 1 |
| 170. | Tidik exercised appropriate professional judgment and clinical decision making with respect to her assessment of Ms. Branco, and her decision to continue Ms. Branco on her home medications. | Ex. 21 Magana Decl. at p. 13:9-13. | **Disputed** that she exercised and clinical decision making with respect to her assessment of Ms. Branco, and her decision to continue Ms. Branco on her home medications. She relied exclusively on assessments from CSU staff lacking medical training to conduct acuity evaluations, failed to ascertain whether she was under the influence or had substances in her |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | system, failed to request the hospital tox results, failed to order a new tox screen at the CSU, failed to follow up on any adverse effect of the anti-psychotic medication she renewed.  See OPRs no. 165,166,169,168 Ex 37 Price. Decl. Opinion no. 1-4 |
| 171. | Tidik responded timely to the on-site staff's initial request for authorization to continue Ms. Branco on her home medications, and asked appropriate follow up questions to obtain additional information before confirming Ms. Branco was authorized to take these home medications while at the CSU overnight. | Ex. 21 Magana Decl. at p. 12:14 – 13:13. | **Disputed** that she exercised and clinical decision making with respect to her assessment of Ms. Branco, and her decision to continue Ms. Branco on her home medications. She relied exclusively on assessments from CSU staff lacking medical training to conduct acuity evaluations, failed to ascertain whether she was under the influence or had substances in her system, failed to request the hospital tox results, failed to order a new tox screen at the CSU, |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | failed to follow up on any adverse effect of the anti-psychotic medication she renewed.  See OPRs no. 165,166,169,168 Ex 37 Price. Decl. Opinion no. 1-4 |
|---|---|---|---|
| 172. | There were no contraindications for the continued medications contained in the records reviewed by, or available to, Tidik. | Ex. 21 Magana Decl. at p. 13: 25-27. | **Objection**: Calls for a legal opinion and early expert witness disclosure.<br><br>**Disputed** |
| 173. | It was within the standard of care for Tidik to continue Ms. Branco on her home medication regimen to ensure continuity of care. | Ex. 21 Magana Decl. at p. 15:7-9 | Undisputed |

| **SUF No.** | **Fact** | **Supporting Evidence** | **Def's Response** |
|---|---|---|---|
| **Issue No. 7**: Plaintiffs Third Cause of Action for State Created Danger under the 14th Amendment Fails as to Tidik<br><br>**Disputed: Tidik's Conduct Was A Substantial Departure Of The Standard Of Practice As She Failed To Conduct A Proper Clinical Assessment Of A High Acuity Client** | | | |
| 174. | Tidik hereby incorporates by reference facts 35, 107-109, 112-117, and 120-173 above. | | Plaintiff incorporates by reference her responses to facts |

61

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | 35, 107-109, 112-117, and 120-173 above |
|---|---|---|---|
| 175. | Based on the information relayed to Tidik by the CSU staff regarding Branco's presentation, she believed that Branco was a suitable candidate for the CSU. | Ex. 22 Tidik Decl. para. 16 | **Objection:** not a fact but a legal conclusion calling for an expert disclosure and opinion. **Disputed**. Tidik's made an improper assessment, because it is knowingly based on limited information relied upon to make her assessment including the lack of toxicology results, the failure to obtain a full history of substance use, in light of CSU policy forbidding the management of detoxing clients, or at risk for detoxification, the failure to request a new urine tox screen to rule Fentanyl in her system, and by implication being under the influence and/or at risk for withdrawals requiring medical intervention, failed to request Q15 |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | overnight monitoring frequency despite the high acuity she presented, failed to refuse admission, failed to make a proper criteria assessment  based on the Sierra/Tidik employment contract, Her Nurse Practitioner Standardized Protocols.<br><br>Ex. 17 Sierra-Tidik employment Contract<br>Ex. 18 NP Standardized Protocols<br>Ex. 37 Nurse Rebekah Price, Plaintiff's NP expert witness Decl. Opi. No. 1-4<br>See Also Ex. 36 SLO/Sierra Contract Amendment p. 17 |

**Issue No. 8: Tidik Did Not Violate Plaintiff's Familial Association Rights, and Plaintiff's Eighth Cause of Action Fails.**

**Disputed:  Tidik had ample time to contemplate her decisions, care and treatment of Branco, and therefore acted with deliberate indifference to her serious medical condition.**

| 176. | Tidik hereby incorporates by reference | | Plaintiff incorporates by |
|---|---|---|---|

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | facts 35, 107-109, 112-117, and 120-173 above. | | reference her responses to fact 35, 107-109, 112-117, and 120-173 above. |

**Issue No. 9: Plaintiff's Fifth Cause of Action for Adult Dependent Abuse Fails Because Tidik Does Not Meet the Statutory Definition of a "Care Custodian"**

**Disputed: Tidik assumed a material role in the systemic failure of Branco's overall care as the nurse practitioner responsible for her welfare and treatment. Branco was in custody as defined by WIC 5150 and therefore any person being providing treatment in a custodial setting fits the criteria**

| | | | |
|---|---|---|---|
| 177. | Tidik hereby incorporates by reference facts 113-117, 133, and 139-155. | | Plaintiff incorporates by reference her responses to fact 113-117, 133, and 139-155 above. |

**Issue No. 10: No Triable Issue of Fact Exists to Support that Tidik was Negligent Within the Meaning of the EADACPA.**

**Disputed: Tidik breached the standard of care in her clinical judgment when assessing and treating Branco, a W&I 5150 involuntarily held client based on grave disability.**

| | | | |
|---|---|---|---|
| 178. | Tidik hereby incorporates by reference facts 35, 107-109, 112-117, and 120-173, and 175 above. | | Plaintiff incorporates by reference her responses to fact 35, 107-109, 112-117, 120-173, and 175 above. |

**Issue No. 11: Tidik Is Entitled To Summary Judgment As To The Ninth Cause Of Action For Wrongful Death Because The Undisputed Evidence Establishes That She Was Not Negligent.**

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | | |
|---|---|---|---|---|
| **Disputed: Tidik breached the standard of care in her clinical judgment when assessing and treating Branco, a W&I 5150 involuntarily held client based on grave disability.** | | | | |
| 179. | Tidik hereby incorporates by reference facts 31, 35, 107-109, 112-117, and 120-173, and 175 above. | | | Plaintiff incorporates by reference her responses to fact 31, 35, 107-109, 112-117, 120-173, and 175 above. |

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| **Issue No. 12: Plaintiff's 42 U.S.C. § 1983 Causes of Action (1ST, 2ND, 3RD, 4TH, and 8TH) fail as Savannah Williams is Not a State Actor.**<br><br>**Disputed: Savannah Williams is a State Actor Because She Was An Employee Of An Agency Contracted by The County To Provide Mental Health Services To Members Of The Public.** | | | |
| 180. | Williams hereby incorporates facts 2, 5, 6, 10, 31, 34, 35, 72, 107, 123, 128, 134, 152, 154, and 155 above by reference. | | Plaintiff incorporates by reference her responses to facts 2, 5, 6, 10, 31, 34, 35, 72, 107, 123, 128, 134, 152, 154, and 155 above by reference. |
| 181. | Williams has been a Licensed Psychiatric Technician since 2013. | Ex. 24. S. Williams Tr. V. 2. p. 38:11-16. | Undisputed. |
| 182. | Within the operative complaint, Plaintiff concedes that Williams was an employee of the | Ex. 23. Doc. 103, ¶14, ¶16, ¶23. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | non-profit Corporation, Defendant SIERRA MENTAL WELLNESS GROUP ("SIERRA") and not the COUNTY at the time of the incident. | | |
| 183. | Williams was not employed by the COUNTY at the time of the incident. | Ex. 24. S. Williams Tr. V. 2. p.269:23-25. | Undisputed. |
| 184. | Williams began working for SIERRA in 2018, as a per diem Psychiatric Technician. She later transitioned to a full-time day shift position as a Licensed Psychiatric Technician for the Crisis Stabilization Unit ("CSU") before resigning in 2020 for approximately two years. | Ex. 24. S. Williams Tr. V. 2. p. 37:24-38:2; 73:4-74:24. | Undisputed. |
| 185. | Williams returned to work at the CSU in the Fall of 2022. | Ex. 24. S. Williams Tr. V. 2. p.74:25-75:6. | Undisputed. |
| 186. | The CSU is not a locked facility. Individuals have the right to leave if they choose. | Ex. 24. S. Williams Tr. V. 2. p. 215:23-216:2. | **Disputed** in part. Although the CSU is not designated as an LPS, hence not considered as a "locked facility", persons admitted on a 5150 hold could not legally leave without the hold being rescinded or |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | without informing law enforcement<br><br>See SUF no. 370 |
|---|---|---|---|
| 187. | Around the Summer of 2023, Williams, who had been working in the position of Medical Coordinator under the RN Supervisor Nurse Farley, took on a lead role in the CSU, supervising Psychiatric Technicians and Licensed Vocational Nurses. | Ex. 24. S. Williams Tr. V. 1. p. 20:1-21:6; 21:15-25; 59:16-23. | Undisputed that Williams was promoted to CSU supervisor after Nurse Farley was let go.<br><br>**Disputed** to infer she had the necessary medical training to replace Nurse Farley as a nurse supervisor or that she was medically trained to conduct nursing assessments. Williams did not have an RN license and therefore, two off-site nurse practitioners were hired so their licenses can be used to operate the CSU<br><br>See Ex 24, Williams Depo. 133:10-18 |
| 188. | As a Medical Coordinator, Williams' duties included the day-to-day operations of the CSU, making sure that the CSU was flowing | Ex. 24. S. Williams Tr. V. 2. p. 21:7-14; 60:27-61:7. | **Disputed** to the extend Williams was conducting or showing other PT's how to conduct nursing assessments |

67

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | properly, showing staff by example with respect to conducting assessments, coping skills, and safety plans, and providing resources for staff to give to clients. | | because they were conducted outside the scope of the CSU psychiatric technicians' licensure scope and thus could not not meet the qualifications to conduct nursing assessments.<br><br>See Ex 53, Atwell Depo 86:22-88:22; 107:9-108:7 and Ex. 54, Atwell's Nov. 22, 23 emails to Julianne Schmidt |
| 189. | On May 15, 2024, Decedent "ELINA BRANCO" ("Decedent") was admitted to the CSU on a Welfare & Institutions Code 5150 hold which had been placed by COUNTY employee. | Ex. 12, Hooson Decl. ¶ 7, ¶ 12. | Undisputed.<br><br>**Disputed** to infer that Hooson was solely acting on behalf of COUNTY when placing the hold. He acted in a dual capacity as MHET evaluator for both SIERRA and COUNTY.<br><br>See SUF 370 |
| 190. | Williams was not at the CSU when Decedent was admitted. | Ex. 24. S. Williams Tr. V. 2. P. 206:9-15; 260:17-24; 264:1-4. | **Objection**: Immaterial Fact whether she was not at the CSU when Branco arrived because she was responsible for staff supervision and |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | oversaw CSU client admission 24 hrs a day. See SUF no. 193.<br><br>Undisputed. |
|---|---|---|---|
| 191. | Williams was provided information about Decedent's admission and 5150 hold through the Nurse Practitioner "NP" Chat stream. | Ex. 24. S. Williams Tr. V. 2. p. 11: 13-21; V. 2. p. 183:5-185:24. | Undisputed. |
| 192. | On May 15, 2024, Williams left the CSU for the night at about 8:00 p.m. | Ex. 24. S. Williams Tr. V. 2. P. 221:20-222:12. | Undisputed as to the time she left.<br><br>**Disputed** to infer her supervising responsibilities toward staff and clients ended when she left as she was still responsible for staff supervision, that the CSU was flowing properly, providing resources to staff to give to clients<br><br>See Ex 24, Williams Depo 21:10-22:11 |
| 193. | On May 15, 2024, after leaving the CSU for the night, Williams was available on-call to staff all night. | Ex. 24. S. Williams Tr. V. 2. p. 95:11-96:4; 120:5-10. | **Disputed** to infer her supervising responsibilities toward staff and clients ended when she left as she was still responsible for |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| | | | staff supervision, that the CSU was flowing properly, providing resources to staff to give to clients<br><br>See Ex. 24, Williams Depo 21:10-22:11 |
| 194. | From the time that Williams left the CSU for the night on May 15, 2024, until her return the morning of May 16, 2024, Williams was not contacted by CSU staff with concerns about Decedent. | Ex. 24. S. Williams Tr. V. 2. P. 257:18-21. | **Disputed**. On May 15th, when NOC shift and co-defendant Bonnie Sayers began her shift, Sayers allegedly brought several concerns that due to Branco's acuity, she was not a proper fit for the facility.<br><br>See Ex. 9, Sayers Depo. 21:23-22:25 |

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|

**Issue No. 13**: Plaintiff's Section 1983 Claims (1ST, 2ND, 3RD, 4TH, and 8TH) Fail Substantively Against Williams As Plaintiff Cannot Establish Deliberate Indifference by Williams

**Disputed**: Williams's Deliberate Indifference Is Demonstrated By Her Failure To Monitor High Acuity Clients, Failure To Ensure Nocturnal Shift Were Not Sleeping On Their Shift, Failure To Supervise The Nocturnal Staff To Ensure Proper Welfare Checks Were Done And Failing To Deny Branco Due To Her Higher Acuity.

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| 195. | Williams hereby incorporates facts 1-6, 9-95, 102, 105-163, 180-194 by reference. | | Plaintiff incorporates by reference her responses to facts 1-6, 9-95, 102, 105-163, and 180-194 above. |
| 196. | In her capacity as a Licensed Psychiatric Technician, Williams has performed duties including medication administration, lab form completion, medication management, assisting clients, monitoring clients within a psychiatric hospital, providing coping skills and de-escalation. | Ex. 24. S. Williams Tr. V. 2. p. 38:22-46:8; 65:28-66:5. | Undisputed. |
| 197. | Between 2018 and 2020, Williams was responsible for providing crisis services to individuals in distress at the CSU. | Ex. 24. S. Williams Tr. V. 2. p. 74:7-75:28. | Undisputed. |
| 198. | In 2019, Williams estimates she cared for approximately 50-70 clients placed on a 5150 hold. | Ex. 24. S. Williams Tr. V. 2. p. 76:1-77:1. | Undisputed. |
| 199. | As a CSU Supervisor, Williams was also given the authority to deny client admissions, if she deemed them | Ex. 24. S. Williams Tr. V. 2 p. 61:8-16. | Undisputed Williams was given authority to deny clients. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | inappropriate for the CSU. | | **Disputed** inasmuch to infer that she had medical training to conduct nursing and acuity assessments and therefore, was qualified to assess whether clients are inappropriate for the CSU. LPTs cannot practice out of their licensure which includes acuity and nursing assessment. Neither can LPTs formulate a plan of care which can only be done by a registered nurse.<br><br>Williams was never trained by Farley nor holds an RN license.<br><br>See Ex. 53, Atwell Depo. 86:22-25, 87:1-13, 88:14-18, 89:5-23; Atwell Depo 86:22-88:22; 107:9-108:7 and Ex. 55, Atwell's Nov. 22, 23 emails to Julianne Schmidt, and Ex. 24, Williams Depo. 23: 9-26 |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 200. | Both Williams and the Nurse Practitioners who worked for the CSU had authority to deny clients. | Ex. 24. S. Williams Tr. V. 2 p. 166:6-25. | Undisputed Tidik and Williams were given authority to deny clients.

**Disputed** inasmuch to infer that Williams had medical training to conduct nursing and acuity assessments and therefore, was qualified to assess whether clients are inappropriate for the CSU. LPTs cannot practice out of their licensure which includes acuity and nursing assessment. Neither can LPTs formulate a plan of care which can only be done by a registered nurse. Williams was never trained by Farley nor holds an RN license.

See Ex. 53, Atwell Depo. 86:22-25, 87:1-13, 88:14-18, 89:5-23, Atwell Depo 86:22-88:22; 107:9-108:7 and Ex. 54, Atwell's Nov. 22, 23 emails to Julianne Schmidt |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | Ex. 24, Williams Depo. 23: 9-26 |
|---|---|---|---|
| 201. | If Williams ever had a question about whether a client should be denied, she would reach out to one of the Nurse Practitioners. | Ex. 24. S. Williams Tr. V. 2 p. 257:9-11. | Undisputed that she testified to this fact at her deposition.<br><br>**Disputed** to infer she possessed the medical training to make any kind of acuity or nursing assessments.<br><br>Ex. 24, Williams Depo. 23: 9-26 |
| 202. | At the CSU, the job duties of Licensed Vocational Nurses and Psychiatric Technicians fell into the same category. These duties included monitoring individuals, providing care, providing resources, and heling with coping skills. | Ex. 24. S. Williams Tr. V. 2. p. 25: 9-20. | **Disputed** to the extent that "providing care" forbids conducting out-of-scope nursing and acuity assessments.<br><br>See Ex. 53, Atwell Depo. 86:22-25, 87:1-13, 88:14-18, 89:5-23; Atwell Depo 86:22-88:22; 107:9-108:7 and Ex. 54, Atwell's Nov. 22, 23 emails to Julianne Schmidt |
| 203. | On the date of the incident which gave rise to this litigation, the CSU monitoring policy required staff to check on and monitor clients and | Ex. 24. S. Williams Tr. V. 2. p. 26:27-27:16. | **Disputed**. It required continuous monitoring looking for signs of life, including signs of breathing, looking |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | document observations based on that monitoring every two hours. | | for chest rise and descent, walking up to the bed, using a flashlight to look at a client's face, then documenting findings. Staff need to make a direct line- of-sight observation, couldn't solely rely on video monitor and had to get up and check up on client's at the bedside.<br><br>Ex. 24, Williams Depo 26:27-27:16 Ex 8, Farley Depo 83:3:84:4 |
| 204. | Per Williams, the monitoring policy included checking for signs of breathing. | Ex. 24. S. Williams Tr. V. 2. p 27:17-24. | Undisputed. |
| 205. | Williams relied on the Nurse Practitioners to inform her of any drug contraindications for clients, if any. | Ex. 24. S. Williams Tr. V. 2. P. 56:9-22. | Undisputed. |
| 206. | In November of 2023, during a staff meeting where client monitoring was addressed, CSU staff all signed an acknowledgement of a "no-sleep" policy | Ex. 24. S. Williams Tr. V. 2. p. 86:3-92:9. | Undisputed. |

75

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | wherein CSU staff had to acknowledge they were not going to sleep on the job and that consequences for doing so included write ups and termination. | | |
| 207. | After the "no-sleep" policy was implemented, no staff member told Williams that they knew that any staff member was continuing to sleep while at work. | Ex. 24. S. Williams Tr. V. 2. p.104:-11; 114:8-10. | **Disputed**. NOC shift Nurse Hursell warned Williams that staff continued to sleep during the NOC shift and specifically told her of a blind spot behind the nurse's station not captured by the surveillance camera and to specifically install a camera facing the blind spot. Considering this information, Williams never followed up to make sure a camera was installed, nor checked to verify whether staff continued to sleep despite Hersell's warnings. She didn't even ask Hersell which NOC shift staff she had observed sleeping. Williams was also informed of NOC |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | staff voicing their disagreements with the new no sleep policy during the Sierra November 2023 staff meeting.<br><br>Ex.24, Williams V.1 Depo 97:6:17; 97:27-98:2; 99: 15-29; 102:7-15 110:25-111:19 |
|---|---|---|---|
| 208. | In the time period between November 2023 and May 2024, the night shift consisted primarily of JANET BROWN, BONNIE SAYERS, Erika Cucan, SAVANNAH SINCLAIR, and Ms. Hursell. | Ex. 24. S. Williams Tr. V. 2. p. 100:12-16. | Undisputed. |
| 209. | In the time period between November 2023 and May 15, 2024, Williams did not become aware of any night shift personnel continuing to sleep at night. | Ex. 24. S. Williams Tr. V. 2. p  96:20-28; V. 2 p. 257:4-8. | **Disputed**. See OPR no. 207. |
| 210. | All CSU clients were informed and asked to sign an acknowledgment that they were being video monitored during their stay. | Ex. 24. S. Williams Tr. V. 2. P. 238:7-16. | Undisputed clients had to sign the acknowledgment.<br><br>**Disputed** to suggest proper client monitoring was taking place despite |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | the signed acknowledgement. See OPRs 203,207 |
|---|---|---|---|
| 211. | On the night of the incident, there were monitoring cameras facing the area where Decedent was sleeping. | Ex. 24. S. Williams Tr. V. 2. P. 29: 16-25. | Undisputed. |
| 212. | Per Williams, there was a period when the CSU Policies and Procedures manual was pulled from the unit as the "higher ups" were in the process of revamping them. Williams did not work on the policies and procedures. She believes they were physically available between May 1, 2024, to May 15, 2024. | Ex. 24. S. Williams Tr. V. 2. P. 155:2-156:22, 157:3-11. | Undisputed that Sierra management removed the physical policy binder from the unit. **Disputed** to suggest the CSU staff had working policies to refer to or to address when caring for clients with questionable acuity and/or drug and alcohol detoxifications. **Disputed** that Williams, as CSU Supervisor genuinely believed a self-serving statement that "she believes they were physically available between May 1 to may 15, 2024 as there still wasn't a policy manual |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | available until at least July of 2024.<br><br>See SUFs 334, 335 |
|---|---|---|---|
| 213. | On the date of the incident, the Policies authored by former RN Supervisor Nurse Farley, including the "CSU 23-hour admission criteria" were still the current policies as the new ones had not been released. | Ex. 24. S. Williams Tr. V. 2. P. 158:25-159:6. | Undisputed it was the effective policy. Disputed that staff had access to it nor knew of the policies' content as management removed the binder for a period of 9 months from the facility.<br><br>See SUFs 333-335 |
| 214. | On the date of the incident, the CSU had a policy of using a metal detector to wand everybody. | Ex. 24. S. Williams Tr. V. 2. P. 210:16-19. | Undisputed that it was contained in the missing policy binder.<br><br>**Disputed** to suggest that Branco was wanded for any contraband or metal objects upon admission to the CSU.<br><br>Ex 24, Williams v.2 Depo 208:18-20 Ex. 10, Aurioles Depo. 102:15-18; 103:9-15 103:24-104:1 |

79

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 215. | In the time period between May 1, 2024 and May 15, 2024, Williams estimates that the CSU saw between 10-20 clients. | Ex. 24. S. Williams Tr. V. 2. p. 59:5-10. | Undisputed. |
|------|------|------|------|
| 216. | The CSU facility had four beds available for client use. | Ex. 24. S. Williams Tr. V. 2. p.169: 4-6. | Undisputed. |
| 217. | In the time period between May 1, 2024, and May 15, 2024, Williams was working as a CSU supervisor Monday through Friday. | Ex. 24. S. Williams Tr. V. 2. p. 59:11-15. | **Disputed** to infer her supervisor responsibilities were limited to week days. She was working on-call on the weekends.<br><br>Ex. 24, Williams V.1 Depo 95:11-18 |
| 218. | From November 2023 to May 15, 2024, Williams worked continuously as the CSU supervisor. She was in the building 40 hours per week and on call 24/7. | Ex. 24. S. Williams Tr. V. 2. p. 95:11-96:4. | Undisputed. |
| 219. | As the CSU supervisor, Williams did not approve the clients that came onto the unit. The staff on the unit approved clients for admission. | Ex. 24. S. Williams Tr. V. 2. p. 163:6-13; 165:2-8. & | **Disputed** to infer that Psychiatric Technicians and Licensed Vocational nurse, by virtue of their assigned authority to approve clients had the medical training, |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | experience and credential to conduct acuity and nursing assessment when admitting clients to the CSU. They did not have such qualifications nor training.<br><br>See SUFs 229, 300<br><br>Ex. 53, Atwell Depo 86:22-88:22; 107:9-108:7 and Ex. 55, Atwell's Nov. 22, 23 emails to Julianne Schmidt |
|---|---|---|---|
| 220. | On the night of the incident, Williams was available on-call to staff throughout the night. | Ex. 24. S. Williams Tr. V. 2. p. 120:5-10. | Undisputed. |
| 221. | On May 15, 2024, Williams arrived to work at the CSU about 9:00 a.m. and her shift ended at 5:00 p.m. | Ex. 24. S. Williams Tr. V. 2. p. 176:18-177:3. | Undisputed. |
| 222. | On May 15, 2024, Williams left the CSU to attend a staff meeting which ran roughly from 5:00 p.m. to 7:00 p.m. | Ex. 24. S. Williams Tr. V. 2. P. 177: 4-12. | Undisputed. |
| 223. | Decedent had not yet arrived at the CSU when Williams left for the staff meeting. | Ex. 24. S. Williams Tr. V. 2. P. 260:17-24. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 224. | As the CSU supervisor, Williams communicated with the on-call Nurse Practitioner Tidik through the "NP Chat" Microsoft Teams thread. | Ex. 24. S. Williams Tr. V. 2. p. 69:13-16. | Undisputed. |
|------|------|------|------|
| 225. | Decedent was approved for admission to the CSU, without input from Williams. | Ex. 24. S. Williams Tr. V. 2. p. 191:11-14;  206:9-15; 264:1-4. | Undisputed. |
| 226. | Williams was provided information about the Decedent's admission and 5150 hold through the NP Chat thread. | Ex. 24. S. Williams Tr. V. 2. p. 11:13-21; V. 2. p. 183:5-185:25; Ex. 19 NP Chat Thread. | Undisputed. |
| 227. | Through the NP Chat, Williams was informed that the Decedent had overdosed that morning, been taken to the ER, and was medically cleared. She was also informed that the Decedent's mother was working on getting a rehab placement for her and that she needed a safe holding environment. | Ex. 24. S. Williams Tr. V. 2. p.  186:1-14; 193:9-18; Ex. 19 NP Chat Thread. | Undisputed. |
| 228. | Williams did not believe that the Decedent was at risk of harm as she had been medically cleared by the ER doctor. | Ex. 24. S. Williams Tr. V. 2. p.  190:2-11. | **Disputed**. Williams had no medical training to determine drug toxicity, assess for |

82

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | acuity and risk of detoxification in light of a recent overdose, to be able to legitimately decide whether Branco posed a risk of harm.  Ex. 24, Williams V.2 Depo 191:2-9 |
|---|---|---|---|
| 229. | Williams returned to the CSU on May 15, 2024, at about 7:00 p.m. to drop off food for the staff. | Ex. 24. S. Williams Tr. V. 2. P. 182:3-21. | Undisputed. |
| 230. | Williams arrived at the CSU on the night of May 15, 2024, at shift change from the day staff which consisted of SHELLI WATSON and BETHANY ARIOLES to the night staff which consisted of BONNIE SAYERS and JANET BROWN. | Ex. 24. S. Williams Tr. V. 2. P. 183:1-4. | Undisputed. |
| 231. | When Williams returned to the CSU the night of May 15, 2024, at roughly 7:00 p.m., she stayed for about 45 minutes, and left before 8:00 p.m. | Ex. 24. S. Williams Tr. V. 2. P. 207:17-20; 221:8-13. | Undisputed. |
| 232. | Williams had a discussion with Decedent about a verbal altercation | Ex. 24. S. Williams Tr. V. 2. P. 207:21-208:10; 212:10-18. | Undisputed. |

83

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | the Decedent had with a male on the unit. Williams asked them both to comply with CSU rules and told them if they could not maintain on the unit, they would be reevaluated and possibly stepped up to a higher level of care, a locked facility. | | |
| 233. | After Williams spoke with Decedent, it was her impression that Decedent had de-escalated. | Ex. 24. S. Williams Tr. V. 2. P.257:12-17. | Undisputed. |
| 234. | When Williams spoke with Decedent, she was able to assess her behavior. Decedent did not appear manic. | Ex. 24. S. Williams Tr. V. 2. p.216:3-9. | **Objection**: Immaterial Fact. Her ability or lack thereof to conduct a medical assessment for acuity such as administering a COWS assessment is at issue.<br><br>Undisputed. |
| 235. | Williams sat across from Decedent, close enough to ascertain whether her pupils were dilated and she did not notice them to be dilated. | Ex. 24. S. Williams Tr. V. 2. p.216:10-217:16. | **Disputed** if this fact is relied upon to infer that the absence of only one of many symptoms of opiate influence is entirely dispositive of being under the influence and/or detoxifying from opiates. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | **Disputed**. Williams also contradicts her self when she testified she "doesn't' Recall looking at Branco's Pupils"<br><br>Williams Depo 216:10-15<br><br>See ex 24 |
| 236. | During the 10-20 minutes that Williams spoke with Decedent, Williams did not observe any factors which lead her to believe that Decedent was under the influence of fentanyl. | Ex. 24. S. Williams Tr. V. 2. p. 268:3-14. | **Disputed** as no COWS was assessed of Branco nor is there any record of it in her medical chart, nor was Williams ever trained by Sierra to address opiate withdrawals and administering COWS assessments.<br><br>William does not remember if any training was given to her on how to properly address opiate withdrawal, including COWS training or training on administrating medication to address the same |

85

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  |  | Ex. 24, Williams V. 2 Depo 181:4-13 |
|---|---|---|---|
| 237. | Based on her training and experience, Williams is familiar with symptoms exhibited by someone going through withdrawal. | Ex. 24. S. Williams Tr. V. 2. p. 268:22-269:1. | **Disputed** as no COWS was assessed of Branco nor is there any record of it in her medical chart, nor was Williams ever trained by Sierra to address opiate withdrawals and administering COWS assessments.<br><br>William does not remember if any training was given to her on how to properly address opiate withdrawal, including COWS training or training on administrating medication to address the same<br><br>Ex. 24, Williams V. 2 Depo 181:4-13 |
| 238. | During the 10-20 minutes that Williams spoke with Decedent, Williams did not observe any factors which suggested to her that Decedent was going through withdrawal symptoms. | Ex. 24. S. Williams Tr. V. 2. P. 269:-2-6. | **Disputed** as no COWS was assessed of Branco nor is there any record of it in her medical chart, nor was Williams ever trained by Sierra to address opiate |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | withdrawals and administering COWS assessments.<br><br>William does not remember if any training was given to her on how to properly address opiate withdrawal, including COWS training or training on administrating medication to address the same<br><br>Ex. 24, Williams V. 2 Depo 181:4-13 |
| 239. | As reflected in the NP Chat, at 8:14 p.m., Williams, sent a Teams Chat message to Nurse Practitioner Tidik to inform her that Decedent had been exchanging curse words with a male client at the CSU. Williams reported that she spoke with Decedent, and told her that if she was unable to maintain and keep her composure, she would be stepped up to a higher level of care. She reported that Decedent had cried and apologized, and was currently sitting outside | Ex. 19 NP Chat Thread. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | with the other female client and staff talking. | | |
| 240. | As reflected in the NP Chat, at 9:58 p.m., LPT BROWN sent a Teams chat message relaying that the Decedent had calmed down and was now sleeping in the day room area. | Ex. 19 NP  Chat Thread. | **Disputed** to infer that Brown was conducting any monitoring of Branco or that she was not in medical distress at the time the message was sent.<br><br>Ex 34 and 35 |
| 241. | After leaving the CSU the night of May 15, 2024, at about 8:00 p.m., Williams did not receive communications from the CSU night staff with concerns about Decedent. | Ex. 24. S. Williams Tr. V. 2. p. 120:11-13; V. 2. P. 221:20-222:12; 257:18-21. | Undisputed. |
| 242. | Williams was never contacted by staff with concerns that Decedent was under the influence of fentanyl. | Ex. 24. S. Williams Tr. V. 2. P.268:15-21. | **Disputed**. See OPR 194. |
| 243. | Williams was never contacted by staff with concerns that Decedent might be going through withdrawals. | Ex. 24. S. Williams Tr. V. 2. P.269:7-11. | **Disputed**. See OPR 194. |
| 244. | On the morning of May 16, 2024, Williams arrived back at the CSU at about 8:30 a.m. | Ex. 24. S. Williams Tr. V. 2. P. 222:13-224:5. | Undisputed. |

88

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  | | | |
|---|---|---|---|
| | JANET BROWN had gone home, but BONNIE SAYERS was still on site as she had stayed an extra hour to cover for Williams' morning shift, as Williams had childcare issues. | | |
| 245. | Decedent was the first client that Williams checked on upon arriving to the CSU on May 16, 2024. | Ex. 24. S. Williams Tr. V. 2. P.  228:12-16. | Undisputed. |
| 246. | Williams looked over the nurses' station and at the Decedent. She saw that Decedent's leg appeared bruised. | Ex. 24. S. Williams Tr. V. 2. p.  228:17-229:7. | Undisputed. |
| 247. | Williams approached Decedent, got up to her eye level, called her name and put her hand on her back. | Ex. 24. S. Williams Tr. V. 2. p.  229:8-229:19. | Undisputed. |
| 248. | The Decedent did not appear to display chest movement. She was sleeping on her stomach. Williams flipped her over and noticed blood stains. She realized Decedent was not breathing. | Ex. 24. S. Williams Tr. V. 2. p.  230:7-22. | Undisputed. |
| 249. | Williams directed a call to 911 and performed CPR on the Decedent. | Ex. 24. S. Williams Tr. V. 2. P. 238:17-25. | Undisputed. |

89

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | The Decedent was completely stiff at the time. | | |
| 250. | When the first responders arrived, they did not attempt CPR. They pronounced Decedent dead. | Ex. 24. S. Williams Tr. V. 2. P. 240:15-19; 248:19-21. | Undisputed. |
| 251. | Williams did not author any medical charts or records regarding Decedent or her admission. | Ex. 24. S. Williams Tr. V. 2. P. 12: 12-25. | Undisputed. |
| 252. | Williams expected both workers on the May 15, 2024, night shift to be awake during the shift, as they had signed the policy and procedure requiring it. | Ex. 24. S. Williams Tr. V. 2. p.  194:11-195:1; 197:20-198:4. | **Disputed**. As a supervisor, she failed her responsibility to ensure client safety was not endangered by failing to enforce the no-sleep policy. she failed to verify whether the policy was even enforced, she never requested HR to review surveillance camera, she never followed up on LPT Hursell' concerns that staff were still sleeping and advised her to install another camera to cover a blind spot where staff was sleeping. Williams was also |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  |  | formerly part of the NOC shift who routinely slept during the night shifts before she became a supervisor. Ex. 24, Williams V.1 Depo 97:6:17; 97:27-98:2; 99: 15-29; 102:7-15 110:25-111:19 See SUF 347 |
|---|---|---|---|
| 253. | Williams had never found BROWN or SAYERS to have falsified monitoring logs prior to the night of the incident. | Ex. 24. S. Williams Tr. V. 2. p. 196: 6-12. | **Disputed** as it assumes Williams regularly monitored surveillance footage, which she never did or even followed up on installing a camera to cover a blind spot near the staff station, which never took place. See OPR 252 |

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|

**Issue No. 14**: Plaintiff's Section 1983 Causes of Action (1ST, 2ND, 3RD, 4TH, and 8TH) Fail Substantively Against Williams As Plaintiff Cannot Establish Personal Participation in Deprivation of Rights

91

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| **Disputed: Williams Personally Participated As A CSU Supervisor And As An Integral Participants To Her Subordinate Staff's Wrongful Conduct.** | | | |
| 254. | Williams hereby incorporates by reference facts 1-6, 9-95, 103, 105-163, and 180-253 above. | | Plaintiff incorporates by reference her responses to facts 1-6, 9-95, 103, 105-163, and 180-253 above. |

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| **Issue No. 15: Plaintiff's Fifth Cause of Action For Neglect of Dependent Adult Fails as Decedent was not a "Dependent Adult"** | | | |
| **Disputed: Branco was a considered a dependent adult within the definition of the statute as she placed on a WIC 5150 hold under grave disability for substance use disorder.** | | | |
| 255. | Williams hereby incorporates by reference facts 96-101 above. | | Plaintiff incorporates by reference her responses to facts 96-101 above. |
| **Issue No. 16: Plaintiff's Fifth Cause of Action For Neglect of Dependent Adult Fails as Plaintiff cannot establish that Williams engaged in Physical Abuse or Neglect Nor that She Acted with Recklessness, Oppression, Fraud or Malice.** | | | |
| **Disputed: Williams' acted in a neglectful manner by failing to comport with her substantial care taking duty owed to Branco as a dependent adult under the statute.** | | | |
| 256. | Williams hereby incorporates by reference facts 1-6, 9-95, 105, 107-163, and 180-253 above. | | Plaintiff incorporates by reference her responses to facts 1-6, 9-95, 105, 107- |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| | | | 163, and 180-253 above. |

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| **Issue No. 17: Plaintiff's Sixth Cause of Action for Negligent Training, Supervision or Retention Fails as Williams is not an "Employer"** <br><br> **Disputed: As a CSU Supervisor, Williams failed to supervise her subordinate staff in approving and monitoring Branco.** | | | |
| 257. | Williams hereby incorporates by reference facts 181-188, and 219 above. | | Plaintiff incorporates by reference her responses to facts 181-188, and 219 above. |

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| **Issue No. 18: Williams Is Entitled To Summary Judgment As To The Ninth Cause Of Action For Wrongful Death Because Plaintiff Fails to Establish a Duty Owed to Decedent** <br><br> **Disputed: Williams owed a duty of due care and diligence to clients like Branco as a CSU Supervisor to ensure their safety and that the CSU can medically manage her acuity levels.** | | | |
| 258. | Williams hereby incorporates by reference facts 1-6, 9-95, 105-163, and 180-253 above. | | Plaintiff incorporates by reference her responses to facts 1-6, 9-95, 105-163, and 180-253 above. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| **Issue No. 19**: Williams Is Entitled To Summary Judgment As To The Ninth Cause Of Action For Wrongful Death Because Plaintiff fails to establish Negligent Conduct against Williams which constituted a Breach of Duty<br><br>**Disputed**: Williams breached a duty of due care and diligence to clients like Branco as a CSU Supervisor by failing to ensure their safety and failing to make sure that the CSU can medically manage her acuity levels. | | | |
| 259. | Williams hereby incorporates by reference facts 1-6, 9-95, 105-163, and 180-253 above. | | Plaintiff incorporates by reference her responses to facts 1-6, 9-95, 105-163, and 180-253 above. |

| SUF No. | Fact | Supporting Evidence | Def's Response |
|---|---|---|---|
| **Issue No. 20**: Williams Is Entitled To Summary Judgment As To The Ninth Cause Of Action For Wrongful Death Because Plaintiff Fails on the Element of Causation with Respect to Williams<br><br>**Disputed**: Williams incompetent supervision was a direct and proximate cause of Branco's Death. | | | |
| 260. | Williams hereby incorporates by reference facts 1-6, 9-95, 105-163, and 180-253 above. | | Plaintiff incorporates by reference her responses to facts 1-6, 9-95, 105-163, and 180-253 above. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | PLAINTIFF'S ADDITIONAL STATEMENT OF UNDISPUTED FACTS | PLAINTIFF'S CITATION | OPPOSING PARTY'S RESPONSE |
|---|---|---|---|
| **Issue no. 21:** County Of San Luis Obispo By And Through Its Contractor, Sierra, Was Deliberately Indifferent To Brancos' Safety Because <u>Its</u> Practice Of Admitting Detoxifying Clients Without Proper Training, Policies And Procedures <u>Was</u> A Moving Force Behind Plaintiff's Injury. | | | |
| 261. | The provision of public mental health services is traditionally a governmental function. | *Armstrong v. Schwarzenegger, 622 F.3d 1058, 1074* | Unable to dispute because this is case law, not a fact supported by evidence. |
| 262. | A government agency cannot avoid its obligations under federal law by contracting with a third-party to perform its functions. The rights of individuals are not so ethereal nor so easily avoided. | *Armstrong v. Schwarzenegger, 622 F.3d 1058, 1074* | Unable to dispute because this is case law, not a fact supported by evidence. |
| 263. | A private company's policies become that of the county if the county delegates final decision-making authority to it. | *Armstrong v. Schwarzenegger, 622 F.3d 1058, 1074* | Unable to dispute because this is case law, not a fact supported by evidence. |
| 264. | Mental health services to the public are *non-delegable duties* of the County | *King v. Kramer, 680 F.3d, 1013, 1020 (7th Cir. 2012)* | Unable to dispute because this is case law, not a fact supported by evidence. |

95

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 265. | According to Sierra's contract to operate the CSU, Sierra agreed to numerous County oversights including operations, management, policy making and reviewing,  final policy and procedure approval, to maintain logs of all grievances, to allow access to the electronic medical charts, to report all incidents, to maintain County approved quality management plan requiring thorough utilization reviews, monitoring process and quality assurance/ improvement activities, and required to submit to quarterly and monthly audits by the County's Department of Behavior Health's Quality Control Department. | Ex. 36 Sierra and County Contract Amendment dated 11.20.2023 - pages 17, 18, 19, 23, 24 | Undisputed. |
| 266. | In addition to its contractual requirements, the State also mandated that the County's oversight responsibilities also include regular site visits, review of incident reports and take corrective actions when deficiencies were identified, reviewing and acting upon prior reports, complaints, or audits | Ex. 29 Decl. of Expert Matt Madaus, LCSW ¶9 | Undisputed, subject to objections. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | identify deficiencies in CSU supervisions or safety practices, and taking steps to mitigate foreseeable risks to high-risk clients placed in the facility. | | |
| 267. | On November 18, 2023, Sierra held a CSU staff and management meeting during which management shared a "theme" to increase the CSU census among other management and staff topics. | Ex. 24 Williams Depo 168:24-169:10<br><br>Ex. 42 Sinclair Depo. 102:9-17<br><br>Ex. 41 Feb 11, 2024, email from Bethany Shakespear regarding increased in CSU Census | Undisputed. |
| 268. | This common census theme was developed by Sierra's upper management to address CSU's low admissions, and with it, a fear of losing the contract to operate the CSU and fear of losing their jobs at the CSU. | Ex. 42 Sinclair depo. 102:18-103:2; 6-10;11-14; 103:24-104:4 | Disputed.<br><br>Ms. Sinclair stated the staff was being told "that we were in damage of losing the contract between which means danger of losing our jobs if we don't have a certain amount of consistent clients and money."<br><br>Ex. 42, pg. 102:18-25. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 269. | Starting from 2022 and continuing into 2023, Ryan Walsh, LMFT who was Sierra' Director of Planning and Analytics had been planning on creative ways to increase the census and shared his goals with former CSU Mgr/RN Sandy Farley. | Ex. 8 Nurse Farley depo. 94:18-97:25  Ex. 48 SMWG Organizational Chart | Undisputed. |
|---|---|---|---|
| 270. | Nurse Sandy Farley had been employed with Sierra as an onsite CSU RN in 2020 in Grass Valley. She was promoted to a supervisor position back on May of 2018. Her scope of responsibilities increased to include the oversight of the CSU regulations, and to address Title 9 compliance and regulations needed to stay open and in compliance with California Law. She stopped working for Sierra in December of 2023. Farley also and developed CSU policies and procedures including the current operative P&Ps no. 4, 6 and 101, which were effect at the time of the incident, and acting as CSU RN managers, with direct oversight and supervisory roles to lower level staff and made clinical decisions with | Ex. 8 Nurse Farley depo. 14:23-24 Ex. 33 CSU P&P's 4,6, and 101 | Undisputed. |

98

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | regards to admissions and denials, conducted in-person, real-time assessments at the CSU. | | |
| 271. | During conversations between Walsh and Farley about increasing the census, Walsh asked Farley for creative ways to increase the census such as incentivizing CSU staff and offering gift cards and movie tickets to staff who had the most CSU walk-ins, admissions from hospitals and referrals to the CSU. | Ex. 8 Nurse Farley Depo. 94:18-96:2 | Undisputed. |
| 272. | Conversations about increasing the census notably increased in frequency toward the latter part of 2023, curiously around the same time Nurse Farley's employment was terminated. | Ex. 8 Nurse Farley Depo. 94:18-97:25 | Disputed in part.<br><br>Ms. Farley did not make any statement that the increase of the conversations "curiously" increased.<br><br>Ex. 8, pgs. 94:18-97:25. |
| 273. | Walsh began approaching Nurse Farley with suggestions and ideas on how to increase the CSU numbers including taking on higher acuity clients. | Ex. 8 Nurse Farley Depo. 94:18-97:25 | Undisputed. |
| 274. | Drug and alcohol clients including detoxifying clients was a category of | Ex. 8 Nurse Farley Depo. 94:18-97:25 | Undisputed. |

99

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | higher acuity clients that Walsh wanted to target. | | |
| 275. | However, the providers including Nurse Farley were not comfortable admitting and managing higher acuity clients under their licenses nor was it approved under the County/Sierra contract. | Ex. 8 Nurse Farley Depo. 97:5-20 | Undisputed. |
| 276. | Nevertheless, Walsh persisted and looked for ways to circumvent the contractual and licensing prohibition from admitting drug and alcohol detoxing clients. | Ex. 8 Nurse Farley Depo. 97:5-20 | Undisputed. |
| 277. | From November 2023 until May 2024, except for one month, the CSU consistently increased their percentage of admitted clients by an average of 12 to 23%, month-over year, except for one month | See Ex. 43 Cameron Sehat Declaration Parag., Ex. 51 CSU census month-over-year increase data chart Table & Ex. 52 Sierra Monthly Census Data Nov. '22 and '23 Dec '22 and '23 Jan. '23 and '24 Feb. '23 and '24 March '23 and '24 April '23 and '24 May '23 and '24 | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  |  | [Sierra 00973-00986]<br><br>See Also Ex. 41 Bethany Shakespear email Feb.11'24 informing CSU staff of County's appraisal of increased CSU census. |  |
| --- | --- | --- | --- | --- |
| 278. | Dr. Stephen Lampe was the former CSU's assigned psychiatrist/prescriber from 2019 until November 2023 and whose responsibilities included supervising the CSU Rn's and staff, and making clinical mental health decisions including medication management of clients. | Ex. 44 Dr. Lampe depo. 19:1-5; 20:14-21:7 | Disputed.<br><br>Misstates cited testimony. In the cited testimony, Dr. Lampe testified that he supervised the prescribing "nurse practitioners," who included Julia Tidik and Terra Clayton, *not* the CSU RN's or staff. Ex. 46 p. 20:3-25. He further testified that the responsibilities of the prescribers involved evaluating medication regimen of patient's admitted to the CSU that were presented to him by the CSU staff. Ex. 46 Dr. Lampe Depo p. 21 1-13. |
| 279. | On or about October-November 2023, Dr. Stephen Lampe had a | Ex. 44 Dr. Lampe depo. | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | meeting with Ryan Walsh, Sierra's who informed him that the county was not happy with the low CSU census. | 60:2-25; 68:20-69:1 | |
| 280. | During the same meeting, Walsh divulged that Sierra would address the low census and attempt to change it by replacing former CSU RN manager, Sandy Farley to a new RN | Ex. 44 Dr. Lampe depo. 61:2-10 | Undisputed. |
| 281. | Both nurse practitioners would now be working remotely, off-site from the CSU. | Ex. 44 Dr. Lampe depo. 37:11-38:11 | Undisputed. |
| 282. | Specifically, Walsh told Dr. Lampe that Nurse Farley was the cause of the low census: she was blocking admissions. | Ex. 44 Dr. Lampe depo. 61:2-10 | Undisputed. |
| 283. | In fact, Ryan Walsh told Dr. Lampe that he planned on replacing Sandy Farley as a solution to increasing the numbers and to alleviate County's concerns of the low CSU census. | Ex. 44 Dr. Lampe depo. 65:23-66:2 | Disputed in part. Dr. Lampe stated, "replacing Sandy," in response to the question if Ryan told him anything they were planning on doing to make the County happy with the numbers. Ex. 44, pg. 65:23-66:2. |

102

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 284. | It was also Dr. Lampe's impression that Nurse Farley blocked admissions of clients suffering from severe substance and alcohol withdrawals because he would not see those types of clients. | Ex. 44 Dr. Lampe Depo. 62:22-63:4 | Undisputed. |
|---|---|---|---|
| 285. | During that same meeting with Mr. Walsh Dr. Lampe was told that his services were no longer needed. | Ex. 44 Dr. Lampe Depo. 24:17-25:9 | Undisputed. |
| 286. | Sierra began using both NP Julia Tidik and Terra Clayton's RN licenses around the same time that Dr. Lampe stopped being a provider for the CSU as he was told his services were no longer needed. | Ex. 44 Dr. Lampe depo. 24:20-25:9 | Disputed in part.<br><br>Dr. Lampe only testified about his understanding of what Sierra was going to do.<br><br>Ex. 44, 24-:20-25:9. |
| 287. | The CSU was never designated, permitted to be operated as detox or rehab center, nor equipped to treat any form of substance and/or alcohol detoxification. | Ex. 44 Dr. Lampe depo 43:22-44:2<br><br>Ex. 36 Sierra County Amendment Contract p. 17 of 50, para. 2)ii. And 3) | Disputed in part.<br><br>Dr. Lampe testified the CSU was "not a detox unit per se, so depending on what the -- what the substance is or was."<br><br>The Contract did state Sierra "shall adopt a County-approved policy for admissions criteria involving alcohol use which required a blood |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | alcohol level … under two-tenths percent…." Ex. 36, pg. 17, sec. f(3); Ex. 44, pg. 43:22-44:2. |
|---|---|---|---|
| 288. | In fact, CSU policies, in effect at the time of the incident, namely policies 4,6 and 101 specifically warned staff that the facility was not a "drug and alcohol detox" center, nor allowed for 5150 clients who were either under the influence of drugs or withdrawing or posed a risk from withdrawing from drugs that may require medical intervention. | Ex. 33 Sierra Policies no 4, 6, 101-CSU Admissions, AWOL, 23 Hour Admission Criteria and Preadmission Procedures | Disputed in part. The policies 4 and 6 were last updated in February 2023. Policy 101 was last updated in January 2022. In 2024, a new law when into effect that allowed substance abuse to be a basis for a 5150 hold. There is no language in policies 4, 6 and 101 stated the CSU was not a "drug and alcohol detox" center. Ex. 13, ¶ 15; Ex. 33, P&PO 4, 6 and 101. |
| 289. | The County/Sierra contract also explicitly advised the parties that the CSU was not a "detox" facility. Sierra | Ex. 36 Sierra/County Contract-Amendment 8 - 11.1.2023 p. 17 of 50, para. 3 | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 290. | As part of its contractual requirements Sierra and County was actively involved in reviewing, revising and editing the CSU policies. | Ex. 36 Sierra/County Amendment to Contract po. 22 of 50, 23 of 50 | Disputed. Pages 22 and 23 do not mention County's overview of reviewing, reviewing and editing policies. The contract imposes certain notification requirements and required Sierra to meet with the County on a quarterly basis to review performance. Ex. 36, pgs. 22-23, sec. k(1), (2), (3), (7), and (8) and $l$(1) and (2)(iv). |
| --- | --- | --- | --- |
| 291. | In keeping with County's oversight regulations, Amanda Getten, SLO county Department of Behavioral Health Quality Control Department supervisor, was actively involved in audits and meeting with Sierra management to review the operations of the CSU. | Ex. 32 County-CSU audit related emails and communications between Angella Atwell, Amanda Getten, County and Sierra management Ex. 45 County 63429-63485; 63751-63755; 63905-63911; 64093 | Undisputed. |
| 292. | During the period relevant to Sierra's theme of increasing the CSU, County assigned a | Ex. 32 County-CSU audit related emails and | Disputed. Ms. Atwell's role was to audit thew charts of |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  |  |  |
|---|---|---|---|
| | registered nurse by the name of Angela Atwell to conduct regular audits of the CSU policies and operations, including audits of its nocturnal welfare and monitoring policies and audits of its client medical charts. | communications between Angella Atwell, Amanda Getten, County and Sierra management<br><br>Ex. 45 County 63429-63485; 63751-63755; 63905-63911; 64093 | the CSU. She did not audit the policies and procedures. The audit period was January 2023 to June 2023.<br><br>Ex. 53, pg. 30:24-31:7, 33:24-34:1. |
| 293. | County CSU auditor Nurse Atwell met and communicated with CSU Mgr Williams during her CSU audits for relevant November to May 2024 period. | Ex. 24 Williams depo. 150: 8-13 | Disputed in part.<br><br>Ms. Williams testified "[t]here was a county registered nurse that audited the CSU."<br><br>Ms. Atwell also testified she interacted with Savannah Williams in March 2024. Ms. Williams showed the medication log and other binders.<br><br>Ex. 24, pg. 150:8-13; Ex. 53 pg. 37:13-24. |
| 294. | By virtue of its numerous audits and access to client charts, County was or at least should have been on notice of 1. the increase in the CSU census and 2. that the increase was at least partly due to admitting | Ex. 36 County/Sierra Contract Amend. 8, Ex. 29 Decl. of Expert Matt Madaus Paras. 9-10 | Disputed.<br><br>This statement is an argument, not a fact. Madaus does not opine on what the County knew or should have known. Counsel's |

106

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | higher acuity clients including drug and alcohol clients. | See Also Ex. 43 Cameron Sehat Decl. re chart depicting increase in the CSU acceptance Census | exhibit only shows increased numbers but there is no explanation for the increase.<br><br>Ex. 29, ¶¶ 9-10; Ex. 43, ¶ 4. |
| 295. | In fact, Bethany Shakespear's email to CSU staff on Feb 11, 2024 applauded the CSU staff for increasing the census and that the County had also noticed the increase of the census and reached out to discuss the future of the CSU with them. | Ex. 41 Shakespear February 11, 2024 email to CSU staff | Undisputed. |
| 296. | During the same relevant period from Nov. 2023 until May 2024, several CSU staff including defendants Janet Brown, Bonnie Sayers, Savannah Sinclair a Voiced numerous concerns and red flags to CSU management including Savannah Williams, Bethany Shakespear and Julia Tidik that the CSU was taking on high acuity drug and alcohol detoxing with no training or medical capacity to safely manage them. | Ex. 42 Sinclair depo. 168:21-169: 10 Ex. 36 Sayers depo. 156:22-162:25 Ex. 46 Janet Brown Text to Sinclair on Teams Thread recent change to accept Alcohol WD/detox clients without policy changes, p. 3 | Disputed in part.<br><br>Ms. Sayers testified in deposition that she reviewed a Teams message that Janet Brown sent regarding alcohol withdrawal. While Ms. Sayers agreed with the comment, there was no testimony she voiced any concern to Sierra management.<br><br>Ms. Sinclair testified she was aware of a client who was admitted at the CSU who was in need of detoxification. She did |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | not provide any testimony about complaints made to Sierra management.<br><br>Ex. 9, pgs. 156:22-159:13; Ex. 42, pgs. 168:21-169:10/ |
| 297. | Specifically, on or about February of 2024 Janet Brown informed and voiced her concerns on the CSU Teams messaging thread that in light of the decision to admit alcohol withdrawing clients, there were no protocols to follow or guidance from supervising staff | See Ex. 46 Brown Text Teams thread to Sinclair p. 3 | Undisputed. |
| 298. | Brown had earlier voiced her concerns about the high acuity clients being admitted at the CSU back at the November 2023 staff meeting | Ex. 15 Tidik depo 113:13-21 | Undisputed. |

**Issue no. 22.   County Had A Policy Of Delegating Decision-Making Authority To Low-Level Psychiatric Technicians To Determine Whether A Client Meets Criteria for Admission**

| | | | |
|---|---|---|---|
| 299. | A psychiatric technician's scope of responsibility includes behavioral health assessment. However, the scope of their license did not allow for any medical diagnosis which was | Ex. 10 Aurioles depo. 56:25-57:7 | Disputed in part.<br><br>Ms. Aurioles testified she was permitted to engage in behavioral assessments, but she would refer medical |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | limited to nurse practitioners. | | diagnosis to the practitioner. She also stated she was not trained on labs and was not familiar on interpreting labs.  She did not offer testimony about the scope of license.  Ex. 10, pg. 56:25-57:7. |
| 300. | Bethany Aurioles's credentials as an LPT did not allow her to interpret any of the CSU client lab results nor was she trained on them. She would just convey them to the clinician. | Ex. 10 Aurioles depo 57:7-16 | Disputed in part.  Ms. Aurioles testified she was not trained on labs and was not familiar on interpreting labs. She did not offer testimony about the scope of her credentials as an LPT.  Ex. 10, pg. 57:7-16. |
| 301. | A psychiatric technician's medical training is limited to observing for behavioral changes including taking vital signs and reporting to nursing supervisors but not making medical diagnosis nor trained on assessing lab results. | Ex. 10 Aurioles depo. 56:25-57:11; 58:1-4 | Disputed.  Ms. Aurioles testified she was not trained on labs and was not familiar on interpreting labs. She did not offer testimony about a psychiatric technician's medical training.  Ex. 10, pg. 57:11, 58:1-4. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 302. | In the crisis and mental health industry, generally speaking, clients on a 5150 hold and on a detox basis are considered "higher acuity" clients. | Ex. 9 Sayers depo. 217:16-218:24 | Disputed. Sayer's understanding was "Any sort of detox is higher." Sayers also stated that "generally acuity, when we communicate it to each other is the acuity of who's on the floor at the time. So if you have multiple people that are considered higher level needs, then you have a higher acuity on the floor." Ex. 9, pg. 218:8-24. |
|---|---|---|---|
| 303. | Sometime prior to Branco's death the CSU management directed low level staff that they were "no longer required to review ER client's incoming hospital lab work" despite contrary written policies requiring the same. | Ex. 10 Aurioles depo. 84: 16-85:6  Ex. 33 P&P 101, 4, 6 | Disputed in part. P&P 101, section 1 (D) and 1(E) outlined the policies for admission by CSU Medical Staff and CSU Mental staff. They do not contain any policy that required the review of lab reports. Ex 33, P&P 11, sec. 1(D) and 1(E). |
| 304. | From November of 2023 until May 15, 2024 and subsequently, the CSU no longer had an onsite registered nurse manager. Both nurse practitioners | EX 17- Tidik/Sierra contract | Disputed. Exhibit 17 is the contract between Tidik and Sierra. It did not |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | were now strictly working remotely, off-site and former CSU psych tech Savannah Wiliams was not promoted to CSU manager. | | involve any other person.<br><br>Under the "Services to Be Performed by CONTRACTOR" section, Tidik was to provide "[m]edication support services include prescribing and monitoring psychiatric medications or biologicals necessary to alleviate the symptoms of mental illness" the CSU in San Luis Obispo County. There is no term in the contract that the services are provided remotely.<br><br>The contract does not mention the termination of a registered nurse at the CSU.<br><br>Ex. 17, pg. 1. |
| 305. | From at least November of 2023 until the date of Branco's admission, it was a CSU policy to rely on low-level staff to approve a client to the CSU.  Only if a low-level staff denies a potential client would a CSU Manager or Nurse Practitioner be consulted | Ex. 24 Williams depo. 165:2-166:10<br><br>Ex. 41 Shakespear Email dated Feb 11, 2024 | Disputed in part.<br><br>Williams stated, when somebody is referred to the CSU and they meet our criteria, then staff will accept them." The staff did not have the authority to deny the clients. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | and possibly over-ride the low-level staff's decision. | | Ex. 24, pg. 165:2-22. |
| 306. | County enlisted the services of a registered Nurse, Angela Atwell, to conduct an audit of the CSU for the period of January 2023 to June 2023 and to conduct spot check from December 2023 to January 2024 | Ex 53 Atwell Depo 33:24-34:1 | Disputed.<br><br>Atwell's audit consisted of client charts, and "[t]he audit period was January 2023 to June 2023." She also testified that she did a spoke check of 10 charts in December 2023 to January 24, 2024.<br><br>Ex. 53, pgs. 33:24-34:1, 30:24-2, 64:12-17. |
| 307. | Atwell's formal job description as a county auditor consisted of "Under direction, is responsible for planning, implementing, and coordinating services in a designated inpatient program or quality assurance program… acts as a consultant and research person for staff and community agencies." | Ex 53 Atwell Depo 12:17-24 | Undisputed. |
| 308. | Atwell was a "Utilization Audit Nurse" working for the County's Quality Support Team with responsibilities including auditing the procedures, | Ex 53 Atwell Depo 25: 2-7 | Disputed.<br><br>The cited text refers to Atwell's auditing of charts at the PHF. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | protocol, and client charts of the Psychiatric Health Facility from 2015 to 2023. | | Ex. 53, pg. 25:2-7. |
| 309. | When conducting the PHF audits, she would customarily review every single chart of every patients admitted to the PHF | Ex 53 Atwell Depo 25: 2-7 | Undisputed. |
| 310. | Until around July 2023, Atwell reported to her supervisor, Amanda Getten, who was the Division Manager for Quality Support at the time of her audits. | Ex 53 Atwell Depo 28:25-29:20 | Undisputed. |
| 311. | After July of 2023 Atwell now reported to her immediate QST program Supervisor, Julianne Schmidt | Ex 53 Atwell Depo 29:1-15 | Undisputed. |
| 312. | From July 2023 to May of 2024, the target of Atwell's audit changed from the PHF to the CSU with a specific role of auditing its charts | Ex 53 Atwell depo 30:21-31 | Disputed in part.<br><br>From July 2023 to May 2024, Atwell's auditing scope changed from the PHF to the CSU.<br><br>Ex. 53, pg. 30:21-23. |
| 313. | As part of her auditing function, Atwell asked to see a copy of the then existing Sierra Policies and Procedures to review | Ex 53 Atwell Depo 31:12-19; 68:5-11 | Disputed,<br><br>Atwell was not instructed to review or audit any of the CSU |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | policies pertaining to their client Admission | | policies and procedures. When Atwell reviewed the CSU admissions and 23-hour criteria policies, she did not have particular reason to review them.<br><br>Ex. 31, pgs. 31:5-7, 68:5-11. |
| 314. | With regards to auditing facility policies, it was Atwell's practice to inform the County medical director of audit findings raising concerns of any medically inappropriate policies | Ex 53 Atwell depo 27: 12-28:6 | Disputed in part,<br><br>Atwell was not instructed to review or audit any of the CSU policies and procedures. If Atwell had concerns about any medically inappropriate policies, then she would raise them with the director,<br><br>Ex. 31, pgs. 28:3-12, 31:5-7. |
| 315. | Atwell also performed an on-site CSU visit and met with Savannah Williams as part of her auditing duties in March 2024 | Ex 53 Atwell depo 37:13 | Disputed.<br><br>The audit occurred in November 2023. At a March 2024 visit, Atwell interacted with Williams.<br><br>Ex. 37:13-16, 52:24-53:8. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 316. | Part of the audit required Atwell to inquire about CSU client monitoring policies.  To that effect, Atwell was told that "they [CSU staff] were monitoring clients every 30 minutes and documenting every 2 hours" | Ex 53 Atwell depo 41:24, 25:9 | Disputed.<br><br>Atwell was not instructed to review or audit any of the CSU policies and procedures. Atwell was not aware of the monitoring requirements and just saw there were two-hour notes.<br><br>Ex. 53, 31:5-7, 41:24-42:3. |
| --- | --- | --- | --- |
| 317. | Atwell's scope of audit did not include a review of Sierra's Alcohol and Drug withdrawal monitoring policies | Ex 53 Atwell depo 93:7-25 | Disputed in part.<br><br>Atwell's audit consisted of client charts, and she was not instructed to review or audit any of the CSU policies and procedures.<br><br>Ex. 53, pgs. 33:24-34:7, 97:13-17. |
| 318. | Atwell only audited 15 percent of the charts (about 30 charts) available at the CSU from January 23 to July 2023 because it wasn't her job to audit the entirety of the charts | Ex 53 Atwell depo 52:9-18 | Disputed in part.<br><br>Atwell testified about the number of charts. There is no statement in the cited testimony stated it wasn't her job to audit the entirety of the charts.<br><br>Ex. 53, pg. 52:9-18. |

115
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 319. | There were no other audit periods past July 2023 date because it's only done once a year and the CSU had shut down prior to the November 2024 audit service date | Ex 53 Atwell depo 52:24-53:8 | Undisputed. |
|---|---|---|---|
| 320. | However, Atwell conducted a spot check audit of 10 charts from December 2023 to January 2024 and still noted deficiencies like missing vital signs every shirt. | Ex 53 Atwell depo 64:12-17 | Undisputed. |
| 321. | Atwell's specific audit inquiry was to make sure clients had an initial nursing assessment, a mental health assessment, if they had referrals, developed a problem list, and a mental health diagnosis, if they had a physical diagnosis, had their vital signs done every shift, clinical necessity, noted if they are a danger to self, danger to others, or disabled | Ex 53 Atwell depo 43:11-18 | Undisputed. |
| 322. | Atwell's auditing job also required her to review client 5150 holds to see what subcategory was listed | Ex 53 Atwell Depo 46:5-25 | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 323. | Considering the limited January to July 2023 chart audits, and the selective 10-chart spot check audit from Dec '23 to Jan 24, Atwell's audit findings could not have ascertained the extent of client acuity much less acuity based on alcohol and/or drug detoxification and withdrawal | Ex 53 Atwell Depo 122:3-12 | Disputed in part.<br><br>Atwell's audit could not have determined the level acuity, because she "audited the fact that they're on the CSU, not how they got there."<br><br>Ex. 53, pg. 122:3-12. |
|------|------|------|------|
| 324. | According to Nurse Atwell, LVNs and LPTs could not formulate a plan of care unless a registered nurse signed off on such a plan. | Ex 53 Atwell Depo. 86:22-25, 87:1-13, 88:14-18, 89:5-23 | Disputed.<br><br>Atwell was addressing the nursing assessments that were done within the time period of the audit. Atwell noted Farley was co-signing the nursing assessments. Atwell wanted to know who was going to be doing it in the future since Farley left and there was no new nurse.<br><br>Ex. 53, pgs. 86:22-88:22, 89:20-23. |
| 325. | Per Atwell's audit finding, after Nurse Farley's employment was terminated and off-site nurse practitioners hired, LVNs and LPTs | Ex 53 Atwell Deposition transcript 107:23 108:1-20 | Disputed.<br><br>During the January to June 2023 audit period, Sandy Farley was actually co-signing charts. Atwell knew |

117

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | were routinely conducting nursing assessments which was *outside their licensure scope.* | | that Farley had left. Atwell sent an email but it does not say LVNs and LPTs were or were not co-signing assessments. The email said its needs to be done in the future because Farley has left. Atwell did not testify as to any investigation to determine when the LVNs and LPTs were outside of their license. Atwell did not testify as to the number to times as to claim it was "routinely" done.<br><br>Ex. 53, pgs. 87:3- 19, 107:23-108:20; Ex. 54, pg. 1. |
| 326. | Because LVN's and LPTs were routinely performing nursing assessments outside the scope of their licensure, Atwell advised that PT/LVN's nursing notes <u>must</u> be co-signed by the off-site nurse practitioners. To that point, Atwell testified at her deposition to the following: *"A: I was specifically told because Sandy was gone and I knew they did not have a new nurse…when sandy left, I asked if she was* | Ex 53 Atwell Depo 86:22-88:22; 107:9-108:7 and Ex 54, Atwell's Nov. 22, 23 emails to Julianne Schmidt | Disputed.<br><br>During the January to June 2023 audit period, Sandy Farley was actually co-signing charts. Atwell knew that Farley had left. Atwell sent an email but it does not say LVNs and LPTs were or were not co-signing assessments. The email said its needs to be done in the future because Farley has left. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | *replaced and I was told no, and I said then the nursing assessments need to be co-signed. Q: And when you suggested they would be co-signed that would include co-signed by the off-site nurse practitioners, correct? A: Yes"* | | Ex. 53, pgs. 87:3- 19; Ex. 54, pg. 1. |
| 327. | Specifically, in an email dated *Nov. 22, 2023*, Atwell brings to the attention of her former supervisor Amanda Getten and current supervisor Julianne Schmidt, because Sandy Farly was no longer at the CSU and had formerly co-signed the nursing assessment, she asked that the two [off site] nurse practitioners to co-sign nursing assessments, and for Bethany Shakespear to co-sign the mental health assessments. | Ex 54 Nov. 22 email to Schmidt | Undisputed. |
| 328. | Although acting in a supervisory role to the CSU staff, Bethany Shakespeare never worked on-site. | Ex 53 Atwell depo 76: 2-9 | Undisputed. |
| 329. | Despite the County auditor's out-of-scope practice concerns, Julianne Schmidt was | Ex 54 See Nov. 22, 2023 email from Schmidt to Atwell | Disputed in part.<br><br>The November 22, 2023 emails states: |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | condoned the LPTs and LVNs out-of-scope assessments. Specifically, Julianne Schmidt advised that she was comfortable with the CSU operations despite the lack of an on-site LPHA (Licensed Practitioner of the Healing Arts) | | "Amanda has advised that she is comfortable with the way that the CSU is operating with the LPTs, and she has researched this fully."<br><br>Ex. 54, pg. 1 |
| 330. | On February 7, 2024 Atwell also inquired with her supervisor, Julianne Schmidt, whether Dr. Puri, the County Behavioral Health Medical Director should be made aware of Atwell's CSU Audit Results. Schmidt after conferring with Angela Getten responds: "*No, we could send things to them if there were large concerns that we needed to make management aware of or policies and procedures we needed consultation on*" | Ex 55 See Feb 7 email response from Schmidt to Atwell | Undisputed. |
| 331. | Based on the county auditor's opinion, CSU client safety would have been best served by having an *on-site* supervising registered nurse. | Ex 53 Atwell Depo. 119: 2 - 121: 9 | Disputed.<br><br>Atwell offered her personal opinion that the CSU should have had a nurse. The reason for that is a nurse has more experience. A nurse can do assessments and a |

120

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | LVN or psych tech cannot.<br><br>Ex. 53, pg. 119:24-120:10. |
|---|---|---|---|
| 332. | According to the CSU policy for Preadmission Procedures, "denials are only to be provided by the CSU manager or Crisis Program Manager" which meant that if staff had hesitations on accepting and did not wasn't to accept, they need to a manager or supervisor. | Ex. 8 Nurse Farley depo 117:3-16 | Undisputed. |
| 333. | During the same Nov. '23 to May '24, Sierra management removed the individual CSU policies, including the important Admission Criteria, W&I 5150 holds and Pre-Admission policies from the CSU policy binder, ostensibly because Sierra and County were revising them. | Savanna Sinclair February 24, 2024, cell phone video depicting an empty policy binder aside from Shakespear's Feb. 24 email reminding staff that only management, CSU supervisor or NP's can deny clients amongst other topics.<br><br>Ex. 9 Sayers depo. 69:1-10;70:8-21 | Disputed in part.<br><br>None of the cited evidence stated Sierra Management removed the CSU policies from the policy binders. Further, Plaintiff did not attach page 101 from the deposition of Bonnie Sayers. The February 11, 2024 email noted that the directives will be rolled out as policies and procedures.<br><br>Ex. 9, pgs. 69:1-10, 70:8-21; Ex. 41, pg. 1; and Ex. 44, pg. 91:10-12. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  |  | Ex. 42 Sinclair depo. 91:10-12; 101:5-11; 12-19; Ex. 33 See P&P no. 4,6 and 101 |  |
|---|---|---|---|---|
| 334. | The lack of any substantive CSU policies was disturbing enough that Savannah Sinclair, a former CSU psychiatric technician, felt compelled to document it with a short video of the empty binder taken on February 24, 2024 |  | Ex. 42 Sinclair depo. 13:1-22; 90:23-91:5<br><br>Ex. 38 Sinclair Video mp3 file;<br><br>Ex. 41 February 11 Email from Shakespear titled "Clarifications of Expectations for Denials, Delays, and Possible Diverts." | Disputed in part.<br><br>Ms. Sinclair testified it was her intention to document the lack of any actual policies as missing from the binder.<br><br>Ex. 42, pg. 91:6-9. |
| 335. | CSU policies were absent from the binder from November 2023 to long past the date of Branco's incident until at least the first June 22, 2024. |  | Ex. 42 Sinclair depo. 127:129:19 | Disputed in part.<br><br>Ms. Sinclair stated she had heard policies were missing from May 17th until the first week of July. She did not witness any policies in the binder on February 22, 2024.<br><br>Ex. 42, pgs. 127:4-13, 129:16-19. |
| 336. | During the period the CSU policies were missing, CSU staff did not have |  | Ex. 41 Shakespear Feb. 11, 2024, email | Disputed. |

122

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | access to any of the CSU admission and 5150 criteria policies and only had access to a Feb 11, 2024 email from Shakespear reminding staff of insubordination if then denied clients without supervisor consent. | | There is nothing in the email stating the staff did not have access to any of the CSU admissions and 5150 criteria policies. The email noted that the directives will be rolled out as policies and procedures.<br><br>Ex 41, pg. 1. |
| 337. | The availability of a Policy and Procedures manual at the CSU nurse' station was required by law under Title 9, Sect. 1810 CSU Regs. | Ex. 8 Nurse Farley depo. 61:13-17 | Undisputed. |
| 338. | CSU managers and nurse practitioners did not have the authority to directly approve and admit CSU clients. Their authority was essentially limited to over-riding any potential denials by low-level staff and only if low level staff were concerned about acuity and raised those concerns to management and Np's. | Ex. 24 Williams depo. 165:2-25 | Disputed.<br><br>Ms. Williams stated that "[w]hen somebody is referred to the CSU and they meet our criteria, then staff will accept them." She further stated that she had the authorization to deny clients or continue admitting the client. She stated nurse practitioners had the authority to deny patients.<br><br>Ex. 24, pgs. 165:16-20, 166:2-5, 11-18. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 339. | A February 11, 2024 email from Bethany Shakespear to CSU staff titled "Clarification of Expectations for Denials, Delays and Hospital Diverts" specifically warned low level staff that only "CSU management, supervisor, on-call NPs, and/or mangers) were allowed to deny acceptances and warning staff that anyone who deviates from this now "protocol" will be considered to have acted with insubordination and face disciplinary charges. | Ex. 41 Feb. 11,2024 Shakespear Email to CSU staff | Undisputed. |
|------|------|------|------|

**Issue no. 23.** **County Was Deliberately Indifferent To Branco's Safety Because It Condoned CSU Staff Sleeping During the Nocturnal Shifts And Failed To Enforce A Claimed "No-Sleeping-On-The-Job" Policy in Nov. 2023**

| 340. | Sierra and County formerly had a policy allowing CSU nocturnal staff to sleep during extended period. | Ex. 9 Sayers depo 76:5-77:21 | Disputed.<br><br>Page 71, lines 5-18 of the deposition discussed Ms. Sinclair's work experience at Atascadero State Hospital and does not mention CSU policies.<br><br>Further, Ms. Sinclar testified she did not sleep while on duty and did not remember whether the topic of |
|------|------|------|------|

124
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | sleeping on the night shift came up in the November 2023 meeting.<br><br>Ex. 42, 71:5-18; 169:15-24. |
| 341. | Sleeping on the job was actually a job "perk" that attracted several NOC staff to take the job and working at night. | Ex. 9 Sayers depo 76:12-77:7 | Disputed.<br><br>Pages 76-77 of Sinclair's deposition do not mention whether sleeping on the job was a "perk."<br><br>Ex. 42, pgs. 76:12-77:7. |
| 342. | At the November 2023 CSU staff meeting, management including Tidik told the NOC staff they no longer were allowed to sleep at night despite previous management including Savannah Williams allowing for it. Staff had heated arguments over the new policy. | Ex. 9 Sayers depo. 76:12-78:19 | Undisputed. |
| 343. | Despite NP Tidik warning against sleeping on the job, some confusion remained as management told the staff that it was ok to sleep at night. | Ex. 9 Sayers depo 79:16-23 | Undisputed. |

125

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 344. | Neither County nor Sierra's Responses to Request for Production of documents included nor have they supplemented their Initial Disclosures to identify and produce the so-called signed acknowledgement and agreement by all Sierra staff to abide to the Nov. 2023 no-sleep policy. | Ex. 47 County and Sierra's Initial and Supplemental Disclosures | Undisputed. |
| 345. | Regardless, neither County nor Sierra has produced any evidence that it enforced the no-sleep policy from the time it went into effect until the date of Branco's incident. | Ex. 47 County and Sierra's Initial and Supplemental Disclosures | Undisputed |
| 346. | Despite a history of well tolerated NOC staff sleeping on the job, Williams, as the new CSU Manager did not believe it was necessary to have Human Resources periodically review CSU surveillance footage at any point from November 2023 to May 2024 to ensure the new no-sleeping policy was being followed. | Ex. 24 Williams depo. 197:3-198:4 | Disputed.<br><br>Ms. Williams testified employees "had just signed a policy saying they were not going to sleep." Although counsel claimed there was a history of sleeping, Ms. Williams did not adopt that statement.<br><br>Ex. 24, pgs. 197:20-198:4. |
| 347. | Of noteworthiness, before Williams' promotion to CSU manager, former | Ex. 8 Nurse Farley depo. 87:3-88:25 | Disputed in part. |

126

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | CSU Manager Farley frequently noted Williams and other staff including Bonnie Sayers, Janet Brown, Savannah Sinclair to be sleeping on the NOC shifts from January 1 to November 2023 time period when she left her position. | | Ms. Farley stated she could only speak to September or October of 2023 because she left. Ex. 8, pg. 87:3-12. |
| 348. | On the night in question, May 15/16, neither Janet Brown nor Bonnie Sayers monitored Branco pursuant to a 2-hour monitoring policy. | Ex. 35 CSU North Main video 22:30 to 7:30 am. | Disputed. Ms. Sayers testified she monitored Branco through the video for signs of distress. Ex. 9, pg. 90:9-13. |
| 349. | On or about June 24, 2025, Plaintiff's counsel was advised that Janet Brown is facing criminal charges stemming from her conduct on May 15/16 and being charged with misdemeanor falsifying of medical records and therefore will not appear for a deposition noticed by Plaintiff invoking her 5th Amendment right. | Ex. 43 Cameron Sehat Decl. Para. 4 | Undisputed. |
| 350. | Brown and Sayers jointly shared client monitoring responsibilities including, although it was Brown who documented the | Ex. 9 Sayers depo. 139:11-140:9 | Disputed in part. The cited page and lines number do not mention that "it was Brown who |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | charts including the 2-hour monitoring logs. | | documented the charts including the 2-hour monitoring logs." <br><br> Ex. 9, pg. 140:4-9. |
| 351. | Sayers never walked up to Branco's cot, to check for signs of breathing, including monitoring for chest rise and descent, of movement during her entire shift. | Ex. 9 Sayers depo 90:9-91:16 | Disputed in part. <br><br> The question was whether Ms. Sayers "ever walk[ed] up to her bed during the night of May 15 to May 16 to check for any signs of distress." There was no question whether Ms. Sayer checked for signs of breathing, chest rise or movement. <br><br> Ex. 9, pgs. 90:9-11, 91:14-16. |
| 352. | Brown never got up from her chair, looked at the monitor, nor walked up to Branco's cot at any point from when she initially set up her make shift bed on the reclining chair | Ex. 35 CSU Video Surveillance from 22:53:39 to the morning when she gets up to end her shift. | Disputed in part. <br><br> Ms. Sayers testified she monitored Branco through the video for signs of distress. <br><br> Ex. 9, pg. 90:9-13. |

**Issue no. 25.:** **County Was Deliberately Indifferent To Branco's Welfare and Safety By Condoning A Policy Of Referring Persons On W&I 5150** *Involuntarily* **Holds To A** *Non-LPS* **Designated CSU Facility** <u>Yet</u> **Requiring Their Consent Prior To**

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 353. | The CSU was never designated by County as a Lanterman-Petris-Short (LPS) facility. | Ex. 29 Decl. of Expert Matt Madaus, LCSW ¶10 | Disputed.<br><br>The County designated the CSU as a facility to provide evaluation and treatment in accordance with Welfare and Institutions Code section 5150.<br><br>Warran Decl. ¶ 3; Hooson Decl. ¶ 6 |
|---|---|---|---|
| 354. | County behavioral health agencies have a responsibility to comply with the LPS act (WIC 5000 et seq.) which limits involuntary psychiatric detention such as 5150 holds to facilities that are LPS-designated by the county *and* approved by the state Department of healthcare services. | Ex. 29 Decl. of Expert Matt Madaus, LCSW ¶10 | Disputed.<br><br>Madaus is providing a legal statement as scope of the requirements under the LPS Act. |
| 355. | County is responsible to ensure County staff place individuals only in facilities with lawful authority to detain them under the LPS Act. | Ex. 29 Decl. of Expert Matt Madaus, LCSW ¶10 | Disputed.<br><br>Madaus is providing a legal statement as scope of the requirements under the LPS Act. |
| 356. | Neither was it designated by the State of California Department of Healthcare services as an LPS facility. | See Ex. 31 DHCS List of LPS-24 hours facility and DHCS List of | Disputed.<br><br>The State Department of Health Care Services approved the |

129

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | LPS-Outpatient-CSU- Excel format; Ex. 29 Decl. of Expert Matt Madaus, LCSW | County designation of the CSU. Further, the County closed the CSU in October 2024. Exhibit 31 does not report the time period of facilities. Further, there is nothing in Exhibit 31 or the declaration of Matt Madaus explaining only State-approved facilities are included on the list.<br><br>Warren Decl. ¶ 3; Ex. 31 |
|---|---|---|---|
| 357. | County was required to monitor its contracted providers for compliance with contracted terms and applicable standards, including ongoing quality assurance and performance improvement activities under 9 CCR 1810.440 and DHCS Information Notices on provider monitoring | Ex. 29 Decl. of Expert Matt Madaus, LCSW ¶¶ | Disputed.<br><br>Madaus is providing a legal statement as scope of the requirements under the California regulations. |
| 358. | An LPS facility has several additional functions and protection to care for clients with a higher level of care and monitoring including Q15 (once every 15- minute welfare checks), locked down facility preventing | Ex. 8 Nurse Farley depo. 75:7-19; 76:13-21<br><br>Ex. 15 Tidik depo.  139:17-140:12 | |

130
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | escape or voluntary elopement, RN and physician staff on the premise. | | |
| 359. | The CSU routinely and frequently admitted clients on a W&I 5150 hold exceeding its 24 hours licensing designation. It was a common practice and regular occurrence for clients to exceed the 24 hour period and remain as long as 48 hrs, 72hrs and even 10 days prior to discharge. | Ex. 8 Nurse Farley depo. 57:8-16; Ex. 42 Sinclair depo 43:22-44:20 | Disputed.<br><br>Farley agreed it was frequent that clients would stay over the 24-hour mark for various reasons. There is no mention about the reasons or whether the reasons allowed the client to stay longer.<br><br>The cited portion of Sinclair's testimony does not mention any instance when clients were at the CSU for more than 24 hours.<br><br>Ex. 8, pg. 57:8-16; Ex. 42, pg. 43:22-44:20. |
| 360. | County's operation of the CSU in detaining and evaluating involuntarily held clients under the auspice of WIC5150 yet requesting their consent to be admitted to the CSU was a controversial policy. | Ex. 29 Madaus Declaration. 1-10 | Dispute.<br><br>Madaus Declaration does not identify any County's operation was "a controversial policy."<br><br>Ex. 29 Madaus Declaration. 1-10 |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 361. | The County officially closed the CSU operations on October 11, 2024, about seventeen days after Plaintiff filed her initial Complaint asking for several remedies including an injunctive relief to close the facility until it can safely be operated and no longer endanger client health and safety. | Ex. 23 Plaintiff's Complaint; Ex. 24 Williams depo 128:25-129:4 | Undisputed. |
|---|---|---|---|

**Issue no. 26**: **Tidik Acted With Deliberate Indifference To Branco's Safety And To Her Serious Medical Condition Because She Substantially Departed From What The Standard Of Care Required Of A Similarly Situated Nurse Practitioner**

| 362. | ***Per her employment contract, Tidik's duties*** included providing "support, guidance, and assistance to all CSU leadership staff for any client-related issues, questions, admittance, denials, and other operational decisions." | Ex.17 Contract between Tidik and SMWG | Disputed in part. Tidik does not dispute that her independent contractor agreement with Sierra contains the quoted language. However, it is not an *employment* contract, it is a contract for services of an independent contractor. Further, the quoted language does not state Tidik's "duties" at the CSU, instead it describes the scope of potential services she may provide under the terms of the contract, as the language states "CONTRACTOR |
|---|---|---|---|

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | agrees to provide any or all of the following services."<br><br>Ex.17 Contract between Tidik and SMWG. |
| 363. | Tidik, as an off-site practitioner, routinely co-signed nursing assessments conducted by LVNs and LPTs during her position as CSU provider. | Ex 54 email to Schmidt and Getten | Disputed. Misstates testimony.<br>The excerpts of the deposition testimony of Atwood included in Plaintiff's Exhibit 53 do not contain any testimony pertaining to Tidik co-signing nursing notes, and it is unclear what testimony is being cited to support this fact, as there is no page 22 or 23 in the portions of the transcript provided as an exhibit. Further, Atwood testified that she reviewed a total of 15% of the charts for the CSU during the January – June, 2023 time period, but did not conduct an audit of records after that time. She testified that "in the audit period that I did, Sandy Farley was actually co-signing, but I knew she had left." There is nothing in this deposition testimony |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | that implies Tidik "Regularly" cosigned nursing assessments. Atwell further testified that the email regarding signing the nursing assessments was "basically saying this is how they did it before and it needs to be done. And so **it's not saying it wasn't done or it was done.**"<br><br>Ex. 53 at p. 52:9-18; 87:3-5, 21-24.<br><br>Additionally, the email shown in exhibit 54 *does not* say that Tidik was co-signing nursing assessments, instead, it states "Because Sandy is gone and Davina works for MHET, I would **suggest** the nurse practitioners co-sign the nursing assessment…" |
|---|---|---|---|
| 364. | ***Janet Brown, a PT*** and Bonnie Sayers, an LVN were both part of the nocturnal shift from 7:00 p.m. to 7 a.m. at the CSU on May 15 and 16th, 2024 | Ex. 9 Sayers depo. 11:16-22 | **Disputed** in part. Janet Brown was an LPT (Licensed Psychiatric Technician). Ex. 23 FAC p. 7:22. |
| 365. | Upon arriving on shift, Sayers brought numerous concerns to everyone | Ex 9 Sayers Depo. 21:3-21:23- | Disputed. First, this "undisputed fact" is improper, as it |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | present including Williams, and other staff concerning Branco's acuity because her toxicology report showed multiple substances. Sayers indicated that she did not feel comfortable with Branco being admitted despite her higher acuity. Sayers even told Williams that she wanted Branco to return to the hospital. | 25; 22:1; 22:4-10; | violates Section 2 of the Court's specific instruction that each undisputed fact be discrete. Lack of supporting evidence. The transcript pages included in Plaintiff's Exhibit 9 at page 21 and 22 are from the deposition of Julia Tidik, not Bonnie Sayers. Further, such testimony would be inadmissible hearsay under FRE 801.<br><br>Furthermore, Sayers repeatedly testified that while she initially had concerns regarding Branco based only on information in her medical chart, once she interacted with Branco, and observed her behavior and presentation, she appeared to be fine, and Sayers didn't have any concerns regarding Branco's suitability for the CSU based on her presentation. (Ex. 9 p. 40:20-41:10, 41:24-42:4, 43:11-16, 44:10-23, 168:9-21, 257:21-258:18, 259:5-260:8.) |

135

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 366. | Both Brown and Sayers were responsible for the welfare and monitoring of four CSU clients during their nocturnal shift on May 15 to 16. | Ex. 15 Tidik depo. 196:21-24 | Undisputed. |
|---|---|---|---|
| 367. | Neither Brown nor Sayers monitored Branco for signs of breathing and/or life. | See Ex. 35 CSU North Main Room Video from 22:30 pm to 830 am. | Undisputed |
| 368. | Brown's 2-hour monitoring logs indicated that Branco was "*engaged in therapeutic rest, sleeping lying in be bed with eyes closed, breathing is even and unlabored. Will continue to monitor*" **with the same notes copied and pasted** until the morning sign off at 7:30 am., *despite Branco's medical distress and death at 10:45 pm the night prior.* | Ex. 15 Tidik Depo 182:10-18:20; 196:14-20<br><br>See Ex. 51 also Janet Brown May 16 2-hour monitoring logs and charts [Sierra 45-47] | Disputed in part.<br><br>It is undisputed that the records read as described. However, the remainder of this "fact" is based on conjecture, as well as legal conclusion and improper expert opinion. |
| 369. | Julia Tidik made an improper assessment, as it was lacking in part due to the limited information she relied upon to make her assessment including the lack of toxicology results, the failure to obtain a full history of substance use, in light of CSU policy forbidding the management of detoxing | Ex. 17 Sierra-Tidik employment Contract Ex. 48 NP Standardized Protocols<br><br>Ex. 37 Nurse Rebekah Price, Plaintiff's NP | Disputed.<br>First, this "undisputed fact" is improper, as it is argumentative, states legal conclusions, contains conjecture, and violates Section 2 of the Court's specific instruction that each undisputed fact be discrete. Lack of supporting evidence. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | clients, or at risk for detoxification, the failure to request a new urine tox screen to rule Fentanyl in her system, and by implication being under the influence and/or at risk for withdrawals requiring medical intervention, failed to request Q15 overnight monitoring frequency despite the high acuity she presented, failed to refuse admission, failed to make a proper criteria assessment based on the Sierra/Tidik employment contract, Her Nurse Practitioner Standardized Protocols. | expert witness Decl. Opinion 1. | As set forth in the JAO, the declaration of Price is not sworn under oath or signed under penalty of perjury as required by 28 USCA 1746, and thus constitutes inadmissible hearsay; Price, a Colorado Family Nurse Practitioner, is not qualified to render an opinion on the standard of care for a California licensed Psychiatric Mental Health Nurse Practitioner.

No Sierra policies and procedures are cited to support this fact.

Plaintiff's assertion that Tidik "failed to refuse admission" directly contradicts Plaintiff's undisputed fact nos. 305, 332, 338, and 398, which all in essence allege that the Nurse Practitioners were not involved in the admissions process unless CSU staff reported concerns or wanted to deny a client. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | Nurse Tidik conducted a reasonable and appropriate clinical assessment of Ms. Branco based on the information provided to her by licensed nursing staff at the CSU. (Exhibit 21, Magana Dec., at p. 12:1-3.) |
| | | | Neither Jason Hooson or CSU staff members reached out to Tidik with any concerns regarding Branco's suitability for the CSU. Ex. 22 Tidik Decl. para. 15. |
| | | | Branco was cleared from Twin Cities in stable condition. Exhibit 23 First Amended Complaint para. 45. |
| | | | Branco's vital signs at her time of admission to the CSU were all within normal limits. Ex. 15 Tidik Tr.155:8-9; Exhibit 20 CSU Records at bate SIERRA 000040; |
| | | | Branco provided her drug history to CSU staff at admission, and |

138

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

only reported daily marijuana and alcohol, with her last drink three weeks prior. Exhibit 20 at Bate SIERRA 000022

There were no "red flags" in the information presented to Tidik. Exhibit 21, Magana Decl., at p. 13:14-15.

There was no indication that Ms. Branco was in need of any additional interventions. Exhibit 21, Magana Decl., at p. 14:13-15.

Based on the information provided to her, Tidik believed that Branco was a suitable candidate for the CSU. 22 Tidik Decl. para. 16

Tidik's contract with Sierra (exhibit 17) is not an employment contract, it is a contract for services of an independent contractor. Further, it does not state she is required to "make a proper criteria assessment."

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | Additionally, Tidik's "Standardized Procedures" (exhibit 18) do not state the above. Instead, the document describes all the services within Nurse Tidik's scope of practice that can be "implemented without direct supervision or immediate observation, or approval of the supervising psychiatrist," (Ex. 18 p. 1 section II),  as required by California *Business and Professions Code* section 2725. |
| 370. | According to the Sierra-County contract, the multi-disciplinary treatment team of the CSU for each client was to conduct an assessment of physical and behavioral health, *under the direction of a nursing supervisor.* | Ex. 52 Sierra/SLO contract, p. 18 <br><br> Ex. 37 Price Decl. Opi. 2, 3 | Disputed for lack of supporting evidence. <br><br> As set forth in the JAO, the declaration of Price is not sworn under oath or signed under penalty of perjury as required by 28 USCA 1746, and thus constitutes inadmissible hearsay; Price, a Colorado Family Nurse Practitioner, is not qualified to render an opinion on the standard of care for a California licensed Psychiatric Mental Health Nurse |

140

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | Practitioner, nor to provide opinions as to causation.<br><br>Exhibit 52 is Sierra's 2021-2022 contract with the County, which was in effect from July 1, 2021 through June 30, 2022, (see Ex. 52 p. 47), and Plaintiff submitted no evidence that this contract was renewed without changes, or in effect as of May, 2024. |
| 371. | Nurse Tidik directed Ms. Branco's admission in the CSU for treatment, knowing that her level of care exceeded the facilities resources and monitoring capabilities. This failure jeopardized Ms. Brancos' health and safety, violated the nursing standard of care and placed her in a dangerous condition which ultimately caused and/or contributed to her unsupervised overdose and ultimately her death. | Ex. 37 Price Decl. Opi. 4 | Disputed.<br>First, this fact violates the Court's order, in that it is compound, and contains conclusory opinions, speculation, and legal argument. Lacks supporting evidence.<br><br>As set forth in the JAO, the declaration of Price is not sworn under oath or signed under penalty of perjury as required by 28 USCA 1746, and thus constitutes inadmissible hearsay; Price, a Colorado Family Nurse Practitioner, is not qualified to render an opinion on the standard |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

of care for a California licensed Psychiatric Mental Health Nurse Practitioner, nor to provide opinions as to causation.

Nurse Tidik did not "[direct] Ms. Branco's admission in the CSU." Ex. 15 Tidik Tr.p. 47:20-22; 108:7-19; Ex. 22 Tidik Decl. para. 10.

There were no "red flags" in the information presented to Tidik. Exhibit 21, Magana Decl., at p. 13:14-15.

There was no indication that Ms. Branco was in need of any additional interventions. Exhibit 21, Magana Decl., at p. 14:13-15.

Based on the information provided to her, Tidik believed that Branco was a suitable candidate for the CSU. 22 Tidik Decl. para. 16

Nurse Tidik acted within the standard of

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | care for an on-call psychiatric mental health nurse practitioner. Ex. 21 Magana Decl. p. 11:25-26; and Para. 13 (a) – (j).

The remainder of this "fact," is pure legal argument and conclusion without evidentiary basis. |
|---|---|---|---|
| **Issue No. 27:** Hooson Failed To Take Reasonable Alternative Measures Despite Branco's High Acuity To Ensure That She Was Referred To An LPS-Designated Facility Capable Of High Frequency Monitoring And Medical Oversight | | | |
| 372. | On the day of the incident Hooson was working as a MHET evaluator in a joint venture for County and Sierra but ultimately working for County who contracted Sierra to provide MHET evaluations on its behalf. | Ex. 26 Hooson depo 24:12-25:7 | Disputed.

On the date of the incident, Hooson was working as a County employee. Hooson's deposition testimony does not state that he was working for Sierra on the date of the incident.

Hooson Decl. ¶ 14. |
| 373. | Hooson was familiar with both the SLO County PHF (psychiatric Health Facility) and the CSU's practices including the | Ex. 26 Hooson depo 156:10-157:10 | Disputed.

Hooson testified that the CSU is a lower level of care in that its is not locked. He also |

143
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | level of monitoring and care each could manage. | | stated that clients are searched with a wand and are changed into new clothes.<br><br>Ex. 26, pg. 156:10-157:10. |
| 374. | Hooson knew the CSU was not LPS designated yet indicated she would be going to one on his 5150 Applications for Branco. | Ex. 26 Hooson depo. 195:16-18 | Disputed in part.<br><br>Hooson only agreed they established that the CSU is not an LPS facility.<br><br>Ex. 26, pg. 195-16-18. |
| 375. | Hooson acknowledge that at least part of his role as a MHET evaluator was discussed in Sierra "CSU: admission, AWOL and discharge" policy 101 addressing his MHET role in placing clients on a 5150 hold and making criteria determination for client CSU fitness | Ex. 26 Hooson depo. 159:14-162:20<br><br>Ex. 33 CSU P&P 101 | Disputed in part<br><br>On the date of the incident, Hooson was working as a County employee in his position as a youth triage crisis evaluator.<br><br>Hooson Decl. ¶ 14. |
| 376. | Hooson received training by Sierra as to his role as a MHET evaluator placing persons on a hold and transferring them to the CSU | Ex. 26 Hooson depo. 158:19-24 | Undisputed. |
| 377. | The CSU 101 policy also addresses his requirement to transport 5150 hold from the ER to the CSU in | Ex. 26 Hooson depo. 162:12-163:13 | Disputed in part.<br><br>The policy states, "[c]lient will be |

144
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| county provided-caged car which he used to transport Branco from the ER to the CSU on May 15. | | | transfeed from the ED by [Sierra] staff via county caged vehicle for continuity of care ….” Hooson was working as a County employee in his position as a youth triage crisis evaluator. Hooson Decl. ¶ 14; Exhibit 33, ¶ 1(C). |
| 378. | Hooson doesn't believe he shares any responsibility in ascertaining whether a client meets CSU admission criteria in light of CSU policy 101 which specifically addresses Hooson's responsibilities as a MHET evaluator | Ex. 26 Hooson depo. 160:16-162:24 | Disputed. There is nothing the cited testimony where Hooson offered his belief about sharing responsibility. Plaintiff's "fact" is merely an opinion about the substance of the testimony. Ex. 26, pg. 160:16-162:24. |
| 379. | However, contrary to Hooson's belief, both MHET and CSU staff jointly share the responsibility to ensure the admission criteria is met "The MHET staff and the CSU medical staff are responsible to ascertain that the criteria above are | Ex. 33 P&P 101, top of p.3 under sub-section "c" | Disputed in part. Plaintiff accurately cites the language from P&P 101, but the policy also states "CSU staff will accepted the client if they meet acceptance criteria." The policy further |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | met and that all the necessary paperwork and medications are available" | | outlines the requirements for "CSU Medical Staff" for the admission of clients.<br><br>At the time of the incident, Hooson was working as a County employee in his position as a youth triage crisis evaluator.<br><br>Hooson Decl. ¶ 14; Exhibit 33, ¶ 1(C) and 1(D). |
| 380. | Of importance, the admission criteria under P&P 101 mandates that the client does not pose a significant risk to self, will not pose a risk of detoxification that will require medical intervention, and be **determined by the MHET**, CSU and ED staff to be able to safely and effectively be managed in the CSU, to make sure all current lab results including toxicology screening are available, and if **on WIC 5150 hold to be transferred in the ED paper scrubs to the CSU with staff maintain possession of all the clients belongings.** | Ex. 33 CSU P&P 101, Sub section B and C, pages 2-3 | Undisputed. |

146

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 381. | The reason for transporting a high risk 5150 client from the ER to the CSU in paper scrubs is to make sure they are not concealing items that can use to self -harm like ligature or drugs so they were to remove all clothing including underwear and only have scrubs on. Once at the CSU, the client is given CSU provided clothing to change into. | Ex. 8 Nurse Farley depo. 50:19-51:7 | Disputed in part.<br><br>Ms. Farley did not testify about reasons why individuals were to wear paper scrubs. Ms. Farley did testify that the client would be given CSU-issued clothing when they arrived at the CSU.<br><br>Exhibit 8, 50:19-51:7. |
|---|---|---|---|
| 382. | Hooson was not aware of any policy requiring a MHET evaluator to transport a 5150-hold client in their hospital issued scrubs from the ER to the CSU. | Ex. 26 Hooson depo. 131:5-14 | Undisputed. |
| 383. | Despite Branco being placed on a 5150-hold based on grave disability due to severe substance use, having overdosed the same morning requiring three separate Narcan doses staggered over 3 hours, Hooson "didn't feel like she should be transported in scrubs" and asked her to put her clothes back on. | Ex. 26 Hooson depo. 127:19-128:25<br><br>Ex. 35 Video HA CSU Main Room North at 17:42:15 | Disputed in part.<br><br>Hooson stated, he ":didn't feel like she should by transported in paper scrubs" when asked if he felt it was okay to do show after placing Branco on a 5150 holds based on grave disability. The question did not ask about "severe substance use," "overdose" and "Narcan doses." |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

|  |  |  | Exhibit 26, pg. 128:19-25. |
|---|---|---|---|
| 384. | Hooson was very familiar with Branco's prior mental health history based on he charting document and information from Linda Cooper | Ex. 26 Hooson depo. 105:3-7 | Disputed in part.<br><br>Hooson had a familiarity of Branco through the emergency room documentation which noted she had previously been admitted to the PHF unity and what Linda Cooper explained to him.<br>There was no mention that Hooson was "very familiar" and the details of Branco;s "prior mental health history."<br><br>Exhibit 26, pg. 105:4-16. |
| 385. | One admission criterion is that the client not pose a risk of detoxification requiring medical intervention | Ex. 33 CSU P&P 101 | Undisputed. |
| 386. | Hooson is familiar with the concept of being "at risk for detoxing and withdrawing". He is also familiar with various drug withdrawal symptoms. | Ex. 26 Hooson depo. 178:19-182:20 | Disputed in part.<br><br>Hooson stated he knows "what it means for somebody to be detoxing and withdrawing." Hooson did not stated he was |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | familiar with various drug withdrawal symptoms in the cited portion of the deposition. Exhibit 26, pgs. 178:19-182:20. |
|---|---|---|---|
| 387. | Despite assessing Branco as a high acuity client, and placing her on an involuntary 5150 hold based on Grave Disability by reason of a severe substance use disorder, Hooson deferred to Branco's discretion in choosing the CSU as opposed to the PHF, because Branco "didn't want to go to that fucking place" referring to a prior stay at the PHF. | Ex. 26 Hooson depo. 103:10-105 | Disputed. Hooson testified he spoke with Branco, and "at that point I reviewed what options we may have at a lower level with a CSU because really what we wanted to do was have her in a safe place … so at that point I asked her if she would be okay with a referral to the CSU, which she agreed with, as did Mom." Exhibit 26, pgs. 104:21-105:3. |
| 388. | Based on his conversation with Linda Cooper, Hooson's impression was that her daughter would relapse immediately if she was not being sent to a place where she could be monitored and safeguarded. | Ex. 26 Hooson depo 167:7-12; 171:11-16 | Disputed in part. Hooson what asked if Linda Cooper told him that she was afraid Branco would immediately relapse if she were not sent to a place where she could be monitored and |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | safeguarded. Hooson did not recalled the exact words but confirmed that was sentiment.<br><br>Exhibit 26, pg. 167:7-12. |
| 389. | In response to Cooper's concerns, Hooson indicates that Branco would receive appropriate level of monitoring and support at the CSU | Ex. 26 Hooson depo 167:12-18 | Undisputed. |
| 390. | Hooson recommends the CSU and indicates, albeit incorrectly, that Branco would not be able to leave once he places her on a 5150 hold. | Ex. 7 Cooper depo. 268:5-17<br><br>Ex. 8 Nurse Farley depo 78:7-19 | Disputed.<br><br>Hooson discussed having Branco go to the CSU with Branco, not Cooper.<br><br>The cited portion of Ms. Farley's deposition concerns two-hour monitoring.<br><br>Hooson Decl. ¶ 12. |
| 391. | Hooson knew that the CSU would not accept clients actively withdrawing from drugs | Ex. 26 Hooson depo 246:23-247:2 | Undisputed. |
| 392. | Specifically, if a person is observed in active fentanyl withdrawal, they would not be an appropriate referral to the CSU. | Ex. 26 Hooson depo 98:25-100:1 | Disputed in part.<br><br>Hooson's opinion that "[i]f somebody was observed to be actively |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | withdrawing from fentanyl, they wouldn't be appropriate for a CSU referral.: |
|---|---|---|---|
| | | | Exhibit 26, pg. 99:17-100:1. |
| 393. | Based on his training and experience with substance use disorder Hooson believed that someone with Branco's history of daily fentanyl use and clinical presentation would be at risk for cravings, withdrawals and relapses. | Ex. 26 Hooson depo. 211:4-212:6 | Disputed.<br><br>Hooson testified Branco "**could** – depending of the substance she **could** suffer from cravings for the use. I don't know what her use was or how much she was using. Cravings and – and withdrawals – are different presentations."<br><br>Exhibit 26, pgs. 21:;19-212:6 [Emphasis added]. |
| 394. | Hooson wasn't sure of the level of monitoring frequency at the CSU at the time, whether it was Q15 or some other frequency, but knew "they had people there 24 hours that could monitor and observe her".."on a continuous basis" and had some type of video monitoring. | Ex. 26 Hooson depo 167:19-168:13 | Undisputed. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 395. | Despite being a lower level of care, Hooson believed the CSU could provide Branco for her safety. | Ex. 26 Hooson depo. 100:20-101:1 | Undisputed. |
|---|---|---|---|

**Issue no. 28: Williams was Deliberately Indifferent to Bronco's Seriour Medical Needs because she Failed To Monitor Branco as a High Acuity Client, Failed To Ensure Nocturnal Shift Were Not Sleeping On Their Shift, Failed To Supervise The Nocturnal Staff To Ensure Proper Welfare Checks Were Done And Failed To Decline Branco Due To Her Higher Acuity.**

| 396. | Williams had the authority to deny clients admission to the CSU | Ex 24. Williams Depo: 165:10-12 | **Undisputed** that as a CSU Supervisor, Williams had the authority to deny client admissions, if she deemed them inappropriate for the CSU. Ex 24. Williams Depo: 165:10-12 |
|---|---|---|---|
| 397. | Williams testified that lower level CSU staff could admit clients to the CSU | Ex 24. Williams Depo 165: 6-8 | Undisputed. |
| 398. | Williams was not in charge of admitting or accepting clients at the CSU. It was the staff's function to approve clients. | Ex 24. Williams Depo 165: 6-8 | **Undisputed** that as the CSU supervisor, Williams did not approve the clients that came onto the unit. The staff on the unit approved clients for admission. Ex 24. Williams Depo 165: 6-8. |
| 399. | Lower-level CSU staff could not deny clients admission to the CSU | Ex 24. Williams Depo 165:10-16 | **Undisputed** that lower-level CSU staff could not deny clients without consulting with |

152
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | CSU management or the on-call Nurse Practitioners. Ex. 41 Feb. 11,2024 Shakespeare Email to CSU staff. |
|---|---|---|---|
| 400. | Lower-level CSU staff could refer to Williams if they were unsure about the admissions criteria | Ex 24. Williams Depo 165:24-25 and 166:1 | **Undisputed.** |
| 401. | Nurse practitioners also had the authority to deny potential clients admission to the CSU | Ex 24. Williams Depo 166:15-18 | **Undisputed.** |
| 402. | Williams testified that assessing the withdrawal risk a potential client presents "depend on what the drug is" and "how under the influence they are." | Ex 24. Williams Depo 161:10-15, 170:8, and 172:11-12 | **Objection.** Vague, ambiguous, lacks foundation, incomplete hypothetical, misstates the cited testimony.<br><br>**Disputed.** Williams was asked whether the CSU would accept a client who posed a risk for detoxification, and responded subject to objections, that it would depend on the substance and depend on the individual and with respect to clients under the influence of opiates, how much under the influence they were.<br><br>Ex 24. Williams Depo. 161:10-22, 170:4-8, 172:3-12. |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| 403. | Williams testified that it was possible to get a urine drug tox screen done in the unit if one was not done by the time the client arrived. | Ex 24. Williams Depo 205:10-11 | **Objection.** Incomplete hypothetical. Misstates testimony to the extent it suggests that Williams had the ability to order a urine drug tox screen.<br><br>**Disputed:** Williams testified that such a test would have to be ordered by a provider. Ex 24. Williams Depo. 174:5-20. |
| 404. | The CSU did not have any policy regarding administering COWS assessments and/or CIWA assessments. | Ex 24. Williams Depo 181:15-24 | **Objection**. Vague, ambiguous, irrelevant. Lacks foundation.<br><br>**Disputed.** Williams testified that staff were trained within their licensure on how to do COWS and CIWA.<br><br>Ex 24. Williams Depo 180:4-15. |
| 405. | That's because the CSU did not admit WIC 5150 clients whose intoxication levels may result in medical emergencye or will requied a medical detox regimen being needed | Ex. 33 Sierra Policy and Procedure No. 004 | **Objection.** Vague, ambiguous. Incomplete statement of fact. Incomplete hypothetical. Lacks Foundation.<br><br>**Disputed.** The cited Exhibit provides that all clients considered for CSU admission who have been |

154
**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | evaluated in a local Emergency Department will have been medically cleared by the ED physician for issues including medical issues that require ongoing medical attention and detoxification issues that might result in a medical emergency.<br><br>It is undisputed that Branco was medically cleared by the Emergency Room physician prior to being admitted to the CSU. Exhibit 33, Pgs. 1-2; JAF No. 128; Exhibit 23 First Amended Complaint para. 45. |
| 406. | Williams testified that she agreed with the decision to admit | Ex 24. Williams Depo 207:4-9 | **Objection.** Misstates testimony. Incomplete statement of fact. Lacks foundation.<br><br>**Disputed.** The referenced exchange is as follows:<br>"Q. All right. So you didn't say, 'She was not fit for the CSU. We should send her back to the Hospital'; correct?<br>    A. Correct, I |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | |
|---|---|---|---|
| | | | never said that.<br>Q. Okay. So by virtue of staff, which I think was Bethany Aurioles accepting Ms. Branco, you were in agreement with their decision to accept Ms. Branco;<br>true?<br>    A. Yes."<br><br>Williams testified that Williams was not at the CSU when Decedent was admitted.  It is undisputed that Decedent was approved for admission without input from Williams.  Ex. 24. S. Williams Tr. V. 2.  P. 177: 4-12; 191:11-14; 206:9-15; 260:17-24; 264:1-4; JAF No. 225. |
| 407. | Williams was aware of Branco's mother's concerns that her daughter was at risk of relapsing unless she was monitored closely. | Ex 24. Williams Depo 209:7-11 | **Objection.** Misstates testimony. Hearsay. Irrelevant.<br><br>**Disputed.** The cited exchange was:<br>Q. Did you have any information that the mother endorsed that her daughter was at risk of relapsing unless she was monitored closely? |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | A. It was relayed to me that way, but I didn't hear it specifically from mom or anything." Ex 24. Williams Depo 209:7-11 |
|---|---|---|---|
| 408. | Williams spent about 10 to 20 minute talking with Branco while at the unit. However, she does not recall looking at Branco's pupils when speaking to her | Ex 24. Williams Depo 216:10-15 | **Objection.** Lacks foundation. Misstates testimony. **Disputed.** Williams testified that based on her training and experience, she is familiar with symptoms exhibited by someone going through withdrawals, that when she spoke with Decedent, she was able to assess Decedent's behavior and Decedent did not appear manic, that she sat across from Decedent, close enough to ascertain whether her pupils were dilated and she did not notice them to be dilated, that during the 10-20 minutes that she spoke with Decedent, she did not observe any factors which lead her to believe that Decedent was under the influence of fentanyl, |

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| | | | nor did she observe any factors which suggested to her that Decedent was going through withdrawal symptoms. Ex. 24. S. Williams Tr. V. 2. p.216:3-217:16; 268:3-14; 268:22-269:6. |
|---|---|---|---|

DATED:  October 23, 2025        SEHAT LAW FIRM, PLC

                                *Cameron Sehat*
                        By:_____
                                Cameron Sehat
                                Jeffrey Mikel
                                Attorneys for Plaintiff
                                LINDA COOPER, individually, and on
                                behalf of the Estate of Decedent, ELINA
                                QUINN BRANCO

DATED:  October 23, 2025        SMITH LAW OFFICES, LLP

                                *David Hall*
                        By:_____
                                Douglas C. Smith
                                David P. Hall
                                Attorneys for Defendants
                                COUNTY OF SAN LUIS OBISPO and
                                JASON HOOSON

DATED:  October 23, 2025        WOOD SMITH HENNING & BERMAN LLP

                                *Crystal Rorabaugh*
                        By:_____
                                Brian Hoffman
                                Crystal Rorabaugh
                                Attorneys for Defendant
                                JULIA TIDIK

DATED:  October 23, 2025        CLOUSESPANIAC, APLC

                                *Lawya Rangel*
                        By:_____
                                Lawya Rangel
                                Yolanda Lopez
                                Attorneys for Defendant
                                SAVANNAH WILLIAMS

**JOINT APPENDIX OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**